MARK D. BRUTZKUS - Bar No. 128102
MICHAEL A. BERNET - Bar No. 306657
BRUTZKUS GUBNER
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:        (818) 827-9000
Facsimile:        (818) 827-9099
Email:            mbrutzkus@bg.law
                  mbernet@bg.law

HARLAN M. LAZARUS (Admitted Pro Hac Vice)
LAZARUS & LAZARUS P.C.
240 Madison Avenue, 8th Floor
New York, NY 10016
Telephone:   (212) 889-7400
Email:            hlazarus@lazarusandlazarus.com

Attorneys for Defendant/Counterclaimant, **DIGITAL GADGETS, LLC**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Interworks Unlimited, Inc., a California corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>Digital Gadgets, LLC., a New Jersey limited liability company,<br><br>        Defendant.<br><br>———————————————<br><br>Digital Gadgets, LLC, a New Jersey limited liability company,<br><br>        Counterclaimant,<br><br>    v.<br><br>Interworks Unlimited, Inc., a California corporation,<br><br>        Counter-defendant. | Case No. **2:17-cv-4983 TJH KSx)**<br><br>**DEFENDANT/COUNTER-CLAIMANT'S OPPOSITION TO PLAINTIFF'S INTERWORKS UNLIMITED INC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: January 7, 2019<br>Time: Under Submission<br><br>Courtroom: 9B |

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………ii

I. PRELIMINARY STATEMENT …………………………………………………………2

II. FACTUAL SUMMARY…………………………………………………………………2

III. LEGAL STANDARD…………………………………………………………………2

IV. ARGUMENT…………………………………………………………………………3

    A.  INTERWORKS LACKED STANDING AT THE TIME THIS ACTION WAS COMMENCED; SUMMARY JUDGMENT SHOULD BE DENIED AND THIS ACTION SHOULD BE DISMISSED………..…………………………………3

    B.  DEFENDANT'S COUNTERCLAIMS …………………………………………7

        1.  DEFENDANT IS NOT BARRED FROM REMEDY UNDER ITS BREACH OF CONTRACT CLAIM……………………………..………………………….........7

        2.  ISSUES OF FACT EXIST REGARDING THE EXCLUSIVITY AGREEMENT; PLAINTIFF'S PRINCIPAL ADMITS TO THE EXISTENCE OF AN ARRANGEMENT BETWEEN THE PARTIES…………….……………………………………………..……..12

        3.  DEFENDANT IS ENTITLED TO REMEDY UNDER ITS BREACH OF WARRANTY CLAIMS……………………………………………………………..15

    C.  DEFENDANT IS ENTITLED TO DAMAGES………………………………17

1

**TABLE OF AUTHORITIES**

**CASES**                                                          **PAGE**

2

3

*Allied Grape Growers v. Bronco Wine Co.*

4
        203 Cal.App.3d 432, 444, 249 Cal.Rptr. 872 (1988))…………………...15

5

*Alpi International, Ltd v. Anga Supply, LLC*

6
        (N.D. Cal. 2015) 118 F. Supp.3d 1172, 1176…………………………….3

7

*Amber Chemical, Inc. v. Reilly Industries, Inc.*

8
        2007 WL 512410, at *5 (E.D. Cal. 2007)………………………………..15

9

*Anderson v. Liberty Lobby, Inc.*

10
        477 U.S. 242, 249 (1986)…………………………………………………2, 3

11

*Anguiano v. Allstate Ins. Co.*

12
        209 F.3d 1167, 1169 (9th Cir. 2000)……………………………………..2

13

*Cardinal Health 301, Inc. v. Tyco Elecs. Corp*

14
        (2008) 169 Cal. App. 4th 116, 135…………………………..…………..10

15

*Davis v. Federal Election Com'n*

16
        554 U.S. 724, 733 (2008)…………………………………………………3

17

*Fieldstone Co. v. Briggs Plumbing Products, Inc.*

18
        (1997) 54 Cal.App.4th 357, 370…………………………………………12

19

*Hunter v. Nature's Way Products, LLC*

20
        2016 WL 4262188 (S.D. Cal. 2016) ……………………………………..16

21

*Hamamoto v. Ige*

22
        881 F.3d 719, 722 (9th Cir. 2018)………………………………………3

23

*International Ltd. V. Anga Supply, LLC*

24
        118 F.Supp.3d 1172 (N.D. Cal. 2015)…………………………………….5

25

*Johnson v. Country of Fresno*

26
        (2003) 111 Cap.App.4th 1087, 1096…………………………………...4, 7

27

*Keegan v. American Honda Motor Co., Inc.*

28
        838 F. Supp.2d 929, 947…………………………………………………9

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*Lange v. TIG Ins. Co.*
    68 Cal.App.4th 1179, 1185-86, 81 Cal.Rptr.2d 39 (1998)…………………15

*Lujan v. Defenders of Wildlife*
    504 U.S. 555, 560, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992)…………….3

*McCown v. Spencer*
    (1970) 8 Cal.App.3d 216, 225……………………………………………4

*Mexia v. Rinker Boat Co.*
    174 Cal.App.4th 1297, 1301–02, 1304–06,
    95 Cal.Rptr.3d 285 (2009))……………………………………………9

*Obesity Research Institute, LLC v. Fiber Research International, LLC*,
    310 F. Supp.3d 1089, 1108 (S.D. Cal. 2018)…………………………..3, 7

*Orichian v. BMW of N. Am., LLC*
    (2014) 226 Cal. App. 4th 1322, 1333-34)………………………….16

*Read v. Buffum*
    (1889) 79 Cal. 77, 81-82………………………………………………3

**STATUTES**

Cal. Com. Code § 2201(3)(b)….…………………………………....14, 15
Cal. Com. Code § 2607(A)(3)……………………………………….7, 12, 15, 17
Cal. Com. Code § 2713……………………………………………...16
Cal. Com. Code § 2714……………………………………………12, 17
Cal. Com. Code § 2717……………………………………………16
Cal. Com. Code § 9102…………………………………………...….....5

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

2044215

## I.   **PRELIMINARY STATEMENT**

Defendant and Counterclaimant Digital Gadgets, LLC ("Digital Gadgets" or "Defendant") by and through its undersigned attorneys submit this Memorandum of Law in opposition to Plaintiff, Interworks Unlimited, Inc.'s ("Interworks" or "Plaintiff") Motion for Summary Judgment (the "Motion"). Plaintiff's Motion should be denied because: 1) Plaintiff lacked standing at the time this action was commenced (see Section IV, A); 2) There are no issues of fact as to Plaintiff's delivery of nonconforming hoverboards (see Section IV, B, 1); 3) Plaintiff breached the exclusivity agreement between the parties (see Section IV, B, 2); and 4) Defendant is entitled to damages (see Section IV, C).

## II.   **FACTUAL SUMMARY**

The Court is respectfully referred to the Declaration of Charles Tebele in Opposition to Plaintiff's Motion Summary Judgment ("Tebele Decl.") for a brief statement of the relevant facts.

## III.   **LEGAL STANDARD**

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) The moving party bears the burden of making this showing, and the district court must view all facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all inferences in favor of the party against whom summary judgment is sought. *Anguiano v. Allstate Ins. Co.*, 209 F.3d 1167, 1169 (9th Cir. 2000).

The judge's function is not . . . to weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc., 477 U.S.* 242, 249 (1986) The Court should not grant summary judgment if there is any evidence that could reasonably support a verdict for the non-moving party. "The opposing party need not show the issue will be resolved conclusively in its favor. *See id.* at 248–49, 106 S. Ct. 2505. All that is necessary is submission of sufficient evidence to create a material factual dispute,

2044215

thereby requiring a jury or judge to resolve the parties' differing versions at trial." *Alpi International, Ltd v. Anga Supply, LLC* (N.D. Cal. 2015) 118 F. Supp.3d 1172, 1176 citing *Liberty Lobby*, 477 U.S. at 250, 106 S. Ct. 2505.

## IV.   ARGUMENT

### A.   INTERWORKS LACKED STANDING AT THE TIME THIS ACTION WAS COMMENCED; SUMMARY JUDGMENT SHOULD BE DENIED AND THIS ACTION SHOULD BE DISMISSED

A litigant invoking the jurisdiction of a Court must have standing not only at the time of the commencement of the litigation but throughout all stages of litigation. *See Davis v. Federal Election Com'n*, 554 U.S. 724, 733 (2008); *see also Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018) ("[T]o qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed"); *see also Obesity Research Institute, LLC v. Fiber Research International, LLC*, 310 F. Supp.3d 1089, 1108 (S.D. Cal. 2018), ("[A] court must evaluate the positions of the parties at the time the pending lawsuit is filed and throughout the proceedings").

"Standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992). "To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *See Davis*, 554 U.S. at 733.

Where a litigant's claims are assigned to a third party and the litigant fails to obtain reassignment of that claim prior to the commencement of an action, that litigant lacks standing. *See Read v. Buffum*, (1889) 79 Cal. 77, 81-82 ("The ratification of the board of directors [for the assignment] was not given until after the commencement of

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

2044215

the action, -- too late to avail the plaintiff anything, as he could not recover for a cause of action accruing after he commenced his action."); *see also McCown v. Spencer*, (1970) 8 Cal.App.3d 216, 225 ("An assignor may not maintain an action upon a claim after making an absolute assignment of it to another; his right to demand performance is extinguished, the assignee acquiring such right."); *Johnson v. Country of Fresno* (2003) 111 Cap.App.4th 1087, 1096 ("The assignment merely transfers the interest of the assignor. The assignee 'stands in the shoes' of the assignor, taking his rights and remedies, subject to any defenses which the obligor has against the assignor prior to notice of the assignment. [Citation omitted.] Once a claim has been assigned, the assignee is the owner and has the right to sue on it. [Citation omitted.] In fact, once the transfer has been made, the assignor lacks standing to sue on the claim. [Citation omitted.]" (emphasis added)).

Here, Plaintiff lacked standing at the time this action was commenced as the invoices and the associated accounts receivable had been assigned to Bibby Financial Services, Inc. prior to the commencement of this action. See Master Purchase and Sale Agreement, **Exhibit 2** (the "Bibby Agreement").

On or about August 14, 2012, Plaintiff entered into a Master Purchase and Sale Agreement with Bibby, whereby Bibby "shall have the option to purchase from and [Interworks] shall assign and offer to [Bibby], as [Interworks'] sole and exclusive factor and as absolute owner, all of [Interworks'] right, title and interest in and to: (i) [Interworks'] now existing and hereafter created Accounts together with all corresponding rights with respect thereto including without limitation, full power to collect, sue for, compromise, assign, in whole or in part, or in any other manner enforce collection thereof in [Bibby's] name or otherwise; (ii) the Good and/or services sold giving rise to each such Account; (iii) all Goods returned by any customer in connection with the Accounts; (iv) all remedies available to [Interworks] including rights of stoppage in transit, replevin, repossession and reclamation; (v) all deposits or other security relating to the Accounts; (vi) all rights under any insurance policy covering any

Goods giving rise to the Accounts; and (vii) all payments or other proceeds of the foregoing in any form." See Bibby Agreement, Section 1.1, **Exhibit 2** (emphasis added). Pursuant to the Bibby Agreement, Accounts shall include "a right to payment of a monetary obligation," i.e., payment for the outstanding invoices. See Cal. Com. Code § 9102.

Moreover, each of the outstanding invoices which Plaintiff sues upon include the following assignment language unequivocally identifying Bibby, as the assignee of the invoices:

> This invoice has been sold and assigned to:
> Bibby Financial Services (CA) Inc.
> File #51042 Los Angeles, CA 90074-1042
> Remit all payments to the address above,
> For questions or report claims Please call 855-466-2888.

*See* Plaintiff's **Exhibit 7**.

The assignment language on the invoices indicate that the "Accounts" associated with invoices were assigned to Bibby.

When questioned about whether the invoices were assigned and payable to Bibby, Plaintiff's principal admitted that the invoices were submitted to Bibby but testified that they were declined. See Deposition Transcript of Eric Lu ("Lu Transcript"), **Exhibit 7**, p. 91, ¶¶ 23-25, p. 92, ¶ 1. However, the invoices speak for themselves and nonetheless create issues of fact barring summary judgment. See International, Ltd v. Anga Supply, LLC, 118 F. Supp.3d 1172, 1176 (N.D. Cal 2015).

Moreover, on or about April 8, 2012, Bibby filed a financing statement with the California Department of State, stating that it obtained a lien on "[a]ll of Debtor's existing and later acquired assets, including but not limited to Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment…" See Bibby UCC Financing Statement and Amendments, **Exhibit 3**. A continuance to the financing statement was filed on March 2, 2017. See id. As such, issues of fact remain concerning Plaintiff's standing and Plaintiff's motion should be denied.

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

2044215

Additionally, the accounts receivable associated with the invoices which Plaintiff sues upon are subject to a competing claim of assignment by Cash Capital Group, LLC ("CCG"). In fact, on or about July 10, 2017[1], CCG, through its counsel, sent notice to Digital Gadgets that Plaintiff sold, assigned and transferred to CCG a certain percentage of its future receivables and directed Digital Gadgets to make payment directly to CCG. See Rubin Law Firm Letter, **Exhibit 6**. CCG's letter, in and of itself, creates an issue of fact as to Plaintiff's standing, barring summary judgment.

On or about January 12, 2017, Plaintiff entered into an agreement with Cash Capital Group, LLC ("CCG") whereby Plaintiff "sells, assigns, and transfers to Cash Capital Group, LLC…without recourse, the Specified Percentage of the proceeds of each future sale made by Seller (collectively 'Future Receipts') until [Interworks] has received the Purchased Amount. 'Future Receipts' includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card…or other form of monetary payment in the ordinary course of Seller's business." See Agreement for the Purchase and Sale of Future Receipts, p. 1, **Exhibit 4** (the "CCG Agreement").

Additionally, "[Interworks] irrevocably appoints [CCG] as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due [CCG] from [Interworks]…including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Future Receipts…(v) to file any claims or take any action or institute any proceeding which [CCG] may deem necessary for the collection of any of the remaining Purchased Amount of the Future Receipts, or otherwise to enforce its rights with receipt to delivery of the Purchased Amount…" Id. at Section 5.

On or about July 6, 2017, the day before this action was commenced, CCG filed a financing statement with the California Department of State, indicating that it obtained a lien on "all assets of [Interworks], now existing and hereafter arising, wherever

---

[1] The letter was dated incorrectly as July 10, 2016.

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

located." See CCG Financing Statement and Termination Statement, **Exhibit 5.**

Moreover, Eric Lu ("Lu"), Plaintiff's principal, admitted in his deposition that Plaintiff had not settled its claims with CCG at the time this action was commenced. See Lu Transcript, **Exhibit 7**, p. 104, ¶¶ 11-17 ("Q. So by the time this lawsuit was started in July of 2017, you had settled with Cash Capital? A. No. The Cash Capital was settled in and around April of 2018. Q. While the lawsuit was pending? A. Yes.").

Reassignment of the invoices subsequent to the commencement of the action does not retroactively repair Plaintiff's standing as "a court must evaluate the positions of the parties at the time the pending lawsuit is filed…" Obesity Research Institute, LLC, 310 F. Supp.3d at 1108.

As such, the account receivable associated with the invoices in issue were subject to competing claims of assignment between Bibby and CCG at the time this action was commenced. Additionally, Plaintiff had additional liens filed upon it prior to the commencement of this action, i.e., additional issues of fact. See Certified UCC Search, **Exhibit 1**.

As Plaintiff did not own the claims it has brought against Defendant at the time this action was commenced, Plaintiff lacked standing, issues of fact remain, Plaintiff's motion should be denied and this action should be dismissed. Johnson, 111 Cap.App.4th at 1096.

## B.  DEFENDANT'S COUNTERCLAIMS

### 1.  Defendant is Not Barred From Remedy Under its Breach of Contract Counterclaim

With respect to Defendant's Counterclaim for Breach of Contract, Plaintiff argues that Defendant is barred from seeking remedy under the same as Defendant failed to give proper notice, pursuant to California Commercial Code § 2607(3)(A), that Plaintiff breached the contract between the parties by delivering nonconforming goods. However, Plaintiff fails to specify how Defendant's notice was noncompliant with § 2607(3)(A) and acknowledges that Defendant did in fact provide notice of the breach

(Motion, p. 14, ¶ 1).

Plaintiff insinuates that Defendant's notice was potentially untimely. More specifically, Plaintiff states that Defendant did not provide notice until June 6, 2017, approximately six months after the goods were delivered. See Plaintiff's Motion, p. 14, ¶ 1. Plaintiff's recitation of the facts is simply incorrect. Not only was Plaintiff put on notice as early as May 2, 2017, but Defendant was provided notice multiple times before the referenced June 6, 2017 email that the battery information did not match the information provided to QVC for SKUs T34604 and T34764. See Email Correspondence from Chris Mitchell and Tony Tu, May 2, 2017, **Exhibit 8**, pp. 113, 114 ("Tony, Just heard back from QVC regarding these documents: 'The information on the form does not match what was previously submitted for item T34764.' This is a major problem and is causing back-end issues for us & them. I attached what you sent to us and what you submitted to QVC."); see Email Correspondence from Chris Mitchell to Tony Tu and Eric Lu, May 4, 2017, **Exhibit 8**, p. 113 ("…We are running into issues with payment from QVC due to this issue now. They believe our boards we have in stock and have been selling are now different than what you had originally passed via [quality assurance]"); see Email Correspondence from Chris Mitchell to Tony Tu, May 9, 2017, **Exhibit 8**, p. 112 ("Tony, I am not sure what is going on, but QVC again said that form you provided doesn't match the units we're selling…your units?? We had an un-opened High Roller sent from CA to NJ to verify and opened it up to find the below battery pack. Neither of the attached forms match the battery. See below and advise ASAP."); see also Correspondence from QVC to Defendant, June 1, 2017, **Exhibit 9** ("Chris, Appreciate you sending us the documents in attached emails. We are doing our best to transfer this item without requesting a new sample but it information is not matching. Only way we could do a transfer if the information provided for T34604 original sample matched the documents sent to us now. Below is the Lithium form which was approved for T34604, Manufacturer's name and battery part numbers do not match. If the battery has changed, we cannot do a transfer. That is

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

2044215

why we have been trying to avoid delay and ask for a physical sample.").

Furthermore, there was no reason to inspect the hoverboards prior to May of 2017 because the underlying tenet to this transaction was that the hoverboards were the same as those already approved by QVC. See Tebele Decl., ¶ 18; see also Deposition Transcript of Charles Tebele ("Tebele Transcript"), **Exhibit 10**, p. 82, ¶¶ 1-17 ("Q. The question, very simple: Did you know Digital Gadgets had to submit samples to QVC for testing and approval before you started selling them? A. That's not true. Q. Not true? A. No. In this case, because Interworks purported to sell us the unit that was already approved by QVC, QVC allowed us to sell it based on our reputation and vouching for the fact that it was the same model, so we began to sell it without submitting a sample. And only after five months later when we needed to submit a sample for a new program and new orders did we then submit them a sample, and then determined that we were selling them all along was fraudulent."); see also T34764 QVC QA Report, **Exhibit 11** ("Please transfer results from T34604"); see also Deposition Transcript of Meghan Kane, Account Manager for Performance Marketing of QVC ("Kane Transcript"), **Exhibit 16**, p. 82, ¶¶ 15-22 ("Q. So isn't it true that by Mr. Zabrani asking or referring to doing his best to transfer this item, the 35011 item, without asking for the additional information of a new sample, doesn't that indicate to you T35011 was supposed to be the same as 34604 and the same as 34764? A. Yes."); see id, p. 86, ¶¶ 18-24, p. 87 ¶ 1-2 ("A. Actually, the reason we had to create a new item number for T35011 is because we were going to bring that into our warehouse and the other one was drop shipped. That's why we had to create it. Q. So they were supposed to be identical, they were just going to go different places? A. Yes."). Moreover, it is not unusual to have a delay in bringing a claim when a defect is latent. See, e.g., Keegan v. American Honda Motor Co., Inc., 838 F. Supp.2d 929, 947 (C.D. Cal. 2012) (citing Mexia v. Rinker Boat Co., 174 Cal.App.4th 1297, 1301–02, 1304–06, 95 Cal.Rptr.3d 285 (2009)). As such, Plaintiff's argument that Defendant's notice was untimely is simply improper.

Additionally, Lu makes the same false statement during his deposition that he

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

2044215

was unaware of the issues with QVC until the June 6, 2017 email. Lu Transcript, **Exhibit 7,** p. 59, ¶¶ 17-21. However, Lu was aware that the battery information did not match the information previously provided by Interworks as Lu himself assisted in providing Defendant with the erroneous battery information on May 10, 2017. See Email Correspondence from Eric Lu to Chris Mitchell, May 10, 2017, **Exhibit 12**. Lu was also made aware as early as May 15, 2017 that Defendant was required to submit a new sample to QVC for testing. See Email Correspondence from Chris Mitchell to Eric Lu, May 15, 2017, **Exhibit 13** ("Hey guys, see below. As I mentioned we need to submit a new QA and now they are treating this is as a new submission given the issues with the docs you sent over previously…Disaster. Do you have all this at the ready with a clean sample you can send us to confirm it matches these forms you provide?").

Plaintiff also argues that Defendant failed to comply with § 2607(3)(A) by denying Plaintiff the opportunity to "examine their inventory, to correct any deficiencies, and mitigate any damages." See Motion, p. 14, ¶¶ 5, 6. In support of the same Plaintiff provides case law that discusses the policy behind the notice requirement in the context of a breach of warranty claim. More specifically, with respect to a claim for breach of warranty, the purpose of the notice requirement is to "allow the seller the opportunity to repair the defective item." See id., citing Cardinal Health 301, Inc. v. Tyco Elecs. Corp. (2008) 169 Cal. App. 4th 116, 135. However, the discussion of the Cardinal Court is merely a policy discussion as the Court did not specifically require a purchaser to give a seller the opportunity to cure.

Moreover, it is worth noting that the Cardinal Court held that the purchaser failed to provide proper notice as it did not provide notice until after a lawsuit was commenced. Cardinal, 169 Cal. App. 4th at 137. "Although [the seller] may not have been in a position to repair or remedy the problem, one of the important policies underlying the notice requirement is to afford the seller an opportunity to engage in settlement discussions and prepare for litigation." Id. at 137. Here, Plaintiff was put on notice that the goods were nonconforming and therefore should prepare for litigation.

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

2044215

See Exhibit 8.

Contrary to the position taken in Plaintiff's Motion, Plaintiff was not interested in repairing the nonconformity, in that when discussing the issue, Lu blamed the nonconformity on the factory. See Email Correspondence between Plaintiff and Defendant, dated June 7, 2017, **Exhibit 14**, p. 172. ("Chris, This is a CHIC issue…all submission for QVC are provided from CHIC to interworks…we are not the manufacture").

Additionally, in response to the outstanding invoices, Interworks refused to provide the necessary information in order to facilitate the quality assurance process with QVC. See Email Correspondence between QVC and Defendant, dated June 30, 2017, **Exhibit 15** ("I do want to note that I know a lot of this information is info needed from Interworks as that is who you bought this inventory from. We have personally reached out to Interworks to help assist with getting this info and they informed us there is an outstanding invoice with DG which is why they are not sending the paperwork to clear up QA."); see also Kane Transcript, **Exhibit 16**, p. 85, ¶¶ 5-12 ("Q. Do you see where you advised, in particular, Paulette, Dennis, Chris Mitchell and Jill that [Interworks] informed us there's an outstanding invoice with Digital Gadgets which is why they're not sending the paperwork? A. Yes. Q. Okay. Did they tell that to you? A. They must have told me that.").

Moreover, Lu never asked to inspect the goods that Defendant submitted to QVC, claiming that he was unaware that Defendant submitted the hoverboard to QVC to testing. See Lu Transcript, p. 60, ¶¶ 2-6 ("Q. And did you ask – at any time, did you ask Digital Gadgets to show you what they had shipped to QVC? A. No, because I was not even aware that they submitted the hoverboard to QVC for QA testing."). Nor did he contact QVC to ascertain the scope of the quality assurance issues. See id. p. 60, ¶¶ 9-11 ("Q. Did you contact QVC to ascertain the scope of these QA issues? A. No, I did not.").

The question whether notice was properly given must be "determined from the

2044215

particular circumstances and, where but one inference can be drawn from undisputed facts, the issue may be determined as a matter of law." Fieldstone Co. v. Briggs Plumbing Products, Inc. (1997) 54 Cal.App.4th 357, 370. Here, the circumstances show that Plaintiff was given ample notice of its breach in a reasonably timely manner.

Plaintiff also argues that Defendant waived its right to receive conforming goods by choosing to keep the nonconforming goods after its discovery of the same. However, the case law provided in support of Plaintiff's argument neither involves the sale of goods or the uniform commercial code. See Motion pp. 15, 16. Furthermore, contrary to Plaintiff's position and its **Exhibit 17**, Defendant stopped selling the hoverboards in June of 2017. See Tebele Decl., ¶ 41.

For the reasons stated above, Defendant provided proper notice of Plaintiff's breach pursuant to § 2607(A)(3). As such, Defendant is entitled to damages for the loss of sales as a result of the nonconforming goods. Cal. Com. Code § 2714.

### 2.     Issues of Fact Exist Regarding the Exclusivity Agreement; Plaintiff's Principal Admits to the Existence of an Arrangement Between the Parties

Plaintiff also alleges that the evidence does not support a showing of the existence of an agreement between the parties whereby Defendant was provided the exclusive right to sell the hoverboards to QVC and Zulily. However, Plaintiff only cites to two emails between the parties and ignores an imperative March 1, 2017 email sent by Plaintiff to Defendant. Moreover, Lu admits to entering into an arrangement in his Declaration in Support of Plaintiff's Motion for Summary Judgment ("Lu Decl."). See Lu Decl., p. 3, ¶¶ 13, 14 ("Thus, in or about December of 2016, Plaintiff decided to enter into an arrangement with Defendant Digital Gadgets, LLC. ("Defendant"), who said they had the ability to drop ship with QVC." "In that arrangement, the Defendant would purchase the Model C's from the Plaintiff. QVC's customer would then purchase the boards from QVC and then the Defendant would ship the boards directly to QVC's customer."). Lu's statement acknowledging the arrangement is an acknowledgement of

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

2044215

the exclusivity agreement.

More specifically, as evidence that an agreement does not exist, Plaintiff cites to a December 21, 2016 email whereby Plaintiff and Defendant had discussed the possibility of Defendant becoming the exclusive vendor of the hoverboards to QVC and Zulily. Motion, p. 17, ¶¶ 9-13. It is undisputed that the parties did not reach an exclusivity agreement at that time. However, over the course of dealings between the parties, it was understood that because QVC canceled their orders with Plaintiff due to Plaintiff's inability to "drop ship" the hoverboards to QVC's customer (Lu Transcript, p. 19, ¶¶ 6-14), Defendant would fill Plaintiff's shoes as the exclusive seller of the hoverboards. See Tebele Transcript, p. 39, ¶¶ 6-13 ("A. I don't know about a written agreement, however there is a certain agreement without question between Interworks and Digital Gadgets that when Digital Gadgets was selling those goods to QVC, which Interworks was stuck with and QVC canceled their orders with, that Digital Gadgets would fill Interworks' shoes as the exclusive partner, there no doubt about that."); see Tebele Decl., ¶¶ 9, 10; see also Spreadsheet produced by QVC showing sales of hoverboards ("QVC Purchase Order Spreadsheet"), Exhibit 18 (indicating that QVC had canceled approximately 9000 Interworks orders between September and November 2016); see also Kane Transcript, **Exhibit 16**, p. 28, ¶¶ 1-7 ("Q. Do you remember why you stopped selling Hoverboards that had sku number T34604? A. We sold out of the inventory that we had an Interworks could not get us the product fast enough to deliver before the holidays, before Christmas."); see also id., p. 34, ¶¶ 14-20 ("The Interworks team could not get the product back to our warehouse fast enough so they sold the product to Digital Gadgets…and Digital Gadgets drop shipped the product directly to the customer.").

On March 1, 2017, Plaintiff admitted that "I gave you QVC and Zullilly," evidencing that Plaintiff had given Defendant the exclusive right to sell the goods to QVC and Zulily. See Email Correspondence between Plaintiff and Defendant, dated March 1, 2017, **Exhibit 17**.

Moreover, in his Declaration in Support of Plaintiff's Motion for Summary Judgment, specifically confirms that Plaintiff entered into an arrangement with Defendant because it did not have the ability to drop ship the goods to QVC's customers. See Lu Decl., p. 3, ¶¶ 12-14.

The aforementioned evidence presents issues of fact concerning the exclusivity agreement, thereby barring summary judgment. Moreover, Plaintiff breached the exclusivity agreement by selling hoverboards directly to QVC. See QVC Purchase Order Spreadsheet, Exhibit 18 (evidencing the sale by Plaintiff to QVC after entering the exclusivity agreement with Defendant).

With respect to the April 16, 2017 email that Plaintiff cites to as supposed evidence that the exclusivity agreement did not come to fruition, Plaintiff ignores the context and background concerning Defendant's request to have an exclusive contract drafted. See Plaintiff's **Exhibit 12**. More specifically, Defendant was planning on purchasing additional boards through its subsidiary, Magnification, Inc. and wanted to memorialize the exclusivity agreement for that new venture. See Tebele Transcript, p. 64, ¶¶ 1-10 ("Is it your understanding, prior to this [April 16, 2017 email], the written exclusive contract had not been drafted by anybody? A. It's not my understanding. I don't know that there was or there wasn't, but what this look like to me is that they were talking about other accounts, and maybe based on all the back and forth, it looks like they wanted to outline it in the contract based on whatever conversation they had."). As stated in the April 16, 2017 email, which Plaintiff conveniently ignores, "[w]e will get set-up with Bibby via Magnification by 6/1." See Plaintiff's **Exhibit 12**.

Plaintiff also alleges that the exclusivity agreement is unenforceable as it was not reduced to a writing and therefore fails to satisfy the UCC's statute of frauds. See Motion, pp. 17, 18. However, an exception to the statute of frauds exists "[i]f the party against whom enforcement is sought admits in his or her pleading, testimony, or otherwise in court that a contract for sale was made." Cal. Com. Code § 2201(3)(b).

Here, Lu, Plaintiff's principal, specifically admits to the existence of an

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

2044215

arrangement between the parties due to Plaintiff's inability to drop ship the hoverboards to QVC's customers. See Lu Decl., p. 3, ¶¶ 12-14. As such, the exclusivity agreement falls outside of the statute of frauds and is enforceable. Cal. Com. Code § 2201(3)(b).

"Estoppel serves as 'one further exception to imposition of the statute of frauds.'" See Amber Chemical, Inc. v. Reilly Industries, Inc., 2007 WL 512410, at *5 (E.D. Cal. 2007) (citing Allied Grape Growers v. Bronco Wine Co., 203 Cal.App.3d 432, 444, 249 Cal.Rptr. 872 (1988)).

"To be binding for purposes of promissory estoppel, the promise must be 'clear and unambiguous.'" Amber Chemical Inc., 2007 WL 512410, at *5 (citing Lange v. TIG Ins. Co., 68 Cal.App.4th 1179, 1185-86, 81 Cal.Rptr.2d 39 (1998)). Here, it is clear and unambiguous that Defendant was to fill the shoes of Plaintiff as the exclusive seller of hoverboards to QVC and Zulily (see above).

Additionally, to establish promissory estoppel, the party asserting estoppel must have suffered unconscionable injury. Amber Chemical Inc., 2007 WL 512410, at *8. Here, Defendant has been unable to fulfill the demand associated with the 2016 QVC orders and therefore has been unconscionably injured. See QVC Purchase Order Spreadsheet, **Exhibit 18**.

### 3. Defendant Is Entitled to Remedy Under Its Breach of Warranty Claims

Plaintiff also alleges that because Defendant failed to provide proper notice of Plaintiff's breach pursuant to Cal. Com. Code § 2607(A)(3) (Motion, pp. 19, 20), Defendant is barred from obtaining remedy under its Breach of Implied Warranty of Merchantability and Breach of Express Warranty claims within its Counterclaim. As stated above, Plaintiff has misconstrued § 2607(A)(3) to include a requirement that a purchaser must allow a seller to repair its breach. Moreover, Defendant had provided notice to Plaintiff, on numerous occasions, that the delivered hoverboards did not conform with those that were previously supplied to QVC. See supra, Section IV, B, 1.

With respect to Defendant's Breach of Express Warranty claim specifically,

2044215

Plaintiff alleges that "Defendant failed to comply with the elements of Breach of Express Warranty and is barred from remedy." Motion, p. 19, ¶¶ 17-18. Plaintiff however does not specifically state how Defendant failed to comply with the elements of a Breach of Express Warranty claim. Moreover, the cited elements and case law pertain to an express warranty to repair defects, not, as is the case here, an express warranty that goods contained certain specifications. See Motion, p. 19, ¶¶ 19-25 (citing Orichian v. BMW of N. Am., LLC (2014) 226 Cal. App. 4th 1322, 1333-34).

Under the California Commercial Code § 2313, "[t]o prevail on a breach of express warranty claim, a plaintiff must prove that the seller (1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff." Hunter v. Nature's Way Products, LLC, 2016 WL 4262188 (S.D. Cal. 2016).

Here, the basis of the entire transaction between Plaintiff and Defendant was that Defendant would sell the exact same hoverboards to QVC's customers due to Plaintiff's inability to drop ship. See Lu Transcript, p. 27, ¶¶ 14-18 ("Q. So that the hoverboards that went from Interworks to QVC should have been identical to the hoverboards that went from Digital to -- drop-shipped to QVC's customers? A. Yes."); see also Lu Transcript, p. 19, ¶¶ 4-14; see Lu Decl., ¶¶ 10-14.

However, the hoverboards delivered to Defendant contained different batteries than what was delivered to QVC. See supra, Section IV, B, 1. As a result, Defendant was unable to sell the hoverboards under QVC SKU T35011. See QVC Purchase Order Spreadsheet, **Exhibit 18**; Tebele Decl., ¶ 24. Nor was it able to fulfill the demand associated with Plaintiff's canceled orders with QVC. Tebele Decl., ¶ 41. As such, Defendant is entitled to obtain damages for its Breach of Warranty claim.

Additionally, Defendant is entitled to set off its damages from any amounts due under the outstanding invoices as a result of Plaintiff's breach. Cal. Com. Code § 2717 ("The buyer on notifying the seller of his intention to do so may deduct all or any part

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

2044215

of the damages resulting from any breach of the contract from any part of the price still due under the same contract."). Here, Plaintiff was aware that Defendant was unwilling to pay for the hoverboards due to Plaintiff's delivery of nonconforming goods. See Email Correspondence between QVC and Defendant, dated June 30, 2017, **Exhibit 15** ("I do want to note that I know a lot of this information is info needed from Interworks as that is who you bought this inventory from. We have personally reached out to Interworks to help assist with getting this info and they informed us there is an outstanding invoice with DG which is why they are not sending the paperwork to clear up QA."); see also Kane Transcript, Exhibit 16, p. 85, ¶¶ 5-12 ("Q. Do you see where you advised, in particular, Paulette, Dennis, Chris Mitchell and Jill that [Interworks] informed us there's an outstanding invoice with Digital Gadgets which is why they're not sending the paperwork? A. Yes. Q. Okay. Did they tell that to you? A. They must have told me that."). As such, Defendant is entitled to set off its damages from the amounts due under the outstanding invoices.

### C.   DEFENDANT IS ENTITLED TO DAMAGES

As Defendant provided timely notice of Plaintiff's breach in compliance with § 2706(3)(A) (see supra Section B, subsection 1), Defendant is entitled to damages for the loss of sales as a result of the nonconforming goods. Cal. Com. Code § 2714.

Plaintiff argues that Defendant cannot show that it sustained damages as a result of the delivery of the nonconforming goods. See Motion, p. 14, ¶¶ 12-22. However, Plaintiff ignores the loss of sales associated with the sale of hoverboards under SKU T35011, approximately 2,700 pieces. See QVC Purchase Order Spreadsheet, Exhibit 18. Plaintiff also ignores the loss of sales associated with the Interworks canceled order under SKU T34604, the demand of which Defendant was supposed to fulfill due to Plaintiff's inability to deliver the same. See id.; see also Tebele Decl., ¶ 41. Defendant estimates the loss of profits associated with the loss of sales to be approximately, $1,164,700.00 plus costs. Id. at ¶ 42.

///

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

2044215

Additionally, pursuant to the terms and conditions of Defendant's purchase order, Defendant is entitled to damages due to the delivery of nonconforming goods. See Tebele Decl., ¶ 44; see also **Exhibit 23**.

Dated:  December 10, 2018              LAZARUS AND LAZARUS, P.C.

By: /s/ Harlan M. Lazarus
　　　 HARLAN M. LAZARUS, ESQ.
Attorneys for Defendant/Counter-
claimant, **DIGITAL GADGETS, LLC**

18

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**