# EXHIBIT 1

# CT Lien Solutions
a Wolters Kluwer Business

## Search Results

| | |
|---|---|
| | **Date:** 11/20/2018 |
| | **Order #:** 67421261 |
| **JARED LOUZON** | **Customer #:** 36927 |
| **Lazarus & Lazarus, P.C.** | **Reference 1:** Interworks |
| **240 Madison Avenue, 8th Floor** | Unlimited, Inc. |
| **New York, NY 10016** | **Reference 2:** -- |

**Target Name: Interworks Unlimited, Inc.**

**Jurisdiction: Secretary of State, California**

| | | |
|---|---|---|
| **Search Type:** UCC Lien | | **Searched Through:** 11/12/2018 |
| Results: | See Attached Certified Search with 16 Copies Attached | Searched: 5 Years |

**NANCY WIFORD**
**Columbus Team 6**
**4400 Easton Commons Way**
**Suite 125**
**Columbus, OH 43219**
**(800) 713-0728 EXT:3546**
**nancy.wiford@wolterskluwer.com**

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

EXHIBIT 1                                    1



**SECRETARY OF STATE**
**STATE OF CALIFORNIA**

**Search Certificate**

SEARCH REQUESTED ON:                                    11/19/2018
Organization Debtor:   **INTERWORKS UNLIMITED, INC.**

Address:  **NOT SPECIFIED**
Date Range From:  **NOT SPECIFIED**
Search:  **UNLAPSED**

**\* Indicates Filings that have been accepted after the Certification Date.**

| Original Filing # | Filing Type | File Date | File Time | Lapse Date | # of Pages |
|---|---|---|---|---|---|
| 12-7324175729 | Financing Statement | 08/08/2012 | 17:01 | 08/08/2022 | 1 |

**Debtor:**
Organization:   INTERWORKS UNLIMITED INC.
                       2418 PECK RD, CITY OF INDUSTRY CA USA, 90601
**Secured Party:**
Organization:   BIBBY FINANCIAL SERVICES (CA), INC.
                       3027 TOWNSGATE RD, STE #140, WESTLAKE VILLAGE CA USA, 91361


                       BIBBY FINANCIAL SERVICES, INC.
                       515 MARIN STREET, SUITE 420, THOUSAND OAKS CA USA, 91360

| Amendment Filing # | Filing Type | File Date | File Time | | # of Pages |
|---|---|---|---|---|---|
| 17-75735895 | Continuation | 03/02/2017 | 12:16 | | 1 |
| 18-76501496 | Assignment | 05/23/2018 | 12:23 | | 1 |
| 18-76589998 | Termination | 07/13/2018 | 12:15 | | 1 |

| Original Filing # | Filing Type | File Date | File Time | Lapse Date | # of Pages |
|---|---|---|---|---|---|
| 15-7458450493 | Financing Statement | 04/07/2015 | 10:40 | 04/07/2020 | 3 |

**Debtor:**
Individual:       LU ERIC H
                       2418 PECK ROAD, CITY OF INDUSTRY CA USA, 90601

EXHIBIT J
Document Number:   74984890003              Page 1 of 4                                    2

**Debtor:**

**Organization:**     AMAZING STUFF SHOP

241 PECK ROAD, CITY OF INDUSTRY CA USA, 90601

INTERWORKS UNLIMITED INC.

2418 PECK ROAD, CITY OF INDUSTRY CA USA, 90601

**Secured Party:**

**Organization:**     CORPORATION SERVICE COMPANY, AS REPRESENTATIVE

P.O. BOX 2576    UCCSPREP@CSCINFO.COM, SPRINGFIELD IL USA, 62708

| Amendment Filing # | Filing Type | File Date | File Time | | # of Pages |
|---|---|---|---|---|---|
| **16-75128315** | **Termination** | **03/08/2016** | **06:11** | | 1 |

| Original Filing # | Filing Type | File Date | File Time | Lapse Date | # of Pages |
|---|---|---|---|---|---|
| **15-7484940739** | **Financing Statement** | **09/15/2015** | **14:36** | **09/15/2020** | 1 |

**Debtor:**

**Organization:**     INTERWORKS UNLIMITED INC.

2418 PECK ROAD, CITY OF INDUSTRY CA USA, 90601

**Secured Party:**

**Organization:**     ACH CAPITAL LLC AS AGENT FOR SHORESIDE CAPITAL

11 BROADWAY, SUITE 814, NEW YORK NY USA, 10004

| Amendment Filing # | Filing Type | File Date | File Time | | # of Pages |
|---|---|---|---|---|---|
| **17-76006701** | **Termination** | **08/11/2017** | **11:04** | | 1 |

| Original Filing # | Filing Type | File Date | File Time | Lapse Date | # of Pages |
|---|---|---|---|---|---|
| **16-7512707117** | **Financing Statement** | **03/07/2016** | **11:38** | **03/07/2021** | 1 |

**Debtor:**

**Organization:**     INTERWORKS UNLIMITED INC.

2418 PECK RD, CITY OF INDUSTRY CA USA, 90601

**Secured Party:**

**Organization:**     CORPORATION SERVICE COMPANY, AS REPRESENTATIVE

P.O. BOX 2576, UCCSPREP@CSCINFO.COM, SPRINGFIELD IL USA, 62708

| Amendment Filing # | Filing Type | File Date | File Time | | # of Pages |
|---|---|---|---|---|---|

EXHIBIT 1
Document Number:   74984890003          Page 2 of 4          3

| 17-75959399 | Termination | 07/13/2017 | 13:32 | | 1 |

| Original Filing # | Filing Type | File Date | File Time | Lapse Date | # of Pages |
|---|---|---|---|---|---|
| 17-7594529716 | Financing Statement | 07/06/2017 | 10:52 | 07/06/2022 | 1 |

**Debtor:**
**Organization:**   INTERWORKS UNLIMITED INC.
2418 PECK ROAD, WHITTIER CA USA, 90601

INTERWORKS UNLIMITED/AMAZING STUFF SHOP
2418 PECK ROAD, WHITTIER CA USA, 90601

**Secured Party:**
**Organization:**   CASH CAPITAL GROUP, LLC
1013 CENTRE ROAD, SUITE 403S, WILMINGTON DE USA, 19805

| Amendment Filing # | Filing Type | File Date | File Time | | # of Pages |
|---|---|---|---|---|---|
| 18-76608073 | Termination | 07/25/2018 | 06:43 | | 1 |

| Original Filing # | Filing Type | File Date | File Time | Lapse Date | # of Pages |
|---|---|---|---|---|---|
| 18-7646271739 | Financing Statement | 04/30/2018 | 09:48 | 04/30/2023 | 1 |

**Debtor:**
**Organization:**   INTERWORKS UNLIMITED INC.
2418 PECK ROAD, CITY OF INDUSTRY CA USA, 90601
**Secured Party:**
**Organization:**   CORPORATION SERVICE COMPANY, AS REPRESENTATIVE
P.O. BOX 2576        UCCSPREP@CSCINFO.COM, SPRINGFIELD IL USA,
62708

| Original Filing # | Filing Type | File Date | File Time | Lapse Date | # of Pages |
|---|---|---|---|---|---|
| 18-7678686451 | State Tax Lien | 10/22/2018 | 15:29 | 10/22/2028 | 1 |

**Debtor:**
**Organization:**   AMAZING STUFF SHOP
2418 PECK RD, CITY OF INDUSTRY CA USA, 906011604

INTERWORKS UNLIMITED INC.
2418 PECK RD, CITY OF INDUSTRY CA USA, 906011604

**Secured Party:**

**Organization:**       EMPLOYMENT DEVELOPMENT DEPARTMENT

                        722 CAPITOL MALL, SACRAMENTO CA USA, 95814

---

**Total Pages:**        **16**

The undersigned Filing Officer hereby certifies that the above listing is a record of all presently active financing statements, tax liens, attachment liens and judgement liens, including any change documents relating to them, which name the above debtor, subject to any above-stated search qualifiers and are on file in my office as of **11/12/2018 at 1700 hours**.

The search results herein reflect only the specific information requested. The results of this Debtor search will not reflect variances of this name. If the Debtor is known under other personal names, trade names, business entities, or addresses, separate searches of these names will have to be requested and conducted. The Secretary of State, his officers and agents disclaim any and all liability for claims resulting from other filings on which the name of the Debtor can be found in any other form than which was requested.

Alex Padilla
Secretary of State

EXHIBIT 1
Document Number:   74984890003         Page 4 of 4                                    5

# UCC FINANCING STATEMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Corporation Service Company
800-858-5294

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703
USA

**DOCUMENT NUMBER:** 34166060002
**FILING NUMBER:** 12-7324175729
**FILING DATE:** 08/08/2012 17:01
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| | |
|---|---|
| **1a. ORGANIZATION'S NAME** | |
| OR INTERWORKS UNLIMITED INC. | |

| **1b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|
| 2418 PECK RD | CITY OF INDUSTRY | CA | 90601 | USA |

| **1d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **1e. TYPE OF ORGANIZATION** | **1f. JURISDICTION OF ORGANIZATION** | **1g. ORGANIZATIONAL ID#, if any** | |
|---|---|---|---|---|---|
| | | Corporation | CA | 3039061 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| | |
|---|---|
| **2a. ORGANIZATION'S NAME** | |
| OR | |

| **2b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|
| | | | | |

| **2d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **2e. TYPE OF ORGANIZATION** | **2f. JURISDICTION OF ORGANIZATION** | **2g. ORGANIZATIONAL ID#, if any** | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

| | |
|---|---|
| **3a. ORGANIZATION'S NAME** | |
| OR Bibby Financial Services (CA), Inc. | |

| **3b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|
| 3027 Townsgate Rd, Ste #140 | Westlake Village | CA | 91361 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All of Debtor's existing and later acquired assets, including but not limited to Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, General Intangibles, Inventory, Investment Property, Instruments, Letter of Credit Rights and all Supporting Obligations including all of Debtor's books and records evidencing and/or related to all Accounts, any Commercial Tort Claim that Debtor may come to have and that is subsequently specifically referenced by written amendment, as well as all of Debtor's software programs, stored data, aging schedules, customer lists, books, records, returned merchandise and all property of Debtor at any time coming into BFS' possession; and all lien rights associated with the Accounts, whether arising by operation of law or pursuant to contract or agreement, including but not limited to mechanic's lien rights; and all Proceeds thereof of each of the foregoing.

**5. ALT DESIGNATION:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

**☐ 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable]**

**7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional]** ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**
INUN201 [68864438]

FILING OFFICE COPY

EXHIBIT 1                                                                 6

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Corporation Service Company<br>800-858-5294 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>CORPORATION SERVICE COMPANY<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62703<br>USA | **DOCUMENT NUMBER:** 60013170002<br>**FILING NUMBER:** 17-75735895<br>**FILING DATE:** 03/02/2017 12:16<br><br>IMAGE GENERATED ELECTRONICALLY FOR XML FILING<br>**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY** |

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
12-7324175729

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in Item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes: **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record.

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| OR | 7a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| | 7b. INDIVIDUAL'S SURNAME | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| OR | a. ORGANIZATION'S NAME<br>Bibby Financial Services (CA), Inc. | | | |
|---|---|---|---|---|
| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
INUN201 [128112849]

FILING OFFICE COPY

EXHIBIT 1                                                                                  7

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company
800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
Springfield, IL 62703-4261
USA

**DOCUMENT NUMBER: 70294850002**
**FILING NUMBER: 18-76501496**
**FILING DATE: 05/23/2018 12:23**

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
12-7324175729

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☑ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:     **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record.     ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c     ☐ ADD name: Complete item 7a or 7b, and item 7c     ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | Bibby Financial Services, Inc. | | | |
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 515 Marin Street, Suite 420 | Thousand Oaks | CA | 91360 | USA |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | Bibby Financial Services (CA), Inc. | | | |
| OR | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
INUN201 Debtor:INTERWORKS UNLIMITED INC. [147006908]

FILING OFFICE COPY

EXHIBIT 1                                                                                    8

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Corporation Service Company<br>800-858-5294 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
Springfield, IL 62703-4261
USA

**DOCUMENT NUMBER: 71586470002**
**FILING NUMBER: 18-76589998**
**FILING DATE: 07/13/2018 12:15**

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

| | |
|---|---|
| **1a. INITIAL FINANCING STATEMENT FILE NUMBER**<br>12-7324175729 | **1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:         **AND** Check one of these three boxes to:

☐ This Change affects ☐ Debtor or ☐ Secured Party of record.   ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | | | |
|---|---|---|---|
| **6a. ORGANIZATION'S NAME** | | | |
| **6b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | |
|---|---|---|---|
| **7a. ORGANIZATION'S NAME** | | | |
| **7b. INDIVIDUAL'S SURNAME** | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| **7c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | | | |
|---|---|---|---|
| **a. ORGANIZATION'S NAME**<br>Bibby Financial Services (CA), Inc. | | | |
| **b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
Debtor:interworks unlimited inc. [149263380]

FILING OFFICE COPY

EXHIBIT 1                                                                                          9

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Corporation Service Company |
| 800-858-5294 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|
| Corporation Service Company |
| 801 ADLAI STEVENSON DRIVE |
| SPRINGFIELD, IL 62703 |
| USA |

**DOCUMENT NUMBER:** 48177580002
**FILING NUMBER:** 15-7458450493
**FILING DATE:** 04/07/2015 10:40

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

---

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| INTERWORKS UNLIMITED INC. |||||
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2418 Peck Road | City Of Industry | CA | 90601 | USA |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| Amazing Stuff Shop |||||
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 241 Peck Road | City Of Industry | CA | 90601 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE |||||
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. BOX 2576 UCCSPREP@cscinfo.com | Springfield | IL | 62708 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
(a) a specified percentage of [Interworks Unlimited Inc dba Amazing Stuff Shop]'s (hereinafter "Merchant") rights to receive payments from Merchant's customers or other third parties (whether by any type of payment card, cash, check, electronic fund transfer or other form of monetary payment) that arise out of Merchant's sale of goods or services to Merchant's customers at any location in the ordinary course of Merchant's business within a specified time period and (b) all personal property of Merchant that relates to item (a) above, including all accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory (as those terms are defined in Article 9 of the Uniform Commercial Code ("UCC") in effect from time-to-time in the State of Florida), trademarks, trade names, service marks, logos and other sources of business identifiers, and all registrations, recordings, and applications with the U.S. Patent and Trademark Office and all renewals, reissues and extensions thereof (collectively "IP"), together with any written agreement granting any right to use any IP, and (c) all proceeds with respect to the items described in (a) and (b) above, as the term

| 5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative |||
|---|---|---|
| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: <br> ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: <br> ☐ Agricultural Lien   ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor |||

| 8. OPTIONAL FILER REFERENCE DATA: |
|---|
| [98239113] |

FILING OFFICE COPY

EXHIBIT 1                                                                 10

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because individual
Debtor name did not fit, check here ☐

| | 9a. ORGANIZATION'S NAME |
| | INTERWORKS UNLIMITED INC. |
| OR | |
| | 9b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

DOCUMENT NUMBER: 48177580002

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | 10a. ORGANIZATION'S NAME | | | | |
| | 10b. INDIVIDUAL'S SURNAME | | | | |
| | Lu | | | | |
| OR | INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| | Eric | | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| | H | | | | |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2418 Peck Road | City Of Industry | CA | 90601 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | 11a. ORGANIZATION'S NAME | | | |
| OR | | | | |
| | 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (collateral):
"proceeds" is defined in Article 9 of the UCC.

Merchant has contractually agreed not to enter into any arrangement, agreement or commitment that relates to or involves the collateral, whether in the form of an actual or attempted sale or purchase of, security interest in or sale or purchase of credits against the collateral with any party other than the Secured Party. Accordingly, the acceptance of any security interest in the collateral by anyone other than the Secured Party may constitute the tortious interference with the Secured Party's agreement with Merchant. Additionally, if Merchant takes additional financing, working capital or a loan that relates to or involves the collateral as described above from any person other than the Secured Party, Merchant shall be in default of Merchant's agreement with the Secured Party and the third party likewise may be liable to the Secured Party for tortious interference with the Secured Party's agreement with Merchant. In the event that any person is granted a security interest in the collateral contrary to Merchant agreement with the

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing. |
| 15. Name and address of RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

FILING OFFICE COPY

EXHIBIT 1                                                                                   11

# UCC FINANCING STATEMENT ADDENDUM

**FOLLOW INSTRUCTIONS**

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

INTERWORKS UNLIMITED INC.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INTITAL(S)     SUFFIX

**DOCUMENT NUMBER:** 48177580002

**IMAGE GENERATED ELECTRONICALLY FOR XML FILING THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only *one* additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

OR

10a. ORGANIZATION'S NAME

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME *or* ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only *one* name (11a or 11b)

OR

11a. ORGANIZATION'S NAME

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (collateral):
Secured Party or takes any other action causing Merchant to be in default of that agreement, the Secured Party may assert a claim to the collateral and any proceeds thereof received by such person and pursue any other remedies available under the law.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing.

15. Name and address of RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

**FILING OFFICE COPY**

EXHIBIT 1

12

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company
800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703
USA

**DOCUMENT NUMBER: 53781470002**
**FILING NUMBER: 16-75128315**
**FILING DATE: 03/08/2016 06:11**

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
15-7456450493

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:     **AND** Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record.
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | |
| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
Debtor:Interworks Unlimited Inc dba Amazing Stuff Shop [112852362]

FILING OFFICE COPY

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Gisella Melendez
800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CT LIEN SOLUTIONS
2727 ALLEN PARKWAY
HOUSTON, TX 77019
USA

**DOCUMENT NUMBER:** 50987670002
**FILING NUMBER:** 15-7484940739
**FILING DATE:** 09/15/2015 14:36

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME** INTERWORKS UNLIMITED INC. | | | | |
| **1b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **1c. MAILING ADDRESS** 2418 PECK ROAD | **CITY** CITY OF INDUSTRY | **STATE** CA | **POSTAL CODE** 90601 | **COUNTRY** USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | |
| **2b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| **3a. ORGANIZATION'S NAME** ACH Capital LLC as agent for Shoreside Capital | | | | |
| **3b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **3c. MAILING ADDRESS** 11 Broadway, Suite 814 | **CITY** New York | **STATE** NY | **POSTAL CODE** 10004 | **COUNTRY** USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All assets of the Debtor, now existing and hereafter arising, wherever located.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

| **6a.** Check only if applicable and check only one box: | **6b.** Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
CA-0-49913910-50476015

**FILING OFFICE COPY**

EXHIBIT 1                                                                14

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Gisella Melendez
800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Lien Solutions
2929 ALLEN PARKWAY, Suite#3300
HOUSTON, TX 77019
USA

DOCUMENT NUMBER: 63348000002
FILING NUMBER: 17-76006701
FILING DATE: 08/11/2017 11:04

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
15-7484940739

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:  **AND**  Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record.  ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a and 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|---|
| OR | ACH Capital LLC as agent for Shoreside Capital | | | |
| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
CA-0-60179031-53776329

**FILING OFFICE COPY**

EXHIBIT 1                                                                                                     15

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Corporation Service Company |
| 800-858-5294 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|

| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|
| CORPORATION SERVICE COMPANY |
| 801 ADLAI STEVENSON DRIVE |
| SPRINGFIELD, IL 62703 |
| USA |

**DOCUMENT NUMBER:** 53767710002
**FILING NUMBER:** 16-7512707117
**FILING DATE:** 03/07/2016 11:38

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Interworks Unlimited Inc. | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2418 Peck Rd | City of Industry | CA | 90601 | USA |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. Box 2576, UCCSPREP@CSCINFO.COM | Springfield | IL | 62708 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
"Pursuant to the ACH Total Receipts Assurances Agreement, all of the Debtor's tangible and intangible assets, whether now existing or hereinafter arising or acquired and wherever located and all proceeds of such assets (collectively, the "Collateral").
Notice-Pursuant to the ACH Total Receipts Assurances Agreement between debtor and Secured Party, debtor has agreed not to grant a security interest in the above collateral to any other entity. Accordingly, the acceptance of any security interest by anyone other than the Secured Party is likely to constitute the tortious interference with the Secured Party's rights.
In the event that any entity is granted a security interest in Debtor's accounts, chattel paper or general intangibles contrary to the above the Secured Party asserts a claim to any proceeds thereof received by such entity."

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: |
|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
[112813469]

FILING OFFICE COPY

EXHIBIT 1                                                                                      16

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company
800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808
USA

**DOCUMENT NUMBER: 62655590002**
**FILING NUMBER: 17-75959399**
**FILING DATE: 07/13/2017 13:32**

IMAGE GENERATED ELECTRONICALLY FOR XML FILING

THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
16-7512707117

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: *Attach* Amendment Addendum (Form UCC3Ad) *and* provide Debtor's name in item 13

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, *and* address of Assignee in item 7c *and* name of Assignor in item 9
For partial assignment, complete items 7 and 9 *and* also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check *one* of these two boxes:          **AND** Check *one* of these three boxes to:
This Change affects ☐ Debtor *or* ☐ Secured Party of record.   ☐ CHANGE name and/or address: Complete item 6a or 6b; *and* item 7a or 7b *and* item 7c   ☐ ADD name: Complete item 7a or 7b, *and* item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only *one* name (6a or 6b)

|    | 6a. ORGANIZATION'S NAME | | | |
|----|----|----|----|----|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only *one* name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

|    | 7a. ORGANIZATION'S NAME | | | |
|----|----|----|----|----|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
|    | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
|    | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|----|----|----|----|----|
|    |    |    |    |    |

**8.** ☐ **COLLATERAL CHANGE:** *Also* check *one* of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only *one* name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

|    | a. ORGANIZATION'S NAME   CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | |
|----|----|----|----|----|
| OR | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
[ 133691289]

FILING OFFICE COPY

EXHIBIT 1                                                    17

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Gisella Melendez
800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Lien Solutions
2929 ALLEN PARKWAY, Suite#3300
HOUSTON, TX 77019
USA

**DOCUMENT NUMBER:** 62468710002
**FILING NUMBER:** 17-7594529716
**FILING DATE:** 07/06/2017 10:52

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | INTERWORKS UNLIMITED INC. | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2418 Peck Road | Whittier | CA | 90601 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | INTERWORKS UNLIMITED/AMAZING STUFF SHOP | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2418 Peck Road | Whittier | CA | 90601 | USA |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Cash Capital Group, LLC | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1013 Centre Road, Suite 403S | Wilmington | DE | 19805 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All assets of the Debtor, now existing and hereafter arising, wherever located.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions)   ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
CA-0-59677431-53589424

FILING OFFICE COPY

EXHIBIT 1                                                                 18

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Lien Solutions
800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071
USA

**DOCUMENT NUMBER: 71849350002**
**FILING NUMBER: 18-76608073**
**FILING DATE: 07/25/2018 06:43**

**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
17-7594529716

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:       **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record.   ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Cash Capital Group, LLC | | | |
| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
CA-0-65705731-55570439- Debtor: INTERWORKS UNLIMITED INC.

**FILING OFFICE COPY**

EXHIBIT 1

19

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Corporation Service Company<br>800-858-5294 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>CORPORATION SERVICE COMPANY<br>801 ADLAI STEVENSON DRIVE<br>Springfield, IL 62703-4261<br>USA | **DOCUMENT NUMBER:** 69722730002<br>**FILING NUMBER:** 18-7646271739<br>**FILING DATE:** 04/30/2018 09:48 |

**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY**

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| OR | **1a. ORGANIZATION'S NAME**<br>INTERWORKS UNLIMITED INC. | | | |
| | **1b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |

| **1c. MAILING ADDRESS**<br>2418 PECK ROAD | **CITY**<br>CITY OF INDUSTRY | **STATE**<br>CA | **POSTAL CODE**<br>90601 | **COUNTRY**<br>USA |
|---|---|---|---|---|

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| OR | **2a. ORGANIZATION'S NAME** | | | |
| | **2b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |

| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| OR | **3a. ORGANIZATION'S NAME**<br>CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | |
| | **3b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |

| **3c. MAILING ADDRESS**<br>P.O. BOX 2576 uccsprep@cscinfo.com | **CITY**<br>SPRINGFIELD | **STATE**<br>IL | **POSTAL CODE**<br>62708 | **COUNTRY**<br>USA |
|---|---|---|---|---|

**4. COLLATERAL:** This financing statement covers the following collateral:
All Assets now owned and hereafter acquired.

Pursuant to an agreement, the debtor herein is not allowed to grant junior liens against any of the Collateral, sell assets outside the ordinary course of business (including accounts and proceeds thereof), or enter into additional financing arrangements. The secured party reserves all of its rights against any person who participates in the violation of the secured party's rights

**5.** Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions)  ☐ being administered by a Decedent's Personal Representative

| **6a.** Check <u>only</u> if applicable and check <u>only</u> one box:<br>☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | **6b.** Check <u>only</u> if applicable and check <u>only</u> one box:<br>☐ Agricultural Lien  ☐ Non-UCC Filing |
|---|---|

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
[145958565]

**FILING OFFICE COPY**

EXHIBIT 1

**RECORDING REQUESTED BY:**
**STATE OF CALIFORNIA**
EMPLOYMENT DEVELOPMENT DEPARTMENT
888-745-3886

**WHEN RECORDED MAIL TO:**
**STATE OF CALIFORNIA**
**EMPLOYMENT DEVELOPMENT DEPARTMENT**
**LIEN GROUP, MIC 92G**
**PO BOX 826880**
**SACRAMENTO, CA 94280-0001**

**DOCUMENT NUMBER: 74314930002**
**FILE NUMBER: 187678686451**
**FILE DATE: 10/22/2018 15:29**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**

## NOTICE OF STATE TAX LIEN
(Filed pursuant to Section 7171 of the Government Code)

INTERWORKS UNLIMITED INC.

AMAZING STUFF SHOP

2418 PECK RD
CITY OF INDUSTRY CA 90601-1604

Secretary of State

Letter ID. L0042231200

Certificate No. G002251341

| TAX PERIOD | TAX | PENALTY | INTEREST | TOTAL |
|---|---|---|---|---|
| 01/01/2018 to 03/31/2018 | $2,500.33 | $693.05 | $90.27 | $3,283.65 |

Interest calculated through 10/19/2018

The Director of the Employment Development Department hereby certifies the above is liable to the State of California for amounts due and required to be paid as determined under the provisions of the California Unemployment Insurance Code, the Revenue and Taxation Code, or both.

THE AMOUNT OF DELINQUENCY ABOVE SET FORTH SHALL BE A LIEN UPON ALL REAL OR PERSONAL PROPERTY AND RIGHTS TO SUCH PROPERTY, INCLUDING ALL AFTER-ACQUIRED PROPERTY AND RIGHTS TO PROPERTY BELONGING TO THE ABOVE NAMED.

Date: 10/19/2018

At Sacramento, California



The Director of the Employment Development Department has complied with all provisions of the California Unemployment Insurance Code in the computation and levy of the amount assessed and has caused this notice of lien to be issued by a duly authorized representative.

By _O Dumanska_

Authorized Representative

This agency has adopted the use of a facsimile signature as affixed above.

DE 2181 Rev. 5 (7-12)

EXHIBIT 1                                                           21

**CT Lien Solutions**
a Wolters Kluwer Business

## Search Results

| | |
|---|---|
| | **Date:** 11/20/2018 |
| | **Order #:** 67421261 |
| **JARED LOUZON** | **Customer #:** 36927 |
| **Lazarus & Lazarus, P.C.** | **Reference 1:** Interworks |
| **240 Madison Avenue, 8th Floor** | Unlimited, Inc. |
| **New York, NY 10016** | **Reference 2:** -- |

---

**Target Name: Interworks Unlimited, Inc.**

---

**Jurisdiction: Department of State, New York**

---

| | | |
|---|---|---|
| **Search Type:** UCC Lien | | **Searched Through:** 11/13/2018 |
| Results: | No Records Found /See Attached Certified Search | Searched: 5 Years |

---

**NANCY WIFORD**
**Columbus Team 6**
**4400 Easton Commons Way**
**Suite 125**
**Columbus, OH 43219**
**(800) 713-0728 EXT:3546**
**nancy.wiford@wolterskluwer.com**

This report contains information compiled from sources which CT Lien Solutions considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Lien Solutions does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall CT Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

EXHIBIT 1                                                                                    22

***State of New York*** }
***Department of State*** } ss:

**It is Hereby Certified,** *that* pursuant to the provision of Article 9 of the Uniform Commercial

Code, the Department of State is a proper office for filing statements under the Uniform Commercial

Code and that the Secretary of State is the custodian of such statements.  It is further certified that a

diligent search has been made of the records of the Uniform Commercial Code Section of the

Department of State, and that no record has been found to be filed against INTERWORKS

UNLIMITED, INC., as of November 13, 2018, 11:59 PM. ● ● ● ●





**WITNESS** my hand and the official seal of the Department
of State at the City of Albany this nineteenth day of
November, two thousand and eighteen.

Whitney Clark
Deputy Secretary of State

EXHIBIT 1                                                     23



STATE OF NEW YORK
DEPARTMENT OF STATE
ONE COMMERCE PLAZA, 99 WASHINGTON AVENUE
ALBANY, NY 12231-0001

ANDREW M. CUOMO
GOVERNOR

ROSSANA ROSADO
SECRETARY OF STATE

# INFORMATION REQUEST RESPONSE

November 19, 2018
*Customer Reference Number: 67421261/2*

C T CORPORATION SYSTEM - 07
187 WOLF ROAD, STE. 101
ALBANY NY 12205-0000

Name of Organization Searched:
INTERWORKS UNLIMITED, INC.

The undersigned hereby certifies that there are no Financing Statements nor any Federal Tax Liens, which have not lapsed, which name the above debtor and which are on file as of 11/13/2018, 11:59 PM.

Please note that the Uniform Commercial Code Filing Database, including images of filings may be searched for variations of the Debtor's name and copies of records may be downloaded at the Department's website www.dos.ny.gov.

Our Customer Service Representatives may be reached at (518) 473-2492.

Sincerely,

Whitney Clark
Deputy Secretary of State

Ref #: 327728

EXHIBIT 1       WWW.DOS.STATE.NY  •  E-MAIL: INFO@DOS.STATE.NY.US       24

# EXHIBIT 2



# MASTER PURCHASE AND SALE AGREEMENT

## BETWEEN

## BIBBY FINANCIAL SERVICES (CA), INC.

## AND

## INTERWORKS UNLIMITED INC.



## MASTER PURCHASE AND SALE AGREEMENT

THIS Master Purchase and Sale Agreement, is made this August 14, 2012 by and between Bibby Financial Services (CA), Inc. ("BFS") and Interworks Unlimited Inc. ("Seller").

A.    **Parties.**

      1.    BFS is a registered organization duly organized with the State of California and who has its place of business located at 3027 Townsgate Rd, Ste #140, Westlake Village, CA 91361.

      2.    Seller is a registered Corporation duly organized with the State of California, FEIN #26-2583718, who has its place of business located at 2418 Peck Road, City of Industry, CA 90601. Both BFS and Seller may hereinafter collectively be referred to as the "Parties."

B.    **Terms of Master Purchase and Sale Agreement and Construction.**

      Seller acknowledges it has heretofore received and reviewed the EdFT81 Standard Provisions, which is affixed hereto and shall be construed and interpreted as a single integrated and complete agreement between the Parties under which, among other things, the Seller will offer for sale its Accounts to BFS. Hereafter, this Master Purchase and Sale Agreement with the Standard Provisions integrated herein shall be collectively referred to as the "Master Purchase and Sale Agreement". All capitalized terms used herein shall have the meaning ascribed to such term as set forth below or in the Standard Provisions.

C.    **Definitions.**

      1.    In addition to those terms defined in Annex A of the Standard Provisions the following terms shall have the meaning ascribed to such term as set forth below:

      1.1    "Purchase Fees" shall mean, collectively, the following fees:

          (i)    "Administrative Fee" which shall mean an administrative fee in the amount of One Percent (1.00%) on the face value of each Account submitted to BFS;

          (ii)    "Discount Fee" which shall mean for each Account submitted to BFS, the initial Thirty (30) day period, an additional discount fee of One Half of One Percent (0.50%) for each Thirty (30) day period or increment thereof that such Account Purchased remains unpaid up to the date of collection of each such Account Purchased or the date of such Account Purchased is Chargeback, which discount fee shall be based on the face value of each Account Purchased;

          (iii)    "Funding Fee" which shall mean a fee of Five and Eight Hundred Seventy-Five Thousandths of One Percent (5.875%) above the Prime Rate for each Account Purchased for which Seller has received an Advance, which Funding Fee shall be calculated on Net Funds Employed.

      1.2    "Advance Rate" shall mean an amount up to Sixty-Five Percent (65%) of the Aggregate Net Face Value of Accounts identified in each Assignment Schedule delivered to BFS.

      1.3    "Facility Fee" shall mean Five Thousand Dollars ($5,000) due and payable to BFS upon execution of this Master Purchase and Sale Agreement. In the event BFS does not receive the Facility Fee prior to the first Advance made by BFS, BFS shall deduct such Facility Fee from such first Advance.

      1.4    "Minimum Sales" shall mean that Seller must offer BFS for sale at least One Million Dollars ($1,000,000) per Month in Accounts.

      1.5    "Total Maximum Facility" shall mean One Million Dollars ($1,000,000), which represents the maximum Net Funds Employed that may be advanced at any given time.

D.    **Chosen Forum.** The Chosen Forum shall mean City of Westlake Village, County of Ventura, State of California.

*Page 2 of 3*

Seller Initials

Seller Initials

BFS Initials

EXHIBIT 2

26

Bibby_Interworks_000004



I HAVE READ AND AGREED TO THE AFOREMENTIONED TERMS & CONDITIONS AND ANNEX A OF THIS MPSA.  IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of this _____ day of _____, 2012.

**BIBBY FINANCIAL SERVICES (CA), INC**

By: _____

Print Name: Nick Hart
Title: Managing Director

**INTERWORKS UNLIMITED INC**                    **INTERWORKS UNLIMITED INC.**

By: _____       By: _____
Print Name: Eric Lu                            Print Name: Michael Kidakarn
Title: President                               Title: Director

STATE OF _California_____

                                    ) SS:
COUNTY OF _Los Angeles_____       )

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgments, the foregoing Master Purchase and Sale Agreement was acknowledged before me by _Eric Lu and Michael Kidakarn_, as an authorized principal of Seller, freely and voluntarily, and is personally known to me or has produced _CA Drivers License_ as identification.

WITNESS my hand and official seal in the County and State last aforesaid this _15_ day of _August_, 2012.

_Neil Matsuzaki_ (signature)
Notary Public

_Neil Matsuzaki_
Typed, printed or stamped name of Notary Public
My Commission Expires: _Oct. 21, 2012_

NEIL MATSUZAKI
Commission # 1818944
Notary Public - California
Los Angeles County
My Comm. Expires Oct 21, 2012

Master Purchase & Sale Agreement -BFS LD1v4 February 2008

EXHIBIT 2                                                              27

Seller Initials ___
Seller Initials ___
BFS Initials ___

Bibby_Interworks_000005

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

State of California

County of _Los Angeles_

On _8/15/2012_ before me, _Neil Matsuzaki, Notary Public_,
Date                                    Here Insert Name and Title of the Officer

personally appeared _Eric H. Lu and Michael KidaKarn_
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> NEIL MATSUZAKI
> Commission # 1818944
> Notary Public - California
> Los Angeles County
> My Comm. Expires Oct 21, 2012

Place Notary Seal Above

Signature: _Neil Matsuzaki_
Signature of Notary Public

---------------------- **OPTIONAL** ----------------------

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _Master Purchase and Sale Agreement_

Document Date: _8/15/2012_     Number of Pages: _3_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
- ☐ Corporate Officer — Title(s): _____
- ☐ Individual
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

Signer's Name: _____
- ☐ Corporate Officer — Title(s): _____
- ☐ Individual
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

© 2010 National Notary Association • NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)     Item #5907

EXHIBIT 2         28

STANDARD PROVISIONS TO MASTER PURCHASE AND SALE AGREEMENT (EDITION FT81)



These EdFT81 Standard Provisions (hereafter "Standard Provisions") shall be incorporated into and made a part of a Master Purchase and Sale Agreement and shall be deemed one final integrated agreement (hereinafter "the Master Purchase and Sale Agreement" or "MPSA"). All capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such term in Annex A hereto.

1.   **SALE OF ACCOUNT RECEIVABLE**

    1.1    Pursuant to the terms and conditions set forth in the MPSA, BFS shall have the option to purchase from and Seller shall assign and offer for sale to BFS, as Seller's sole and exclusive factor and as absolute owner, all of Seller's right, title and interest in and to: (i) Seller's now existing and hereafter created Accounts together with all corresponding rights with respect thereto, including without limitation, full power to collect, sue for, compromise, assign, in whole or in part, or in any other manner enforce collection thereof in BFS' name or otherwise; (ii) the Goods and/or services sold giving rise to each such Account; (iii) all Goods returned by any customer in connection with the Accounts; (iv) all remedies available to Seller including rights of stoppage in transit, replevin, repossession and reclamation; (v) all deposits or other security relating to the Accounts; (vi) all rights under any insurance policy covering any Goods giving rise to the Accounts; and (vii) all payments or other proceeds of the foregoing in any form.

    1.2    All Accounts shall be submitted to BFS and shall be listed on an Assignment Schedule in a form satisfactory to BFS, as may be modified from time to time, and shall be delivered to BFS with: (a) identical duplicates of each invoice evidencing the terms of each Account (the originals having been mailed by Seller to Seller's customers at Seller expense or at BFS' election originals shall be delivered to BFS for forwarding to Seller's customers); (b) all original shipping or delivery receipts, including, but not limited to, Bills of Lading; and (c) such other documents and proof of delivery of merchandise or rendition of services as BFS may require (hereinafter the documents in foregoing a - c shall collectively be referred to as "Supporting Documentation"). BFS shall have the right to verify that each Account submitted by Seller on an Assignment Schedule is an Eligible Account.

2.   **ADVANCES, PURCHASE FEES AND RESERVE**

    2.1    Upon acceptance by BFS of an Assignment Schedule, BFS shall be deemed to have purchased the Accounts set forth therein. Upon BFS' purchase of the Accounts listed on an Assignment Schedule, BFS shall have the option to pay to Seller an Advance against the Purchase Price for all Eligible Accounts based on the Advance Rate for said Accounts or any portion thereof. Thereafter, Available Funds will be distributed to Seller upon request, subject to BFS' right to maintain a Reserve. Unless otherwise provided in writing and signed by BFS, the maximum total aggregate amount that BFS will Advance to Seller at any given time shall not exceed the Total Maximum Facility, *provided, however*, that Seller shall not be excused from any obligation under the MPSA if BFS makes an Advance in excess of the Total Maximum Facility. Seller shall pay any Operational Fees associated with the purchase of the Accounts, BFS' due diligence and the preservation of BFS' Collateral.

    2.2    As compensation for BFS' purchase of Accounts, Seller shall pay and BFS shall be entitled to receive the Purchase Fees. All Purchase Fees shall be due at the time of purchase of the Accounts. Seller may not grant any extension of the Maximum Sale Terms to any Account Debtor without BFS' prior written approval, and if Seller so grants any extension of the Maximum Sale Terms to any Account Debtor BFS reserves the right to increase the Administration Fee by 1.00% for each additional 30-day period or portion thereof for such period of time that any Accounts are outstanding for such Account Debtor. Seller has advised BFS that the Aggregate Net Face Value of Accounts Seller intends to offer BFS for sale each period shall not be less than the Minimum Sales and acknowledges the Purchase Fees payable under the MPSA have been calculated based upon such Minimum Sales. In the event of a Minimum Sales Shortfall, Seller shall pay to BFS a Minimum Sales Shortfall Fee. The Minimum Sales Shortfall Fee shall be in addition to any other fees, expenses or Obligations that Seller owes to BFS and shall at all times either be chargeable to Seller's Available Funds, or at BFS' option, payable to BFS by Seller upon demand.

    2.3    All Advances and distribution of Available Funds shall be subject to BFS' right to maintain a Reserve. The term "Reserve" shall mean a ledger entry, not cash account, which shall serve as security in the event that BFS i) fails to receive full payment for each Account Purchased for any reason, including but not limited to customers' returns, allowances, deductions, Disputes and/or a Chargeback Account, including any ChargedBack Account BFS anticipates might arise in the future; or ii) has Obligations due and owing. BFS may, in its sole and exclusive discretion, increase or decrease such Reserve as BFS may deem necessary to protect BFS' interests. BFS may hold any payment instrument received the later of i) the Collection Float Days; or ii) until BFS can confirm the availability of good and clear funds for such payment instrument.

3.   **REPRESENTATIONS AND WARRANTIES**

    3.1    Seller, and those principals and/or agents of Seller authorized by Seller to execute any Assignment Schedule, each make the following warranties, representations and covenants to BFS upon the delivery of each Assignment Schedule:

    (a)  Seller is either a corporation, limited liability company, limited partnership or other entity duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization and is qualified and authorized to do business and is in good standing in all states in which such qualification and good standing are necessary or desirable;
    (b)  Seller has offered for sale all Accounts created since the last Assignment Schedule;
    (c)  Seller is the sole and absolute owner of each Account offered for sale, each Account offered for sale is sold free and clear of any liens, security interests or encumbrances and all Supporting Documentation for each Account has been duly issued prior to Seller's delivery of each Assignment Schedule;

EXHIBIT 2

*EdFT81*

Seller Initials
Seller Initials
BFS Initials



(d) Seller has the full legal right to sell, assign and transfer each Account and such sale, assignment and transfer thereof does not contravene or conflict with the terms of any other agreement, commitment or instrument to which Seller is a party; and upon Seller's delivery of each Assignment Schedule, there will vest in BFS all of Seller's right, title and interest in and to each Account Purchased;

(e) All terms governing each Account are accurately reflected in the Supporting Documentation and each Account is undisputed and represents a sum certain owed by an Account Debtor, without offset or counterclaim, which sum is due and payable not more than the Maximum Sale Terms and no Account offered for sale has any express or implied condition giving use to a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or any right to return basis;

(f) Each invoice plainly states on its face, in a form acceptable to BFS, that each Account offered for sale is payable only to BFS (or such other language that BFS may from time to time require);

(g) Each Account represents Seller's bona fide sale, delivery and acceptance of merchandise or full and complete performance of service to an Account Debtor;

(h) Seller shall not change the payment terms to any Account Debtor without the prior written consent of BFS, including but not limited to the Maximum Sale Terms;

(i) Seller is not and has at no time been affiliated with and does not own, control, or exercise dominion, in any way whatsoever, over any Account Debtor;

(j) Each fact in any financial record, statement, books and records or other documents Seller has shown to BFS, either before or after the execution of the MPSA, were true and accurate and no information has since come to Seller's attention to materially effect same;

(k) Seller is not Insolvent;

(l) Unless authorized by BFS in writing, no financing statement identifying Seller as Debtor, except as to BFS, may or has at any time during the term of the MPSA been authorized or has been filed in any public office;

(m) Seller's principal place of business is accurately set forth in the MPSA, Seller maintains all of its books and records relating to its Accounts at such place and Seller has not and will not change its mailing address, principal place of business, or office in which Seller's records are kept without first giving BFS written notice thereof;

(n) Seller has no Parent, Affiliate and/or Subsidiary that is not disclosed in writing to BFS;

(o) No Account Purchased or any payment made with regard thereto will at any time during or after termination of the MPSA be avoidable by any bankruptcy trustee under Title 11 of the United States Bankruptcy Code or by any creditor, whether under state or federal law, as a preference, fraudulent conveyance or otherwise;

(p) Each Account Purchased shall be absolutely enforceable against Seller's Account Debtor in accordance with the express terms of the invoice, whether as to price, terms delivery, guaranty or quality;

(q) Seller has disclosed in writing to BFS any and all delinquent federal, state and/or local taxes; and in the event Seller subsequently permits or suffers any delinquent tax at any time during the Term of the MPSA, Seller will satisfy all such delinquent taxes within ten (10) days after Seller receives notice or such additional time period as is acceptable to BFS;

(r) Seller has contemporaneously as to each Account Purchased, made the proper entry on its books and records recording the absolute sale of such Accounts to BFS;

(s) Seller is fully responsible for the acts, omissions and/or defalcations of its employees in the event that any employee, including any agent, representative or assign, fails to deliver any check or other payment belonging to BFS;

(t) Seller has instructed any Parent, Subsidiary or Affiliate entity that it may not sell or factor any of their Accounts to any entity other than BFS without first giving written notice to BFS and obtaining the written consent of BFS;

(u) No inventory, equipment or other asset has been sold outside the ordinary course of Seller's business without first giving BFS written notice and obtaining BFS' written consent;

(v) Each individual that executes and delivers the Assignment Schedule has the power and authority to do so on behalf of Seller;

(w) Seller has immediately and in any event not more than twenty-four(24) hours upon receipt of such information by Seller, notified BFS of any Dispute, return, rejection, loss of or damage to merchandise, any request made by an Account Debtor for an extension of time to pay or any fact or circumstance with respect to any Account Purchased or Account which is likely to effect the sum owing thereon or any other fact or circumstance that is likely to give rise to any Event of Default;

(x) Seller shall at all times execute and deliver to BFS any and all documents that BFS deems desirable or necessary to effectuate the provisions of the MPSA;

(y) Seller has no delinquent obligations under any organized labor contracts, and in the event Seller permits or suffers any such delinquent obligations at any time during the term of the MPSA, Seller will satisfy all such delinquent obligations within ten (10) days after Seller receives notice or is otherwise advised of same;

(z) Seller has no delinquent obligations under any pension obligations, and in the event Seller permits or suffers any such delinquent obligations at any time during the term of the MPSA, Seller will satisfy all such delinquent obligations within ten (10) days after Seller receives notice or is otherwise advised of same;

(aa) Each person signing on behalf of Seller has the power and authority to execute and deliver the Assignment Schedule and any other documents in connection with the MPSA.

(bb) Seller shall provide such financial information as BFS may request, including but not limited to tax returns and financial statements.

3.2     Each of the warranties, representations and covenants above shall be deemed renewed upon the submission to BFS of an Assignment Schedule and all representations, warranties and covenants above shall survive any termination of the MPSA.

4.    **GRANT OF SECURITY INTEREST**

Seller Initials
Seller Initials
BFS Initials

EXHIBIT 2

EdFT81

Bibby_Interworks_000008

**BIBBY**
FINANCIAL SERVICES

4.1     Seller hereby grants to BFS, as security for all present and future Obligations owing to BFS, a continuing first priority and exclusive security interest in all of Seller's existing and later acquired assets, including but not limited to Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, General Intangibles, Inventory, Investment Property, Instruments, Letter of Credit Rights and all Supporting Obligations including all of Seller's books and records evidencing and/or related to all Accounts, any Commercial Tort Claim that Seller may come to have and that is subsequently specifically referenced by written amendment, as well as all of Seller's software programs, stored data, aging schedules, customer lists, books, records, returned merchandise and all property of Seller at any time coming into BFS' possession; and all lien rights associated with the Accounts, whether arising by operation of law or pursuant to contract or agreement, including but not limited to mechanic's lien rights; and all Proceeds thereof of each of the foregoing (the "Collateral").

4.2     Upon execution of the MPSA, BFS shall notify all Account Debtors to insure that all of Seller's Accounts, whether or not BFS makes an Advance against such Accounts, shall be paid directly to BFS at either its address set forth in the MPSA or any other address that BFS may elect to use for the receipt of Account Debtor payments. Such notification may include a notation on Seller's invoices of the fact that, *inter alia*, the Account has been sold and assigned and that payment is due exclusively to BFS ("Payment Notation"), such Payment Notation to be at the sole discretion of BFS. Until all Obligations are paid in full and this MPSA terminated, Seller shall not change or provide contrary remittance or payment information to any Account Debtor. BFS shall have the right at any time, either before or after the occurrence of an Event of Default and without notice to Seller, to notify any or all Account Debtors of the assignment to BFS and to direct such Account Debtors to make payment of all amounts due or to become due to Seller directly to BFS. As to any Account proceeds that do not represent any Account for which Seller has received an Advance, and so long as no Event of Default has occurred, such proceeds of Accounts shall be Available Funds for and on account of Seller, subject to the right of BFS to maintain a Reserve. Seller authorizes BFS to file any Financing Statements or other instrument that BFS deems appropriate to perfect BFS' ownership rights and security interest(s) granted hereunder without further authorization from Seller.

4.3     For the purpose of this section, all rights granted to BFS shall also include each of BFS' Parent, Affiliates and Subsidiaries ("Related Entities") to the extent Seller becomes indebted to any one or more Related Entities, in which event, BFS shall be entitled to assert on any such Related Entity's behalf any right BFS receives under the MPSA. Moreover, to the extent any one of the Related Entities holds funds for or is otherwise obligated to Seller, any Related Entity may setoff or otherwise withhold such funds in favor of and disburse same to BFS or any other Related Entity to whom Seller is obligated.

4.4.    In the event Seller or any one or more of its principals, officers or directors during the Term of the MPSA or while Seller remains liable to BFS for any Obligations under the MPSA or arising out of or related to the MPSA, (i) forms a new entity; or (ii) has failed to disclose to BFS at the time of the Effective Date of this MPSA an existing entity, that does business similar to that of Seller, whether in the form of a corporation, partnership, limited liability company or otherwise, such entity shall be deemed to have expressly assumed the obligations due BFS by Seller under the MPSA. Upon the formation of any such entity, BFS shall be deemed to have been granted an irrevocable power of attorney with authority to file a new financing statement with the appropriate secretary of state or UCC filing office naming the newly formed successor business or undisclosed existing business, as Debtor. BFS shall be held harmless and be relieved of any liability as a result of BFS' filing of any such financing statement or the resulting perfection of a security interest in any of the successor entity's assets and BFS shall have the right to notify the successor entity's or undisclosed existing entity's Account Debtors of BFS' security interest, its right to collect all Accounts, and to notify any new lender who has sought to obtain a competing security interest of BFS' right in such entity's assets.

5.      **EVENTS OF DEFAULT**

5.1     An Event of Default shall be deemed to have occurred under the MPSA upon the happening of any one or more of the following:

   (a) Seller shall fail to pay when due any Obligation;
   (b) There shall be commenced by or against Seller any voluntary or involuntary case under the United States Bankruptcy Code, any Assignment For The Benefit of Creditors or an appointment of a receiver or custodian over Seller or its assets occurs;
   (c) Seller becomes Insolvent;
   (d) Any lien, garnishment, attachment or the like shall be filed, occur, arise or attach to any portion of the Seller's Assets and the same is not released within ten (10) days;
   (e) A judgment is entered against Seller in excess of $10,000, unless the same is satisfied within thirty (30) days after the date of entry thereof or an appeal or appropriate proceeding for review thereof is taken within such periods and a stay of execution pending such appeal is obtained;
   (f) Seller shall fail to perform any material duty under the MPSA;
   (g) Seller breaches any warranty, representation or covenant set forth herein, or any warranty, representation or covenant is not true, accurate or correct;
   (h) Any Assignment Schedule, report, certificate, financial statement, or other document furnished by Seller to BFS, or by any other person on behalf of Seller, is untrue, incorrect or becomes untrue or incorrect in any material respect;
   (i) Seller shall fail to pay any federal or state tax or fail to timely file any tax form as and when due;
   (j) A material adverse change occurs in Seller's financial condition, business or operations, or the death or disability of any principal or Guarantor;
   (k) There shall be a change in the control, management or ownership of Seller; or

Seller Initials
Seller Initials
BFS Initials

EdFT01  EXHIBIT 2                                                                31

Bibby_Interworks_000009



(l)   BFS deems itself insecure and has reasonable cause to believe that the prospect of Seller's performance under the MPSA appears jeopardized or if BFS deems itself insecure and has reasonable cause to believe that the prospect of any Guarantor's performance appears jeopardized regardless of Seller's performance.

5.2   Upon the occurrence of an Event of Default, all Obligations owed to BFS shall be immediately due and payable.   BFS shall have the right, at its discretion, to cease further Advances and/or to terminate the MPSA, all of which may be done without notice to Seller and BFS may immediately exercise all rights and remedies under the MPSA, the Uniform Commercial Code and applicable law. Upon the occurrence of an Event of Default, BFS shall have the right to enforce all lien rights of Seller and to take any and all actions necessary or desirable to enforce such lien rights, including but not limited to mechanics lien rights, in the name of BFS.

5.3   If an Event of Default occurs due to the filing of a tax lien or levy, until such lien or levy is satisfied and discharged, BFS shall be entitled to withhold any sum(s) that may otherwise be due Seller and may remit same to the taxing authority.  Moreover, Seller agrees that until the tax lien or levy is satisfied or discharged, BFS shall be entitled to collect all proceeds of Accounts and apply such proceeds to any Obligations.

5.4   An Event of Default shall not suspend or abate any performance due to BFS by Seller.  Notwithstanding a termination of the MPSA by BFS, Seller's Obligations shall remain unconditionally due and owing and any amounts due shall accrue interest at the maximum rate allowable by law until all Accounts Purchased and Obligations due BFS have been fully satisfied.  Upon an Event of Default, BFS shall be authorized to notify each bank or other financial institution in which Seller maintains an account; and Seller hereby irrevocably authorizes such financial institution that so much of the funds necessary to cure Seller's breach as set forth in writing by BFS to such financial institution shall be set aside to and for the exclusive benefit of BFS.  Seller shall be obligated for the Missing Payment Notation Fee on any Account Purchased in which the invoices issued by Seller to an Account Debtor do not contain the Payment Notation   Seller shall pay to BFS a Liquidation Administration Fee for each Account Purchased and outstanding at any time during a Liquidation Period.  In order to satisfy any of the Obligations due BFS, Seller authorizes BFS to initiate electronic debit or credit entries through the ACH system to any Deposit Account maintained by Seller.  Seller shall hold BFS harmless of any claim(s) or damage(s) that might arise as a result of BFS' notification unless it can be shown that BFS acted in bad faith and without just cause.

5.5   BFS shall be entitled to equitable relief without having to establish an inadequate remedy at law or other grounds except that the Collateral securing Seller's obligations to BFS is subject to being dissipated and such equitable relief may include injunctive or receivership remedies.  Seller waives any requirement that BFS post or otherwise obtain or procure any bond.  Alternatively, in the event BFS, in its sole and exclusive discretion, desires to procure and post a bond, BFS may procure and file with the court a bond in an amount up to and not greater than $10,000.00 notwithstanding any common or statutory law requirement to the contrary.  Upon BFS' posting of such bond it shall be entitled to all benefits allowed by law as if such bond was posted in compliance with state law. Seller waives any right it may be entitled to, including an award of attorney's fees or costs, in the event any equitable relief sought by and awarded to BFS is thereafter, for whatever reason(s), vacated, dissolved or reversed.  Seller agrees to reimburse BFS for all reasonable attorney's fees, court costs and other expenses incurred by BFS in the enforcement of the MPSA including, but not limited to, protecting or enforcing its interest in the Accounts Purchased, the Collateral securing Seller's obligations to BFS  or in connection with any bankruptcy case or insolvency proceeding involving Seller.  As used in this MPSA, attorneys' fees will be deemed to be the full and actual cost of any legal services actually performed in connection with the matters involved, including those related to any appeal or the enforcement of any judgment calculated on the basis of the usual fee charged by attorneys performing such services.  Notwithstanding the existence of any law, statute or rule, in any jurisdiction that may provide Seller with a right to attorney's fees or costs, Seller hereby waives any and all rights to hereafter seek attorney's fees or costs thereunder and Seller agrees that BFS exclusively shall be entitled to indemnification and recovery of any and all attorney's fees or costs in respect to any litigation based hereon, arising out of, or related hereto, whether under, or in connection with, this and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either Party. All post-judgment interest shall bear interest at the Post-Judgment Rate.   In the event, after termination, Seller breaches its duty to indemnify BFS under this section, all of BFS' rights hereunder shall be deemed reinstated, including but not limited to BFS' rights to act as Seller's attorney in fact in order to file any previously terminated UCC financing statements to perfect BFS' rights as a secured party, which rights shall not be terminated until such breach is remedied.   This Section 5.5 shall survive termination of the MPSA.

5.6   Upon an Event of Default, all of Seller's rights of access to BFS' online, internet available services, shall be provisional pending Seller's cure of all such Events of Default.  During such period of time, BFS may limit or terminate Seller's access to BFS' online services.  Seller acknowledges that the information BFS makes available to Seller constitutes and satisfies any duty to respond to a Request for an Accounting or Request regarding a Statement of Account pursuant to § 9-210 of the UCC.

5.7   Seller agrees to indemnify BFS from any loss arising out of the assertion of any Avoidance Claim and shall pay to BFS on demand, the amount thereof.  Seller shall notify BFS within two business days of it becoming aware of the assertion of an Avoidance Claim.

5.8   Upon an Event of Default, the Parties acknowledge that it shall be presumed commercially reasonable and BFS shall have no duty to undertake to collect any Account if BFS receives information from an Account Debtor that a material Dispute exists or in the event BFS receives information that any Dispute exists and the amount of recovery is outweighed by the likely costs and expenses to pursue any such Account.  This provision is not intended to impose any duties on BFS in circumstances other than those specifically addressed herein.  Furthermore, in the event BFS undertakes to collect from or enforce an obligation of an Account Debtor or other person obligated on the Collateral securing the Obligations of BFS and determines that the possibility of collection is outweighed by the likely costs and expenses that will be incurred, BFS may at any such time cease any further collection efforts and such action shall be

EXHIBIT 2

EdFT81

Seller Initials
Seller Initials
BFS Initials



considered commercially reasonable.  Before Seller may, under any circumstances, seek to hold BFS responsible for taking any action not deemed commercially reasonable, Seller shall be required to first notify BFS, in writing, of all reasons why Seller believes BFS has acted in a manner not deemed commercially reasonable and advise BFS of the action that Seller believes BFS should take.

6.    **TERM AND TERMINATION**

6.1    The MPSA will remain in effect for the entire Term, which Term will be automatically extended for successive periods of one (1) year unless Seller provides written notice of cancellation at least sixty (60) but no more than ninety (90) days prior to the expiration of the initial or any renewal Term.  Any notice of termination by Seller, however, and notwithstanding payment in full of all Obligations by Seller, is conditioned on Seller's delivery, to BFS, of a general release in a form reasonably satisfactory to BFS.  Seller understands and agrees that this provision constitutes a waiver of its rights under § 9-513 of the UCC.  BFS shall not be required to record any terminations or satisfactions of any of BFS' security interests unless and until Seller has executed and delivered to BFS said general release and Seller shall have no authority to do so without BFS' express written consent.

6.2    Any request by Seller to give notice of early termination of the MPSA at any time prior to the end of the Term of the MPSA must be in writing.  In the event that BFS agrees to grant such a request for early termination or there is an Event of Default under the MPSA that results in an early termination of this Agreement by either Seller or BFS, Seller shall pay BFS the Termination Fee, which Termination Fee shall be in addition to any other fees due to BFS hereunder.  Any and all fees and Obligations due to BFS hereunder shall survive termination of this MPSA.

6.3    Any termination of the MPSA shall not affect BFS' security interest and BFS' ownership of the Accounts Purchased, and the MPSA shall continue to be effective, until all transactions entered into and Obligations incurred hereunder have been completed and satisfied in full.  Notwithstanding anything to the contrary, and assuming  no Event of Default has occurred pursuant to which BFS may terminate without notice, BFS may terminate the MPSA at any time by giving not less than thirty (30) days notice.

7.    **OPERATIONS AND PROCEDURES**

7.1    Seller irrevocably appoints BFS as its attorney and agent in fact with power to: (a) file any Financing Statements, amendments or other filings;  (b) strike Seller's address from any correspondence to any Account Debtor and insert BFS' address; (c) receive, open and discard all mail addressed to Seller via BFS' address; (d) endorse the name of Seller or Seller's trade name on any check or other evidence of payment payable to Seller that may come into the possession of BFS; (e) demand, sue for, compromise and/or collect any and all moneys due to Seller; (f) compromise, prosecute or defend any action, claim or proceeding as to the Accounts; (g) send notices, demand or requests to the Account Debtor in the name of Seller for any purpose whatsoever deemed necessary or desirable by BFS including, without limitation, notices regarding payment instructions or seeking estoppel information on the Accounts and such other matters integral to the relationship; and (h) upon an Event of Default, be irrevocably authorized to redirect all of Seller's mail to BFS and after reviewing all mail in order to ascertain which portion is applicable to the Accounts Purchased or Collateral, make all other mail available for pick-up by Seller.  The Power of Attorney granted to BFS herein shall be deemed to be coupled with an interest and, therefore, irrevocable until all Accounts Purchased are paid in full and all Obligations to BFS are satisfied.  Seller shall execute and supply to BFS any and all forms (i.e. Forms 8821 and/or 2848) that BFS may require in order to enable BFS to obtain and receive tax information issued by the Department of the Treasury, Internal Revenue Service, or receive refund checks.

7.2    Should Seller receive payment of all or any portion of any Account, Seller shall immediately notify BFS of the receipt of the payment, hold said payment in trust for BFS separate and apart from Seller's own property and funds, and shall deliver said payment to BFS within one (1) business day in the identical form in which received.  Should Seller receive any check or other payment instrument with respect to an Account and fail to surrender and deliver to BFS said check or payment instrument within one (1) business day, BFS shall be entitled to charge Seller a Misdirected Payment Fee to compensate BFS for the additional administrative expenses that the Parties acknowledge is reasonably likely to occur as a result of a breach of this section.  In the event any Goods, the sale of which gave rise to an Account Purchased, are returned to or repossessed by Seller, such Goods shall be held by Seller in trust for BFS, separate and apart from Seller's own property and subject to BFS' sole direction and control.

7.3    All of BFS' electronically maintained data, all hard-copy print-outs of such data, including all of BFS' books and records and all other data in relation thereto between BFS and Seller shall be admissible in evidence without objection by Seller as prima facie evidence of the status of the Accounts and Obligations due BFS.  Each statement, report, or accounting rendered or issued by BFS to Seller shall be deemed conclusively accurate and binding on Seller unless within fifteen (15) days after the date of issuance or the date such information is posted or otherwise made available on BFS' internet website, Seller notifies BFS to the contrary by registered or certified mail, setting forth with specificity the reasons why Seller believes such statement, report, accounting or the date such information is posted or otherwise made available on BFS' internet website is inaccurate, as well as what Seller believes to be correct amount(s).  Seller's failure to receive any monthly statement shall not relieve it of the responsibility to request such statement or otherwise excuse Seller from accessing the BFS' internet website to obtain such information; and Seller's failure to do so shall nonetheless bind Seller to whatever BFS' records or website reports.

7.4    BFS shall have the right to conduct an examination and verification of a company's financial, accounting, accounts receivable and invoicing records and supporting documents by an employee of BFS or a professional selected by BFS to verify the accuracy of such records (an "Audit") upon i) an Event of Default; ii) a breach of the MPSA by Seller; iii) in order to protect BFS security interest hereunder; or iv) a request of Seller to modify any terms or conditions of the MPSA.  BFS shall be permitted to conduct an Audit upon 24 hours advance notice to Seller.  Seller shall be responsible for all Audit Expenses.

*Page 5 of 7*

Seller Initials
Seller Initials
BFS Initials



7.5     All Accounts sold to and purchased by BFS are with recourse to Seller and at Seller's sole credit risk.  BFS shall have the right to require any Advances on any Accounts be Chargeback at any time, either before or after maturity, for any reason, including but not limited to recourse for an Account or in connection with the termination of the MPSA.  In the event of a Chargeback Account:: (i) Seller agrees to pay BFS the full amount thereof, and failing to do so, Seller shall be responsible for all damages, including all expenses incurred by BFS in attempting to collect or enforce payment of such Accounts; and (ii) in addition to BFS' right to receive its other fees set forth in the MPSA, BFS shall be entitled to assess a Chargeback Fee.

7.6     Seller agrees that it may not grant any allowance, credit or adjustment to an Account Debtor, or accept any return of merchandise, without express prior written consent of BFS.  BFS may, at its option, settle and/or compromise any Dispute without any liability to Seller so long as the compromise is done in good faith.  BFS, as the sole and absolute owner of the Accounts, shall have the sole and exclusive power and authority to collect each such Account, through legal action or otherwise, and exercise, to the maximum extent permitted by applicable law, any other right now existing or hereafter arising with respect to any of such Accounts.  Any settlement made by BFS shall not relieve Seller of any of its obligations under the MPSA and no Chargeback shall be deemed a reassignment of BFS' interest in the Accounts.

7.7     BFS shall have the right to set a funding limit for each Account Debtor (the "Funding Limit"), which Advances to each Account Debtor shall not exceed the Funding Limit.  Seller acknowledges that BFS is not a credit agency and that its credit decisions are based on information received from third-party sources.  Accordingly, BFS reserves in its sole and exclusive discretion the right to set and modify the Account Debtor Funding Limits at any time and from time to time.

7.8     Any Account over ninety (90) days old on which Account Seller has received an Advance shall be charged an Over 90 Day Fee, in addition to any other fees charged to such Account.  BFS, as the sole and absolute owner of the Accounts, shall have the sole and exclusive power and authority to collect each such Account, through legal action or otherwise, and exercise, to the maximum extent permitted by applicable law, any other right now existing or hereafter arising with respect to any of such Accounts.  Any settlement made by BFS shall not relieve Seller of any of its obligations under the MPSA and no Over 90 Day Fee shall be deemed a reassignment of BFS' interest in the Accounts.

8.     **GOVERNING LAW AND ATTORNEYS FEES**

8.1     The MPSA shall be deemed executed in the Chosen Forum and in all respects shall be governed by and construed in accordance with the domestic laws of the Chosen Forum, without regard to any choice of law or conflict of law provisions or rules (whether of the Chosen Forum or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the Chosen Forum.  Seller consents to the jurisdiction of any state or federal court sitting in the Chosen Forum in any action or proceeding the subject matter of which arises out of or relates, directly or indirectly, to the MPSA and each of Seller and BFS agree that all claims in respect to any action or proceeding shall be heard and determined in the Chosen Forum.  Seller further agrees to waive any right it may have to seek a change of venue based on inconvenience of the Chosen Forum or otherwise.

8.2     **BFS AND SELLER AND ANY OBLIGOR HEREUNDER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THAT ANY PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, ARISING OUT OF OR RELATED HERETO WHETHER, UNDER OR IN CONNECTION WITH THE MPSA OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, INCLUDING ANY COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.**  To the extent any law in the Chosen Forum would refuse enforcement of this waiver of jury trial provision, then, in such event, and only in such event, the Parties agree that BFS may elect to apply that the law of the state, if different from the Chosen Forum, in which the Seller is either organized or is physically located in order to make this provision enforceable.  If there is no difference between such other state's law and the Chosen Forum, then BFS shall exclusively be entitled to require that any controversy or claim arising out of or relating to the MPSA, or any breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court in the Chosen Forum.  Notwithstanding the foregoing, BFS shall be entitled to institute suit in order to obtain provisional relief in the form of prejudgment remedies, including, replevin, garnishment, attachment or the like without being held to have waived its right to compel arbitration on all remaining issues and in such event any claim that Seller may wish to assert shall be subject to arbitration.

9.     **INDEMNIFICATION**

9.1     At no time shall BFS owe any duty or obligation to any Account Debtor in connection with the Goods or services sold or Accounts Purchased.  Seller agrees to indemnify BFS against any liability, loss or expense caused by, or arising out of, any costs or expenses and any liability that may arise due to an action or other proceeding brought by an Account Debtor or third party against BFS the collection of any Account, the rejection or revocation of merchandise or disputes with respect to any services of every kind and nature by an Account Debtor.

9.2     Seller will indemnify and hold harmless BFS and its officers, directors, principals, partners, members, employees, agents, representatives and affiliates (each being an "Indemnified Party") from and against any and all losses, claims, actions, damages and liabilities, joint or several, to which such Indemnified Party may become subject under any applicable federal or state law, made by any third party or otherwise, relating to or in connection with the MPSA and the performance by such Indemnified Party under the MPSA, and Seller will reimburse any Indemnified Party for all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) as they are incurred in connection with the investigation of, preparation for or defense of any pending or threatening claim, or

EXHIBIT 2

EdFT81

Seller Initials
Seller Initials
BFS Initials

Bibby_Interworks_000012

**BIBBY**
FINANCIAL SERVICES

any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto.   The provisions of this Section 9.2 shall survive the termination of the MPSA.

10.   **GENERAL PROVISIONS**

     10.1.   <u>Assignment</u>.   This MPSA shall inure to the benefit of and is binding upon the Parties, together with their executors, administrators, successors, and assigns. Seller hereby gives BFS the right at any time to assign and delegate all of its rights and duties under the MPSA to any entity affiliated with BFS or any entity which has a common owner with BFS.  Seller may neither assign any of its rights nor delegate any of its duties under the MPSA to any party without the express prior written consent of BFS, which consent shall be in BFS' sole and exclusive discretion.

     10.2   <u>Entire Agreement/Amendments/Waivers</u>.     The MPSA contains the entire understanding of the Parties hereto and no amendment, modification or waiver, oral or otherwise, with respect to any provision will in any event be effective unless the same is in writing and signed by an officer of BFS.   Such amendment, modification or waiver must have an original signature of an officer of BFS, and no email correspondence shall be considered a writing for purposes of such amendment, modification or waiver.   No failure or delay on BFS' part in exercising any right, power or remedy granted to BFS hereunder will constitute or operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right set forth herein.

     10.3   <u>Breach of BFS</u>.   Seller's sole remedy for any breach alleged to have been committed by BFS of any obligation or duty owed under the MPSA, any other agreement between Seller and BFS or any duty or obligation arising out of or related to the MPSA shall be limited to the Available Funds, which Available Funds shall be the amount five (5) days after the time notice in writing of such breach is first given to BFS.  Under no circumstances shall BFS be liable for any incidental, special or consequential damages, including, but not limited to, loss of goodwill, loss of profit, or any other losses associated therewith, whether BFS did or did not have any reason to know of a loss that may result from any general or particular requirement of Seller.

     10.4.   <u>Relationship of Parties</u>.    Seller acknowledges that the relationship under the MPSA is principally that of seller and purchaser and that there is not now, and Seller will at no time seek or attempt to establish, any fiduciary or confidential relationship between BFS and Seller. Seller waives any right to assert, now or in the future, the existence or creation of any fiduciary or confidential relationship between BFS and Seller in any action or proceeding, whether by way of claim, counterclaim, cross claim or otherwise.

     10.5   `Notices.  Any notice or other communication by either Party to the other in connection with an Event of Default, breach of the MPSA, termination of the MPSA or any written notice as provided for herein shall be in writing and shall be sent to the address set forth in Paragraph A of the MPSA and shall given and be deemed to have been duly given, (i) three Business Days following deposit in the United States mail, with proper postage prepaid; (ii) upon delivery if delivered by hand to the Party to be notified;  or (iii) the following day if sent by a nationally recognized overnight delivery service. The address for notices may be changed by written notice delivered as set forth herein.  No email correspondence shall be considered a written notice for purposes of this Section 10.5.

     10.6   <u>Additional Instruments</u>.  Each of the Parties shall from time to time, at the request of others, execute, acknowledge and deliver to the other Party any and all further instruments that may be reasonably required to give full effect and force to the provisions of the MPSA.

     10.7   <u>Originals</u>.  The MPSA may be executed in any number of counterparts, each of which so executed shall be deemed an original and constitute one and the same agreement.  Facsimile copies with signatures shall be given the same legal effect as an original.

     10.8   <u>Severability</u>.  In case any one or more of the provisions contained in the MPSA shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and the MPSA shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

     10.9.   <u>Interpretation.</u>  In the event an ambiguity or question of intent or interpretation arises, the MPSA shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of the MPSA.

     10.10   <u>No Third Parties Benefited</u>.  The MPSA is made and entered into for the sole benefit of the Parties hereto, their permitted successors and assigns, and no other person or persons shall have any right or action under the MPSA.

     10.11   <u>Construction</u>. The Parties have read this MSPA, understand its contents, and represent that each has full and complete authority to sign this MPSA and that the execution, delivery and performance hereunder has been duly authorized by each Party.  Each of the Parties hereto has had an opportunity to consult with its respective legal counsel prior to executing this MPSA.  In the event an ambiguity or question of intent or interpretation arises, this MPSA shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this MPSA.

     10.12   <u>Number and Gender</u>.  Whenever the singular number is used in this MPSA and when required by the context, the same shall include the plural.

Seller Initials
Seller Initials
BFS Initials

EdFT81   EXHIBIT 2



## ANNEX A
## STANDARD PROVISIONS DEFINITIONS

All capitalized terms in the MPSA shall have the meanings ascribed to such term as it is defined or identified in the MPSA in either this Annex A or Paragraph C styled "Terms Definitions" or, if not so defined or identified in the MPSA, as such term may be defined by the Uniform Commercial Code as adopted by the Chosen Forum (the "UCC"). The following terms used herein shall have the following meanings:

"**Accounts Purchased**" shall mean all Accounts that are offered for sale to BFS regardless of whether an Advance is made against such Account.

"**Advance**" shall mean the amount BFS may pay Seller upon delivery of Accounts offered for sale based upon the applicable Advance Rate.

"**Affiliate**" shall mean a Person that owns or controls, directly or indirectly, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's directors, officers, members or managers.

"**Aggregate Net Face Value**" shall mean the face amount of all Accounts identified on an Assignment Schedule less any allowances, discounts or deductions available to an Account Debtor or any other deduction that Seller may make available.

"**Assignment Schedule**" shall mean the form of cover page that shall be used by Seller to offer BFS Accounts for sale.

"**Available Funds**" shall mean the Accounts Purchased have been collected in good funds after the expiration of the Collection Float Days minus (i) the Advance; (ii) all returns, credits, allowances and discounts calculated upon shortest or longest selling terms, at BFS' option, on any alternative terms of sale offered by Seller to Account Debtors; (iii) any Chargedback Account; (iv) any and all expenses arising in connection with the MPSA; (v) any and all fees; (vi) all other costs or expenses incurred by BFS; and (vii) BFS' right to use such Available Funds to secure any Obligation.

"**Avoidance Claim**" shall mean any claim that any payment received by BFS is avoidable under the Bankruptcy Code or any other debtor relief statute.

"**Calendar Quarter**" shall be defined as: Quarter One - January, February, March; Quarter Two - April, May, June; Quarter Three - July, August, September; Quarter Four - October, November and December.

"**Chargeback**" shall mean an Account Purchased that is repurchased by Seller under the terms and conditions herein, which repurchase shall be an Obligation of Seller.

"**Chargeback Fee**" shall mean a fee in the amount of two percent (2%) for each Account Purchased that Seller, after being requested to repurchase, fails to repurchase.

"**Collection Float Days**" shall mean an additional three (3) business days after BFS' receipt of an Account Debtor's payment.

"**Dispute**" means any alleged defense, counterclaim, offset, dispute or other claim asserted by an Account Debtor regarding any Account Purchased which relates to the sale of goods, rendition of services or any other transaction or occurrence, whether or not bona fide.

"**Effective Date**" shall mean the date which is the later of the date (i) Seller receives its first Advance under the MPSA; or (ii) executes this MPSA.

"**Eligible Accounts**" shall mean all Accounts which are eligible for Advance, which Eligible Accounts may exclude i) any invoices over ninety (90) days old; ii) any invoices that are in Dispute; iii) any invoices on which an Advance will exceed the assigned Account Debtor credit limit established by BFS; iv) any invoices for which incomplete back up documentation has been submitted; v) any invoice billed to an Account Debtor of which fifty percent (50%) of such Account Debtor's overall account is more than 90 days outstanding; vi) any invoices owed by an Account Debtor that is the subject of an insolvency proceeding; or vii) any invoice which does not meet the terms and conditions of the MPSA.

"**Event of Default**" shall mean those events described in Section 5 of these Standard Provisions.

"**Field Review or Audit Expenses**" shall mean the expenses associated with an Audit, including but not limited to Seven Hundred Fifty Dollars ($750.00) per day and any related travel expenses.

"**Guarantor**" shall mean any person or entity guarantying the Obligations of Seller under the MPSA.

*Page 1 of 3*

Seller Initials
Seller Initials 
BFS Initials

**EXHIBIT 2**
EdF181 Annex A

Bibby_Interworks_000014

36



"**Insolvent**" shall mean Seller is generally not able to pay its debt obligations as they become due.

"**LIBOR Rate**" shall mean as of any date of determination, the per annum rate of interest (rounded upward, if necessary, to the nearest 1/8th of 1%), determined by BFS as of the first business day of each calendar month in which such determination is made, equal to (i) the British Bankers Association London Inter-Bank Offer Rate ("BBA LIBOR") for a one month term, as published by Reuters (or other commercial available source as designed by BFS); or (ii) if BBA LIBOR is not available for any reason, the interest rate at which Dollar deposits in the approximate amount of the LIBOR Loans would be offered by Bank of America's London branch to major banks in the London interbank Eurodollar market for such term.  If the Board of Governors imposes a Reserve Percentage with respect to LIBOR deposits, then LIBOR shall be the foregoing rate, divided by 1 minus the Reserve Percentage. However, for the purposes of this agreement Libor Rate shall be a minimum of 0.375%.

"**Liquidation Administration Fee**" shall mean an additional five percent (5%) of the face value of each unpaid Account during the Liquidation Period.

"**Liquidation Period**" shall mean a period beginning on the earliest date of (i) the commencement by or against Seller by the filing of any voluntary or involuntary petition under the United States Bankruptcy Code; (ii) the general assignment by Seller of its assets in order to commence a proceeding for the benefit of its creditors; (iii) the appointment of or taking possession by a receiver, liquidator, assignee, custodian or similar official of all or a substantial part of Seller's assets; or (iv) the cessation of business of Seller and ending on the date on which BFS has actually received all fees, costs, expenses and Obligations owing.

"**Maximum Sale Terms**" shall mean Seller's terms of sale may not authorize a due date for payment of the goods or services sold beyond sixty (60) days from the date of the invoice.

"**Minimum Sales Shortfall**" shall mean Seller's failure in any given Month to meet its Minimum Sales.

"**Minimum Sales Shortfall Fee**" shall mean the fee incurred by Seller in the event of a Minimum Sales Shortfall, which fee shall be calculated as (Minimum Sales minus Actual Sales) x Purchase Fees, *provided, however*, that for the purposes of calculating the Minimum Sales Shortfall, Purchase Fees shall not include any Funding Fees.

"**Misdirected Payment Fee**" shall mean the greater of (i) fifteen percent (15%) of the amount of any payment; or (ii) One Thousand Dollars ($1,000), which Misdirected Payment Fee shall be assessed in the event an Account Purchased has been received by Seller and not delivered in kind to BFS on the next business day following the date of receipt by Seller, or thirty percent (30%) of the amount of any such payment which has been received by Seller as a result of any action taken by Seller to cause such payment to be made to Seller in order to compensate BFS for the reasonably likely additional administrative expenses caused by this conduct.

"**Missing Payment Notation Fee**" shall mean fifteen percent (15%) of the amount due on an Account Purchased at the time of purchase.

"**Net Funds Employed**" shall mean all Advances plus all Purchase Fees.

"**Obligation**" shall mean and includes all Advances, fees, debts, liabilities and obligations due to BFS, including but not limited to liability for breach of any warranty, representation or covenant and duty, of every kind and description that Seller owes to BFS under the MPSA or otherwise (whether or not evidenced by a writing and whether or not for the payment of money), direct or indirect, absolute or contingent and including those that BFS reasonably anticipates are likely to occur or that may adversely effect BFS' ability to collect Accounts Purchased in the future.

"**Operational Fees**" shall mean (a) any and all search fees and filing fees that may be required by BFS in connection with its due diligence; (b) applications for credit insurance or due diligence that may be required to ascertain the creditworthiness of Seller or Sellers Account Debtors; (c) wire transfer fees or other financial institution fees; (d) any and all expenses in connection with Field Review or Audit Expenses; (v) all other costs or expenses incurred by BFS, including but not limited to, all costs and expenses relating to a notice of lien, audit, lien and title examinations, or expenses incurred in protecting and preserving Accounts, and professional fees, including accountant and attorney's fees, related to the foregoing.

"**Over 90 Day Fee**" shall mean a fee in the amount of one percent (1%) for each Account Purchased for which Seller has received an Advance, which Account represents an any invoice over ninety (90) days old and which fee shall continue at a rate of one percent (1%) for each fifteen (15) day period or any portion thereof for as long as such Account Purchased remains over ninety (90) days old, which Over 90 Day Fee shall be an Obligation of Seller.

"**Parent**" shall mean a company that owns enough voting stock in another Person to control management and operations of such Person.

Seller Initials
Seller Initials
BFS Initials

EXHIBIT 2
EdFT81 Annex A

Bibby_Interworks_000015



"**Person**" shall mean any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, estate, entity or government agency.

"**Post-Judgment Rate**" shall mean eighteen percent (18%).

"**Prime Rate**" shall mean the "prime rate" as published in *The Wall Street Journal* (Eastern Edition) in its "Money Rates" column or, if no longer published as such, the rate of interest announced from time to time by any other bank selected by BFS, as its prime rate, base rate, or reference rate. If *The Wall Street Journal* publishes more than one "prime rate" under its "Money Rates" column, then the Prime Rate shall be the highest of such rates.  Any adjustment in the Prime Rate, whether downward or upward, will become effective on the first day of the month following the month in which the Prime Rate is reduced or increased.

"**Purchase Price**" shall mean the Aggregate Net Face Value of the Accounts.

"**Subsidiary**" shall mean any Person, joint venture, or any other entity of which more than fifty percent (50%) of the voting stock or other equity interest is owned or controlled, directly or indirectly, by the Person or one or more Affiliates of the Person.

"**Term**" shall mean the initial one-year anniversary from the Effective Date of the MPSA and any renewal hereunder.

"**Termination Fee**" shall mean the higher of (i) five percent (5%) of the Total Maximum Facility or (ii) fifty percent (50%) of the average monthly Purchase Fees for the three (3) month periods prior to the date of such termination multiplied by the remaining month periods in the Term or any portion thereof.

Seller Initials
Seller Initials
BFS Initials

EXHIBIT 2
*EdFT81 Annex A*

38

Bibby_Interworks_000016

**PERSONAL GUARANTY**



## PERSONAL GUARANTY

THIS GUARANTY (this "Guaranty") is made as of August 14, 2012 by and between Eric Lu, an individual residing at 944 S Pine St, San Gabriel, CA 91776 (hereinafter alternatively referred to as the "Guarantor" or the "undersigned") to and for the benefit of Bibby Financial Services (CA), Inc., a California Corporation ("BFS"). All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such capitalized terms in the Master Purchase and Sale Agreement (as hereinafter defined).

## RECITALS

1.      WHEREAS, Interworks Unlimited Inc. a Corporation organized under the laws of the State of California (hereinafter referred to as "Debtor") is a business to which the undersigned is an owner, officer, director and/or stockholder.

2.      WHEREAS, Interworks Unlimited Inc. and BFS are parties to that certain Master Purchase and Sale Agreement dated of even date herewith (the Master Purchase and Sale Agreement, together with any and all ancillary documents executed in connection therewith, are collectively referred to herein as the "Master Purchase and Sale Agreement").

3.      WHEREAS, it is in the direct interest and advantage of the undersigned to assist the Debtor to procure funds, credit or other assistance from BFS in order to further its business and sales, and the undersigned hereby acknowledges that the consummation by BFS of the transactions contemplated by the Master Purchase and Sale Agreement will provide substantial direct and indirect benefits to the undersigned as Guarantor.

4.      WHEREAS, to induce BFS to purchase or otherwise acquire from the Debtor accounts receivable or other obligations or chooses-in-action (hereinafter collectively referred to as "Accounts"), or to advance moneys or extend credit to the Debtor, or to factor the sales or finance the Accounts of the Debtor (either according to any present or future agreements or according to any changes in any such agreements or in any other terms and arrangements and changes thereof) or to otherwise directly or indirectly advance money or credit to the Debtor, or to otherwise assist the Debtor in financing its business or sales (without obligating BFS to do any of the foregoing), the undersigned, desires to execute this Guaranty.

5.      WHEREAS, It is a condition to BFS' obligation to consummate the transactions contemplated by the Master Purchase and Sale Agreement that Guarantor execute and deliver this Guaranty.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce BFS to consummate the transactions contemplated by the Master Purchase and Sale Agreement, Guarantor does hereby warrant, represent and covenant unto BFS as follows:

1.      Recitals.    Each of the recitals is incorporated herein as paragraph 1. The recitals set forth herein constitute an integral part of this Guaranty, evidencing the intent of the parties in executing this Guaranty and describing the circumstances surrounding its execution. Accordingly, said recitals are, by express reference, made a part hereof and incorporated herein, and this Guaranty shall be construed thereof.

2.      Guaranty.    (a)    Guarantor, does hereby absolutely and unconditionally, irrespective of validity or enforceability of the Master Purchase and Sale Agreement and whether or not due or to become due before or after any bankruptcy or insolvency proceeding involving Debtor or would have become due but for the Debtor's insolvency proceeding, guarantee to BFS and its assigns prompt payment in full at maturity and all times thereafter (waiving notice of non-payment) of any and all indebtedness, obligations and liabilities of every kind or nature (both principal and interest) now and at any time hereafter owing to BFS by the Debtor and the prompt, full and faithful performance and discharge by the Debtor of all the terms, conditions, agreements, representations, warranties, guaranties and provisions on the part of the Debtor contained in the Master Purchase and Sale Agreement or in any modification or addenda thereto or substitution thereof, or contained in any schedule or other instrument heretofore given by or on behalf of said Debtor in connection with the sale or assignment of any such Account to BFS, or contained in any other agreements, undertakings or obligations of the Debtor with or to BFS, of any kind or nature (the "Guaranteed Obligations"), and the undersigned also hereby agrees on demand to reimburse BFS and its assigns for all expenses, collection charges, court costs and attorney's fees incurred in endeavoring to collect or enforce any of the foregoing against the Debtor and/or undersigned or any other person or concern liable thereon; for all of which, with interest at the highest lawful contract rate after due until paid, the undersigned hereby agrees to be directly, unconditionally and primarily liable jointly and severally with the Debtor and any other guarantor and agrees that the same may be recovered in the same or separate actions brought to recover the principal indebtedness.

(b)      To secure payment under this Guaranty, Guarantor does hereby grant to BFS a security interest in and to any and all assets of such Guarantor. Guarantor hereby authorizes BFS, at any time and from time to time, to file any such financing statements, continuation statements and other agreements, instruments and documents, and do such other acts and

Guarantor Initials

BFS Initials

39

Bibby_Interworks_000017

Exhibit 2



things as BFS may reasonably deem necessary or customary or desirable in order to establish and maintain a valid, attached and perfected security interest in the assets of Guarantor. Guarantor hereby agrees to execute and deliver to BFS any of the foregoing upon the request of BFS in order that BFS may establish and maintain a valid, attached and perfected security interest in the assets of Guarantor.

3.    Guaranty Absolute.  This Guaranty shall in all respects be a continuing, absolute and unconditional guaranty of payment and not of collection, shall not be subject to any counterclaim, setoff, deduction or defense based upon any claim that Guarantor may have against any person, and shall remain in full force and effect until all obligations under the Master Purchase and Sale Agreement shall have been fully paid.  This Guaranty and Guarantor obligations hereunder are irrevocable and, in the event of Guarantor death, shall be binding upon such Guarantor's estate pursuant to paragraph 10 herein.  The liability of Guarantor hereunder shall in no way be affected or impaired by any of the following, any or all of which within the control of BFS may be done or omitted by BFS in its sole discretion without notice to anyone and irrespective of whether the obligations under the Master Purchase and Sale Agreement shall be increased or decreased thereby:

(a)    any extension, amendment, modification or renewal of, or indulgence with respect to, or substitution for, the obligations under the Master Purchase and Sale Agreement, including the time, place or terms of performance of any obligation under the Master Purchase and Sale Agreement, or any agreement relating thereto at any time;

(b)    any failure or omission to enforce any right, power or remedy with respect to the obligations under the Master Purchase and Sale Agreement or any agreement relating thereto, or any collateral securing the obligations under the Master Purchase and Sale Agreement;

(c)    any waiver of any right, power or remedy or of any default with respect to the obligations under the Master Purchase and Sale Agreement or any agreement relating thereto or with respect to any collateral securing the obligations under the Master Purchase and Sale Agreement;

(d)    any non-perfection, exchange, release, surrender, sale, compromise, settlement, waiver, subordination or modification, with or without consideration, of any collateral securing any part of the obligations of Debtor under the Master Purchase and Sale Agreement, any other guaranties with respect to any part of the obligations of Debtor under the Master Purchase and Sale Agreement, or any other obligation of any person or entity with respect to any part of the obligations of Debtor under the Master Purchase and Sale Agreement;

(e)    the enforceability or validity of any part of the obligations of  under the Master Purchase and Sale Agreement or the genuineness, enforceability or validity of any agreement relating thereto or with respect to any collateral securing any part of the obligations of Debtor under the Master Purchase and Sale Agreement;

(f)    the application of payments received from any source to the payment of indebtedness other than any part of the obligations of Debtor under the Master Purchase and Sale Agreement or amounts which are not covered by this Guaranty even though BFS might lawfully have elected to apply such payments to all or any part of the obligations of Debtor under the Master Purchase and Sale Agreement or to amounts which are not covered by this Guaranty;

(g)    any change of ownership of Debtor or the insolvency, bankruptcy or any other change in the legal status of Debtor or the death, disability or lack of corporate power, as the case may be, of Debtor, Guarantor or any other Guarantors of all or any part of the obligations of Debtor under the Master Purchase and Sale Agreement;

(h)    any change in or the imposition of any law, decree, regulation or other governmental act which does or might impair, delay or in any way affect the validity, enforceability or the payment when due of the obligations of Debtor or any of BFS' other rights under the Master Purchase and Sale Agreement;

(i)    the failure of Debtor or Guarantor to maintain in full force, validity or effect or to obtain or renew when required all governmental and other approvals, licenses or consents required in connection with the obligations of Debtor under the Master Purchase and Sale Agreement or Guarantor under this Guaranty, or to take any other action required in connection with the performance of all obligations pursuant to the Master Purchase and Sale Agreement or this Guaranty;

(j)    the existence of any claim, defense, setoff or other rights which Guarantor may have at any time against Debtor in connection herewith or any unrelated transaction;

(k)    BFS retaining or obtaining the primary or secondary liability of any party or parties, in addition to Guarantor, with respect to the obligations of Debtor under the Master Purchase and Sale Agreement, or the release or compromise of any such liability, or the institution of bankruptcy, receivership, insolvency, reorganization or liquidation proceedings against any such person, or the release or discharge of Debtor or of any other person, whether primarily or secondarily liable for and obligated with respect to the Guaranteed Obligations, or the institution of bankruptcy, receivership, insolvency, reorganization, dissolution or liquidation proceedings by or against any such guarantor or person, or the entry of any restraining or other order in any such proceeding;

(l)    any neglect, delay, omission, failure or refusal to take or prosecute any action for the collection of all or any part of Debtor's obligations under the Master Purchase and Sale Agreement or of Guarantor under this Guaranty or to take or prosecute any action in connection with the Master Purchase and Sale Agreement;

(m)    any disposition of or with respect to any obligations or any security or collateral therefore, whether or not such disposition is commercially reasonable or accomplished in a commercially reasonable manner

(n)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, Debtor, Guarantor or others.

*Page 2 of 6*

Guarantor Initials

BFS Initials

EXHIBIT 2
Personal Guaranty

40

Bibby_Interworks_000018



4.  **Application of Payments.**  All payments received from Debtor, or on account of the obligations of Debtor under the Master Purchase and Sale Agreement from whatsoever source, shall be taken and applied by BFS toward the payment of such of the obligations of Debtor under the Master Purchase and Sale Agreement, and in such order of application as BFS may in its sole discretion from time to time elect, and this Guaranty shall apply to and secure any ultimate balance that shall remain owing to BFS under the Master Purchase and Sale Agreement.  BFS shall have the exclusive right to determine how, when and what application of payments and credits, if any, whether derived from Debtor or any other source shall be made on the obligations, and such determination shall be conclusive upon Debtor and Guarantor.  If any of the obligations are not paid when due, or upon any default under the Master Purchase and Sale Agreement, BFS may, at its sole discretion, proceed without notice directly against the Guarantor, without first proceeding against Debtor.

5.  **Waivers by Guarantor.**  Guarantor expressly waives:

   (a)  all promptness, diligence in collection, and all presentment for payment, demand, protest and/or notice, as to anyone and everyone, of protest, dishonor, default or non-payment;

   (b)  notice of the creation and existence of any and all of the debt of Debtor under the Master Purchase and Sale Agreement, and of any security therefore, and of the acceptance of this Guaranty, or of extensions of credit or indulgences hereunder or of any other matters or things whatsoever relating hereto;

   (c)  any requirement that BFS protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action with respect to any person, entity or property;

   (d)  any defense or circumstance (including, without limitation, disability, insolvency, lack of authority or power, insanity, death or dissolution) which might otherwise constitute a legal or equitable discharge of Guarantor liability under this Guaranty;

   (e)  any requirement, substantive or procedural, that (i) BFS first enforce any rights or remedies against Debtor or any other person or entity liable to BFS for all or any part of the obligations of Debtor under the Master Purchase and Sale Agreement, including, without limitation, that a judgment first be rendered against Debtor or any other person or entity, or that Debtor or any other person or entity should be joined in such cause, or (ii) BFS first enforce rights against any collateral, security, property liens or other rights or remedies of BFS, which shall ever have been given to secure all or any part of the obligations of Debtor under the Master Purchase and Sale Agreement or of Guarantor under this Guaranty (such waiver to be without prejudice to BFS' right, at its option, to proceed against Debtor or any other person or entity, whether by separate action or by joinder);

   (f)  any defense given to sureties or Guarantor at law or in equity; and

   (g)  any rights to extension, composition or otherwise under the Bankruptcy Code or any amendments thereto, or under any state or other federal statute.

6.  **Subrogation.**  Until the obligations of Debtor under the Master Purchase and Sale Agreement are paid in full, Guarantor shall not exercise any right of subrogation, reimbursement, indemnification or contribution with respect to payments made by Guarantor pursuant to this Guaranty.  Guarantor waives any benefit of the collateral, if any, which may from time to time secure the obligations of Debtor under the Master Purchase and Sale Agreement or any part thereof and authorize BFS to take any action or exercise any remedy with respect thereto which BFS in its sole discretion shall determine.

7.  **Bankruptcy.**  Should BFS repay any amount received in payment of the obligations of Debtor under the Master Purchase and Sale Agreement (whether received from Debtor, Guarantor pursuant hereto, or otherwise) by reason of (a) any judgment, decree or order of any court or administrative body; or (b) any settlement or compromise of any claim against BFS for any such amount, Guarantor shall remain liable to BFS for the amount so repaid to the same extent as if such amount had never originally been received by BFS, notwithstanding any termination hereof or the cancellation of the Master Purchase and Sale Agreement or other instrument evidencing any of the obligations of Debtor under the Master Purchase and Sale Agreement. Guarantor obligations hereunder shall not be limited if BFS is precluded for any reason from enforcing or exercising any right or remedy with respect to obligations of Debtor under the Master Purchase and Sale Agreement, and Guarantor shall pay to BFS, upon demand, the amount of such obligations that would otherwise have been due and payable had such rights and remedies been permitted to be exercised.  The Guarantor hereby irrevocably waives and releases the Debtor from all "claims" (as defined in Section 101 of the Bankruptcy Code) to which Guarantor is or would at any time be entitled by virtue of its Guaranteed Obligations under this Guaranty, including, without limitation, any right of subrogation (whether contractual, under the Bankruptcy Code or otherwise), reimbursement, contribution, exoneration or similar right against the Debtor.

8.  **Representations and Warranties.**  Guarantor represents and warrants to BFS that:

   (a)  such Guarantor has all requisite power, authority and capacity to enter into and perform all obligations under this Guaranty, and has no defense to any action, suit or proceeding that may be instituted under this Guaranty;

   (b)  this Guaranty constitutes the valid and legally binding obligation of such Guarantor, enforceable in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, moratorium, reorganization and other laws of general applicability relating to or affecting creditors' rights and equitable limitations on the availability of specific remedies;

Guarantor Initials

BFS Initials

41

EXHIBIT 2
Personal Guaranty

Bibby_Interworks_000019



(c)     there are currently no proceedings or investigations pending or, to such Guarantor's knowledge, threatened before any court which, in any one case or in the aggregate, if determined adversely to such Guarantor's interests, would have a material adverse effect on Guarantor's properties or condition (financial or otherwise), present or prospective;

(d)     no other agreement or special condition exists between such Guarantor and BFS regarding the liability of Guarantor under this Guaranty;

(e)     there is no statute, regulation, rule, order or judgment, and no provision of any mortgage, contract or agreement binding on such Guarantor or affecting Guarantor's property which would prohibit, conflict with or in any way prevent the execution, delivery or carrying out of the terms of this Guaranty;

(f)     as of the date hereof, the Guarantor is an owner, officer, director and/or stockholder, directly or indirectly, of Debtor; and

(g)     as of the date hereof, and after giving effect to this Guaranty and the obligations evidenced hereby, (i) such Guarantor is and will be solvent; (ii) the fair salable value of such Guarantor's assets exceed and will continue to exceed each of Guarantor's liabilities (both fixed and contingent); and (iii) such Guarantor is and will continue to be able to pay each of Guarantor's debts as they mature.

9.     <u>Events of Default</u>. (a)     Any of the following shall constitute an event of default hereunder:

(1)     default shall be made in the due observance or performance of any term, covenant or agreement contained herein;

(2)     any representation or warranty made by Guarantor herein shall prove to have been misleading in any material respect when made; or

(3)     there shall occur an Event of Default giving rise to remedies in favor of BFS under the Master Purchase and Sale Agreement.

(b)     Upon the happening of any of the foregoing events of default under this Guaranty, all obligations of Debtor under the Master Purchase and Sale Agreement then existing shall, at the option of BFS, immediately become due and payable from Guarantor, Guarantor shall, without notice or demand, promptly pay the amount due thereon to BFS, in lawful money of the United States, at BFS address set forth herein, and BFS may avail itself of any remedies upon default provided in any documents securing Guarantor obligations hereunder or allowed by applicable law.  Whenever Guarantor pays any sum which is or may become due under this Guaranty, written notice must be delivered to BFS contemporaneously with such payment.  In the absence of such notice to BFS by Guarantor in compliance with the provisions hereof, any sum received by BFS on account of amounts due under the Master Purchase and Sale Agreement shall be conclusively deemed paid by Debtor.

10.     <u>Death of Guarantor</u>.  In the event of the death of the Guarantor, the obligations of the deceased Guarantor under this Guaranty shall continue as an obligation against such deceased Guarantor's estate as to any amount due under the Master Purchase and Sale Agreement that is outstanding on the date of Guarantor's death and any renewals or extensions thereof.  The terms and conditions of this Guaranty, including, without limitation, the consents and waivers set forth herein, shall remain in effect with respect to any amount due under the Master Purchase and Sale Agreement described in the preceding sentence in the same manner as if Guarantor had not died.

11.     <u>Covenants</u>.  Guarantor shall:

(a) promptly inform BFS of (i) any litigation or governmental investigation against such Guarantor or affecting any security for all or any part of the Master Purchase and Sale Agreement or this Guaranty which, if determined adversely, might have a material adverse effect upon the financial condition of Guarantor or upon such security or might cause a default under the Master Purchase and Sale Agreement; (ii) any claim or controversy which might become the subject of such litigation or governmental investigation; and (iii) any material adverse change in the financial condition such Guarantor; and

(b)     so long as the Guaranteed Obligations under this Guaranty continue, Guarantor shall not (i) transfer or pledge any material portion of assets for less than full and adequate consideration, or (ii) permit the sale of all or substantially all the assets of Debtor or any of its successors or assigns or the direct or indirect acquisition by any person (or group of persons acting in concert) of ownership or control of a controlling interest in the voting securities (or the power to vote the same) of Debtor or any of its successors or assigns.

12.     <u>Assignment</u>.  Guarantor hereby gives BFS the right at any time to assign this Guaranty.  Guarantor may neither assign any rights nor delegate any duties under this Guaranty without the express prior written consent of BFS, which consent shall be in BFS' sole and exclusive discretion.

13.     <u>Notices</u>.  All notices, requests, demands, claims and other communications hereunder shall be in writing to the address of the party set forth herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) if personally delivered, when so delivered, (ii) if mailed, five (5) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below, (iii) if given by telex or telecopier, once such notice or other communication is transmitted to the telex or telecopier number specified below and the

Guarantor Initials

BFS Initials

EXHIBIT 2
*Personal Guaranty*

42

Bibby_Interworks_000020



appropriate answer back or telephonic confirmation is received; or (iv) if sent through an overnight delivery service under circumstances where such service guarantees next day delivery, the day following being so sent:

BFS:                          Nick Hart, Managing Director
                              3027 Townsgate Rd, Ste #140
                              Westlake Village, CA  91361
                              805.446.6112  Telefacsimile


with a copy to:               Laurie A. Martin Montplaisir, Esq.
                              Schuyler, Roche & Crisham, P.C.
                              130 E. Randolph Street, Suite #3800
                              Chicago, Illinois 60601
                              312.565.2400    Telephone
                              312.565.8300    Telefacsimile

GUARANTOR:                    Eric Lu
                              944 S Pine St
                              San Gabriel, CA  91776
                              562-692-8433

Guarantor and BFS may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other person notice in the manner herein set forth.

   14.   Severability.  Wherever possible each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under said law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

   15.   No Waiver; Remedies.  No failure or delay on the part of BFS in the exercise of any right or remedy shall preclude other or further exercise thereof, or the exercise of any other right or remedy; nor shall any modification or waiver of any of the provisions of this Guaranty be binding upon BFS except as expressly set forth in a writing duly signed and delivered on behalf of BFS.  No action of BFS permitted hereunder shall in any way affect or impair the rights of BFS and the obligation of Guarantor under this Guaranty. The remedies herein provided are cumulative and not exclusive of any rights of set-off or other remedies provided by law.

   16.   Amendments.  No provision of this Guaranty may be amended, supplemented or modified, or any of the terms and provisions hereof waived, except by a written instrument executed by BFS and Guarantor.  Verbal modifications shall not be effective in any event unless the same is in writing and signed by each Party, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given.

   17.   Costs and Expenses.  Guarantor shall pay all costs and expenses including, without limitation, all court costs and reasonable and customary attorneys' and paralegals' fees and expenses paid or incurred by BFS in connection with (a) the collection of all or any part of the Guaranteed Obligations; (b) the collection of all or any part of the obligations of Guarantor hereunder; (c) the enforcement of any term or provision of this Guaranty; or (d) any action by or against Guarantor in connection with this Guaranty. This covenant shall survive the payment of the Master Purchase and Sale Agreement.  Guarantor shall pay interest on all amounts owed by under this Guaranty from date of demand therefore until such obligations are paid in full, at the per annum rate of the Prime Rate (as set forth by the Wall Street Journal on such demand date and each anniversary date thereof) plus ten percent (10%).   It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the contrary) that the amount recoverable is the amount billed to the prevailing party by its counsel and that such amount will be reasonable if based on the billing rates charged to the prevailing party by its counsel in similar matters.

   18.   Compliance with Applicable Usury Laws.   Notwithstanding any other provision of this Guaranty or of any instrument or agreement evidencing, governing or securing all or any part of the obligations of Debtor under the Master Purchase and Sale Agreement, Guarantor and BFS, by its acceptance hereof, agrees that Guarantor shall never be required or obligated to pay interest in excess of the maximum nonusurious interest rate as may be authorized by applicable law for the Master Purchase and Sale Agreement.  It is the intention of Guarantor and BFS to conform strictly to all such applicable laws which limit interest rates, and any of the aforesaid contracts for interest, if and to the extent payable by Guarantor, shall be held to be subject to reduction to the maximum nonusurious interest rate allowed under said law.

   19.   Governing Law.   This Guaranty shall be governed by the internal laws of California, without giving effect to the choice of law provisions thereof.  Each of BFS and Guarantor submit to the jurisdiction of any state or federal court sitting in the City of Westlake Village, County of Ventura, State of California in any action or proceeding arising out of or relating directly or indirectly to this Guaranty and agrees that all claims in respect of the action or proceeding may be heard and determined in any

EXHIBIT 2
Personal Guaranty

Guarantor Initials
BFS Initials

43

Bibby_Interworks_000021



such court. Guarantor further agrees to waive any right Guarantor may have to seek a change of venue based on inconvenience of the forum or otherwise.

20. <u>Waiver of Jury</u>. (A) EACH PARTY MUTUALLY AGREES THAT TRIAL BY JURY IS HEREBY WAIVED BY SUCH PARTY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANOTHER PARTY REGARDING ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTY, THE MASTER PUCHASE AGREEMENT, OR TRANSACTIONS RELATED THERETO, WHETHER FOR CONTRACT, TORT, OR OTHERWISE, AND EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA AND OF ANY FEDERAL COURT IN SUCH STATE FOR DETERMINATION OF ANY DISPUTE AS TO ANY SUCH MATTERS, AND THAT ANY SUCH LAWSUIT SHALL BE EXCLUSIVELY WITHIN THE COUNTY OF VENTURA, STATE OF CALIFORNIA.

(B) To the extent any law in the State of Califoria would refuse enforcement of this waiver of jury trial provision, then, in such event, the parties agree that BFS may elect to apply that the law of the state, if different from the California, in which the Debtor is either organized or is physically located in order to make this provision enforceable. If there is no difference between such other state's law and California, then BFS shall exclusively be entitled to require that any controvery or claim arising out of or relating to the Guaranty, or any breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court in the State of California. Notwithstanding the foregoing, BFS shall be entitled to institute suit in order to obtain provisional relief in the form of prejudgment remedies, including, replevin, garnishment, attachment or the like without being held to have waived its right to compel arbitration on all remaining issues and in such event any claim that Guarantor may wish to assert shall be subject to arbitration.

21. <u>Miscellaneous</u>. This Guaranty shall: (a) bind Guarantor and such Guarantor's heirs, personal representatives, executors, administrators, successors and assigns (except that neither Guarantor may not assign or delegate his duties and obligations under this Guaranty without BFS express prior written consent); and (b) inure to the benefit of BFS, its successors and assigns. The successors and assigns of Guarantor shall include, without limitation, a receiver, trustee or debtor-in-possession of or for Guarantor.

22. <u>Interpretation.</u> The parties have read this Guaranty, understand its contents, and represent that each have full and complete authority to sign this Agreement. Each of the parties hereto has had an opportunity to consult with their respective legal counsel prior to executing this Guaranty. In the event an ambiguity or question of intent or interpretation arises, the Guaranty shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of the Guaranty.

IN WITNESS OF AND INTENDING TO BE BOUND, the undersigned have executed this Guaranty this ___15___ day of
_____August_____ , 2012.

**Guarantor**

By: _____
Eric Lu, individually as Guarantor

I, the undersigned Notary Public, in and for the jurisdiction aforesaid, does certify that
__Eric Lu_____, who is personally known to me as the person who executed the foregoing Guaranty, personally appeared before me on the date set forth above and acknowledged the execution of same as his/her free act and deed.

STATE OF __California__        )
                               ) SS:
COUNTY OF __Los Angeles__     )

WITNESS my hand and official seal in the County and State last aforesaid this _15_ day of __August__ , 2012.

_____
Notary Public

__Neil Matsuzaki__
Typed, printed or stamped name of Notary Public
My Commission Expires: __Oct. 21, 2012__

NEIL MATSUZAKI
Commission # 1818944
Notary Public - California
Los Angeles County
My Comm. Expires Oct 21, 2012

Page 6 of 6

Guarantor Initials _____

BFS Initials _____

EXHIBIT 2
PAGE 112
44

Bibby_Interworks_000022

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

State of California

County of *Los Angeles*

On *8/15/2012* before me, *Neil Matsuzaki, Notary Public*,
     Date                              Here Insert Name and Title of the Officer

personally appeared *Eric H Lu*
                                    Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

**NEIL MATSUZAKI**
Commission # 1818944
Notary Public - California
Los Angeles County
My Comm. Expires Oct 21, 2012

Place Notary Seal Above

Signature *Neil Matsuzaki*
                                Signature of Notary Public

**——————— OPTIONAL ———————**

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: *Personal Guaranty*

Document Date: *8/15/2012*          Number of Pages: *6*

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
- ☐ Corporate Officer — Title(s): _____
- ☐ Individual
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____
- ☐ Corporate Officer — Title(s): _____
- ☐ Individual
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2010 National Notary Association • NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)         Item #5907

EXHIBIT 2

Bibby_Interworks_000023

# EXHIBIT 3

# UCC FINANCING STATEMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Corporation Service Company
800-858-5294

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703
USA

**DOCUMENT NUMBER:** 34166060002
**FILING NUMBER:** 12-7324175729
**FILING DATE:** 08/08/2012 17:01
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
THE ABOVE SPACE IS CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| | |
|---|---|
| **1a. ORGANIZATION'S NAME** INTERWORKS UNLIMITED INC. | |

OR

| **1b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **1c. MAILING ADDRESS** 2418 PECK RD | **CITY** CITY OF INDUSTRY | **STATE** CA | **POSTAL CODE** 90601 | **COUNTRY** USA |
|---|---|---|---|---|

| **1d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **1e. TYPE OF ORGANIZATION** Corporation | **1f. JURISDICTION OF ORGANIZATION** CA | **1g. ORGANIZATIONAL ID#, if any** 3039061 | ☐ NONE |
|---|---|---|---|---|---|

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| | |
|---|---|
| **2a. ORGANIZATION'S NAME** | |

OR

| **2b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|

| **2d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **2e. TYPE OF ORGANIZATION** | **2f. JURISDICTION OF ORGANIZATION** | **2g. ORGANIZATIONAL ID#, if any** | ☐ NONE |
|---|---|---|---|---|---|

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

| | |
|---|---|
| **3a. ORGANIZATION'S NAME** Bibby Financial Services (CA), Inc. | |

OR

| **3b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **3c. MAILING ADDRESS** 3027 Townsgate Rd, Ste #140 | **CITY** Westlake Village | **STATE** CA | **POSTAL CODE** 91361 | **COUNTRY** USA |
|---|---|---|---|---|

**4. This FINANCING STATEMENT covers the following collateral:**

All of Debtor's existing and later acquired assets, including but not limited to Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, General Intangibles, Inventory, Investment Property, Instruments, Letter of Credit Rights and all Supporting Obligations including all of Debtor's books and records evidencing and/or related to all Accounts, any Commercial Tort Claim that Debtor may come to have and that is subsequently specifically referenced by written amendment, as well as all of Debtor's software programs, stored data, aging schedules, customer lists, books, records, returned merchandise and all property of Debtor at any time coming into BFS' possession; and all lien rights associated with the Accounts, whether arising by operation of law or pursuant to contract or agreement, including but not limited to mechanic's lien rights; and all Proceeds thereof of each of the foregoing.

**5. ALT DESIGNATION:** ☐LESSEE/LESSOR ☐CONSIGNEE/CONSIGNOR ☐BAILEE/BAILOR ☐SELLER/BUYER ☐AG. LIEN ☐NON-UCC FILING

**☐6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable]**

**7. Check to REQUEST SEARCH REPORT(S) on Debtor(s)** [ADDITIONAL FEE] [optional] ☐All Debtors ☐Debtor 1 ☐Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**
INUN201 [68864438]

**FILING OFFICE COPY**

EXHIBIT 3

46

# UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS**

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Corporation Service Company<br>800-858-5294 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703
USA

**DOCUMENT NUMBER:** 60013170002
**FILING NUMBER:** 17-75735895
**FILING DATE:** 03/02/2017 12:16

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER<br>12-7324175729 | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:       **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record.      ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a and 7b and item 7c      ☐ ADD name: Complete item 7a or 7b, and item 7c      ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| **OR** | | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 7b. INDIVIDUAL'S SURNAME | | | |
| **OR** | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME<br>Bibby Financial Services (CA), Inc. | | | |
|---|---|---|---|---|
| **OR** | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
INUN201 [128112849]

FILING OFFICE COPY

EXHIBIT 3                                                                                        47

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company
800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
Springfield, IL 62703-4261
USA

**DOCUMENT NUMBER: 70294850002**
**FILING NUMBER: 18-76501496**
**FILING DATE: 05/23/2018 12:23**

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|
| 12-7324175729 | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:     **AND** Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record.    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | Bibby Financial Services, Inc. | | | |
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 515 Marin Street, Suite 420 | Thousand Oaks | CA | 91360 | USA |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | Bibby Financial Services (CA), Inc. | | | |
| OR | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. **OPTIONAL FILER REFERENCE DATA:**
INUN201 Debtor:INTERWORKS UNLIMITED INC. [147006908]

**FILING OFFICE COPY**

EXHIBIT 3        48

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Corporation Service Company<br>800-858-5294 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
Springfield, IL 62703-4261
USA

**DOCUMENT NUMBER: 71586470002**
**FILING NUMBER: 18-76589998**
**FILING DATE: 07/13/2018 12:15**

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
12-7324175729

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: Attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

**AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record.

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c  ☐ ADD name: Complete item 7a or 7b, and item 7c  ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | | |
|---|---|---|---|---|
| | 7a. ORGANIZATION'S NAME | | | |
| | 7b. INDIVIDUAL'S SURNAME | | | |
| OR | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME<br>Bibby Financial Services (CA), Inc. | | | |
|---|---|---|---|---|
| OR | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
Debtor:interworks unlimited inc. [149263380]

FILING OFFICE COPY

EXHIBIT 3

49

# EXHIBIT 4

 **CASHCAPITAL**  **Agreement for the Purchase and Sale of Future Receipts**

**Seller's Legal Name:** INTERWORKS UNLIMITED INC.     D/B/A: INTERWORKS UNLIMITED / AMAZING STUFF SHOP

**Form of Business Entity:** [ ] Corporation; [ ] Limited Liability Company; [ ] Partnership; [ ] Limited Partnership; [ ] Limited Liability Partnership; [ ] Sole Proprietorship; [ ]Other: _____

**Street Address:** 2418 PECK ROAD _____, City: WHITTIER _____, State: CA ___; Zip: 90601

**Mailing Address:** _____, City: _____, State: _____; Zip: _____

**Primary Contact Name:** _____ Title: _____

**Time In Business:** _____ Federal Tax ID Number: 26-2583718

**Purchase Price:** $ 750,000.00     **Purchased Amount:** $ 1,020,000.00     **Average Monthly Sales:** $ 857,000.00
**Specified Percentage:** 18 % **Origination Fee:** $ 15,000.00 (to be deducted from the Purchase Price)

**Initial Daily Amount:** $ 5,396.83 (Average Monthly Sales x Specified Percentage / Average Business Days in a Calendar Month)

**Account for the Deposit of All Future Receipts:** Bank: _____

**Account No:** _____

**Effective,** JANUARY 12 , 20 17 Seller, identified above, hereby sells, assigns and transfers to Cash Capital Group, LLC, located at 1013 Centre Road, Suite 403S Wilmington, DE 19805 ("Buyer"), without recourse, the Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts") until Seller has received the Purchased Amount. "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business. As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.

Both parties agree that the obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the Account and the ability to withdraw the Initial Daily Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

**Seller:** INTERWORKS UNLIMITED INC.

Agreed to by: _____ (Signature), its _____ (Title)

**Buyer:** Cash Capital Group, LLC

Agreed to by: _____ (Signature), Its _____ (Title)

Initial: _____

1

Cash Capital Group, LLC

EXHIBIT 4

50

CCG 000018

Agreement of Each Owner: Each Owner signing below agrees to the terms of the Credit Report Authorization below.

ERIC LU _____   (Print Name); _____   (Signature);

MICHAEL KIDAKAM _____   (Print Name); _____   (Signature);

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the single business banking account specified above, which may not be used for any personal, family or household purposes (the "Account") and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Daily Amount from the Account each business day by either ACH or electronic check. Seller will provide Buyer with all required access codes and agrees not to change them without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer. Seller understands that it is responsible for either ensuring that the Daily Amount is available in the Account each business day or advising Buyer prior to each daily withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on Appendix A. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable.

2. **Seller May Request Changes to the Daily Amount:** The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation.   No more often than once a month, Buyer may adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage.  Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

3. **Daily Amount Upon Default.** Upon the occurrence of an Event of Default, the Daily Amount shall equal 100% of all Future Receipts.

4. **Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein.  Seller agrees that it will treat Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance.  Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5. **Power of Attorney.** Seller irrevocably appoints Buyer as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Buyer from Seller, or in the case of a violation by Seller of this Agreement or the occurrence of an Event of Default under Section 15 hereof by Seller, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Future Receipts; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or

Initials: _____

2

Cash Capital Group, LLC

EXHIBIT 4

clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to direct payables to Buyer; (v) to file any claims or take any action or institute any proceeding which Buyer may deem necessary for the collection of any of the remaining Purchased Amount of the Future Receipts, or otherwise to enforce its rights with respect to delivery of the Purchased Amount; and/or (vi) to contact any Processor of Seller and to direct such Processor(s) to deliver directly to Buyer all or any portion of the amounts received by such Processor(s) and to provide any information regarding Seller requested by Buyer. Each Processor may rely on the previous sentence as written authorization of Seller to provide any information requested by Buyer. Each Processor is hereby irrevocably authorized and directed by Seller to follow any instruction of Buyer without inquiry as to Buyer's right or authority to give such instructions. Seller acknowledges the terms of the preceding sentence and agrees not to (a) interfere with Buyer's instructions or a Processor's compliance with this Agreement or (b) request any modification thereto without Buyer's prior written consent.

6.   **Fees and Charges:**  Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller.  If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.

7.   **Credit Report and Other Authorizations:**  Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

8.   **Authorization to Contact Current and Prior Banks:**  Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

9.   **Financial Information.** Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10.  **Transactional History.** Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

11.  **Publicity.** Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

12.  **Application of Amounts Received by Buyer.**  Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13.  **Representations, Warranties and Covenants of Seller:**

   13.1.   **Good Faith, Best Efforts and Due Diligence.** Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.

   13.2.   **Stacking Prohibited.** Seller shall not enter into any Seller cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

Initials:

3

Cash Capital Group, LLC

EXHIBIT 4

CCG 000020

**13.3. Financial Condition and Financial Information.** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the condition or operation of Seller or any change in the ownership of Seller.  Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations.  Seller further agrees to authorize the release of any past or future tax returns to Seller.

**13.4. Governmental Approvals.** Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**13.5. Authority to Enter Into This Agreement.**  Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**13.6. Change of Name or Location or Sale or Closing of Business.** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer.  Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently.  Seller agrees that until Buyer has received all of the Purchased Amount Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes.  This provision, however, does not prohibit Seller from closing its business temporarily if such closing  is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller.  Prior to any such closure, Seller will provide Buyer ten business days notice to the extent practicable.

**13.7. No Pending or Contemplated Bankruptcy.** As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement.  Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**13.8. Seller to Maintain Insurance.**  Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.

**13.9. Seller to Pay Taxes Promptly.**  Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

**13.10. No Violation of Prior Agreements.**  Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement the prohibits the sale or pledge of Seller's future receipts.

**13.11. No Diversion of Receipts.** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity.

**13.12. Seller's Knowledge and Representation.**  Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

Initials:

4

Cash Capital Group, LLC

EXHIBIT 4

CCG 000021

53

14. **Rights of Buyer:**

14.1. **Financing Statements Financing Statements and Security Interest.** Seller grants Buyer a security interest in all of Seller's present and future accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Seller. Seller authorizes Buyer to file one or more UCC-1 forms consistent with the Uniform Commercial Code ("UCC") in order to give notice of this security interest and that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

14.2. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter, without notice,  the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

14.3. **Phone Recordings and Contact.**  Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored.  Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

15. **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with Buyer's right to collect the Daily Amount; (b) Seller violates any term or covenant in this Agreement; (c) Seller uses multiple depository accounts without the prior written consent of Buyer; (d) Seller changes its depositing account or its payment card processor without the prior written consent of Buyer; (e) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer and/or Buyer's Affiliate ACH Capital, LLC; or (f) Seller fails to provide timely notice to Buyer such that in any given calendar month there are four or more ACH transactions attempted by Buyer are rejected by Seller's bank.

16. **Remedies.** If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

16.1. The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.

16.2. Buyer may enforce the provisions of the Personal Guaranty of Performance against each Owner.

16.3. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit.  In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.  However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

16.4. This Agreement shall be deemed Seller's Assignment of Seller's Lease of Seller's business premises to Buyer. Upon an Event of Default, Buyer may exercise its rights under this Assignment of Lease without prior notice to Seller.

Initials: 

5

Cash Capital Group, LLC

EXHIBIT 4

CCG 000022

16.5. Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer.

16.6. Seller shall pay to Buyer all reasonable costs associated with the Event of Default and the enforcement of Buyer's remedies, including but not limited to court costs and attorneys' fees.

16.7. Buyer may exercise and enforce its rights as a secured party under the UCC.

16.8. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

17. **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

18. **Assignment**. Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

19. **Notices**.

19.1. Notices from Buyer to Seller.  Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent.  Notices sent by regular mail become effective upon mailing to Seller's address set forth in this Agreement.

19.2. Notices from Seller to Buyer.  Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

20. **Binding Effect; Governing Law, Venue and Jurisdiction**. This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum.

21. **Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

22. **Interpretation**. All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

23. **Entire Agreement and Severability**. This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof.  In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

24. **Facsimile Acceptance**.  Facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes.

Initials:

6

Cash Capital Group, LLC

EXHIBIT 4

55

CCG 000023

25. **Confidentiality:** The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

26. **Monitoring, Recording, and Solicitations.**

26.1. **Authorization to Contact Seller by Phone.** Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

26.2. **Authorization to Contact Seller by Other Means.** Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

27. <u>JURY WAIVER.</u> THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

28. <u>CLASS ACTION WAIVER.</u> THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

29. <u>ARBITRATION.</u> IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR NAF RULES. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT

Initials:

7

Cash Capital Group, LLC

EXHIBIT 4

CCG 000024

56

CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID.

30. <u>RIGHT TO OPT OUT OF ARBITRATION</u>. SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: BUYER – ARBITRATION OPT OUT, CASH CAPITAL GROUP, LLC, 1013 CENTRE ROAD, SUITE 403S WILMINGTON, DE 19805, ATTENTION: LEGAL DEPARTMENT.

31. <u>SERVICE OF PROCESS</u>. IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON SELLER'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES.

<u>AUTHORIZED SERVICING AGENT - ACH Capital, LLC</u>

ACH Capital, LLC is the authorized servicing agent of Cash Capital Group, LLC for this Agreement providing administrative, bookkeeping, reporting and support services for Cash Capital Group, LLC and the Seller. ACH Capital, LLC is not affiliated or owned by Cash Capital Group, LLC and is acting as an independent agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting, remittance and receipts collection. ACH Capital, LLC is not a credit card processor, or in the business of processing credit cards. Seller and Guarantor hereby acknowledge that in no event will ACH Capital, LLC be liable for any claims made against Cash Capital Group, LLC or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by the Seller and Guarantor. As such, Seller hereby authorizes ACH Capital, LLC to initiate ACH Debits (withdrawals) from Seller's bank account for the delivery of the Purchased Amount as it becomes due and payable under the terms of this Agreement. Furthermore, Seller represents and warrants that it is the owner of the Account or has the full authority to grant this authorization. If there are any questions in regard to an ACH Debit (withdrawal) from the Account, you may contact ACH Capital, LLC at 1-212-671-1781 between the hours of 9am and 7pm (EST) Monday through Friday.

Seller: INTERWORKS UNLIMITED INC.

Agreed to by: _____ (Signature), its _____ (Title)

Guarantor: ERIC LU _____ (Print Name) Signature: _____

Guarantor: MICHAEL KIDAKAM _____ (Print Name) Signature: _____

Initials: 

B

Cash Capital Group, LLC

EXHIBIT 4

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of <u>JANUARY 12</u>, 20<u>17</u>, by <u>ERIC LU</u>
<u>MICHAEL KIDAKAM</u>                    (the "Guarantor"), for the benefit of <u>Cash Capital Group, LLC</u>
_____ ("Buyer").

Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Purchase Agreement (as hereinafter defined).

### RECITALS

**A.** Pursuant to that Agreement for the Purchase and Sale of Future Receipts (the "Purchase Agreement"), dated of even date herewith, between Buyer and <u>INTERWORKS UNLIMITED INC.</u> ("Seller"), Buyer has purchased Future Receipts of Seller.

**B.** Buyer is not willing to enter into the Purchase Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance to Buyer of all of the obligations of Seller; and

**C.** Guarantor will directly benefit from Buyer and Seller entering into the Purchase Agreement.

### AGREEMENT

As an inducement to Buyer to purchase the Future Receipts identified in the Purchase Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms:** All capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

**2. Guaranty of Obligations:** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of Seller's obligations under the Purchase Agreement.

**3. Guarantor's Other Agreements:** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller without the prior written consent of Buyer, which may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor hereby agrees to pay all costs and attorney's fees incurred by Buyer in connection with any actions commenced by Buyer to enforce its rights or incurred in any action to defend its performance under the Purchase Agreement and this Guaranty. This Guaranty is binding upon Guarantor, and Guarantor's heirs, legal representatives, successors and assigns. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Purchase Agreement or otherwise modify, amend or change the terms of the Purchase Agreement. Guarantor is hereby notified that a negative credit report reflecting on his/her credit record may be submitted to a credit reporting agency if the terms of this Guaranty are not honored by the Guarantor.

**4. Waiver; Remedies:** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Purchase Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**5. Acknowledgment of Purchase:** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount is a purchase of the Purchased Amount and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges Buyer is not a lender, bank or credit card processor, and

Initials: _____                                                    1                                                    Cash Capital Group, LLC

**EXHIBIT 4**

CCG 000026
58

that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount of Future Receipts.

**6. Governing Law and Jurisdiction:** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of New York without regard to principles of conflicts of law.  Except as provided in Section 9 of this Guaranty, Guarantor submits to the exclusive jurisdiction and venue of the state or federal courts having jurisdiction over any city/county in the State of New York of any claims or actions arising, directly or indirectly, out of or related to this Guaranty.  The parties stipulate that the venues referenced in this Agreement are convenient.  The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**7.   JURY WAIVER:** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY.  THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**8.   CLASS ACTION WAIVER:**  THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY.  TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**9.   ARBITRATION:** IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO THE OTHER PARTY, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR NAF RULES. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID.

**10.  RIGHT TO OPT OUT OF ARBITRATION:**  SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE

Initials:

2

Cash Capital Group, LLC

EXHIBIT 4

CCG 000027

59

DATE OF THIS AGREEMENT: BUYER – ARBITRATION OPT OUT, CASH CAPITAL GROUP, LLC, 1013 CENTRE ROAD, SUITE 403S WILMINGTON, DE 19805, ATTENTION: LEGAL DEPARTMENT.

11. SERVICE OF PROCESS. IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), GUARANTOR HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON GUARANTOR'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. GUARANTOR MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. GUARANTOR WILL HAVE (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, GUARANTOR EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES.

12. **Severability:** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

13. **Opportunity for Attorney Review:** The Guarantor represents that it has carefully read this Guaranty and has, or had a reasonable opportunity to, consult with its attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as its free act and deed.

14. **Counterparts and Facsimile Signatures:** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

**For Individual Guarantors –**
Guarantor: ERIC LU _____ (Print Name)
Signature: _____

**For Individual Guarantors –**
Guarantor: MICHAEL KADMAN _____ (Print Name)
Signature: _____

**For Corporate Guarantors (or other entities) –**
Guarantor: _____
By: _____
Print Name of Signer: _____
Its: _____ (Official Position)

Initials: _____

Cash Capital Group, LLC

EXHIBIT 4

CCG 000028

60

# EXHIBIT 5

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Gisella Melendez
800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Lien Solutions
2929 ALLEN PARKWAY, Suite#3300
HOUSTON, TX 77019
USA

**DOCUMENT NUMBER:** 62468710002
**FILING NUMBER:** 17-7594529716
**FILING DATE:** 07/06/2017 10:52

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| INTERWORKS UNLIMITED INC. | | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2418 Peck Road | Whittier | CA | 90601 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| INTERWORKS UNLIMITED/AMAZING STUFF SHOP | | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2418 Peck Road | Whittier | CA | 90601 | USA |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Cash Capital Group, LLC | | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1013 Centre Road, Suite 403S | Wilmington | DE | 19805 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All assets of the Debtor, now existing and hereafter arising, wherever located.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
CA-0-59677431-53589424

FILING OFFICE COPY

EXHIBIT 5                                                                 61

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Lien Solutions<br>800-331-3282 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>Lien Solutions<br>P.O. Box 29071<br>Glendale, CA 91209-9071<br>USA | **DOCUMENT NUMBER: 71849350002**<br>**FILING NUMBER: 18-76608073**<br>**FILING DATE: 07/25/2018 06:43**<br><br>**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**<br>**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY** |

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
17-7594529716

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: *Attach* Amendment Addendum (Form UCC3Ad) *and* provide Debtor's name in item 13

**2.** ☑ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, *and* address of Assignee in item 7c *and* name of Assignor in item 9
For partial assignment, complete items 7 and 9 *and* also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**
Check *one* of these two boxes:     **AND** Check *one* of these three boxes to:
This Change affects ☐ Debtor *or* ☐ Secured Party of record.    ☐ CHANGE name and/or address: Complete item 6a or 6b; *and* item 7a or 7b *and* item 7c    ☐ ADD name: Complete item 7a or 7b, *and* item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only *one* name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only *one* name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** *Also* check *one* of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only *one* name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | a. ORGANIZATION'S NAME<br>Cash Capital Group, LLC | | | |
|---|---|---|---|---|
| OR | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
CA-0-65705731-55570439- Debtor: INTERWORKS UNLIMITED INC.

**FILING OFFICE COPY**

EXHIBIT 5     62

# EXHIBIT 6

# THE RUBIN LAW FIRM, PLLC

11 Broadway, Suite 814
New York, New York 10004
T. 212.804.7012
F. 212.804.7013

July 10, 2016

**VIA MAIL**
Digital Gadgets, LLC
Attention: Accounting/Legal Department(s)
21 Engelhard Drive
Monroe Township, NJ 08831

> Re:   **Interworks Unlimited, Inc. d/b/a Interworks Unlimited/ Amazing Stuff Shop and Michael Kidakarn and Eric Lu.
> Fed Tax Id. 26-2583718**

Dear Sir/Madam:

I am counsel to Cash Capital Group, LLC and am writing regarding the Agreement between **Interworks Unlimited, Inc. d/b/a Interworks Unlimited/ Amazing Stuff Shop and Michael Kidakarn and Eric Lu, Fed Tax Id. 26-2583718** ("Merchant") and Cash Capital Group, LLC (the "Agreement"). Cash Capital Group, LLC ("CCG") and Merchant have entered into that certain Merchant Agreement, dated  January 12, 2017 (the "Merchant Agreement"), a copy of which is enclosed with this letter.  Pursuant to the language of the Merchant Agreement, the Merchant has sold, assigned and transferred to CCG a certain percentage of its future receivables.

The Merchant is in default under the terms of the Agreement due to a change in its financial institution and/or depositing account(s) without the prior written consent of CCG (the "Event of Default"). The balance currently due and owing to CCG pursuant to the Merchant Agreement is $424,730.09 plus interest from June 30, 2017.

The terms of the Agreement: (i) permits CCG to notify Digital Gadgets, LLC of the sale of receivables and to direct Digital Gadgets, LLC to make payment directly to CCG of all or any portion of the amounts received by Digital Gadgets, LLC and (ii) irrevocably appoints CCG as the Merchant's agent and attorney-in-fact with full authority to take any action or execute any instrument or document and to settle all obligations due to CCG, including collecting money and directing third parties to make payment to CCG in satisfaction of the amounts owed under the Merchant Agreement.

Notwithstanding any prior instructions to Digital Gadgets, LLC, unless and until Digital Gadgets, LLC receives written instructions from The Rubin Law Firm c/o CPN to the contrary in

EXHIBIT 6                                                                                                           63

accordance with the terms hereof, effective immediately, Digital Gadgets, LLC is hereby irrevocably authorized and directed by The Rubin Law Firm c/o CCG (acting as Merchant's attorney-in-fact) to hold in trust all funds that would otherwise be paid to Merchant, as and when payment thereof is required by the Agreement, until further direction is provided by The Rubin Law Firm c/o CCG regarding the proper disbursement of such funds.

This notice is given to you pursuant to Section 9-406 of the Uniform Commercial Code. In order to avoid paying twice, please make payment to CCG, since payment to the Merchant will not discharge the obligation to make payment to CCG pursuant to this notice.

Please confirm, in writing, your agreement to send or transfer, or cause to be sent or transferred, all such amounts immediately upon receipt of this letter. Please feel free to contact me at 347-514-8929 or via email at kchrispin@rubinlaw.legal with any questions regarding this letter.

Sincerely,

The Rubin Law Firm, PLLC

By: _____

Kishanti Chrispin, Paralegal

The Rubin Law Firm, PLLC

Ph #: 347-514-8929

Fax: 212-804-7013

Enclosures

EXHIBIT 6                                                                    64

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

CT Lien Solutions
Representation of filing

**This filing is Completed**
File Number : 157484940739
File Date : 15-Sep-2015

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| Phone: 800-331-3282 Fax: 818-662-4141 |

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)     25426 - CAPITAL STACK

CT Lien Solutions
330 N Brand Blvd #700
Glendale, CA  91203

49913910

CALI

File with: Secretary of State, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| INTERWORKS UNLIMITED INC. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2418 PECK ROAD | CITY OF INDUSTRY | CA | 90601 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACH Capital LLC as agent for Shoreside Capital | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 11 Broadway, Suite 814 | New York | NY | 10004 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, now existing and hereafter arising, wherever located.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box.
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
49913910          INTERWORKS UNLIMITED INC.          10038652

FILING EXHIBIT 6 UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

 **CASHCAPITAL**      **Agreement for the Purchase and Sale of Future Receipts**

Seller's Legal Name:  INTERWORKS UNLIMITED INC.                    D/B/A:  INTERWORKS UNLIMITED / AMAZING STUFF SHOP

Form of Business Entity: [ ] Corporation;  [ ] Limited Liability Company;  [ ] Partnership;  [ ] Limited Partnership;  [ ] Limited
Liability Partnership; [ ] Sole Proprietorship;  [ ]Other: _____

Street Address: 2418 PECK ROAD _____, City: WHITTIER _____, State: CA ___ ; Zip: 90601 ____

Mailing Address: _____, City: _____, State: _____; Zip: _____

Primary Contact Name: _____ Title: _____

Time in Business: _____ Federal Tax ID Number: 26-2583718 ____

Purchase Price: $ 750,000.00 ____     Purchased Amount: $ 1,020,000.00 ____    Average Monthly Sales: $ 857,000.00 ____
Specified Percentage: 18 _____% Origination Fee: $ 15,000.00 ____  (to be deducted from the Purchase Price)

Initial Daily Amount: $ 5,396.83 ___  (Average Monthly Sales x Specified Percentage / Average Business Days in a Calendar Month)

Account for the Deposit of All Future Receipts: Bank: _____

Account No: _____

Effective, JANUARY 12 ____, 20 17 Seller, identified above, hereby sells, assigns and transfers to Cash Capital Group, LLC, located at
1013 Centre Road, Suite 403S Wilmington, DE 19805 ("Buyer"), without recourse, the Specified Percentage of the proceeds of each
future sale made by Seller (collectively "Future Receipts") until Seller has received the Purchased Amount. "Future Receipts"
includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each
such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's
business. As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any
Origination Fee shown above.  Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.

Both parties agree that the obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its
review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee.  Prior to accepting
this Agreement, Buyer may conduct a processing trial to confirm its access to the Account and the ability to withdraw the Initial Daily
Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained
by Buyer during the processing trial.

Agreement of Seller:  By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms
and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family,
or household purposes.

Seller:  INTERWORKS UNLIMITED INC.

Agreed to by: _____  (Signature), its _____ (Title)

Buyer:  Cash Capital Group, LLC

Agreed to by: _____  (Signature), its _____ (Title)

Initials: _____

1                                      Cash Capital Group, LLC

**EXHIBIT 6**                                                          66

**Agreement of Each Owner:** Each Owner signing below agrees to the terms of the Credit Report Authorization below.

ERIC LU _____ (Print Name);  _____ (Signature);

MICHAEL KIDAKAM _____ (Print Name); _____ (Signature);

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the single business banking account specified above, which may not be used for any personal, family or household purposes (the "Account") and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Daily Amount from the Account each business day by either ACH or electronic check. Seller will provide Buyer with all required access codes and agrees not to change them without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer. Seller understands that it is responsible for either ensuring that the Daily Amount is available in the Account each business day or advising Buyer prior to each daily withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on Appendix A. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable.

2. **Seller May Request Changes to the Daily Amount:** The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer may adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

3. **Daily Amount Upon Default.** Upon the occurrence of an Event of Default, the Daily Amount shall equal 100% of all Future Receipts.

4. **Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5. **Power of Attorney.** Seller irrevocably appoints Buyer as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Buyer from Seller, or in the case of a violation by Seller of this Agreement or the occurrence of an Event of Default under Section 15 hereof by Seller, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Future Receipts; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or

Initials: _____

2

Cash Capital Group, LLC

EXHIBIT 6

67

clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to direct payables to Buyer; (v) to file any claims or take any action or institute any proceeding which Buyer may deem necessary for the collection of any of the remaining Purchased Amount of the Future Receipts, or otherwise to enforce its rights with respect to delivery of the Purchased Amount; and/or (vi) to contact any Processor of Seller and to direct such Processor(s) to deliver directly to Buyer all or any portion of the amounts received by such Processor(s) and to provide any information regarding Seller requested by Buyer. Each Processor may rely on the previous sentence as written authorization of Seller to provide any information requested by Buyer. Each Processor is hereby irrevocably authorized and directed by Seller to follow any instruction of Buyer without inquiry as to Buyer's right or authority to give such instructions. Seller acknowledges the terms of the preceding sentence and agrees not to (a) interfere with Buyer's instructions or a Processor's compliance with this Agreement or (b) request any modification thereto without Buyer's prior written consent.

6. **Fees and Charges:** Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.

7. **Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

8. **Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

9. **Financial Information.** Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10. **Transactional History.** Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

11. **Publicity.** Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

12. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13. **Representations, Warranties and Covenants of Seller:**

    13.1. **Good Faith, Best Efforts and Due Diligence.** Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.

    13.2. **Stacking Prohibited.** Seller shall not enter into any Seller cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

Initials:

3                                                                 Cash Capital Group, LLC

EXHIBIT 6                                                                        68

13.3. **Financial Condition and Financial Information.** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.

13.4. **Governmental Approvals.** Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

13.5. **Authority to Enter Into This Agreement.** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

13.6. **Change of Name or Location or Sale or Closing of Business.** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller agrees that until Buyer has received all of the Purchased Amount Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten business days notice to the extent practicable.

13.7. **No Pending or Contemplated Bankruptcy.** As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

13.8. **Seller to Maintain Insurance.** Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.

13.9. **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

13.10. **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement the prohibits the sale or pledge of Seller's future receipts.

13.11. **No Diversion of Receipts.** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity.

13.12. **Seller's Knowledge and Representation.** Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

Initials:

4

Cash Capital Group, LLC

EXHIBIT 6

69

**14. Rights of Buyer:**

14.1. **Financing Statements Financing Statements and Security Interest.** Seller grants Buyer a security interest in all of Seller's present and future accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Seller. Seller authorizes Buyer to file one or more UCC-1 forms consistent with the Uniform Commercial Code ("UCC") in order to give notice of this security interest and that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

14.2. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

14.3. **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

**15. Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with Buyer's right to collect the Daily Amount; (b) Seller violates any term or covenant in this Agreement; (c) Seller uses multiple depository accounts without the prior written consent of Buyer; (d) Seller changes its depositing account or its payment card processor without the prior written consent of Buyer; (e) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer and/or Buyer's Affiliate ACH Capital, LLC; or (f) Seller fails to provide timely notice to Buyer such that in any given calendar month there are four or more ACH transactions attempted by Buyer are rejected by Seller's bank.

**16. Remedies.** If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

16.1. The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.

16.2. Buyer may enforce the provisions of the Personal Guaranty of Performance against each Owner.

16.3. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

16.4. This Agreement shall be deemed Seller's Assignment of Seller's Lease of Seller's business premises to Buyer. Upon an Event of Default, Buyer may exercise its rights under this Assignment of Lease without prior notice to Seller.

Initials: _[signature]_

5

Cash Capital Group, LLC

EXHIBIT 6

70

16.5. Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer.

16.6. Seller shall pay to Buyer all reasonable costs associated with the Event of Default and the enforcement of Buyer's remedies, including but not limited to court costs and attorneys' fees.

16.7. Buyer may exercise and enforce its rights as a secured party under the UCC.

16.8. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

17. **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

18. **Assignment.** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

19. **Notices.**

19.1. Notices from Buyer to Seller.  Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent.  Notices sent by regular mail become effective upon mailing to Seller's address set forth in this Agreement.

19.2. Notices from Seller to Buyer.  Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.  .

20. **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum.

21. **Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

22. **Interpretation.**  All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

23. **Entire Agreement and Severability.** This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof.  In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

24. **Facsimile Acceptance.**  Facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes.

Initials:

6

Cash Capital Group, LLC

EXHIBIT 6

71

25. **Confidentiality:** The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

26. **Monitoring, Recording, and Solicitations.**

    26.1. **Authorization to Contact Seller by Phone.** Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

    26.2. **Authorization to Contact Seller by Other Means.** Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

27. <u>JURY WAIVER</u>. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY.  THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

28. <u>CLASS ACTION WAIVER</u>.  THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY.  TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT:  (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

29. <u>ARBITRATION</u>.  IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR NAF RULES.  SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT

Initials: _____

7

Cash Capital Group, LLC

EXHIBIT 6

72

CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID.

30. <u>RIGHT TO OPT OUT OF ARBITRATION.</u>  SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: BUYER -- ARBITRATION OPT OUT, CASH CAPITAL GROUP, LLC, 1013 CENTRE ROAD, SUITE 403S WILMINGTON, DE 19805, ATTENTION: LEGAL DEPARTMENT.

31. <u>SERVICE OF PROCESS.</u> IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON SELLER'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES.

AUTHORIZED SERVICING AGENT - ACH Capital, LLC

ACH Capital, LLC is the authorized servicing agent of Cash Capital Group, LLC for this Agreement providing administrative, bookkeeping, reporting and support services for Cash Capital Group, LLC and the Seller. ACH Capital, LLC is not affiliated or owned by Cash Capital Group, LLC and is acting as an independent agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting, remittance and receipts collection. ACH Capital, LLC is not a credit card processor, or in the business of processing credit cards. Seller and Guarantor hereby acknowledge that in no event will ACH Capital, LLC be liable for any claims made against Cash Capital Group, LLC or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by the Seller and Guarantor. As such, Seller hereby authorizes ACH Capital, LLC to initiate ACH Debits (withdrawals) from Seller's bank account for the delivery of the Purchased Amount as it becomes due and payable under the terms of this Agreement. Furthermore, Seller represents and warrants that it is the owner of the Account or has the full authority to grant this authorization. If there are any questions in regard to an ACH Debit (withdrawal) from the Account, you may contact ACH Capital, LLC at 1-212-671-1781 between the hours of 9am and 7pm (EST) Monday through Friday.

Seller: **INTERWORKS UNLIMITED INC.**

Agreed to by: _____ (Signature), its _____ (Title)

Guarantor: ERIC LU          (Print Name) Signature: _____

Guarantor: MICHAEL KIDAKAM          (Print Name) Signature: _____

Initials: _____

EXHIBIT 6                                                        73

**Appendix A – List of Fees and Charges**

In addition to the Purchased Amount of Future Receipts, the Agreement provides that the following fees shall be applied:

1. Underwriting Fee - $ 2,295.00
2. Non-Sufficient Funds (NSF) Fee - $ 35.00 each (Up to FOUR TIMES ONLY before a default is declared)
3. Stopped Fee - $ 135.00
4. ACH Processing Fee - $ 6,000.00
5. UCC Filing Fee- $150.00
6. Default Fee - $5,000.00
7. Financing Fee:
   a. $5,000 - $9,999  = $149
   b. $10,000 - $19,999 = $299
   c. $20,000 - $49,999 = $699
   d. $50,000 - $100,000 = $1,299
   e. $100,001 - $249,999 = $1,995
   f. $250,000 - $399,999  = $3,995
   g. $400,000 - $699,999 = $5,995
   h. $700,000 - $1,000,000 = $6.665

Initials:

Cash Capital Group, LLC

EXHIBIT 6

74

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of <u>JANUARY 12</u>, 20<u>17</u>, by <u>ERIC LU</u>
<u>MICHAEL KIDAKAM</u>                                                                 (the "Guarantor"), for the benefit of <u>Cash Capital Group, LLC</u>
<u>        </u> ("Buyer").

Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Purchase Agreement (as hereinafter defined).

### RECITALS

A. Pursuant to that Agreement for the Purchase and Sale of Future Receipts (the "Purchase Agreement"), dated of even date herewith, between Buyer and <u>INTERWORKS UNLIMITED INC.</u>          ("Seller"), Buyer has purchased Future Receipts of Seller.

B. Buyer is not willing to enter into the Purchase Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance to Buyer of all of the obligations of Seller; and

C. Guarantor will directly benefit from Buyer and Seller entering into the Purchase Agreement.

### AGREEMENT

As an inducement to Buyer to purchase the Future Receipts identified in the Purchase Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms:** All capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

**2. Guaranty of Obligations:** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of Seller's obligations under the Purchase Agreement.

**3. Guarantor's Other Agreements:** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller without the prior written consent of Buyer, which may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor hereby agrees to pay all costs and attorney's fees incurred by Buyer in connection with any actions commenced by Buyer to enforce its rights or incurred in any action to defend its performance under the Purchase Agreement and this Guaranty. This Guaranty is binding upon Guarantor, and Guarantor's heirs, legal representatives, successors and assigns. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Purchase Agreement or otherwise modify, amend or change the terms of the Purchase Agreement. Guarantor is hereby notified that a negative credit report reflecting on his/her credit record may be submitted to a credit reporting agency if the terms of this Guaranty are not honored by the Guarantor.

**4. Waiver; Remedies:** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Purchase Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**5. Acknowledgment of Purchase:** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount is a purchase of the Purchased Amount and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges Buyer is not a lender, bank or credit card processor, and

Initials: _____

1

Cash Capital Group, LLC

EXHIBIT 6

75

that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount of Future Receipts.

6. **Governing Law and Jurisdiction:** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of New York without regard to principles of conflicts of law. Except as provided in Section 9 of this Guaranty, Guarantor submits to the exclusive jurisdiction and venue of the state or federal courts having jurisdiction over any city/county in the State of New York of any claims or actions arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Agreement are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

7. **JURY WAIVER:** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

8. **CLASS ACTION WAIVER:** THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

9. **ARBITRATION:** IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO THE OTHER PARTY, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR NAF RULES. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID.

10. **RIGHT TO OPT OUT OF ARBITRATION:** SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE

Initials: _____

2

Cash Capital Group, LLC

EXHIBIT 6

76

DATE OF THIS AGREEMENT: BUYER – ARBITRATION OPT OUT, CASH CAPITAL GROUP, LLC, 1013 CENTRE ROAD, SUITE 403S WILMINGTON, DE 19805, ATTENTION: LEGAL DEPARTMENT.

**11.** SERVICE OF PROCESS. IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), GUARANTOR HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON GUARANTOR'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. GUARANTOR MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. GUARANTOR WILL HAVE (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, GUARANTOR EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES.

**12. Severability:** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**13. Opportunity for Attorney Review:** The Guarantor represents that it has carefully read this Guaranty and has, or had a reasonable opportunity to, consult with its attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as its free act and deed.

**14. Counterparts and Facsimile Signatures:** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

For Individual Guarantors –
Guarantor: ERIC LU _____ (Print Name)
Signature: _____

For Individual Guarantors –
Guarantor: MICHAEL KIDNEEN (Print Name)
Signature: _____

For Corporate Guarantors (or other entities) –
Guarantor: _____
By: _____
Print Name of Signer: _____
Its: _____ (Official Position)

Initials: _____

EXHIBIT 6                                                                    77

**AUTHORIZATION AGREEMENT**
**FOR AUTOMATED CLEARING HOUSE TRANSACTIONS**

[ INTERWORKS UNLIMITED INC. ]("Seller") hereby authorizes Buyer ("Buyer") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other obligations due to Buyer from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the "Agreement") entered into between Seller and Buyer, as it may be amended, supplemented or replaced from time to time. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Agreement.

Transfer Funds To/From:          Name of Bank: _____

                                 ABA Transit/Routing #: _____

                                 Checking Account #:        _____

This authorization is to remain in full force and effect until all obligations due to Buyer under the Agreement have been fulfilled.

Seller Information:              Seller's Name:  INTERWORKS UNLIMITED INC. _____

                                 Signature of Authorized Representative: _____

                                 Print Name: _____

                                 Title: _____

                                 Seller's Tax ID: _____

                                 Date: _____


# [Attached Voided Check Here]

Initials: _____          1          Cash Capital Group, LLC

EXHIBIT 6          78

Dear Seller,

    Please fill out the form below with the access information for your bank account, please write legibly and indicate lower/upper case sensitivity.

Legal Name/ DBA: _____

Bank portal website: _____

Username: _____

Password: _____

Security Question/Answer 1:_____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Security Question/Answer 4:_____

Security Question/Answer 5:_____

Security Question/Answer 6:_____

Any other information necessary to access your account: _____



Initials:

2

Cash Capital Group, LLC

# EXHIBIT 6

79

[redacted lines]

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**CT Lien Solutions**
Representation of filing

**This filing is Completed**
File Number : 157484940739
File Date  : 15-Sep-2015

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Phone: 800-331-3282 Fax: 818-662-4141 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)    25426 - CAPITAL STACK

CT Lien Solutions
330 N Brand Blvd #700
Glendale, CA  91203

49913910

CALI

File with: Secretary of State, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| INTERWORKS UNLIMITED INC. | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2418 PECK ROAD | CITY OF INDUSTRY | CA | 90601 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ACH Capital LLC as agent for Shoreside Capital | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11 Broadway, Suite 814 | New York | NY | 10004 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, now existing and hereafter arising, wherever located.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box. | 6b. Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien  ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
49913910                    INTERWORKS UNLIMITED INC.                    10038652

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

EXHIBIT 6

80

# EXHIBIT 7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

```
INTERWORKS UNLIMITED, INC.,  )
a California Corporation,    )
                             )
             Plaintiff,      )
                             )
        VS.                  ) CASE NO.
                             ) 2:17-cv-4983 AB KSx
DIGITAL GADGETS, LLC;        )
a New Jersey limited         )
liability company,          )
                             )
             Defendants.     )
_____)
                             )
AND RELATED CROSS-ACTION.    )
_____)
```

DEPOSITION OF
ERIC LU

Thursday, September 13, 2018

9:58 A.M.

21650 Oxnard Street
Suite 500
Woodland Hills, California 91367

EXHIBIT 7                                          81

Page 2

1      Deposition of ERIC LU, called as a witness by
2  the Defendant and Counter-Claimant, before
3  HELENA FLORES, Certified Shorthand Reporter
4  Number 13313, for the State of California, with
5  principal office in the County of Los Angeles,
6  commencing at 9:58 A.M., September 13, 2018, at
7  21650 Oxnard Street, Suite 500, Woodland Hills,
8  California.
9                    *  *  *
10
11  APPEARANCES OF COUNSEL:
12
13       For the Plaintiff and
      Counter-Defendant:
14          LAW OFFICES OF ROGER C. HSU
          BY:  ROGER C. HSU, ESQ.
15          175 South Lake Avenue
          Suite 210
16          Pasadena, California 91101
          (626) 792-7936
17
18
19
20       For the Defendant and
      Counter-Claimant:
21          LAZARUS & LAZARUS, P.C.
          BY:  HARLAN M. LAZARUS, ESQ.
22          240 Madison Avenue
          8th Floor,
23          New York, New York 10016
          (212) 889-7400
24
25

Page 3

1              I N D E X
2  Examination                     Page
3  By Mr. Lazarus                      5
4
5
6
7      DEFENDANT and COUNTER-CLAIMANT'S EXHIBITS
8  Exhibit 1    First Amended Counterclaim of
9           Digital Gadgets, LLC, for Breach
           of Contract, Breach of Contract,
           Breach of Implied Warranty of
10           Merchantability, Breach of
           Warranty, Negligence, Fraud, and
11           Indemnification            50
12  Exhibit 2    Answer to First Amended
           Counterclaim            50
13
14  Exhibit 3    E-mail Chain, Top E-mail to
           "Eric," from Chris Mitchell,
15           Dated 6/7/17            57
16  Exhibit 4    E-mail Chain, Top E-mail to
           Charlie Tebele, from Chris
17           Mitchell, Dated 6/30/17      66
18  Exhibit 5    E-mail Chain, Top E-mail to Chris
           Mitchell, from "Eric," Dated
19           12/21/16, Bates Labeled Digital
           Gadgets 35            80
20  Exhibit 6    E-mail Chain, Top E-mail to
           Charlie Tebele, from Chris
21           Mitchell, Dated 3/6/17, Bates
           Labeled Digital Gadgets 244 to
22           -246            82
23  Exhibit 7    Letter to Digital Gadets, LLC,
           from the Rubin Law Firm, PLLC,
24           Dated 7/10/16            92
25  ///

Page 4

1      DEFENDANT and COUNTER-CLAIMANT'S
           EXHIBITS, CONTINUED
2
3  Exhibit 8    Cash Capital Agreement for the
           Purchase and Sale of Future
4           Receipts, Bates Labeled
           CCG 000018 to -28            94
5  Exhibit 9    UCC Financing Statement, Bates
           Labeled CCG 000001        103
6
7
8
9
10      QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
11           Page      Line
           11        12
12           12        8
13
14
15
16      INFORMATION REQUESTED
17           (None.)
18
19
20
21
22
23
24
25

Page 5

1            Woodland Hills, California
2  Thursday, September 13, 2018; 9:58 A.M. - 2:20 P.M.
3
4              ERIC LU,
5  called as a witness by and on behalf of the Defendants
6  and Counter-Claimant, having been placed under oath, was
7  examined and testified as follows:
8
9              EXAMINATION
10  BY MR. LAZARUS:
11      Q.    Good morning, Mr. Lu.  My name is
12  Harlan Lazarus, and I represent Digital Gadgets.  I'm
13  here today to take your deposition in a matter,
14  Interworks Unlimited against Digital Gadgets.
15          Have you ever been deposed before?
16      A.    Yes.
17      Q.    How many times?
18      A.    Two.
19      Q.    And when were those depositions?
20      A.    About maybe ten years ago.
21      Q.    Well, in either of those depositions, did you
22  testify on behalf of Interworks Unlimited?
23      A.    No.
24      Q.    Okay.  In either of those depositions, were you
25  a plaintiff or a defendant?

Page 6

1   **A.**   Plaintiff.
2   **Q.**   Okay.  I'm going to ask you questions during
3   the course of the day.  To the best of your ability,
4   please answer my questions.  To the best of your
5   ability, when I'm asking a question, please wait for me
6   to finish the question before you answer it, and I will
7   do my best to not interrupt you when you're answering.
8   **A.**   Okay.
9   **Q.**   You have to answer verbally so that the court
10  reporter can take it down.  If, during the course of the
11  examination, you wish to confer with counsel, that's
12  fine, except I would ask you that you answer a pending
13  question before you confer with counsel.  So if we're in
14  the middle of a question, before you speak to counsel,
15  you should try your best to answer the question.
16      Of course, if you don't understand the
17  question, you can ask me to rephrase it.  And, lastly,
18  if during the course of the morning, you wish to take a
19  break -- during the course of the day, I should say --
20  just let me know, and we'll take a break.
21  **A.**   Okay.
22  **Q.**   By whom are you currently employed?
23  **A.**   Interworks Unlimited.
24  **Q.**   And what is your position?
25  **A.**   President.

Page 7

1   **Q.**   What is the business of Interworks?
2   **A.**   Distribution.
3   **Q.**   Distribution of what?
4   **A.**   Distribution of gaming, consumer electronics,
5   and toys.
6   **Q.**   And are you the owner of Interworks?
7   **A.**   Yes.
8   **Q.**   Are there any other owners?
9   **A.**   No.
10  **Q.**   How many employees does Interworks have?
11  **A.**   Nine.
12  **Q.**   Is Tony Tu one of your employees?
13  **A.**   Yes.
14  **Q.**   What's his position?
15  **A.**   He's the accounts executive.
16  **Q.**   And what are his duties and responsibilities?
17  **A.**   His duties are to assist me to process -- to
18  communicate with our clients, customers, and our
19  vendors.
20  **Q.**   How long has Interworks been in business?
21  **A.**   Almost ten years.
22  **Q.**   Where is Interworks located?
23  **A.**   Interworks is located at 2418 Peck Road,
24  City of Industry, California 90601.
25  **Q.**   Has it been at that location for the ten

Page 8

1   years --
2   **A.**   Yes.
3   **Q.**   -- of its existence?
4       And are your offices there?
5   **A.**   Yes.
6   **Q.**   Do you know a company, Digital Gadgets, LLC?
7   **A.**   Yes.
8   **Q.**   And how do you know them?
9   **A.**   They were introduced to me by a sales -- a VP
10  of sales at Chic.
11  **Q.**   And who is the VP of sales?
12  **A.**   Her name is Janet, last name is Lu, L-u.  Not
13  related.
14  **Q.**   And who is Chic?
15  **A.**   Chic is the manufacturer of the hoverboard.
16  **Q.**   When did this introduction take place?
17  **A.**   To my recollection, it's sometime in September
18  or October of 2016.
19  **Q.**   And do you recall the reason for the
20  introduction?
21  **A.**   Yes.  Digital Gadgets -- Chris Mitchell, who
22  was trying to solicit Chic for distribution in the
23  U.S. -- we -- Interworks has the exclusive distribution.
24  And an introduction was made between Janet and Chris, to
25  me, for the reason that they want to sell Chic products

Page 9

1   in the United States.  And that's the reason for the
2   introduction, is they can buy directly from us because
3   we're the distributor -- the exclusive distributor.
4   **Q.**   So Mr. Mitchell had made inquiry of Chic to
5   acquire product from them --
6   **A.**   Correct.
7   **Q.**   -- and Ms. Lu advised Mr. Mitchell that
8   Interworks was the exclusive distributor, and therefore
9   put the two of you together?
10  **A.**   Correct.
11  **Q.**   Now, at the time of this introduction, what was
12  the business relationship between Chic and Interworks?
13      What were you the exclusive distributors of?
14  **A.**   Exclusive distributors for their hoverboards.
15  **Q.**   Do they make a product besides hoverboards?
16  **A.**   Solely hoverboards.
17  **Q.**   And was the exclusivity that you had, was that
18  in a writing?
19  **A.**   Yes.
20  **Q.**   Has that writing been produced in this lawsuit?
21  **A.**   I'm not sure.
22      MR. LAZARUS:  I'd call for the production of
23  the exclusivity agreement.
24  **Q.**   When did Interworks and Chic enter into the
25  exclusivity agreement?

Page 10

1   **A.**   Sometime in 2015.
2   **Q.**   Prior to the exclusivity arrangement, were you
3   doing business with Chic?
4   **A.**   Yes, we were.
5   **Q.**   And the prior business consisted of purchasing
6   hoverboards?
7   **A.**   Correct.
8   **Q.**   And how long had that prior business gone on?
9   **A.**   Probably for about a year.
10  **Q.**   Tell me, please, how it came to pass that the
11  arrangement became an exclusive.
12  **A.**   Well, for a business relationship, you know, we
13  sold their product.  They needed a distributor for the
14  U.S. channel.  And we had the retail channels; so, you
15  know, that's kind of how it came about.
16  **Q.**   They had no other distributor in the U.S.?
17  **A.**   At that time, no.
18  **Q.**   Did they propose the exclusive arrangement, or
19  did you?
20  **A.**   I think it was mutual.
21  **Q.**   In your earlier answer, you used the
22  expression, "we had the retail channels."
23       What does that mean?
24  **A.**   Retail channels is your retail stores in the
25  United States.  You know, big-bucks stores.  Your -- you

Page 11

1   know, your Wal-Mart, Target, your Best Buy, Toys "R" Us.
2   You know, big-bucks retailers.
3   **Q.**   When you say "We had the retail channels," what
4   do you mean?
5   **A.**   That means we sell to the retail channels.
6   **Q.**   Okay.  Did you have any exclusivity arrangement
7   with any retailer?
8   **A.**   No.
9   **Q.**   Prior to the exclusivity arrangement, had you
10  sold hoverboards to the retail channel?
11  **A.**   Yes.
12  **Q.**   To whom did you make those sales?
13       MR. HSU:  Hold on.
14       Objection.  Trade secrets.  Not reasonably
15  calculated to lead to any admissible evidence.
16       Where are we going?
17  BY MR. LAZARUS:
18  **Q.**   Okay.  Just answer the question.
19       MR. HSU:  I instruct the witness not to answer.
20       MR. LAZARUS:  Okay.  Mark that, and I will seek
21  sanctions.
22  **Q.**   Prior to the exclusivity arrangement, had you
23  made sales of hoverboards to QVC?
24  **A.**   Can you repeat that question?
25       MR. LAZARUS:  Could you read the question back.

Page 12

1       (Whereupon, the record was read back
2       by the Court Reporter as follows:
3       "Q.  Prior to the exclusivity
4       arrangement, had you made sales of
5       hoverboards to QVC?")
6       THE WITNESS:  No.
7   BY MR. LAZARUS:
8   **Q.**   To whom had you made sales?
9   **A.**   Again, that's a trade secret.  I --
10  **Q.**   What's secret about it?
11  **A.**   Because Digital Gadgets is a competitor, and
12  they have all rights to get the information from who I'm
13  selling to so they can attempt to solicit my accounts.
14  So for that reason, I don't think that I should disclose
15  any of the retail accounts.  I mean, if you can figure
16  what the retail accounts are, you know, it's what is out
17  there.  It's retailers.
18  **Q.**   Okay.  So exactly why it's not confidential or
19  secret.
20       So which retailers was it?
21  **A.**   It's secret in who is selling hoverboards.  I
22  don't want to disclose that.
23  **Q.**   Okay.  So on your counsel's instruction, you're
24  refusing to disclose your customer base for hoverboards;
25  is that correct?

Page 13

1   **A.**   That's correct.
2       MR. HSU:  I reiterate my objection and
3   instruction.  Thank you.
4       MR. LAZARUS:  And your objection is it's a
5   secret?
6       MR. HSU:  Trade secret.  Without a protective
7   order, you're not going to get it.  And I offered you.
8       THE REPORTER:  I'm sorry?
9       MR. HSU:  "And I offered you."
10      MR. LAZARUS:  Don't try to justify your
11  misconduct.
12      MR. HSU:  You can say whatever you want.
13      MR. LAZARUS:  I will say whatever I want.
14  Thank you.
15      MR. HSU:  It's your deposition.
16      MR. LAZARUS:  It is my deposition.
17  **Q.**   For what period of time prior to the
18  exclusivity arrangement had you sold hoverboards to QVC?
19  **A.**   Did you say "prior to the exclusivity"?
20  **Q.**   Yes, sir, that's what I said.
21  **A.**   I did not sell hoverboards to QVC.
22  **Q.**   Okay.  So after -- the first sales by
23  Interworks, to QVC, of hoverboards came after you
24  entered into the exclusivity arrangement?
25  **A.**   Correct.

Page 14

1  **Q.**   Okay.  And how many units did you sell?
2  **A.**   Roughly, off my head (verbatim), about 10,000.
3  **Q.**   Over what period of time?
4  **A.**   Of a one-month period.
5  **Q.**   What month?
6  **A.**   The month of November.
7  **Q.**   What year?
8  **A.**   2016.
9  **Q.**   And what model hoverboard did you sell?
10  **A.**   It's the High Roller Model C.
11  **Q.**   Prior to selling hoverboards to QVC, had you --
12  Interworks made sales of products to QVC?
13  **A.**   No.
14  **Q.**   Who introduced you to QVC?
15  **A.**   I contacted QVC.
16  **Q.**   And when did you do that?
17  **A.**   Around April of 2016.
18  **Q.**   And who did you contact?
19  **A.**   The buyer, Meghan Kane.
20  **Q.**   And between April of 2016 and November of 2016,
21  how did it develop that you were able to sell
22  10,000 units to QVC?
23  **A.**   Well, we made our sales pitch.  We presented
24  our product.  And Chic has the patent for the
25  hoverboard; so at that point, QVC decided to bring it on

Page 15

1  board.
2  **Q.**   At what point?
3  **A.**   What's that?
4  **Q.**   At what point did they decide to bring in your
5  board?
6  **A.**   I would say somewhere around June -- June, July
7  time frame.
8  **Q.**   And from June to November, what happened?
9  **A.**   Can you rephrase that?
10      "What happened"?  What do you mean, "what
11  happened"?  I'm not understanding the question.
12  **Q.**   Well, if they decided to bring them in in June,
13  and the first sales were in November, what happened in
14  the period between June and November relative to those
15  sales?
16  **A.**   Well, between the time between June and
17  November, when they needed the goods, they -- as a
18  buyer, they have to plan when they're going to air it
19  because, as you know, QVC is not a -- QVC is not a
20  retail store.  So they have to book an airing time.  And
21  during that process, they're setting up for the
22  holidays.  So they're going to -- you know, we discuss
23  the product, then they gave us airing time when they
24  needed to deliver the goods and when they're going to do
25  the airing.  So...

Page 16

1  **Q.**   And they told you that the airing would be
2  approximately November of 2016?
3  **A.**   Right.
4  **Q.**   Okay.  When did you take in the -- withdrawn.
5      Did you physically receive the hoverboards from
6  Chic?
7  **A.**   Well, the goods came in late October, beginning
8  of November.  And products came in in sequence.  It's
9  coming in containers.  It's a large volume; so it's many
10  containers that come in.  So around that period of time,
11  products are flowing in.
12  **Q.**   In the fall of 2016, sometime in October?
13  **A.**   Right.
14  **Q.**   And where did they come into?
15  **A.**   The Long Beach port and then to my warehouse.
16  **Q.**   Okay.  Where is your warehouse?
17  **A.**   2418 Peck Road.
18  **Q.**   And did you take in 10,000 pieces from Chic,
19  approximately?
20  **A.**   Yes.
21  **Q.**   And were all 10,000 of those sold to QVC?
22  **A.**   Yes.
23  **Q.**   Other than -- other than those 10,000 pieces,
24  and in the period of calendar year 2016, had you taken
25  in any other hoverboards for any other customer?

Page 17

1  **A.**   Yes.
2  **Q.**   Okay.  And how many pieces did you sell?
3  **A.**   Probably in the range of another, give or take,
4  10,000.
5  **Q.**   And was that before or after you took in the
6  pieces for QVC?
7  **A.**   Before.
8  **Q.**   And after you took in the 10,000 pieces to --
9  for QVC, did you ever again take in hoverboards for sale
10  to QVC -- for Interworks sale to QVC?
11  **A.**   Yes.
12  **Q.**   When?
13  **A.**   Like I said, products were coming in from --
14  you know, coming in for the holidays.  So there needs to
15  be replenishment.  So there were goods coming in
16  through -- every month, there's goods coming in.
17      (Interruption in proceedings due to cell
18  phone.)
19      MR. LAZARUS:  Excuse me.
20      Yeah?  I am.  You're --
21      THE WITNESS:  You have to type that.  He didn't
22  say "Off the record."
23      THE REPORTER:  I can do my job, thank you.
24  BY MR. LAZARUS:
25  **Q.**   I'm sorry.

Page 18

1    After the 10,000 pieces were taken in, were
2  they delivered to QVC?
3    **A.**   Which 10,000?  Before or the after?
4    I told you, there's before QVC and after --
5  after I shipped 10,000 QVC items.  So -- so before or
6  after?
7    **Q.**   Okay.  You said you took in 10,000 pieces for
8  QVC in October.
9    **A.**   Right.  Right.
10    Then, after, there's a continuation of products
11  coming in.
12    **Q.**   Okay.  Were all 10,000 pieces shipped to QVC?
13    **A.**   Yes.
14    **Q.**   Were they shipped, or were they called out by
15  QVC customers --
16    **A.**   They were shipped to QVC.
17    **Q.**   Okay.  The subsequent pieces, over what period
18  of time would you make those shipments?
19    **A.**   Well, the remaining -- the flow of products
20  that's coming in, those are for our other customers, for
21  reorders and for the holidays.  So, you know, there's
22  always a flow of products coming in.  It's not 10,000
23  for QVC and you stop.  There's a flow of products.
24    **Q.**   Okay.  But I asked you about QVC.
25    When did you next ship goods to QVC after the

Page 19

1  10,000 pieces?
2    **A.**   After we shipped the 10,000 pieces to QVC, the
3  next shipment, we actually went through Digital Gadgets.
4    **Q.**   What does that mean, "we went through
5  Digital Gadgets"?
6    **A.**   So Interworks sells directly to QVC, to their
7  direct DC vendor.  Digital Gadgets is a drop-ship
8  vendor.  And due to the timing and the holidays, QVC
9  needed more products and the timing for us to ship to
10  the DC for the airing out to the customers, and the
11  timing didn't work out.  So that's where Digital Gadgets
12  came in and asked to work together to do the online side
13  or the drop-ship side.  So we sold Digital Gadgets goods
14  so that they can be the drop-ship vendor for QVC.
15    **Q.**   The goods -- the 10,000 pieces that Interworks
16  sold to QVC were delivered to the QVC distribution
17  center?
18    **A.**   Correct.
19    **Q.**   And they were billed to QVC by Interworks?
20    **A.**   Correct.
21    **Q.**   The drop-ship goods that you're referring to
22  were delivered -- withdrawn.
23    Were the drop-ship goods that you referred to
24  delivered to the DC?
25    **A.**   No.

Page 20

1    **Q.**   Where were they delivered?
2    **A.**   They were delivered to the Phoenix distribution
3  in Santa Fe, which is Digital Gadgets's third-party
4  warehouse logistics company.
5    **Q.**   And if you know, after delivery to Phoenix,
6  where did those goods next go?
7    **A.**   Those goods, to my understanding, should be for
8  QVC's customers.
9    **Q.**   Do you mean to say that they were shipped out
10  of the Phoenix warehouse, to your understanding, direct
11  to the QVC customer?
12    **A.**   Correct.
13    **Q.**   Now, in what manner -- withdrawn.
14    What is the reason that that was an expedited
15  manner of doing business?
16    How did you save time?
17    **A.**   Well, saving time is -- the transit time from
18  our warehouse to -- to QVC's DC takes about seven days.
19  Okay?  And for QVC to receive the goods and prepare the
20  goods to ship, I don't know how long that's going to
21  take.  Okay?  So with the drop-ship, they can
22  immediately ship directly to the consumer versus going
23  to the DC -- to the distribution center and the
24  distribution center out to that consumer.
25    And, again, the reason that we did the

Page 21

1  drop-ship is because it's a timing and it's
2  Christmastime, and so people want their gifts before
3  Christmas.
4    **Q.**   You will recall that you answered, a minute or
5  two ago, when I was asking you about the shipments --
6  after the 10,000 units, when your next shipments were to
7  QVC, and your answer was that the next shipment was
8  actually through Digital Gadgets.
9    Do you recall that?
10    **A.**   Mm-hmm.
11    **Q.**   Okay.  So was there an agreement, between you
12  and Digital Gadgets, pertaining to the sale and delivery
13  of hoverboard units, by Digital, to QVC, at the time
14  that you made the sale to Digital Gadgets?
15    **A.**   When you refer to "agreement," do you -- are
16  you referring to a contract, or are you referring to a
17  PO?  What are you referring to, "agreement"?
18    **Q.**   Do you know what an agreement is?
19    **A.**   I do know what an agreement is, but there's
20  many forms of "agreement."
21    **Q.**   Thank you.
22    Was there an agreement between you and
23  Digital Gadgets whereby you and Digital Gadgets
24  understood that these hoverboards would go to QVC?
25    **A.**   The agreement is they're PO'd to us.

Page 22

1  **Q.**   The Digital Gadgets PO?
2  **A.**   Correct.  Digital Gadgets's PO.
3  **Q.**   Okay.  However, again, referring to your
4  earlier answer, you stated that your next shipment to
5  QVC went through Digital Gadgets --
6  **A.**   Correct.
7  **Q.**   Do you recall that?
8      -- so when Digital Gadgets purchased those
9  goods from Interworks, was it your understanding that
10 Digital Gadgets would deliver those units to QVC?
11 **A.**   That's correct.
12 **Q.**   And how many units were -- were subject of this
13 agreement?
14 **A.**   4,800 pieces for the first order.
15 **Q.**   First quarter of what year?
16 **A.**   No.  First order.
17 **Q.**   I'm sorry.  First order.  Okay.
18     And what model was that?
19 **A.**   Model C.
20 **Q.**   Now --
21 **A.**   And a second order of 5,800 pieces.
22 **Q.**   And timing-wise, when was the 4,800-piece order
23 placed?
24 **A.**   4,800-piece order was placed roughly around
25 beginning of December.

Page 23

1  **Q.**   And the 5,800-piece order?
2  **A.**   5,800 pieces was around early January.
3  **Q.**   Now, prior to the placement of those orders --
4  and, by the way, I want to be clear.
5      Those were Digital Gadgets orders to
6  Interworks; correct?
7  **A.**   Correct.
8  **Q.**   Okay.  Prior to the placement of those orders,
9  by Digital Gadgets, with Interworks, had you spoken to
10 QVC concerning the routing of these goods through
11 Digital Gadgets?
12 **A.**   Yes.
13 **Q.**   With whom did you speak?
14 **A.**   Again with Meghan Kane.
15 **Q.**   Tell me what those conversations were.
16 **A.**   The conversations were, "How can we expedite
17 more products?"  "How can we sell and push more units
18 for the holidays?"
19     And the solution was to use a drop-ship vendor.
20 **Q.**   And that was Digital Gadgets?
21 **A.**   So -- Digital Gadgets.  Correct.
22 **Q.**   And that's the earlier story you told me about
23 the introduction?  That's the reason for the
24 introduction?
25 **A.**   Correct.

Page 24

1  **Q.**   Now, the units for the first order, when --
2  when that order was placed by Digital Gadgets, did
3  Interworks have those units in inventory?
4  **A.**   Yes.
5  **Q.**   How about when the second order came?
6  **A.**   Yes.
7  **Q.**   And when -- when did you acquire those units?
8  **A.**   Again, it's between November through December.
9  The whole -- products come on a container load.  And
10 there's 2,400 per container; so they come on a weekly
11 basis.
12 **Q.**   Were they -- did they arrive at the same time
13 as the 10,000 pieces that you shipped to the QVC drop
14 center?
15 **A.**   No.  They come two or three containers per
16 week.  So in sequence, they come, you know, on the -- on
17 a week-to-week basis.  Not in one shot, the 10,000, but,
18 you know, little by little they trickle in.
19 **Q.**   Am I correct that the 10,000 pieces that you
20 sold to QVC arrived contemporaneous with the
21 4,800 pieces that ultimately went through
22 Digital Gadgets?
23 **A.**   Can you repeat that question?
24 **Q.**   Let me try again.  Did you --
25 **A.**   Yeah.

Page 25

1  **Q.**   Did these -- did you buy 10,000 pieces for drop
2  for your shipment to the QVC DC, and then buy
3  4,800 pieces for Digital Gadgets to drop-ship?
4  (Verbatim.)
5  **A.**   No.  We bought -- we bought 20,000 units --
6  **Q.**   Okay.
7  **A.**   -- from the factory.  And the units that come
8  in, we allocate 10,000 to QVC, which they committed to;
9  and then whatever that QVC wanted additionally for the
10 drop-ship, that's what Digital Gadgets ordered.
11 **Q.**   Okay.  And is there a piece of paper from
12 Interworks, to Chic, that is an order for 20,000 units
13 of hoverboards -- these 20,000?
14 **A.**   You mean like a PO?
15 **Q.**   Yes, sir.
16 **A.**   Of course.
17 **Q.**   Okay.  And do you, Interworks, maintain a copy
18 of that PO?
19 **A.**   Of course.
20     MR. LAZARUS:  I call for the production of that
21 purchase order, which I don't think has been produced.
22     THE WITNESS:  But again, Roger, with this is
23 this is a trade secret, also, because that's my factory.
24 And this document -- I mean, this document has all the
25 information -- costs and -- you know, the factory

Page 26

1 information.  And I don't want this disclosed because --
2 BY MR. LAZARUS:
3    Q.   I'm not interested in -- I understand what
4 you're saying.  I don't need the explanation.  You don't
5 want to produce it.  I will take it up with the court
6 down the road.  I don't need the explanation.
7         MR. HSU:  Yeah.  When the request is being
8 made, we can respond to it.
9         MR. LAZARUS:  The request is being made now,
10 and I will put it in writing when I get the transcript.
11 But I do want to go on record.  I want the PO -- or POs
12 from Interworks, to Chic, for these -- for these
13 hoverboards.
14    Q.   Now, when the hoverboards -- these
15 20,000 pieces arrived, were they all received at the
16 Interworks warehouse?
17    A.   Yes.
18    Q.   And the approximately 10,000 pieces were
19 drop-shipped to -- pardon me -- were -- withdrawn.
20        10,000 pieces, approximately, were shipped to
21 the QVC distribution center, and another 10,000 over
22 time, approximately, went to the Phoenix warehouse for
23 Digital Gadgets?
24    A.   Correct.
25    Q.   Was there one PO to Chic, from Interworks, for

Page 27

1 these 20,000 pieces, or more than one?
2    A.   Through the year or...?  I mean --
3    Q.   These 20,000 pieces that we've been talking
4 about.
5    A.   I don't remember how many POs.  But it could be
6 one; it could be two.
7    Q.   Okay.  And what was ordered on the POs?
8    A.   The Model C hoverboards.
9    Q.   And the Model C hoverboards that were shipped
10 to the QVC distribution center, were they from the same
11 POs that were shipped by Interworks to -- to Phoenix,
12 the warehouse for Digital Gadgets?
13    A.   Yes.
14    Q.   So that the hoverboards that went from
15 Interworks to QVC should have been identical to the
16 hoverboards that went from Digital to -- drop-shipped to
17 QVC's customers?
18    A.   Yes.
19    Q.   And when -- withdrawn.
20        Of the nine employees that Interworks has, were
21 they all there in calendar year 2016 and '17?
22    A.   I believe so.
23    Q.   And how many of those employees were at the
24 warehouse or worked at the warehouse?
25    A.   So when you say "worked at the warehouse," are

Page 28

1 you referring to working in the pick-and-pack, or are
2 you talking about working in the office?
3         I mean -- you know, the question is kind of
4 vague.  Like, you know, working in the warehouse -- my
5 employees who do processing don't really work in the
6 warehouse.
7    Q.   Then you answered the question.
8    A.   Yeah.
9    Q.   How many work in the warehouse?
10    A.   About three, four.
11    Q.   Okay.  And how many work in the office
12 associated with the warehouse?
13    A.   About five.
14    Q.   Is Mr. Tu one of those?
15    A.   He's one of the five.
16    Q.   Do the four warehouse workers have different
17 duties from one another?
18    A.   No.
19    Q.   Okay.  What do they do?  What do they do when
20 goods are received?
21    A.   They unload containers, pick-and-pack.
22    Q.   So our record is clear, when you say
23 "pick-and-pack," what does that mean?
24    A.   That means they take the product, label the
25 product with the shipping information, and get it ready

Page 29

1 and prepare to ship.
2    Q.   And in the ordinary course, do they inspect the
3 received units?
4    A.   They do not inspect goods.
5    Q.   Why not?
6    A.   Well, let me rephrase that.
7        When you talk about "inspect the goods" -- so
8 are you talking about opening the boxes and looking into
9 the products and inspecting the products, or are you
10 talking about making sure that the boxes are not damaged
11 from the outside?
12    Q.   Okay.  Whichever one you want.
13        Do they inspect the goods or not?
14    A.   Well, they do inspect the goods, looking --
15 making sure that the product is not damaged from the
16 outside.
17    Q.   So they don't open the box?
18    A.   They do not open the box.  However, we do do
19 spot checks.  So what we do is Tony -- he goes out there
20 and opens certain boxes, turn it on, turn it off to test
21 the products. (Verbatim.)  And after that is done, then
22 everything goes out.
23    Q.   Do you know that Mr. Tony Tu did that with
24 respect to the hoverboards that were delivered, by
25 Interworks, to Digital Gadgets?

Page 30

1   **A.**   Yeah, he did do the inspection.
2   **Q.**   How do you know?
3   **A.**   Because he inspects the product.  That's part
4   of his job.
5   **Q.**   Okay.  But do you know that he inspected these
6   goods?
7   **A.**   Yes.
8   **Q.**   How do you know that?
9   **A.**   Because he -- he communicated with
10  Digital Gadgets that, you know, the products that went
11  out -- (inaudible) his inspections.
12        MR. LAZARUS:  Could you repeat the --
13        THE REPORTER:  Did you say "passed his
14  inspections"?
15        THE WITNESS:  Huh?
16        THE REPORTER:  "Because he -- he communicated
17  with Digital Gadgets that, you know, the products that
18  went out" --
19        Did you say "passed his inspection"?  Is that
20  what you said?
21        THE WITNESS:  "Passed inspection"?
22        THE REPORTER:  I'm asking you.
23        THE WITNESS:  Oh, okay.
24        Yeah, make sure that the products are spot
25  checked and tested, and make sure they're good.

Page 31

1   BY MR. LAZARUS:
2   **Q.**   So how do you know he did this?
3   **A.**   How do I know he did that?
4        Well, that's part of his job.  I mean, I don't
5   know if did he it or not, but he -- that's -- he claimed
6   that he did.  He said that he did.  And that's part of
7   his job.  And that's not only for QVC.  That's for every
8   customer that we ship the products to.
9        One thing is -- that we do clearly is, when the
10  goods come in, instead of having the guys that did the
11  pick-and-pack, I have Tony, which is a more knowledge
12  and detailed person, inspect the product.
13  **Q.**   And the inspection that you referred to was he
14  opened boxes and turned the product on and off?
15  **A.**   Right.  Testing the product if everything is
16  functioning correctly.
17  **Q.**   Which means turning it on and turning it off?
18  **A.**   Turning it on, making sure the wheels spin
19  and -- you know, that's a typical test that we do.
20  **Q.**   Do you keep records of those tests?
21  **A.**   We don't have records of those tests.
22  **Q.**   Do you know if Mr. Tony Tu kept records of his
23  testing?
24  **A.**   I don't think he -- we keep testing records.
25  **Q.**   Now, when the products arrive -- the hoverboard

Page 32

1   products arrived at your warehouse, what paperwork came
2   with the hoverboards?
3   **A.**   That would be standard bill of lading.  And I
4   believe the -- the performer invoices from -- from
5   the -- from the factory that comes along with the bill
6   of lading.
7   **Q.**   Now, prior to the 20,000 pieces that we're
8   talking about arriving at the Interworks warehouse, and
9   in the process of Interworks making sales to QVC, did
10  Interworks supply product specifications to QVC for
11  these hoverboards?
12  **A.**   Yes.
13  **Q.**   Okay.  And how do you know that that happened?
14  **A.**   Well, that's -- that's a requirement for
15  documentations that they request and that we submitted
16  to them.
17  **Q.**   What are those documentations?
18  **A.**   The UL certifications and patent.  And I
19  think -- I think those are the two major ones that we
20  have submitted to them.
21  **Q.**   Do you know if third-party test reports were
22  submitted?
23  **A.**   I believe so.
24  **Q.**   And who at Interworks was tasked with sending
25  those documents for the --

Page 33

1   **A.**   Tony sent those documents.
2   **Q.**   Did Tony set up the hoverboard product on the
3   QVC vendor portal?
4   **A.**   Yes.
5   **Q.**   What does that mean?  What did he do?
6   **A.**   So I don't handle that aspect.  Okay?  So what
7   that means is -- to my knowledge, is putting up the
8   vendor number, the UPC number, you know, the cost.
9   Basic setup information.
10  **Q.**   Okay.  And do you know if QVC has a process
11  whereby they pass or fail proposed products?
12  **A.**   I think so.
13  **Q.**   Are you a participant, you personally, in that
14  process?
15  **A.**   No, I'm not.
16  **Q.**   Who is?
17  **A.**   Tony was the one who did the processing.
18  **Q.**   Okay.  Does Tony -- was it Tony's job to
19  physically send a hoverboard to QVC for their
20  inspection?
21  **A.**   Yes.
22  **Q.**   And do you know how many hoverboards were sent
23  to QVC for QVC's approval before delivery of the
24  10,000 pieces by Interworks?
25  **A.**   I'm not -- I'm not sure how many pieces they

Page 34

1 sent.
2  **Q.**   Okay.  And do you know whether Interworks
3 maintains records pertaining to the reports --
4 pertaining to -- withdrawn.
5      Do you know whether Interworks maintains copies
6 of the paperwork that was sent to QVC by Interworks?
7  **A.**   We should have that, yes.
8  **Q.**   And what does that paperwork consist of?
9  **A.**   Again, I don't know.
10  **Q.**   That would be these UL certifications,
11 third-party reports, and the patent information?
12  **A.**   If that's information -- so I -- you know,
13 again, I don't handle that part.  Tony is the one who
14 provides the information to QVC.  So all the -- he deals
15 with -- Tony deals with the -- with the factory and
16 getting those information.  So I do not -- you know, I
17 do not know exactly what is needed.
18  **Q.**   When the 20,000 units arrived at Interworks --
19 10,000 for shipment to the QVC DC, and the others for
20 drop-shipment through Digital Gadgets -- what efforts,
21 if any, did Interworks make to determine whether the
22 product that was received conformed to the products that
23 were approved by QVC?
24  **A.**   Well, the goods that were purchased were
25 purchased from Chic, who is the patent holder for the

Page 35

1 hoverboard.  So since we are the distributor, we believe
2 that Chic produces the superior -- more superior product
3 than all the knockoffs they sell in the market.
4  **Q.**   When Interworks received the 10,000 pieces --
5 10,000 for delivery to the QVC DC by Interworks, and
6 10,000 for delivery by drop-shipment through
7 Digital Gadgets -- what efforts did Interworks make to
8 determine whether those products and their
9 specifications conformed to the product specifications
10 approved by QVC?
11  **A.**   So, again, each -- each pallet that goes out,
12 we spot check about ten pieces.  So we make sure that,
13 you know, all the products that are being shipped are
14 working properly.
15  **Q.**   So now your testimony is that, on each pallet
16 ten pieces are checked.
17  **A.**   Yes.
18  **Q.**   And it's Tony Tu that does that?
19  **A.**   Tony does the spot checks, yes.
20  **Q.**   And you -- Tony Tu spot checks ten pieces off
21 each pallet?
22  **A.**   Correct.
23  **Q.**   And he does that by opening the box?
24  **A.**   Well, the process is that the hoverboards come
25 with the carrying case.  So the boxes are open, and we

Page 36

1 put a carrying case inside the box.  So at that time, he
2 turns it while we do the repack.
3  **Q.**   Explain to me one more time the carrying case
4 part.  I don't understand.
5  **A.**   So the hoverboard that we ship to QVC, we
6 include a carrying case, which means we have to open the
7 box, put the carrying case in, reseal it.  At that time,
8 he does the spot check.
9  **Q.**   Okay.  So every box is opened?
10  **A.**   Correct.
11  **Q.**   And some boxes are opened and spot checked by
12 Mr. Tu?
13  **A.**   Correct.
14  **Q.**   But every box is opened, and they -- and the
15 cover or container is supplied with the hoverboard?
16      THE WITNESS:  Can you repeat that question?
17      (Whereupon, the record was read back
18      by the Court Reporter as follows:
19      "Q.  But every box is opened, and
20      they -- and the cover or container is
21      supplied with the hoverboard?")
22      THE WITNESS:  Repeat that one more time --
23 BY MR. LAZARUS:
24  **Q.**   Let me just ask you.
25  **A.**   Yeah.

Page 37

1  **Q.**   When the box is open, what do you do?
2  **A.**   When the box is opened, we insert a carrying
3 case inside, and then we seal it.  There are boxes where
4 Mr. Tu will go in there and turn it on, check the wheels
5 make sure they spin.  And then we reseal it.
6  **Q.**   Was that carrying case supplied in connection
7 with the units delivered to Digital Gadgets as well?
8  **A.**   Yes.
9  **Q.**   So every box that was delivered by Interworks
10 to Digital Gadgets went through the same process as
11 those that were delivered by Interworks to QVC's
12 distribution center?
13  **A.**   Correct.
14  **Q.**   And was the spot check for the Digital Gadgets
15 goods the same as the spot check for the QVC goods?
16  **A.**   Yes.
17  **Q.**   And do you know if Mr. Tu ever looked at specs
18 for hoverboards as approved by QVC and looked at a
19 hoverboard interior, or opened the hoverboard, to see if
20 the specs matched -- the technical specs?
21  **A.**   That is a "No" because, once you open it, it
22 voids the warranty.
23  **Q.**   So none -- not -- withdrawn.
24      So of these 20,000 pieces, there was no
25 inspection done past the spot checking by Mr. Tu; is

Page 38

1  that correct?
2  **A.**   That's correct.
3      MR. LAZARUS: Did you keep your exhibits?  You
4  don't have to --
5      THE REPORTER: There are a lot of papers; so
6  let's not get them mixed up.
7      MR. LAZARUS: Okay.  With that in mind, if
8  you'll just take out Tu 10.
9  **Q.**   Have you ever seen Tu 10 before?
10  **A.**   I don't remember seeing this.
11  **Q.**   You do know that Interworks has commenced an
12  action against Digital Gadgets; correct?
13  **A.**   Correct.
14  **Q.**   And do you see that this document, Tu 10, is
15  titled, on the first page, the right side, "Complaint
16  for Breach of Contract," and it continues?
17  **A.**   What page?
18      MR. HSU: The first page.
19      THE WITNESS: Okay.
20  BY MR. LAZARUS:
21  **Q.**   Okay.  Have you ever seen this document before?
22  And feel free to look through it.
23  **A.**   Yes.  This one -- this one, yes.  I thought
24  this was a Tony file.  So -- okay.  Yes.
25  **Q.**   Okay.  So you have seen this before?

Page 39

1  **A.**   Yes.
2  **Q.**   Okay.  I want you to look at Paragraph 9 of the
3  complaint, at Page 4, which says that -- "Even though
4  the hoverboards were conforming and accepted, defendant
5  has failed to fully pay for these orders."
6      Do you see that?
7  **A.**   Mm-hmm.
8  **Q.**   How do you know the hoverboards were
9  conforming?
10  **A.**   Again, the hoverboards were made by the
11  original creator of this product.  Okay?  The specs, the
12  quality control -- it is the best quality hoverboard in
13  the market.  Okay?
14      In China, the factories -- I've inspected the
15  factory, seen the quality of the product.  So when the
16  products come in, when we do our spot check, it
17  determines how many units turn on or don't turn on.
18  That's what we're trying to determine.  That's the only
19  way that we can determine that these goods are good or
20  bad.  Okay?  There's no other way.  If we open the
21  product, that voids the contract -- or voids the
22  warranty.
23  **Q.**   Now, when it says here at Paragraph 9, "Even
24  though the hoverboards were conforming," what do you
25  understand the reference to -- "conforming" to mean?

Page 40

1  **A.**   Conforming, meaning that the specs that they
2  have in the patent and how they made this product, all
3  the components, all the ICs, are per the specs of the
4  creator of the product.
5  **Q.**   Okay.  And the specs that you are referring to
6  were specs that were approved by QVC?
7  **A.**   Well, yes.
8  **Q.**   Okay.  And so the products that were delivered
9  by Interworks, to Digital Gadgets, were conforming to
10  the QVC specs?
11  **A.**   Yes.
12  **Q.**   Do you know that?
13  **A.**   I know that.
14  **Q.**   How do you know that?
15  **A.**   I know that because the shipments that came in
16  from Chic -- I know that the qualities -- are a good
17  quality product, and the fact that we did do our due
18  diligence of spot checking the products.  And products
19  that went out to Digital Gadgets had no issues.
20  **Q.**   Okay.  So you're assuming that they were the
21  same because you followed a course of conduct that you
22  typically follow with respect to the receipt and
23  delivery of goods?
24  **A.**   Correct.
25  **Q.**   Now, when -- withdrawn.

Page 41

1      Do you know how big a factory Chic is?
2  **A.**   They're -- they're a big factory.
3  **Q.**   Okay.  Do you know how many workers they have?
4  **A.**   At least 100-something, plus.
5  **Q.**   100 or --
6  **A.**   I never counted how many they have.  But, you
7  know, I would say there are 100-plus.
8  **Q.**   And do you know how many hoverboards they
9  produced annually in 2016?
10  **A.**   That, I do not know.
11  **Q.**   Do you know whether Chic, in 2016, continually
12  manufactured hoverboards?
13  **A.**   Yes.
14  **Q.**   Yes, they did?
15  **A.**   Yes, they did.
16  **Q.**   Do you know whether the hoverboards that you
17  purchased from Chic in 2016 -- do you know whether they
18  were all from the same production run?
19  **A.**   That, I'm not sure.  Okay?  So I am assuming
20  that, you know, it's all from the one factory.
21  **Q.**   You're assuming that it's all from one factory,
22  but you do not know if it's all from one production
23  line?
24  **A.**   I assume that, when I PO to Chic, it's coming
25  from Chic.

Page 42

1  **Q.**   Okay.  But do you know if the units you
2  purchased from Chic were manufactured by Chic all at the
3  same time?
4  **A.**   To my understanding, yes.
5  **Q.**   Do you know what a "lot" is?
6  **A.**   I know what a "lot" is.
7  **Q.**   What is a "lot"?
8  **A.**   A "lot" is what they produce in a group, what
9  goes out.
10  **Q.**   Were these goods -- I'm sorry.
11      Were the goods received by Interworks in the
12  fall of 2016 from one lot or more than one lot?
13  **A.**   Again, we PO for 20,000 pieces.  And what we
14  receive should be from one lot.
15  **Q.**   Why do you say it should be from one lot?
16  **A.**   Or it is from one lot.
17  **Q.**   How do you know?
18  **A.**   I don't know.
19  **Q.**   And do you know that -- or do you know if, in
20  the course of manufacturing consumer electronic
21  products, there's a variation, from time to time, in the
22  product of goods from lot to lot?
23  **A.**   I'm a distributor.  So I'm not a manufacturer.
24  So I'm not very familiar with that.
25  **Q.**   And you don't check for it?

Page 43

1  **A.**   I look at, I visit the factory.  I see the
2  production line.  And from what is proven and shown to
3  me at the factory, I have all reason to believe that
4  these are high-quality goods.  They've presented the
5  patent.  So, you know, the -- my understanding, these
6  are the superior products, compared to what's in the
7  market.
8  **Q.**   Referring again to Paragraph 9, "Even though
9  the hoverboards were conforming and accepted" -- what do
10  you mean when you say they were accepted?
11  **A.**   They're accepted because, again, the products
12  are from Chic.  And they have the patent to support
13  their product, and they have the quality control to
14  support their product.
15  **Q.**   But what do you mean, they were -- these
16  hoverboards were accepted?
17      MR. HSU:  Objection.  Calls for a legal
18  conclusion.  And calls for speculation.
19      MR. LAZARUS:  Okay.  No speaking objections.
20  The witness can answer.
21      MR. HSU:  That's not a speaking objection.
22      MR. LAZARUS:  That's a speaking objection.
23      MR. HSU:  That's my document, not his document.
24  How --
25      MR. LAZARUS:  It's a speaking objection and --

Page 44

1      MR. HSU:  That is a speaking objection.  But
2  prior to that, it wasn't.
3  BY MR. LAZARUS:
4  **Q.**   How do you know the goods were accepted?
5  **A.**   Same thing as conforming, you know.  We
6  understand that the product is -- the product that we
7  receive and accept are the quality product that Chic
8  produces, based on what they have on their patent,
9  what -- their claims on the patents, and what components
10  they use in their patented product.
11  **Q.**   And the products that you received that were
12  sent or delivered by Interworks to the QVC distribution
13  center were supposed to be conforming and the same as
14  the products that were delivered by Interworks to
15  Digital Gadgets for drop-shipment; is that correct?
16  **A.**   Correct.
17      MR. LAZARUS:  Let's take a two-minute break.
18      (Brief recess.)
19      MR. LAZARUS:  Back on the record.
20  **Q.**   Mr. Lu, do you know a person Charlie Tebele?
21  **A.**   Yes.
22  **Q.**   Have you ever met him?
23  **A.**   Yes.
24  **Q.**   When did you meet him first?
25  **A.**   CES 2017.

Page 45

1  **Q.**   And what is CES?
2  **A.**   Consumer Electronics Show.
3  **Q.**   And that show is usually in January, is it not?
4  **A.**   Beginning of January.
5  **Q.**   Prior to meeting Mr. Tebele at CES 2017, had
6  you ever spoken to him?
7  **A.**   Yes.
8  **Q.**   How much prior to CES had you spoken to him?
9  **A.**   I don't recall how many times, but there were a
10  few conference calls.
11  **Q.**   How much backwards in time was that?
12      Weeks?  Days?  Months?
13  **A.**   Probably months.
14  **Q.**   Was Mr. Tebele the first person you spoke to
15  after the introduction by Meghan?
16  **A.**   No.
17  **Q.**   Who you did you speak to first?
18  **A.**   Chris Mitchell.
19  **Q.**   Okay.  And how many times did you speak to
20  Chris Mitchell before you met with Mr. Tebele?
21  **A.**   Numerous times.
22      So can I ask a question?
23      So it's my understanding that Mr. Mitchell is
24  no longer with the company.  Is that... just asking if
25  he's still with the company.

Page 46

1    MR. LAZARUS:  Off the record, please.
2    (Discussion held off the record.)
3    MR. LAZARUS:  Back on the record.
4    Q.   Prior to your meeting with Mr. Tebele at CES,
5  had Digital Gadgets placed the hoverboard order with
6  Interworks?
7    A.   Yes.
8    Q.   And with whom -- withdrawn.
9    Who placed it on behalf of Digital Gadgets?
10  Who was the person that placed the order?
11    A.   Chris Mitchell.
12    Q.   And other -- withdrawn.
13    Did Chris Mitchell place the order with you?
14    A.   Yes.
15    Q.   And did you negotiate the price and terms with
16  Mr. Mitchell?
17    A.   Yes.
18    Q.   Did anybody else conduct those negotiations for
19  Interworks?
20    A.   No.
21    Q.   Did you conduct those negotiations, at any
22  time, with Mr. Tebele?
23    A.   No.  However, the deal was run through
24  Mr. Tebele through Chris Mitchell.
25    Q.   And what does that mean, "the deal was run

Page 47

1  through Mr. Tebele through Chris Mitchell"?
2    A.   So the offer were made (verbatim), and
3  Mr. Tebele was included in the e-mails.  And in
4  reference to e-mails from Chris Mitchell, he referred
5  Charlie Tebele as accepting the deals and the pricing
6  and whatnot.
7    Q.   Okay.  Just to be clear, when you say the offer
8  was made, who made an offer?
9    A.   Well, I -- there's offers that was offered from
10  Chris on the pricing, what they needed it to be, and
11  what they -- what they wanted.
12    Q.   And to your knowledge, the pricing and terms
13  were -- were run by Chris Mitchell through Charlie?
14    A.   Correct.
15    Q.   And did you, at any time, discuss the product
16  specifications with Chris Mitchell?
17    A.   The information for product specs was sent by
18  Tony to Chris.
19    Q.   But my question was, did you ever discuss the
20  product specifications with Chris Mitchell?
21    A.   So you have to clarify "specifications."
22    What kind of specifications are you talking
23  about?  You know, what model?
24    Are we talking about how fast it goes?
25    I mean, again, it's very vague for me to

Page 48

1  answer.
2    Q.   Okay.  So what specifications did you talk
3  about with Mr. Mitchell?
4    A.   It's the model.
5    Q.   Just the model?
6    A.   Yeah.
7    Q.   So you didn't talk about the speed or similar?
8    A.   Well, those informations were sent to him by
9  Tony.
10    Q.   So you did not speak to Mr. Mitchell about
11  those specifications?
12    A.   Well, I mean, specification of the product --
13  again, those informations were e-mailed to him, of what
14  the product is.
15    Q.   Okay.
16    A.   So -- you know.
17    Q.   But I'm asking you what you spoke to
18  Mr. Mitchell about.
19    A.   Well, I don't recall.  There were many things
20  that we spoke about.
21    Q.   But did you speak about product specifications
22  with Mr. Mitchell, other than the model?
23    A.   I believe so.
24    Q.   What did you tell him?
25    A.   Probably the basic specs of the product.

Page 49

1    Q.   What are the basic specs of the product?
2    A.   Well, the color, the -- the speed, and the
3  patent involved.
4    Q.   Did you discuss the approval, by QVC, of the
5  specs for the product with Mr. Mitchell?
6    A.   No.
7    Q.   Did you and Mr. Mitchell discuss QVC as the
8  ultimate -- or as the Digital Gadgets' customer for
9  these goods?
10    THE WITNESS:  Can you repeat that question for
11  me?
12    (Whereupon, the record was read back
13    by the Court Reporter as follows:
14    "Q.  Did you and Mr. Mitchell discuss
15    QVC as the ultimate -- or as the
16    Digital Gadgets customer for these
17    goods?")
18    THE WITNESS:  What do you mean by "ultimate"?
19  BY MR. LAZARUS:
20    Q.   Okay.  Let me rephrase the question.
21    Did you discuss with Mr. Mitchell that
22  Digital Gadgets was going to sell the goods to QVC?
23    A.   Yes.
24    Q.   And did Mr. Mitchell know that, prior to his
25  purchase, on behalf of Digital, of these hoverboards,

Page 50

1 you had made sales separately, of the same item, to QVC?
2  **A.**   Yes.
3  **Q.**   How about with Mr. Tebele?  Did you ever talk
4 about the specifications of the product with Mr. Tebele?
5  **A.**   No.
6  **Q.**   I want to show you next a document which I'll
7 ask the reporter to mark -- mark two at once.  The First
8 Amended Counterclaim of Digital Gadgets should be Lu 1.
9 And then the answer to the first amended counterclaim
10 should be Lu 2.
11       (Defendant/Counter-Claimant's
12       Exhibits Lu 1 and Lu 2 were marked
13       for identification by the Court
14       Reporter, and copies are attached
15       hereto.)
16 BY MR. LAZARUS:
17  **Q.**   The witness has in front of him what has now
18 been marked as Lu 1 and Lu 2.  Just to be clear, is --
19 Lu 1 was the counterclaim --
20  **A.**   Yes.
21  **Q.**   -- and Lu 2 is the answer to the counterclaim.
22       Have you ever seen either of those documents
23 before?
24  **A.**   Yes.
25  **Q.**   I want you to look at Paragraph 12 of the

Page 51

1 counterclaim, where it states, "In connection
2 therewith" --
3  **A.**   What page?
4  **Q.**   Page 3, Paragraph 12.
5  **A.**   Okay.
6  **Q.**   And if you read it, before Paragraph 12,
7 Paragraph 11 says, "As set forth in Interworks'
8       complaint, and commencing approximately
9       December 2016, Digital Gadgets began
10       purchasing hoverboards from Interworks."
11       In Paragraph 12 it says, "In connection
12       therewith, Interworks, at all relevant
13       times, knew that DG purchased the
14       Hoverboards for resale to QVC, an American
15       cable satellite and broadcast television
16       network and flagship shopping channel
17       specialized in home shopping."
18       Do you see all that?
19  **A.**   Mm-hmm.
20  **Q.**   Is that true, that Interworks knew, at all
21 times, that DG was purchasing these hoverboards for
22 QVC?
23  **A.**   Okay.  So regarding this question, a little
24 vague in the sense that it says, "In connection
25       with" -- "therewith, Interworks, at all

Page 52

1       relevant times, knew that DG purchased
2       and" -- "purchased the hoverboards for
3       resale to QVC."
4       Are we talking about our hoverboard or --
5 because they were also selling hoverboards.  So are they
6 referring to our hoverboards?
7  **Q.**   Well, it says, in 11, that DG began purchasing
8 boards from Interworks.  And 12 says "In connection
9 therewith."
10  **A.**   Okay.
11  **Q.**   So those hoverboards purchased by DG --
12       (Interruption in the proceedings.)
13       (Brief recess.)
14 BY MR. LAZARUS:
15  **Q.**   So do you see that the hoverboards referred to
16 in Paragraph 12 are hoverboards that are referred to in
17 11 --
18  **A.**   Mm-hmm.
19  **Q.**   -- and that says the hoverboards that DG bought
20 from Interworks?
21  **A.**   That's correct.
22  **Q.**   Okay.  So is it true that Interworks knew, at
23 all times, that the hoverboards for resale
24 to QVC?
25  **A.**   Correct.

Page 53

1       (Interruption in the proceedings.)
2       MR. LAZARUS:  Just give me one second.
3       (Brief recess.)
4 BY MR. LAZARUS:
5  **Q.**   I want to look with you at Paragraph 44 of the
6 first amended counterclaims of Digital Gadgets, which is
7 Lu 1.
8       And Paragraph 44, which is at Page 7, reads,
9       "The hoverboards at issue are consumer
10       goods that Interworks, as a merchant who
11       specializes in the manufacturer of such
12       goods, warranted would pass quality control
13       inspection and industry standards without
14       objection as goods fit for the ordinary
15       purposes for which they were intended."
16       Do you see that?
17  **A.**   Mm-hmm.
18  **Q.**   Okay.  Now, do you see the reference to
19 "quality control inspection"?
20  **A.**   Mm-hmm.
21  **Q.**   Did Interworks warrant that the hoverboards
22 purchased by DG from Interworks would pass QVC quality
23 control inspection?
24  **A.**   I would first have to talk about -- we are not
25 a manufacturer.  We're a distributor.  So what warrant

Page 54

1  would pass the quality control inspection in industry
2  standard -- the QC control is done on the factory level,
3  which is the manufacturer, which is Chic.  So the
4  products that we received and the products that we sell
5  are warranted by Chic, which is a factory.  So this
6  statement here, this clause here is really incorrect.
7  **Q.**   It's incorrect?
8  **A.**   Yes, because we're not the manufacturer.
9  **Q.**   Okay.  So are you -- is it your testimony that
10 you did not warrant to Digital Gadgets that the goods
11 would pass QVC quality control?
12 **A.**   Well, we -- we don't warrant the goods because
13 that's the manufacturer's job.  So if there is a problem
14 with the product, it would be returned back to the
15 factory for credit.  Okay?  So it's not our
16 responsibility, because we're a distributor and not the
17 manufacturer; so we don't warrant the goods.
18 **Q.**   Well, DG could not have returned the goods to
19 Chic for credit because they weren't billed by Chic.
20 **A.**   But DG has -- when -- we've requested DG to
21 ship the goods back to us, but they refused.
22 **Q.**   But that's not my question.  My --
23 **A.**   But that's my answer to --
24 **Q.**   My question is that DG had no contract with
25 Chic and, therefore, could not have returned the goods

Page 55

1  to Chic for credit because they didn't buy them from
2  Chic.
3  **A.**   But they could have returned it back to us, and
4  we would have returned it back to the factory.
5  **Q.**   Because you were their supplier?
6  **A.**   Correct.
7  **Q.**   Okay.  And the question, however, that led us
8  down this path was, did you, Interworks, warrant the
9  quality of these goods to Digital Gadgets?
10 **A.**   So the factory warrants the products to
11 Interworks, which -- we warrant the product to
12 Digital Gadgets.  So should Digital Gadgets have any
13 issues with the quality, it would be a -- it should be
14 returned back to us, and then we would pass it back to
15 the factory.
16      However, Digital Gadgets never paid for the
17 goods; so I don't know how it can credit them for the
18 goods.
19 **Q.**   Did you tell Digital Gadgets that the goods
20 would pass QVC quality control?
21 **A.**   Well, that's the only way we can sell to QVC,
22 is to pass the QVC quality control.
23 **Q.**   So you told DG that these goods would pass QVC
24 quality control?
25 **A.**   Correct.

Page 56

1  **Q.**   I want you to look, please, at Paragraph --
2  withdrawn.
3       I want you to look, please, at Lu 2, and
4  specifically at Page Number 6.  I apologize.  Page
5  Number 5.
6       Do you see there's a Paragraph 44 there?
7  **A.**   Mm-hmm.
8  **Q.**   And if I told you that each paragraph of the --
9  your answer corresponds to a similarly numbered
10 paragraph of the complaint, would you agree?
11 **A.**   Not understanding the question.
12 **Q.**   Okay.  Well, do you see Paragraph 44 of the
13 third counterclaim, which is the one that we were
14 looking at?
15 **A.**   The first counter -- the first one?
16 **Q.**   Third counterclaim, Page 7.
17 **A.**   Okay.
18 **Q.**   And that's the paragraph we just looked at.
19 Do you see that?
20 **A.**   Mm-hmm.
21 **Q.**   And do you see that that's the one where
22 Interworks warrants the quality -- would pass quality
23 control inspection and industry standards?  Do you see
24 that?
25 **A.**   Right.

Page 57

1  **Q.**   And do you see, at Paragraph 44 of the answer,
2  Interworks admits that?
3  **A.**   That it passed the quality control?
4  **Q.**   You admit that it would pass the quality
5  control?
6  **A.**   Correct.
7  **Q.**   And you admit that it would pass the quality
8  control of QVC?
9  **A.**   Yes.
10     MR. LAZARUS:  Okay.  I'd like to have marked as
11 the next exhibit, which would be Lu 3, an e-mail chain
12 consisting of two pages, the first of which is an e-mail
13 from Chris Mitchell to Eric, the next is an e-mail from
14 Eric to Chris Mitchell, and the next is from
15 Chris Mitchell to Eric.  It's dated June 7th, the
16 Chris Mitchell e-mail, at the top; and June 6th is below
17 that.
18          (Defendant/Counter-Claimant's Exhibit
19          Lu 3 was marked for identification by
20          the Court Reporter, and a copy is
21          attached hereto.)
22 BY MR. LAZARUS:
23 **Q.**   If you'll take a minute to look at these
24 e-mails.
25 **A.**   Okay.

**EXHIBIT 7**

Page 58

1    Q.    Mr. Lu, referring to the e-mail which -- the
2  greeting begins at Page 1, but it's the June 6th e-mail
3  from Chris Mitchell to you, beginning, "Hey Eric.  I
4  just got killed."
5        Do you see that?
6    A.    Okay.
7    Q.    Do you recall the circumstances in which you
8  received this e-mail?
9    A.    Yes.
10   Q.    Please explain.
11   A.    So Chris sent me an e-mail -- sent me this
12 e-mail, saying that -- that there's a QA issue.  Okay?
13 For QVC.  So that was my understanding.  And, again,
14 these goods were not paid for.  So if there's any QA
15 issue, I told -- I had told Chris to return the product
16 and that I would return it back to the factory.
17       He cannot produce the products to me.  He
18 cannot produce the inventory to me.  He could not
19 produce how many units they've sold to me.
20       So from my understanding, at this period of
21 time, they also had submitted another hoverboard, their
22 own hoverboard, called -- something called Hover-Way
23 Maxx -- to QVC.  And to my understanding, they don't
24 want to pay my -- they don't want to pay me for the
25 goods that I have shipped in December, January.

Page 59

1        Six months later, they come back to me and say
2  they have issues with QVC.  They held our product --
3  because if QVC wanted to do this testing, the product
4  should come from us to QVC.  But they had these
5  products.  And I don't know what they submitted to QVC
6  for the QA.  That's -- they could tamper with it.  They
7  could change it so that they could sell their Hover-Way
8  Maxx board to QVC.  Because they know they haven't paid
9  us.  They know they're not going to get products from
10 us.
11       Therefore, in my speculation, they altered the
12 product to meet these issues, and using this issue as a
13 claim to not to give me my products back or pay me.
14 (Verbatim.)
15   Q.    Mr. Lu, what, if anything, did you do --
16 withdrawn.
17       This e-mail is dated June 6th of 2017.
18       Was this the first time that you learned that
19 Chris Mitchell, Digital Gadgets, maintained there was a
20 QA issue?
21   A.    Yes.
22   Q.    Okay.  And after the date of this e-mail, what,
23 if anything, did you do to investigate the bona fides of
24 the QA issue?
25   A.    There's nothing that I can investigate because

Page 60

1  I don't know what they shipped to QVC.
2    Q.    And did you ask -- at any time, did you ask
3  Digital Gadgets to show you what they had shipped to
4  QVC?
5    A.    No, because I was not even aware that they
6  submitted the hoverboard to QVC for QA testing.  This
7  was not brought to my attention until we were
8  threatening them with legal action to pay the invoices.
9    Q.    Did you contact QVC to ascertain the scope of
10 these QA issues?
11   A.    No, I did not.
12   Q.    To this day, what, if anything, have you done
13 to verify or -- or contradict the QA issues that
14 Mr. Mitchell spoke of?
15   A.    Number one, we're not -- we're not
16 Digital Gadgets; so we cannot obtain this information
17 from QVC.  Number two is that they did not provide us
18 with the information.  And again, like I said, we were
19 not aware there's a QA testing until he told us and sent
20 us this e-mail.
21   Q.    Did you try and contact QVC?
22   A.    No.
23   Q.    To this day, do you know whether or not there
24 was a QA issue?
25   A.    As of today?

Page 61

1    Q.    Yes, sir.
2    A.    As of today, yes.
3    Q.    And do -- what was the issue?
4    A.    The issue that they have, I believe it's about
5  the battery.  So that's pretty much what was said here.
6    Q.    Okay.  So when did you find that out, that the
7  issue was about the battery?
8    A.    I found that out shortly after we requested
9  payment from them.  And then they slapped us with --
10 they gave us this document that they -- there's a QA
11 problem with the battery.
12   Q.    But did you find out before you asked them for
13 payment or after you asked?
14   A.    After.
15   Q.    Okay.  And what did they say the issue was with
16 the battery?
17   A.    They said it was a different battery.
18   Q.    And you say "they" said it.
19       Did they say it to you?
20   A.    They said it in the e-mail.
21   Q.    To you?
22   A.    Right.
23   Q.    Okay.  And who said it to you?
24   A.    It was an e-mail from Chris Mitchell.
25   Q.    Okay.  And what did you do, when you received

### Page 62

1 that e-mail, to determine whether or not there was a
2 battery difference?
3   A.   Well, I -- I requested the information from
4 Chris Mitchell and -- to get more detail in what the
5 battery is or -- you know, what was the problem with the
6 battery and what did QVC need.
7   Q.   And did Mr. Mitchell give you that information?
8   A.   To my recollection, I don't remember if he did
9 or not.  It was very, very vague that they -- he
10 required -- or requested battery certifications.
11       So, you know, to my understanding, these
12 hoverboards have been sold to them since December, early
13 January.  And these products were being sold for the
14 past six months at QVC with no issue.  And at the same
15 time of the submission of their own Hover-Way Maxx board
16 and with our pressure to get our payments back, this
17 arised. (Verbatim.)
18       And, again, the reason why we're looking at the
19 documents that they're requesting, the battery
20 complaints and all this complaint -- I don't know what
21 was submitted.  This product has been in the warehouse
22 for six months -- more than six months.
23       I don't know if they're tampering with it.  I
24 don't know if one of the warehouse guys took it out and
25 opened it up, changed some batteries and submitted it to

### Page 63

1 QVC to make our board not pass.  So -- their way of
2 refusing to pay me, or to show our board is less
3 superior than their own Hover-Way board that they've
4 submitted for QVC because they know they're not going to
5 get products from me.
6   Q.   You were aware that the QVC issue was that the
7 battery and what DG delivered to them was different than
8 the battery that QVC had approved?
9   A.   Again, the battery issue -- they have my
10 products for six months.  I have no idea what they did
11 to them.  Okay?  It did not come from my warehouse.  If
12 the product had come from my warehouse for submission,
13 yes, you can say there's a problem with this.  The
14 product went from their warehouse directly to QVC.  I
15 have no idea what they did to it.
16   Q.   Mr. Lu, but the issue that QVC raised was a
17 difference in the batteries.
18   A.   Again, the board was in their warehouse.  They
19 can tamper with it.  They can do whatever they want to
20 do and submit it to QVC.  I don't know.
21   Q.   But that's not what I'm asking.
22   A.   But that's the answer I'm giving you.
23   Q.   Okay.  But you have to answer my question.  And
24 the question is, are you aware that QVC's issue was a
25 difference in batteries?

### Page 64

1   A.   That was brought to me by the e-mail.  But,
2 again, I cannot determine what the battery is because we
3 did not ship out of my warehouse for the QA testing.  It
4 was out from Digital Gadgets' warehouse, which -- I have
5 no idea, again, what they did to it.
6       So to your question -- you're asking me if I
7 know the problem.  Okay?  I know the problem because
8 they told me via e-mail.  It didn't come from QVC to me.
9 It was an e-mail from Digital Gadgets to me.  Okay?
10       Again, the product was purchased from us.  So
11 if there was supposed to be any testing done, the
12 products should come out of our warehouse to send to QVC
13 for testing, not their product that they have that -- I
14 don't know what they did to it.
15   Q.   Do you know that QVC determined that the
16 battery that DG submitted to it in its product was
17 different than the battery that Interworks had approved
18 previously by QVC?
19   A.   I'm not aware of that.  And because I'm not
20 aware of that, that puts me in speculation that
21 Digital Gadgets might tamper with the battery.
22   Q.   Do you know that QVC has made the claim or --
23 made the claim that the batteries were different?
24   A.   From their e-mail, from what Chris told me,
25 that's what the issue was.  Okay?  However, any testing

### Page 65

1 done on this product, they should have advised us from
2 the beginning and said, "QVC is requiring an additional
3 testing.  Can you, Eric, send the products to QVC?"
4   Q.   Did --
5   A.   So -- because initially -- this is our product;
6 so we should submit the products to -- to QVC.
7       Now we're going back where Digital Gadgets sold
8 this product.  For six months, not a complaint.  And all
9 of a sudden, there's a battery issue, and then they
10 don't want to pay, you know?
11       I mean, to me, it -- you know, you're asking me
12 a question, do I know?  Yes.  They told me.  But at the
13 same time, the product was in their warehouse.  I don't
14 know what they did to the product.  I have no control of
15 the product.
16   Q.   Mr. Lu, you agree, do you not, that QVC raised
17 an issue with respect to the battery?
18   A.   They raised an issue to QVC.  They did not
19 raise the issue to me.
20   Q.   Who did not raise the issue to you?
21   A.   QVC did not raise the issue to me as
22 Interworks.  They raised the issue to Digital Gadgets.
23 And again, the submission -- if this was a submission,
24 it should be brought to my knowledge, not after the
25 submission is done and then they claim that there's a

EXHIBIT 7

Page 66

1 battery issue, because I have no control over that and I
2 have no control over the inventory that they took from
3 me and submitted something that might not be mine.
4    Q.    You continued to receive inventory from Chic,
5 did you not?
6    A.    Yes.
7    Q.    Of the High Roller Model C?
8    A.    Yes.
9    Q.    Did you ever look at the batteries there?
10   A.    No, I did not.
11         MR. LAZARUS:  Okay.  I'd like to have marked as
12 Lu 4 an e-mail chain beginning with an e-mail from
13 Chris Mitchell to Charlie Tebele, dated June 30th, and
14 subsequent -- or other e-mails being an e-mail from
15 Meghan Kane to Paulette Brown, also of June 30th.
16         (Defendant/Counter-Claimant's Exhibit
17         Lu 4 was marked for identification by
18         the Court Reporter, and a copy is
19         attached hereto.)
20 BY MR. LAZARUS:
21   Q.    If you'll take a minute to review that, Mr. Lu.
22         Have you had an opportunity to review what is
23 now marked as Lu 4?
24   A.    Mm-hmm.
25   Q.    Do you see that, at the e-mail from Meghan Kane

Page 67

1 to Paulette Brown, for June 30th, Ms. Kane writes,
2         "Still a lot of back-and-forth regarding
3         the QA for T3501 (sic), the model (sic)
4         hoverboard we are/were trying to bring in
5         for July.  The following is still needed."
6         Then it goes through a list of seven items.
7         Do you see that?
8    A.    Mm-hmm.
9    Q.    She then says, "I" -- the second page of
10 Lu 4, "I do want to note that I know a lot
11         of this information is info needed from
12         Interworks, as that is who you bought this
13         inventory from.  We have personally reached
14         out to Interworks to help assist with
15         getting this info, and they informed us
16         there is an outstanding invoice with DG,
17         which is why they are not sending the
18         paperwork to clear up QA."
19         Do you see that?
20   A.    Mm-hmm.
21   Q.    Is that true?
22   A.    I don't recall this because this e-mail was not
23 CC'd to me.
24   Q.    Okay.  Is it true that QVC contacted Interworks
25 with respect to getting the information concerning the

Page 68

1 Model C hoverboards, and that you refused to supply it?
2    A.    Again, this is not CC'd to me.  So I'm not -- I
3 don't recall this.  I don't recall Meghan reaching out
4 to us for this information.
5    Q.    You think she's lying?
6    A.    I don't think she's lying, but...
7    Q.    She might have reached out; you just don't
8 recall it?
9    A.    I don't think she reached out because --
10   Q.    Well, then she's lying.
11   A.    I wouldn't say she's lying, but she didn't
12 reach out to me.
13   Q.    Who did she --
14   A.    I have no idea --
15   Q.    So --
16   A.    -- because I don't recall this incident and I
17 don't recall this -- this is not CC'd to me.
18   Q.    Okay.  But the fact that it's not CC'd to you
19 doesn't mean that you didn't say this; right?
20   A.    Can you repeat that question?
21   Q.    The fact that you're not CC'd doesn't mean that
22 you did not tell QVC that you won't help because there's
23 an outstanding invoice.
24   A.    Well, it might not come directly to me.  Again,
25 this e-mail trail -- or this -- Meghan requesting this

Page 69

1 information might have gone through Tony, or it might
2 have gone through somebody in my office.  But it didn't
3 come to me.  So what could have happened is they have
4 requested it -- or she might have requested it, but I
5 don't recall.
6         But, you know, would I hold -- would I hold the
7 documents because of lack of payment?  I think anybody
8 would.  Six months and you don't get paid for the goods
9 that you shipped, and now you're requesting documents?
10 You know, would you give them the documents if people
11 don't pay you for six months?
12   Q.    You understood that QVC had raised an issue --
13   A.    I do not recall the issue --
14   Q.    Excuse me, sir.
15         You understand that QVC had raised an issue
16 concerning the Model C hoverboard with Digital Gadgets?
17   A.    Again, this is not -- this was not brought to
18 my attention until this June 7th e-mail that it was
19 brought to my attention.  This was not brought to my
20 attention, that we were not -- that the buyer had
21 contacted me.  That, I don't recall happening.  And,
22 again, like I said, this was not -- this was not
23 forwarded to me.
24   Q.    Well, you do know that QVC had raised issues
25 with respect to the Model C hoverboard in June of 2017?

Page 70

1    MR. HSU: Objection. Calls for speculation.
2    THE WITNESS: Yeah. I --
3 BY MR. LAZARUS:
4  Q.   You don't know that?
5  A.   No.
6  Q.   You didn't know, through the e-mails we've
7 looked at previously, including the June 7th e-mail,
8 that QVC had raised issues with the Model C?
9  A.   It was an issue that was raised by
10 Digital Gadgets. And right before the time that -- many
11 times that I've requested payment that they raised this
12 issue. (Verbatim.) So prior to that, I have no
13 knowledge of even this QA testing.
14  Q.   Okay. Do you doubt today that QVC raised the
15 issue?
16    Do you think that this is a fabricated e-mail
17 or a fabricated circumstance?
18    MR. HSU: Objection. Argumentative.
19    Go ahead.
20    THE WITNESS: I don't doubt that they raised
21 the issue. But you also have to understand that this
22 product was not submitted by Interworks.
23 BY MR. LAZARUS:
24  Q.   Okay. Do you recall Mr. Tu coming to you and
25 asking you for permission to supply information to QVC

Page 71

1 relative to these hoverboards?
2    MR. HSU: Can you help read back the question.
3    (Whereupon, the record was read back
4    by the Court Reporter as follows:
5    "Q. Okay. Do you recall Mr. Tu
6    coming to you and asking you for
7    permission to supply information to
8    QVC relative to these hoverboards?")
9    THE WITNESS: I don't recall exactly.
10 BY MR. LAZARUS:
11  Q.   Did Mr. -- I'm sorry?
12  A.   No.
13  Q.   Did Mr. Lu have authority -- pardon me.
14    Did Mr. Tu have authority on his own to make a
15 decision not to assist QVC?
16  A.   Well, he does have that power.
17  Q.   Okay. And do you know if he exercised that
18 power and made a decision not to supply QVC with the
19 requested information because there was an outstanding
20 invoice due to Interworks from DG?
21  A.   He could have -- he could have mentioned that.
22 He could have told them, you know -- again, he could
23 have. I -- you know, again, I don't know. I don't
24 remember. This is -- this is back in --
25  Q.   Would it not have been in the best interest of

Page 72

1 Interworks to clear up the issue with QVC so as to
2 enhance the possibility of a payment from
3 Digital Gadgets to Interworks?
4    MR. HSU: Objection. Argumentative.
5    Go ahead.
6    THE WITNESS: Well, if we're going to -- you
7 know, if you're going to say if it's to our best
8 interest, it's really to the best interest of
9 Digital Gadgets to pay Interworks, I mean, for the goods
10 that they want to sell, you know. So, again, this is a
11 seven-month balance that has not been paid. Okay?
12    We as Interworks still have all rights to sell
13 to QVC. So at this point, should we help and get this
14 thing cleared? If you ask me if it's to my best
15 interest, I would say "No" because -- haven't paid me.
16 But -- but, again, with the testing process -- we were
17 not advised of this testing process. Should
18 Digital Gadgets advise us before that we have to do a
19 re-test, then I think it would be different. It would
20 be done differently.
21 BY MR. LAZARUS:
22  Q.   I'm going to go back to what is Lu 3,
23 Mr. Mitchell's e-mail to you.
24    And he writes, "I can't do anything until
25    this QA and insurance issue is fixed. You

Page 73

1    don't have insurance on the boards, and now
2    there is a litany of QA issues, given that
3    the board we got from our CA warehouse,"
4    paren, "(that you sent us)," end paren,
5    "was" -- "and was sent into QVC 'bc' you
6    wouldn't get us the right QA documents,
7    don't match the first QA submission."
8    Do you see that?
9  A.   Mm-hmm.
10  Q.   Is that true?
11  A.   That's not true.
12    If the products that we shipped to
13 Digital Gadgets that they owned for seven months
14 sitting, in the warehouse -- again, the tampering with
15 the product -- it's very, very obvious that, you know,
16 they can do it. They could have put some -- he said the
17 poly bag is -- it's not the right thickness. Unreal.
18 Okay?
19    If the product comes from the factory and they
20 approved the poly bag, how could the poly bag be
21 different, other than the fact that they can alter and
22 put a lower quality poly bag in there and cause the
23 issue and not -- make an excuse to pay me? (Verbatim.)
24    So, again, my speculation is they don't want to
25 pay. And they made all these issues up because, at the

Page 74

1  same time, they submitted their Hover-Way Maxx. So they
2  have all the intention to tell QVC. "Don't buy theirs.
3  Buy our board." Okay?
4       Because, again, the products did not ship from
5  our warehouse for the QA. And the product was shipped
6  from their warehouse without our knowledge that there's
7  a QA testing being done. So the way that
8  Digital Gadgets conducted their business through the
9  last six months -- promising to pay and not pay,
10  promising to give detailed financial information to our
11  factory for their credit line -- was all false. All the
12  promises were false. All the payment dates were dragged
13  and dragged and dragged on.
14       So I believe that, for them to sell their
15  Hover Max board, they tampered with my product. I
16  believe so.
17  Q.   And do you see that Mr. Mitchell writes,
18       "They opened it all up, and none of it
19       matches what you guys sent originally. Not
20       only is battery different, but the physical
21       age grade of the products is different too.
22       This says 12-plus, but QV is saying you were
23       originally instructed to say 14-plus," dot,
24       dot, dot, "12-plus requires kids' testing.
25       Disaster."

Page 75

1       Do you see that?
2  A.   Yes. So, again, this comes to my theory of the
3  tampering of the product, because that's the same
4  product that was submitted and sold to QVC. It was the
5  same product that was shipped to them. I did not ship
6  them products after the first two orders.
7       And they can claim that -- "Oh, the new
8  products have issues," or whatever. These were the same
9  lot, same products that were being sold during the
10  holidays all the way through to the time of this new QA
11  test. Okay?
12       Number one, Digital Gadgets never provided us
13  with any sales data and their inventory data, which
14  they're supposed to. But they did not.
15       Number two, it's my theory that they tampered
16  with the product. Okay? How could you have a product
17  that's been selling for eight, nine months and, all of a
18  sudden, the product becomes a whole different product?
19       There's a lot of knockoff hoverboards, and
20  Digital Gadgets buys a lot of the knockoff hoverboards.
21  So, hey, they can swap one in there and say, "This is
22  the new High Roller board" -- whatever, whatever -- to
23  discredit our product so that they can sell theirs.
24  That's the way that I can see this because nothing has
25  changed. Everything that was shipped to them from day

Page 76

1  one, all the orders, are the same product. How could,
2  all of a sudden, all the components become different six
3  months later, when I'm pushing for payment?
4       So, you know, I can't explain that to you, but
5  logically there's something wrong here.
6  Q.   Mr. Lu, what have you done, since June of 2017,
7  to determine that the product was switched by
8  Digital Gadgets so as to undermine Interworks? What
9  investigation have you done?
10  A.   I've not done no investigation because I have
11  no right to request QVC to give us the -- the testing
12  data or even return the hoverboards back to us or
13  whatever that was submitted. Okay? Because we were not
14  the ones who submitted.
15       Digital Gadgets was the one who submitted; so
16  they're the vendor on file. Therefore, if anything
17  that -- was being returned, it would be returned back to
18  them. So there's no way for me to do any investigation.
19  It's -- the only way is my speculation of the change
20  because the product that had shipped to them had sold at
21  QVC with no problem.
22  Q.   What is the reason that you didn't contact QVC?
23  A.   Contact QVC about what?
24  Q.   To determine the veracity of this issue.
25  A.   The reason being -- well, you know, number one,

Page 77

1  I would need to get a court order -- which I think we
2  should do after this, and pull the board that they
3  examined and whatever was being tested. I think we
4  should do that, you know, and subpoena the hoverboard
5  that was submitted and tested that's open. Then we
6  could see if that was ours or not, you know. So...
7  Q.   But it's your theory that this all comes
8  about --
9  A.   Then you subpoena the board back, and then we
10  can do the testing on that. I mean, I think that's the
11  best way to prove it, you know? Because I can't prove
12  anything right now because I don't have the hoverboard
13  here. But if you bring the hoverboard back, I can have
14  Chic send out a representative and see if this is their
15  board, you know, because they're the expert.
16       Neither QVC nor Chris Mitchell nor anybody --
17  Charlie -- is expert on this. So we have to see it. I
18  have to see it. And I think that would determine what
19  the answer is.
20  Q.   Referring back to Lu 3, your e-mail to
21  Mr. Mitchell, you write, "This is a Chic issue.
22       All QA submissions for QVC are provided
23       from Chic to Interworks. We are not the
24       manufacturer. So the best thing to do is
25       get all the boards back and return back to

Page 78

1    Chic.  I will issue an RA tomorrow.  I
2    could only provide you with the documents
3    that I have which are provided from Chic,
4    and those are the documents that I provided
5    to you.  And what they gave me is also what
6    I have provided to QVC the first time
7    around.  If there's QA submission issues,
8    please send me the reports, and I can have
9    Chic provide the documents to me."
10    Do you see that?
11    **A.**    Mm-hmm.
12    **Q.**    Did Mr. Mitchell ever submit the submissions to
13    you?
14    **A.**    I don't recall.
15    **Q.**    Okay.  But you do know -- or you did see
16    Ms. Kane's e-mail, where they were trying to contact you
17    relative to these products, and Ms. Kane maintains that
18    you refused to cooperate.
19    You saw that; right?
20    **A.**    Again, this is not CC'd to me; so I -- I'm not
21    aware of that.  Okay?  I don't have any e-mails of them
22    sending me requests of that.
23    MR. LAZARUS:  Okay.  It's a quarter after
24    12:00.
25    MR. HSU:  You want to take an hour?

Page 79

1    MR. LAZARUS:  Yeah.
2    MR. HSU:  Okay.
3    (Lunch recess taken at 12:14 P.M.)
4    (Proceedings resumed at 1:15 P.M.)
5    BY MR. LAZARUS:
6    **Q.**    Mr. Lu, good afternoon.
7    Did you ever discuss the possibility of
8    entering into an exclusive arrangement with
9    Digital Gadgets for the hoverboard?
10    **A.**    It was brought to me.  It was asked on behalf
11    of Digital Gadgets.  It was never confirmed.  And it was
12    never said that we would go into exclusivity, but it was
13    something that they wanted.
14    **Q.**    When you say, "it was something that they
15    wanted," with whom did you discuss exclusivity?
16    **A.**    This was with Chris Mitchell and Chris Tebele.
17    **Q.**    And did you discuss it with them via e-mail, in
18    person, or by phone, or all of them?
19    **A.**    All of them.
20    **Q.**    And did you discuss exclusivity with Mr. Tebele
21    in person?
22    **A.**    It was asked for exclusivity, by Mr. Tebele,
23    during the CES meeting that we had.
24    **Q.**    And what did you say?
25    **A.**    I said we would think about it and see how our

Page 80

1    business would progress, then we can consider it.
2    **Q.**    And did you ever further discuss it after CES?
3    **A.**    It was requested again by Chris Mitchell on
4    e-mails, requesting if they can have an exclusivity.
5    **Q.**    And what did you say?
6    **A.**    The answer was "No."
7    **Q.**    Did you actually say "No"?
8    **A.**    Yes.
9    **Q.**    Okay.  And you said that in an e-mail?
10    **A.**    It said it in an e-mail and in a phone
11    conversation.
12    **Q.**    Do you have that e-mail with you --
13    **A.**    No.
14    **Q.**    -- or available?
15    How about with Mr. Tebele?  Did you ever tell
16    Mr. Tebele, "No, there will not be exclusivity"?
17    **A.**    He was probably CC'd on the e-mails too.
18    **Q.**    I want to show you the next e-mail that was
19    previously Bates stamped Digital Gadgets 35 and have
20    that marked as Lu 5.
21    (Defendant/Counter-Claimant's Exhibit
22    Lu 5 was marked for identification by
23    the Court Reporter, and a copy is
24    attached hereto.)
25    THE WITNESS:  Okay.

Page 81

1    BY MR. LAZARUS:
2    **Q.**    Have you seen that e-mail before?
3    **A.**    Yes.
4    **Q.**    And did you discuss exclusivity with Mr. Tebele
5    at CES?
6    **A.**    Not in great detail.
7    And, again, it was their request and asking me
8    permission for exclusivity.
9    **Q.**    Now, during the period of the fall of 2016, and
10    after you delivered to the QVC distribution center the
11    10,000 pieces that we spoke of this morning, did you
12    continue to deliver High Roller Model Cs to QVC
13    directly?
14    **A.**    No.
15    **Q.**    What was the reason?
16    **A.**    The reason being is QVC wanted to have a
17    drop-ship vendor to drop-ship the goods.
18    **Q.**    And did there come a time when you approached
19    QVC and asked to resume shipping hoverboards to QVC
20    directly from Interworks?
21    **A.**    No.
22    **Q.**    You never went back to them and asked them to
23    resume direct hoverboard purchases from you?
24    **A.**    Because at that time, QVC did not set up a --
25    an airing, to my knowledge, to air the product during

Page 82

1 the summer -- during the period of time. So they had it
2 online, which -- Digital Gadgets did the fulfillment.
3   **Q.**   I'll show you next an e-mail chain Bates
4 stamped 244 through 246.
5       I'll have that marked as Lu 6.
6       (Defendant/Counter-Claimant's Exhibit
7       Lu 6 was marked for identification by
8       the Court Reporter, and a copy is
9       attached hereto.)
10       THE WITNESS:  Okay.
11 BY MR. LAZARUS:
12   **Q.**   Do you see that, in this e-mail chain, the red
13 comments are yours?
14   **A.**   Correct.
15   **Q.**   And do you see that, at Page 244, towards the
16 bottom, you write, "Also, these are goods that I
17       could have sold to my other accounts, and
18       I've given you guys a lower cost for
19       servicing QVC"?
20       Do you see that?
21   **A.**   Mm-hmm.
22   **Q.**   What do you mean, that you gave them a lower
23 cost for servicing QVC?
24       (Interruption in proceedings due to cell
25 phone.)

Page 83

1       MR. LAZARUS:  I'll call you back.
2       THE WITNESS:  I offered them a better cost to
3 continue to service QVC.
4 BY MR. LAZARUS:
5   **Q.**   And how were they servicing QVC?
6   **A.**   Drop-shipping.
7   **Q.**   What did you mean when you used the expression
8 "servicing"?
9   **A.**   "Servicing" is drop-shipping, because you're a
10 drop-ship vendor or not a drop-ship vendor.
11   **Q.**   The same exhibit, Bates Stamp Page 244 -- 245.
12 Again your red comment, beginning, "As I've been up
13 front with you."
14       "As I have been upfront with you and told
15       you that I was going to visit QVC, and we
16       want to lay to rest all these claims and
17       update the buyers the currently situation
18       (sic) with the ITC lawsuit and all the
19       legal issues surrounding the hoverboards."
20       What were you referring to?
21   **A.**   The ITC lawsuit is a -- it is a case of --
22 surrounding Chic suing all the copycats in the market
23 making hoverboards.
24   **Q.**   What were you approaching or going to go to QVC
25 about?

Page 84

1   **A.**   Well, explaining to them that -- the legal
2 process and how the progress of the case is going for
3 Chic and their -- and their -- how they're holding up
4 with their patent against all the copycats.
5   **Q.**   In the same portion at Bates stamp Page 245,
6 you continue, "and also pitch the new Model F and K2
7       Mini.  As I have told you, I am there to
8       discuss the product, either Digital Gadget
9       (sic) or Interworks sells to QVC is not my
10       concern."
11       Do you see that?
12   **A.**   Mm-hmm.
13   **Q.**   What was that in reference to?
14   **A.**   It's in reference to us pitching the new
15 products to QVC; and whether QVC wants to buy directly
16 from Interworks for the store, or we can be set up as a
17 direct vendor at the time, or Digital Gadgets can
18 also -- we can allow Digital Gadgets to sell the Model F
19 and K2, the new products, to QVC as a drop-ship vendor.
20   **Q.**   And was it your contemplation that, while
21 Digital Gadgets was drop-shipping QVC, you would
22 simultaneously be shipping direct to their DC?
23   **A.**   Could be, yeah.
24   **Q.**   Did you ever agree with Digital Gadgets that,
25 for so long as they were drop-shipping QVC, you would

Page 85

1 not ship direct to the QVC --
2   **A.**   No.
3   **Q.**   -- DC?
4   **A.**   No.
5   **Q.**   What -- why would QVC need both sources of --
6   **A.**   QVC don't -- I'm sorry.  Go ahead.
7   **Q.**   -- of the hoverboard?
8   **A.**   So QVC does not need both parties.  Okay?  So
9 for me, I can sell QVC directly, which -- they have to
10 have an air time.  And with the air time, they would do
11 the -- their airing of the hoverboards.  And then we
12 would, like the first round, ship the goods directly to
13 the DC, and they would send it out to the consumers.
14       Now, I can use Digital Gadgets.  I can use
15 distributor A, B, C, D, E -- whoever I want to use.  It
16 doesn't have to be Digital Gadgets.  So I can assign
17 whomever I want to be the drop-ship vendor per QVC
18 wanting -- "Hey, we like to work with this guy," "this
19 guy," "this guy."
20       I can sell it to whomever I want.  But
21 initially we were working with Digital Gadgets.  So, you
22 know, we talked about how, if I'm going to sell the
23 product and if this has to go to a drop-ship, then I'll
24 allow them to sell it.
25   **Q.**   You would allow Digital Gadgets to do the

**EXHIBIT 7**

Page 86

1  drop-ship --
2  **A.**   Correct.
3  **Q.**   -- because you did not want to do the
4  drop-ship?
5  **A.**   No.  Because we're not a certified drop-ship
6  vendor.  That's a whole different process.
7  **Q.**   What does that mean, "a certified drop-ship
8  vendor"?
9  **A.**   So you have to apply to be a drop-ship vendor
10  because the process labeling and that stuff is different
11  than shipping it directly to a DC, because now you're
12  shipping directly to a consumer on behalf of QVC so.  We
13  were not the drop-ship vendor at the time.
14  **Q.**   So when you say you're not a certified
15  drop-ship vendor, you mean that QVC had not certified
16  Interworks as a drop-ship vendor?
17  **A.**   Right.  We do not have that part of the vendor.
18  **Q.**   And QVC, at the point in time of November or
19  thereabouts of 2016, wanted drop-ship goods as opposed
20  to shipments directly to their DC?
21  **A.**   Well, the second shipment which we used
22  Digital Gadgets for was that -- because of the timing
23  issue.  And that's why we sold the goods to Digital
24  Gadgets.
25  **Q.**   What about the next shipment?

Page 87

1  **A.**   Well, the second shipment was also the
2  continuation.  Because they needed more goods, and the
3  products were selling; so Digital Gadgets continued to
4  order.
5  **Q.**   What was the reason that you did not ship these
6  later shipments direct to QVC?
7  **A.**   Because we were looking at the new models.
8        MR. LAZARUS:  I want to put in front of the
9  witness a group of documents that we previously marked
10  Asamoah 1 through Asamoah 5, which we've described on
11  yesterday's transcript with Mr. Tu.
12  **Q.**   If you could take a look at that, please.
13  **A.**   Okay.
14  **Q.**   Mr. Lu, have you had an opportunity to review
15  the documents in front of you, Asamoah 1 through 5?
16  **A.**   Yeah.
17  **Q.**   Okay.  I want you to turn to the page -- fourth
18  page in, which is marked Asamoah 2.
19  **A.**   Okay.
20  **Q.**   And do you know what this document is?
21  **A.**   Yeah.  This is our invoice to Digital Gadgets.
22  **Q.**   Okay.  And what product were you invoicing?
23  **A.**   High Roller Model C black and High Roller
24  Model C white.
25  **Q.**   Do you see the Interworks document has a PL

Page 88

1  number, a PO number, in the left-hand columns?
2  **A.**   Correct.
3  **Q.**   Who assigned the PL number?
4  **A.**   That would be from Digital Gadgets.
5  **Q.**   What does that stand for?
6  **A.**   Purchase order number.
7  **Q.**   The PL number stands for the purchase order
8  number?
9  **A.**   I'm sorry.  The PL number is our sales order
10  number.
11  **Q.**   Okay.  So is there an internal document called
12  a sales order?
13  **A.**   Yes.
14  **Q.**   And is it something that is printed, or is it
15  maintained solely in the computer systems of Interworks?
16  **A.**   It is in the system.
17  **Q.**   And what --
18  **A.**   And it's -- it's also printed.
19  **Q.**   And what does it show on the sales orders?
20  **A.**   The same information that's on the invoice.
21  **Q.**   Okay.  And this invoice, do you see that the
22  terms state "Net 60 days"?
23  **A.**   Correct.
24  **Q.**   What does that mean?
25  **A.**   That means this invoice is due 60 days upon the

Page 89

1  ship date.
2  **Q.**   And if you turn, in the document, further on,
3  and if you can find the document Bates stamped
4  Digital Gadgets 199.
5  **Q.**   Okay.
6  **Q.**   What is this document?
7  **A.**   That's a picking sheet.
8  **Q.**   And what is a picking sheet?
9  **A.**   A picking sheet is what we would put out for
10  the shippers to pick the product, and then confirm that
11  it's shipped the units that it was -- it was supposed to
12  be packed.
13  **Q.**   And do you see on that document, one of the
14  notations is "Consignment"?
15  **A.**   Mm-hmm.
16  **Q.**   What does that mean?
17  **A.**   Consignment means we assign the products to the
18  customer, and they -- yeah, and then they pay the goods.
19  **Q.**   And then they what?
20  **A.**   They pay the goods as we ship the goods.
21  **Q.**   Okay.  And did you enter into an arrangement
22  with Digital Gadgets for consignment sales?
23  **A.**   We did not engage in a consignment deal with
24  Digital Gadgets.
25        There was a discussion of consignment under the

Page 90

1  condition and stipulation of Digital Gadgets providing
2  their financials to our factor to see how much credit
3  that they are creditworthy of (verbatim), in which we've
4  requested for two and a half months. And Charlie Tebele
5  would give us the runaround.
6         And, also, the bank -- I'm going to use the
7  word "conspired" with Charlie, saying that they had
8  faxed the information numerous times and our insurance
9  company had never got anything. And we followed up; we
10  called. No response from anybody, and never was any
11  financials documents sent to our insurance company.
12        And finally they had a credit reference from
13  Digital Gadgets's bank account. And this is prior to
14  Charlie telling us that he has got a gazillion dollars,
15  "Don't worry about financial." The bank statement came
16  back from Charlie's bank with only $26,000. And I've
17  given them one -- almost a million dollars' worth of
18  products. So --
19  Q.   Before you made your shipments to
20  Digital Gadgets, did you -- did you do a credit check on
21  them?
22  A.   We did not do a credit check because of the --
23  first of all, we didn't do the credit check because it
24  was very, very time-consuming that QVC needed the
25  product. And we rushed it. But Chris Mitchell and

Page 91

1  Charlie promised that they would supply the documents to
2  us and we would do it simultaneously. And I think
3  there's numerous e-mails, me chasing them for the
4  financials. And they've never complied and gave us the
5  financials.
6  Q.   And you mentioned a "factor."
7         What is a "factor"?
8  A.   A "factor" is our insurance company for product
9  that is shipped to a customer. And they would need to
10  do the credit check and ensure what would be the credit
11  line or what is the company's credit worthy (verbatim)
12  of, you know, amount of credits to grant them.
13  Q.   And who was your factor in 2016?
14  A.   Our factor is called Bibby Financial.
15  Q.   Okay. And are you aware that various of the
16  invoices in this lawsuit are marked assigned that
17  the invoices were assigned and payable to
18  Bibby Financial?
19  A.   These invoices were submitted to Bibby at the
20  time that we were trying to get the credit check and
21  credit reference, as Charlie had said that he's totally
22  creditworthy of millions of dollars.
23  Q.   Were the invoices assigned -- the invoices to
24  Digital Gadgets assigned and payable to Bibby Financial?
25  A.   It was submitted to them, but they were

Page 92

1  declined.
2  Q.   Do you know a business, Cash Capital?
3  A.   Yes.
4  Q.   Who is Cash Capital?
5  A.   Cash Capital is our -- it's a lender.
6  Q.   And when were they your lender?
7  A.   I believe it's around 2016.
8  Q.   Are they still your lender today?
9  A.   No, they're not.
10  Q.   Do you have another lender today?
11  A.   No, I do not.
12        MR. LAZARUS: Can we have this marked, please.
13        (Defendant/Counter-Claimant's Exhibit
14         Lu 7 was marked for identification by
15         the Court Reporter, and a copy is
16         attached hereto.)
17        THE WITNESS: Okay.
18  BY MR. LAZARUS:
19  Q.   Do you recall receiving this notification on or
20  about July 10th of 2016?
21        I would appreciate counsel not directing his
22  attention to specific portions of the document. I don't
23  think that's fair or appropriate.
24        MR. HSU: Well, I'm looking at the very last
25  page, which I've never seen before. I'm not asking any

Page 93

1  questions, not pointing out. But go ahead.
2  BY MR. LAZARUS:
3  Q.   Okay. Do you recall receiving this document in
4  or about July of 2016?
5  A.   I think the date is incorrect. The date should
6  be 2017, not 2016.
7  Q.   Okay. Do you recall receiving this document in
8  July of 2017?
9  A.   I don't recall receiving this letter.
10  Q.   Did there come a time when you entered into an
11  agreement with Cash Capital?
12  A.   Yes.
13  Q.   What was the nature of that agreement?
14  A.   It was for financing -- financing purchasing.
15  Q.   Okay. And do you see that the letter of --
16  dated July 10th, of 2016, at the end of the first
17  paragraph, it writes, "Pursuant to the language of
18         the merchant agreement, the merchant has
19         sold, assigned and transferred to CCG a
20         certain percentage of its future
21         receivables"? Do you see that?
22  A.   Okay.
23  Q.   Is that true?
24  A.   No.
25  Q.   So they lied?

Page 94

1   **A.**   We -- we did not -- we did not offer to
2   transfer our funds or receivables to Cash Capital.
3   **Q.**   Well, you did enter into an agreement with
4   them, didn't you?
5   **A.**   Well, regardless if we did or not --
6   **Q.**   Well, but I'm asking if you did.  It's not a
7   "regardless if you did or not."  I'm asking you if you
8   entered into an agreement with them.
9   **A.**   We did enter an agreement with them.
10  **Q.**   Okay.  Let's look at the agreement, which I'll
11  now show you and ask the reporter to mark.
12      I'm giving the reporter a document, the first
13  page of which is a personal guarantee from Mr. Lu.  It
14  has Mr. Lu's name.  Okay.  I apologize.
15      I'm going to give you a document, the first
16  page of which is marked CCG18, and it carries on through
17  CCG28.  And it's called "Agreement for the Purchase and
18  Sale of Future Receipts."
19      (Defendant/Counter-Claimant's Exhibit
20      Lu 8 was marked for identification by
21      the Court Reporter, and a copy is
22      attached hereto.)
23      THE WITNESS:  Yes.
24  BY MR. LAZARUS:
25  **Q.**   Have you seen that document before?

Page 95

1   **A.**   Yes.
2   **Q.**   Does that refresh your recollection as to
3   whether or not you entered into an agreement with Cash
4   Capital Group for the assignment of receivables?
5   **A.**   Yes.
6   **Q.**   You did, didn't you?
7   **A.**   Yes.
8   **Q.**   Okay.  And when did you enter into that
9   agreement?
10  **A.**   I would say January of 2017.
11  **Q.**   Okay.  And at January of 2017, do you --
12  withdrawn.
13      If you look at the Exhibit 4 -- Paragraph 4, it
14  says, "Sale of future receipts."  "Seller is selling.
15      a portion of a future revenue stream to
16      buyer at a discount, not borrowing money
17      from buyer."
18      Do you see that?
19  **A.**   What page is that?
20  **Q.**   It's Page 2 of the CCG document.
21  **A.**   Mm-hmm.
22  **Q.**   "Sale of future receipts.  This is not a loan."
23  **A.**   Okay.
24  **Q.**   Do you recall this paragraph of this document?
25  **A.**   Well, to my understanding, this was a loan, and

Page 96

1   this was processed as a loan.  The way they put the
2   contract in for a sales of future receipt, I was
3   overlooked.  But they presented it to me as a loan.
4   **Q.**   Did you read it?
5   **A.**   I went through it.
6   **Q.**   That means you read it, doesn't it?
7   **A.**   Yeah.
8   **Q.**   Okay.  And it says, "This is not a loan."
9   **A.**   Well, I took it as a loan because of my agent,
10  who prepared this document for me as a loan.
11  **Q.**   And who is the agent?
12  **A.**   They're called something "Capital" too.
13  Something "Capital."  I don't recall the name because I
14  don't use them.
15  **Q.**   Who is Michael Kidakam?
16  **A.**   Michael Kidakam is a partner of the company.
17  **Q.**   Of what company?
18  **A.**   Of Interworks.
19  **Q.**   When you say he's a partner, is he an owner of
20  equity in the company?
21  **A.**   At that point, yes.
22  **Q.**   And today?
23  **A.**   He's no longer owner or employee of
24  Interworks.
25  **Q.**   And when did his ownership terminate?

Page 97

1   **A.**   Around mid last year, 2017.
2   **Q.**   And what was the reason for the termination?
3   **A.**   Well, he wanted to seek different
4   opportunities.
5   **Q.**   Did you buy him out?
6   **A.**   Well --
7       MR. HSU:  Hold on.  Let me make an objection,
8   and you can answer it.
9       Objection.  Not reasonably calculated to lead
10  to any admissible evidence.
11      Go ahead.
12      THE WITNESS:  No.  He just wanted to do
13  something else.
14  BY MR. LAZARUS:
15  **Q.**   Did he surrender his shares in the company?
16  **A.**   Yes, he did.
17      MR. HSU:  Same objection.
18  BY MR. LAZARUS:
19  **Q.**   And have you spoken to him since that time?
20  **A.**   I spoke -- what do you mean, have I spoken to
21  him since that time?
22  **Q.**   Have you spoken to him since he surrendered his
23  shares in the company?
24  **A.**   Yes.
25  **Q.**   Okay.  Have you ever spoken to him about this

Page 98

1 lawsuit?
2 **A.** Yes.
3 **Q.** What have you said to him, and what has he said
4 to you, about this lawsuit?
5 **A.** I've settled the lawsuit.
6 **Q.** I'm sorry?
7 **A.** I've settled the lawsuit.
8 **Q.** We're talking two different things.
9 **A.** You're talking about --
10 **Q.** I'm talking about this lawsuit, Interworks
11 versus Digital Gadgets.
12 **A.** Okay.
13 **Q.** Have you ever talked to him about this lawsuit,
14 Interworks against Digital Gadgets?
15 **A.** No.
16 **Q.** Okay. Was he involved in the transaction
17 between Interworks and Digital Gadgets?
18 **A.** No.
19 **Q.** What was his role in the company?
20 **A.** He's a designer.
21 **Q.** What did he design?
22 **A.** He designs packaging, artworks.
23 **Q.** Okay.
24 **A.** He's a designer.
25 **Q.** At -- at any time after your receipt of the

Page 99

1 letter from the Rubin law firm dated July 10th,
2 mistakenly 2016, did you speak to Cash Capital about the
3 demand that they made upon Digital Gadgets in this
4 letter?
5 **A.** I was not aware that there was a demand to
6 Digital Gadgets.
7 **Q.** Do you see that the letter states, "The
8 terms of this agreement permits CCG to
9 notify Digital Gadgets of the sale of the
10 receivables and to direct Digital Gadgets
11 to make payment directly to CCG"?
12 **A.** Well, I did not get this letter. I was not
13 aware of that.
14 **Q.** I'm just asking if you see that now.
15 **A.** Yes.
16 **Q.** Okay. And at any point in calendar year 2017,
17 were you aware that you had sold the revenue stream from
18 the DG receivables to Cash Capital?
19 **A.** Again, this was a loan that was presented to
20 me. It was not selling of the receipt. And the reason
21 why I was in this position is because Digital Gadgets
22 did not pay my invoices. That hindered my cash flow,
23 which affected our business.
24 So, you know -- again, I did not know about
25 this letter. But, you know, selling the invoices --

Page 100

1 I've never sold any invoices to Cash Capital.
2 **Q.** Even though that's what it says?
3 **A.** Well, I was not aware of it. It was considered
4 a loan.
5 **Q.** You considered it a loan but --
6 **A.** It was presented to me as a loan.
7 **Q.** By whom?
8 **A.** By the agent. Whatever -- Cash -- whatever
9 capital company that did the process for me.
10 **Q.** Well, Cash Capital did not present it to you as
11 a loan, did they?
12 **A.** No, it was not Cash Capital that presented it
13 to me.
14 **Q.** At any time in calendar year 2017, was it
15 brought to your attention that you had sold your future
16 revenue stream to Cash Capital?
17 **A.** No.
18 **Q.** At the time you -- withdrawn.
19 Did you terminate the agreement with
20 Cash Capital?
21 **A.** Yes, we did.
22 **Q.** And are you aware that, at a point in time,
23 Cash Capital entered a judgment against you?
24 **A.** Yes, they did.
25 **Q.** And what happened with that judgment?

Page 101

1 **A.** That was settled.
2 **Q.** When?
3 **A.** It was settled, off my head, around like
4 April --
5 **Q.** I'm sorry?
6 MR. HSU: Well, let me interject an objection.
7 Confidentiality of the settlement agreement.
8 Please do not disclose the content of the --
9 MR. LAZARUS: No, he can disclose the
10 settlement agreement. You're putting words into his
11 mouth.
12 MR. HSU: I'm instructing --
13 MR. LAZARUS: He did not say there's a
14 confidentiality.
15 MR. HSU: He has not said that.
16 MR. LAZARUS: You're telling him.
17 MR. HSU: Do not raise your voice.
18 MR. LAZARUS: I can raise my voice when you are
19 not playing by the rules.
20 MR. HSU: I am telling him not to --
21 MR. LAZARUS: You are telling him what to
22 testify.
23 MR. HSU: Do we have any question pending,
24 Mr. Lazarus?
25 MR. LAZARUS: Yes. As a matter of fact, we do.

Page 102

1    MR. HSU:  Okay.  Let's hear it.
2    MR. LAZARUS:  Would the reporter read the
3  attempted question.
4    (Whereupon, the record was read back
5    by the Court Reporter as follows:
6    "Q.  And what happened with that
7    judgment?
8    "A.  That was settled.
9    "Q.  When?
10   "A.  It was settled, off my head,
11   around like April --")
12   MR. HSU:  He just answered.  He answered.
13   THE WITNESS:  Can I get excused to the restroom
14  real quick?
15   MR. HSU:  Sure.
16   (Brief recess.)
17   MR. LAZARUS:  What was the last question?
18   (Whereupon, the record was read back
19   by the Court Reporter as follows:
20   "Q.  And what happened with that
21   judgment?
22   "A.  That was settled.
23   "Q.  When?
24   "A.  It was settled, off my head,
25   around like April --")

Page 103

1  BY MR. LAZARUS:
2    Q.  April of what year?
3    A.  2018.
4    Q.  '18?
5    A.  Yes.
6    Q.  At the time this lawsuit was commenced, had --
7  are you aware of whether Cash Capital had filed a lien
8  on all of the assets of Interworks?
9    A.  I'm not aware of who or when they sent any
10  liens out.
11   MR. LAZARUS:  Can we have this marked as the
12  next exhibit.  I apologize.  I just want to identify it.
13  Tu 9 is Bates stamped CCG 1.  Thank you.
14   (Defendant/Counter-Claimant's Exhibit
15   Tu 9 was marked for identification by
16   the Court Reporter, and a copy is
17   attached hereto.)
18  BY MR. LAZARUS:
19   Q.  Have you ever seen this document before?
20   A.  No, I have not.
21   Q.  Okay.  Have you -- do you have any
22  understanding of what a UCC financing statement is?
23   A.  To my understanding, an UCC filing is the
24  position in which the financial institute holds the --
25  what do you call it?  The first rights of whatever

Page 104

1  income that comes in.
2    Q.  And do you see that this lien filing is a
3  filing on all assets of the debtor?
4    A.  Where is that?
5    Q.  It's in the box number 4, "Collateral."
6    A.  I was not aware of this filing.
7    Q.  At the date that you commenced this lawsuit
8  against Digital Gadgets, had you settled your claims
9  with Cash Capital?
10   A.  Yes.
11   Q.  So by the time this lawsuit was started in July
12  of 2017, you had settled with Cash Capital?
13   A.  No.  The Cash Capital was settled in and around
14  April of 2018.
15   Q.  While the lawsuit was pending?
16   While this lawsuit was pending?
17   A.  Yes.
18   Q.  Okay.  So when the lawsuit was commenced, by
19  Interworks, against Digital Gadgets, were you aware that
20  Cash Capital owned the receivables on which you were
21  suing?
22   A.  I was not aware of that.
23   Again, if Digital Gadgets paid the receivables
24  to them, then it would have probably been cleared a long
25  time ago.

Page 105

1    MR. LAZARUS:  Helena, could you put the
2  original exhibits in front of the witness.
3    Q.  Okay.  If you turn to Tu 6 in the package of
4  the original exhibits in front of you, it's an ACORD
5  Certificate of Liability Insurance.
6    MR. HSU:  Tu 6.
7    THE WITNESS:  Okay.
8  BY MR. LAZARUS:
9    Q.  Have you ever seen Tu 6 before today?
10   A.  Yes.
11   Q.  Okay.  What is Tu 6?
12   A.  Tu 6 is a certificate of liability insurance.
13   Q.  Okay.  And if you'll turn to the next document
14  in the package in front of you, which is Tu 7.
15   MR. HSU:  This is Tu 7.
16  BY MR. LAZARUS:
17   Q.  Have you ever seen that document before?
18   A.  I believe so.
19   Q.  Okay.  What is this document?
20   A.  It's a certificate of liability insurance.
21   Q.  Okay.  And do you see that this document names
22  Digital Gadgets as a certificate holder?
23   A.  Correct.
24   Q.  And who caused this document to name
25  Digital Gadgets as a certificate holder?

Page 106

1    **A.**    We -- we contacted our insurance company to --
2    **Q.**    What was the reason that you contacted the
3    insurance company so as to name Digital Gadgets as a
4    certificate holder?
5    **A.**    We added them as an additional insured.
6    **Q.**    What was the reason you added them as an
7    additional insured?
8    **A.**    Well, that is the -- pretty much part of the
9    process with all the retail accounts and distributors.
10   You know, we add them into our umbrella product
11   liability insurance.
12   **Q.**    Is that something that's required by the
13   retailers?
14   **A.**    It's required by retailers and distributors.
15   **Q.**    Okay.  And QVC -- did QVC require that you add
16   Digital Gadgets as a certificate holder under your
17   policy?
18   **A.**    No.
19   **Q.**    Did Digital Gadgets require that you add them
20   as a certificate holder under your insurance --
21   **A.**    Yes.
22   **Q.**    -- policy?
23   **A.**    Yes.
24   **Q.**    And did you agree to do that?
25   **A.**    I added them.

Page 107

1    **Q.**    Well, do you see that -- you added, but do you
2    see the indication in the section of document marked
3    "Description of Operations," "No coverage extended to
4    hoverboards"?
5    **A.**    Well, I guess the --
6    **Q.**    Do you see that?
7    **A.**    I do see that.
8         But Digital Gadgets didn't give you the first
9    certificate, which doesn't have that clause in there.
10   And the reason for the clause for this certificate was
11   we were changing our insurance company.  The old
12   insurance company had to cancel this policy.  That's why
13   they're no longer covering the hoverboard.  We added
14   another policy to cover all the retailers from covering
15   hoverboards.
16   **Q.**    Isn't it true that there was a period of time
17   in which there were no insurance coverage for
18   Digital Gadgets?
19   **A.**    No, because it's a -- it's a bridge-binding
20   policy that, when we did the transition, there was --
21   there was still insurance coverage.
22   **Q.**    So there was --
23   **A.**    There was insurance coverage.
24   **Q.**    -- there was never a time when there was no
25   coverage for --

Page 108

1    **A.**    No.
2    **Q.**    -- Digital Gadgets?
3    **A.**    No, not for Digital Gadgets and not for any of
4    my accounts.
5    **Q.**    I want to go back to the documents that are
6    Bright Asamoah exhibits, 1 through 5, if we can.
7         MR. HSU:  We're looking at the invoices; right?
8    Asamoah --
9         MR. LAZARUS:  Yes.
10   **Q.**    Okay.  And I'd ask you to turn to Asamoah 5,
11   which has Bates stamp Interworks 472.
12   **A.**    Okay.
13   **Q.**    Do you see that Asamoah 5, Bates Stamp
14   Interworks 472, is a purchase order?
15   **A.**    Mm-hmm.
16   **Q.**    And do you see that it's a purchase order from
17   Digital Gadgets to Interworks?
18   **A.**    Correct.
19   **Q.**    Do you see that the purchase order has terms
20   and conditions?
21   **A.**    Yes.
22   **Q.**    Are you familiar with those terms and
23   conditions?
24   **A.**    The purchase order terms and conditions?
25   **Q.**    Yes, sir.

Page 109

1         Have you ever seen them before?
2    **A.**    I personally did not read those terms and
3    conditions.
4    **Q.**    Okay.  And who -- in the ordinary course of the
5    business of Interworks, who would receive purchase
6    orders from a customer such as Digital Gadgets?
7    **A.**    It would either go to me or it would go to
8    Tony.
9    **Q.**    Okay.  And do you know if Mr. Tu ever received
10   purchase orders from Digital Gadgets in the form in
11   front of you as Asamoah 5?
12   **A.**    I believe so.
13   **Q.**    Okay.  Do you know if he read them?
14   **A.**    I do not know if he did or not.
15   **Q.**    Do you know -- did you ever discuss the
16   purchase order terms and conditions, as they appear in
17   Asamoah 5, with Mr. Tu?
18   **A.**    No, I did not.
19   **Q.**    And do you see that, among the terms and
20   conditions, is a term that says, "Buyer may charge
21        seller all expenses of unpacking, examining,
22        repacking and reshipping nonconforming
23        goods.  In the event buyer receives goods
24        whose defects were nonconforming or not
25        apparent upon examination, buyer reserves

Page 110

1    the right to require replacement as well as
2    payment of damages if such defect or
3    nonconformity appears.  Nothing contained
4    in this purchase order shall relieve in any
5    way seller from the obligation of testing,
6    inspection, and quality control."
7        Do you see that?
8    **A.**   Mm-hmm.
9    **Q.**   Did you ever see this language in this purchase
10   order prior to today?
11   **A.**   I do not recall.
12   **Q.**   Okay.  Did Mr. -- withdrawn.
13       Did Digital Gadgets ever request that you
14   replace the hoverboards with respect to which QVC had
15   raised issues?
16   **A.**   No, they did not.
17   **Q.**   Did you --
18   **A.**   But I did, though.
19   **Q.**   I'm sorry?
20   **A.**   I requested them to send it back.
21   **Q.**   Okay.
22   **A.**   But they refused.
23   **Q.**   Did you, at any time, offer to pay damages to
24   Digital Gadgets for that nonconformity -- for a
25   nonconformity?

Page 111

1    **A.**   There is no nonconformity.  There's none
2    proving any defects or anything.  They just don't want
3    to pay.  They don't want to give it back to me.  So, you
4    know -- what can I say, you know?
5    **Q.**   Have you ever spoken to any persons at QVC
6    concerning this lawsuit?
7    **A.**   I don't think so.
8    **Q.**   Are you still shipping QVC product?
9    **A.**   Currently I'm not.
10       MR. LAZARUS:  I have no further questions,
11   subject to my receipt of documents I've asked for.
12       MR. HSU:  We'll get the request from you, I
13   guess.
14       Should we do the same stipulation, providing
15   the court reporter can find it?
16       MR. LAZARUS:  Which stipulation is that?
17       MR. HSU:  The stipulation concerning the
18   administration of the original of the depo transcript.
19       The original shall go to your office, and I
20   shall receive a certified copy of Mr. Lu's deposition
21   transcript.  And within 30 days thereafter, I will
22   notify your office of all changes Mr. Lu will make, if
23   any, and his signature under penalty of perjury.
24       THE REPORTER:  And by receiving a certified
25   copy, you're not receiving his Original and one.  You're

Page 112

1    ordering a copy?
2        MR. HSU:  I'm ordering a certified copy.
3        So on the certified copy, he will sign on
4    the -- under penalty of perjury, and then I'll forward
5    that to your office within 30 days after we received the
6    certified copy.
7        The original -- if the original is lost, a
8    certified copy shall be deemed as original for all
9    purposes.  And you will keep the original and lodge it
10   with the court for trial purposes and thereafter, for
11   all purposes for appeal and whatever purposes in this
12   case.
13       THE REPORTER:  So stipulated, Counsel?
14       MR. LAZARUS:  Yes.
15       (Whereupon, the deposition concluded
16       at the hour of 2:20 P.M.)
17
18
19
20
21
22
23
24
25

Page 113

1        I certify or declare under penalty of perjury
2    that the foregoing testimony is true and correct.
3
4        Executed this _____ day of _____,
5    2018, at _____, California.
6
7
8        _____
9             ERIC LU
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 114

1  STATE OF CALIFORNIA     )

2                          ) ss

3  COUNTY OF LOS ANGELES   )

4

5        I, HELENA FLORES, Certified Shorthand Reporter

6  qualified in and for the State of California, do hereby

7  certify:

8        That the foregoing transcript is a true and

9  correct transcription of my original stenographic notes.

10       I further certify that I am neither attorney or

11  counsel for nor related to or employed by any of the

12  parties to the action in which this proceeding was

13  taken; and furthermore, that I am not a relative or

14  employee of any attorney or counsel employed by the

15  parties hereto or financially interested in the action.

16       IN WITNESS WHEREOF, I have hereunto set my hand

17  this 18th day of September, 2018.

18

19

20       _____

21             HELENA FLORES
              CSR No. 13313

22

23

24

25

1   STATE OF CALIFORNIA     )

2                   )  ss

3   COUNTY OF LOS ANGELES   )

4

5        I, HELENA FLORES, Certified Shorthand Reporter

6  qualified in and for the State of California, do hereby

7  certify:

8        That the foregoing transcript is a true and

9  correct transcription of my original stenographic notes.

10       I further certify that I am neither attorney or

11  counsel for nor related to or employed by any of the

12  parties to the action in which this proceeding was

13  taken; and furthermore, that I am not a relative or

14  employee of any attorney or counsel employed by the

15  parties hereto or financially interested in the action.

16       IN WITNESS WHEREOF, I have hereunto set my hand

17  this 18th day of September, 2018.

18

19

20

21                           HELENA FLORES

22                           CSR No. 13313

23

24

25

# EXHIBIT 8

## Jared Louzon

| | |
|---|---|
| **From:** | Chris Mitchell |
| **Sent:** | Tuesday, May 09, 2017 10:09 PM |
| **To:** | Tony Tu |
| **Cc:** | Eric@interworks-usa.com; Jon Alberti; Jill Pierson; regibel@interworks-usa.com; Gillian Yip ELF; Brian Dougherty |
| **Subject:** | RE: High Roller Model C Lithium Form |
| **Attachments:** | Lithium Battery Form Final for QVC.XLS; Copy of Lithium Battery Form Model C.XLS |

Tony,

I am not sure what is going on, but QVC again said that the form you provided doesn't match the units we're selling...your units??

We had an un-opened High Roller sent from CA to NJ to verify and opened it up to find the below battery pack. Neither of the attached forms match the battery. See below and advise ASAP. We need an **accurate** Lithium Battery Form to keep receiving payments.

Thank you,
Chris



**From:** Tony Tu [mailto:tony@interworks-usa.com]
**Sent:** Thursday, May 04, 2017 7:33 PM
**To:** Chris Mitchell <cmitchell@techpointproducts.com>; Brian Dougherty <BDougherty@techpointproducts.com>
**Cc:** Eric@interworks-usa.com; Jon Alberti <jalberti@techpointproducts.com>; Jill Pierson
<jpierson@digitalgadgets.com>; regibel@interworks-usa.com; Gillian Yip ELF <gyip@elfwarehouse.com>
**Subject:** RE: High Roller Model C Lithium Form

Hi Chris,

1

Digital Gadgets 280

**EXHIBIT 8**



112

Attached please find the battery form, this is what I found in the last year email trail, which we previously submitted to
QVC.


Best Wishes!

Tony Tu
Interworks
(562) 692-8400


**From:** Chris Mitchell [mailto:cmitchell@techpointproducts.com]
**Sent:** Thursday, May 04, 2017 6:20 AM
**To:** Tony Tu <tony@interworks-usa.com>; Brian Dougherty <BDougherty@techpointproducts.com>
**Cc:** Eric@interworks-usa.com; Jon Alberti <jalberti@techpointproducts.com>; Jill Pierson
<jpierson@digitalgadgets.com>; regibel@interworks-usa.com; Gillian Yip ELF <gyip@elfwarehouse.com>
**Subject:** RE: High Roller Model C Lithium Form

Tony,

Haven't seen a response here.

Eric, got your WeChat's.

We are running into issues with payment from QVC due to this issue now. They believe our boards we have in stock and
have been selling are now different than what you had originally passed via QA.

Therefore, I need the ORIGINAL EMAIL TRAIL from you guys to QVC with all the documents you submitted to QVC so that
we can get paid.

Can you please provide today?

Eric, I'll get back to you on the closeout deals we have been discussing, but need this QA / Payment issue resolved ASAP.

Please help.

Thank you guys!
Chris

**From:** Chris Mitchell
**Sent:** Tuesday, May 02, 2017 7:08 PM
**To:** 'Tony Tu' <tony@interworks-usa.com>; Brian Dougherty <BDougherty@techpointproducts.com>
**Cc:** Eric@interworks-usa.com; Jon Alberti <jalberti@techpointproducts.com>; Jill Pierson
<jpierson@digitalgadgets.com>; regibel@interworks-usa.com; Gillian Yip ELF <gyip@elfwarehouse.com>
**Subject:** RE: High Roller Model C Lithium Form
**Importance:** High

Tony,

Just heard back from QVC regarding these documents: "The information on the form does not match what was
previously submitted for item T34764."

2

EXHIBIT 8                          Digital Gadgets 281                          113

This is major problem and is causing back-end issues for us & them.

I attached what you sent to us and what was submitted to QVC.

Also, please update the below section in the attached:

| QVC Item number: (i.e. E123456) | | Battery part #: | 10ICR19/65-2 |
|---|---|---|---|
| | | (i.e.: CR2032) | |
| Vendor sku: | | UL File #: | |

Can you please advise today the **correct** paperwork for what you previously submitted to QVC for these documents? This isn't a new item request, it's already been set-up with QVC so just need those same documents.

Please provide today.

Let me know if you have any questions, thank you so much for your quick attention!

Best,
Chris

**From:** Tony Tu [mailto:tony@interworks-usa.com]
**Sent:** Thursday, April 20, 2017 8:06 PM
**To:** Chris Mitchell <cmitchell@techpointproducts.com>; Brian Dougherty <BDougherty@techpointproducts.com>
**Cc:** Eric@interworks-usa.com; Jon Alberti <jalberti@techpointproducts.com>; Jill Pierson <jpierson@digitalgadgets.com>; regibel@interworks-usa.com; Gillian Yip ELF <gyip@elfwarehouse.com>
**Subject:** RE: High Roller Model C Lithium Form

Hi Chris,

Please see the attached battery form and as well as the MSDS report.

Best Wishes!

# *Inter*WORKS

Tony Tu
2418 Peck Road, City of Industry, CA 90601
Tel: (562) 692-8400 Ext. 109
Fax: (562) 692-8433

UNAUTHORIZED INTERCEPTION IS PROHIBITED BY FEDERAL LAW
**[Electronic Communications Privacy Act of 1986, 18 U.S.C. 2701(a) and 2702(a)]**

This message is being sent by tony@interworks-usa.com for Interworks Unlimited Inc. It is intended exclusively for the individuals or entity to which it is addressed.  This e-mail may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message. This message is protected by Constitutional Rights and applicable legal privileges. It is strictly confidential.

Digital Gadgets 282

EXHIBIT 8                                                                                    114

**From:** Chris Mitchell [mailto:cmitchell@techpointproducts.com]
**Sent:** Thursday, April 20, 2017 12:34 PM
**To:** Brian Dougherty <BDougherty@techpointproducts.com>
**Cc:** Tony Tu <tony@interworks-usa.com>; Eric@interworks-usa.com; Jon Alberti <jalberti@techpointproducts.com>; Jill Pierson <jpierson@digitalgadgets.com>; regibel@interworks-usa.com; Gillian Yip ELF <gyip@elfwarehouse.com>
**Subject:** Re: High Roller Model C Lithium Form

Tony, thank you.

You should have had to complete this when submitting your QA sample so surprised you need to contact chic, can you please check your files?

Also, they are now asking for updated labels for shipping and we need to confirm with the dot.

Can you please send us the MSDS report for this model C too?

Thank you!

On Apr 21, 2017, at 1:59 AM, Brian Dougherty <BDougherty@techpointproducts.com> wrote:

> Hi Tony,
>
> Thank you for your follow up.
>
> We need to receive the form back tomorrow our time as we have a customer breathing down our necks for it.
>
> Thank you.
>
> Regards,
> Brian
>
> **From:** Tony Tu [mailto:tony@interworks-usa.com]
> **Sent:** Thursday, April 20, 2017 1:52 PM
> **To:** Brian Dougherty <BDougherty@techpointproducts.com>; Eric@interworks-usa.com
> **Cc:** Chris Mitchell <cmitchell@techpointproducts.com>; Jon Alberti <jalberti@techpointproducts.com>; Jill Pierson <jpierson@digitalgadgets.com>
> **Subject:** RE: High Roller Model C Lithium Form
>
> Hi Brian and Chris,
>
> I've forwarded the battery form to our factory, I'll send it back to you once I have the information. Thanks.
>
>
> Best Wishes!
>
> <image001.jpg>
> Tony Tu
> 2418 Peck Road, City of Industry, CA 90601
> Tel: (562) 692-8400 Ext. 109

4

EXHIBIT 8                                                                  115

Fax: (562) 692-8433

UNAUTHORIZED INTERCEPTION IS PROHIBITED BY FEDERAL LAW
[Electronic Communications Privacy Act of 1986, 18 U.S.C. 2701(a) and 2702(a)]

This message is being sent by tony@interworks-usa.com for Interworks Unlimited Inc. It is intended exclusively for the individuals or entity to which it is addressed. This e-mail may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message. This message is protected by Constitutional Rights and applicable legal privileges. It is strictly confidential.

**From:** Brian Dougherty [mailto:BDougherty@techpointproducts.com]
**Sent:** Wednesday, April 19, 2017 12:09 PM
**To:** tony@interworks-usa.com; Eric@interworks-usa.com
**Cc:** Chris Mitchell <cmitchell@techpointproducts.com>; Jon Alberti <jalberti@techpointproducts.com>; Jill Pierson <jpierson@digitalgadgets.com>
**Subject:** RE: High Roller Model C Lithium Form

Hi Tony/Eric,

Would you please follow up on the below request from Chris and advise?

Thank you!

Regards,
Brian

**From:** Chris Mitchell
**Sent:** Tuesday, April 18, 2017 5:20 PM
**To:** Tony Tu <tony@interworks-usa.com>
**Cc:** Jill Pierson <jpierson@digitalgadgets.com>; 'Eric' <Eric@interworks-usa.com>
**Subject:** High Roller Model C Lithium Form

Tony, Eric,

Do you have the attached sheet completed for the Model C that you submitted to QVC for the QA pass?

They are changing the item number for some reason and are asking for this document again.

Can you please provide ASAP?

Appreciate it!
Chris

**From:** Tony Tu [mailto:tony@interworks-usa.com]
**Sent:** Tuesday, February 14, 2017 5:35 PM
**To:** Chris Mitchell <cmitchell@techpointproducts.com>; 'Eric' <Eric@interworks-usa.com>
**Subject:** RE: High Roller Returns from QVC

Hi Chris,

5

EXHIBIT 8          Digital Gadgets 284          116

Attached please find UL2272.


**From:** Chris Mitchell [mailto:cmitchell@techpointproducts.com]
**Sent:** Tuesday, February 14, 2017 2:06 PM
**To:** Tony Tu <tony@interworks-usa.com>; 'Eric' <Eric@interworks-usa.com>
**Subject:** RE: High Roller Returns from QVC

Thank you Tony, what about UL2272?

**From:** Tony Tu [mailto:tony@interworks-usa.com]
**Sent:** Tuesday, February 14, 2017 2:19 PM
**To:** 'Eric' <Eric@interworks-usa.com>; Chris Mitchell <cmitchell@techpointproducts.com>
**Subject:** RE: High Roller Returns from QVC

Hi Chris,

Please see the attached UL 1642 documents for the charger. And I've also included SGS test report of
the battery charger as well.


Best Wishes!

<image003.jpg>
Tony Tu
2418 Peck Road, City of Industry, CA 90601
Tel: (562) 692-8400 Ext. 109
Fax: (562) 692-8433


UNAUTHORIZED INTERCEPTION IS PROHIBITED BY FEDERAL LAW


[Electronic Communications Privacy Act of 1986, 18 U.S.C. 2701(a) and 2702(a)]


This message is being sent by tony@interworks-usa.com for Interworks Unlimited Inc. It is intended exclusively for the
individuals or entity to which it is addressed.   This e-mail may contain information that is proprietary, privileged,
confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to
read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please
notify the sender immediately by e-mail and delete all copies of the message. This message is protected by Constitutional
Rights and applicable legal privileges. It is strictly confidential.

**EXHIBIT 8**                                                                  **117**

# Lithium Battery Information Form

Vendor Name: **INTERWORKS UNLIMITED INC.**

Battery mfg / supplier name: **Shenzhen JETECH Energy Technology Co.,Ltd.**

QVC Item number: **T34604**
(i.e. E123456)

Battery part #: **18650S-10S2P-36**
(i.e.: CR2032)

Vendor sku: **11200 - Black**

UL File #: **MH21015**

| Battery / Cell type | |
|---|---|
| Ion / Polymer (Secondary / Rechargeable): | Y |
| Metal / Alloy (Primary / Non-rechargeable): | N |
| Is it a Button cell battery?: | N |

| Cell Information | |
|---|---|
| Total quantity of cells in this product: | 20 |
| Equivalent lithium content per cell (Metal ONLY): | N/A grams |
| Watt Hour rating per cell (Ion ONLY): | 7.95 WH |
| Capacity: 2150 mAhs | Volts: 3.70 |

| Battery Information (batteries composed of more than one cell) | |
|---|---|
| Total quantity of batteries in this product: | 1 |
| Equivalent lithium content per battery (Metal ONLY): | N/A grams |
| Watt Hour rating per battery (Ion ONLY): | 154.80 WH |
| Capacity: 4300 mAhs | Volts: 36.00 |

Digital Gadgets 286

# Lithium Battery Information Form

Vendor Name: SHENZHEN VICTPOWER TECHNOLOGY CO., LTD.

Battery mfg / supplier: SHENZHEN VICTPOWER TECHNOLOGY CO., LTD.

QVC Item number: (i.e. E123456)

Battery part #: 10ICR19/65-2 (i.e.: CR2032)

Vendor sku:

UL File #:

| Battery / Cell type | |
|---|---|
| Ion / Polymer (Secondary / Rechargeable): | Y |
| Metal / Alloy (Primary / Non-rechargeable): | N |
| Is it a Button cell battery?: | N |

| Cell Information | |
|---|---|
| Total quantity of cells in this product: | 20 |
| Equivalent lithium content per cell (Metal ONLY): | 1.12 grams |
| Watt Hour rating per cell (Ion ONLY): | 7.74 WH |
| Capacity: 2150.00 mAhs | Volts: 3.60 |

| Battery Information (batteries composed of more than one cell) | |
|---|---|
| Total quantity of batteries in this product: | 20 |
| Equivalent lithium content per battery (Metal ONLY): | 22.34 grams |
| Watt Hour rating per battery (Ion ONLY): | 154.80 WH |
| Capacity: 4300.00 mAhs | Volts: 36.00 |

Digital Gadgets 287

H:\msoffice\winword\pqf\lithium battery info\lithium information form v13 01.28.15

EXHIBIT 8                                                                                    119