EXHIBIT 9

**Jared Louzon**

| | |
|---|---|
| **From:** | Rafiq Zabrani <Rafiq.Zabrani@qvc.com> |
| **Sent:** | Thursday, June 1, 2017 11:03 AM |
| **To:** | Paulette Brown; Gabrielle Ceritano; Jill Pierson; Dennis Dangelo; Meghan Kane; Chris Mitchell |
| **Cc:** | Cheryl Baiocchi; Chris Mitchell; Alex Bird; John R. Teter; Mark Shaeffer |
| **Subject:** | RE: Hoverboard QA |
| **Attachments:** | FW: Hoverboard QA |

Chris,

Appreciate you sending us the documents in attached emails. We are doing our best to transfer this item without requesting a new sample but it information is not matching. Only way we could do a transfer if the information provided for T34604 original sample matched the documents sent to us now. Below is the Lithium form which was approved for T34604, Manufacturer's name and battery part numbers do not match. If the battery has changed, we cannot do a transfer. That is why we have been trying to avoid delay and ask for a physical sample.

Battery mfg / supplier name: Shenzhen JETECH Energy Technology Co.,Ltd.

QVC Item number: T34604
(i.e. E123456)

Battery part #: JT-BC200-01
(i.e.: CR2032)

Battery mfg / supplier name: Shenzhen Elite Electronic Co. Ltd.

QVC Item number: T35011
(i.e. E123456)

Battery part #: HY-BSE-1002US
(i.e.: CR2032)

Thanks
Rafiq



*Rafiq Zabrani*
*Sr. Quality Engineer*
*QA Engineering Home Goods*
*Rafiq.zabrani@qvc.com*
*484-701-6940*

This message (including any attachment) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient of this e-mail or the e-mail address above is yours, then you may not use, copy or retransmit it. If so, please delete this message and notify the sender immediately. Any disclosure, copying, or distribution of this message or the taking of any

Digital Gadgets 278



EXHIBIT 9                                                                 120

# Lithium Battery Information Form

Vendor Name:   Digital Gadgets

Battery mfg / supplier name:   Shenzhen Elite Electronic Co. Ltd.

QVC Item number:   T35011          Battery part #: HY-BSE-1002US
(i.e. E123456)                     (i.e.: CR2032)

Vendor sku:   T35011               UL File #: MH61527

| Battery / Cell type | |
|---|---|
| Ion / Polymer (Secondary / Rechargeable): | Y |
| Metal / Alloy (Primary / Non-rechargeable): | N |
| Is it a Button cell battery?: | N |

| Cell Information | |
|---|---|
| Total quantity of cells in this product: | 20 |
| Equivalent lithium content per cell (Metal ONLY): | N/A grams |
| Watt Hour rating per cell (Ion ONLY): | 7.70 WH |
| Capacity: 215 mAhs | Volts: 1.80 |

| Battery Information (batteries composed of more than one cell) | |
|---|---|
| Total quantity of batteries in this product: | 1 |
| Equivalent lithium content per battery (Metal ONLY): | N/A grams |
| Watt Hour rating per battery (Ion ONLY): | 154.00 WH |
| Capacity: 4300 mAhs | Volts: 36.00 |

Digital Gadgets 279

# EXHIBIT 10

# United States District Court
# Central District Of California

INTERWORKS UNLIMITED, INC., a )
California Corporation, )
                       )
            Plaintiff, )
                       )
     vs. )  Case No. 2:17-cv-4983 AB KSx
                       )
                       )
DIGITAL GADGETS, LLC; a New )
Jersey limited liability company, )
                       )
           Defendants. )
_____ )
                       )
AND ALL RELATED ACTIONS. )
_____ )

## Deposition of
## CHARLES TEBELE

**Date:**        August 21, 2018

**Reporter:**        Cindy Afanador

**Location:**        488 Madison Avenue
                          Suite 1120
                          New York, New York 10022



## Hines Reporters

### International Tower
888 S. Figueroa Street, Suite 840, Los Angeles, CA 90017
866.432.4300

www.hinesreporters.com

EXHIBIT 10 ──────────────────────────────────── 122

1  UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA

3  ---------------------------------------x

4  INTERWORKS UNLIMITED, INC., a

5  California Corporation,

6                    Plaintiff,

7            -against-

8  DIGITAL GADGETS, LLC; a New Jersey

9  limited liability company,

10                   Defendant.

11  Case No:  2:17-cv-4983 AB KSx

12  ---------------------------------------x

13                    488 Madison Avenue

14                    New York, New York

15

16                    August 21, 2018

17                    10:01 a.m.

18

19      Examination Before Trial of the

20  Defendant by CHARLES TEBELE, pursuant to

21  Notice, before CINDY A. AFANADOR, a Notary

22  Public of the State of New York.

23

24

25

EXHIBIT 10        **H I N E S   R E P O R T E R S**        123   **1 (1)**

Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                    Deposition of Charles Tebele

A P P E A R A N C E S :

LAW OFFICES OF ROGER C. HSU
Attorneys for Plaintiff
     175 South Lake Avenue, Suite 210
     Pasadena, California 91101
BY:  ROGER C. HSU, ESQ.

LAZARUS & LAZARUS, P.C.
Attorneys for Defendant
     240 Madison Avenue, 8th Floor
     New York, New York 10016
BY:  HARLAN LAZARUS, ESQ.

BRUTZKUS GUBNER
Attorneys for Defendant
     21650 Oxnard Street, Suite 500
     Woodland Hills, California 91367
NOT PRESENT

Page 2

---

conducted in this conference room, although
relatively informal, but the oath you just
took carries the same legal effect and force
as if you were testifying in a court of law;
do you understand that?
     A.    Yes.
     Q.    Okay.
          At any time during your
deposition, if you don't understand my
question, please stop me and ask me to
rephrase it or repeat it until you fully
understand my question.
          During your deposition today,
please ask me for breaks, or if your counsel
wants to have a break, I will do everything to
accommodate you, but there is only one thing
that I would ask you to accommodate me.  When
there is a question pending, I would ask you
to provide answer to me before you take your
break; would that be acceptable to you?
     A.    Yes.
     Q.    Okay.
          From time to time today, your
lawyer may object to my question, but if your
lawyer does not instruct you not to answer my

Page 4

---

          THE COURT REPORTER:  Please state
your full name for the record.
          THE WITNESS:  Charles Tebele.
          THE COURT REPORTER:  What is your
address?
          THE WITNESS:  570 Lexington
Avenue, New York, New York 10022.
C H A R L E S   T E B E L E, called as a
     witness, having been duly sworn by a
     Notary Public, was examined and
     testified as follows:
EXAMINATION BY
MR. HSU:
     Q.    Good morning.
     A.    Morning.
     Q.    Mr. Tebele, have you ever been
deposed before?
     A.    Yes.
     Q.    Okay.
          While you were sitting here
yesterday, you might have heard some basic
ground rules of deposition.  I'm just gonna
quickly go over them so you understand.
          Today's deposition is being

Page 3

---

question, in other words, if you don't hear
that instruction from your lawyer, you will
still have to answer my question.
          Of course, if your lawyer does
instruct you not to answer, that would be a
different story, and then I would ask you at
the time whether you will comply with that
instruction, and then we'll move on from
there.
          The court reporter can only take
down one person's statement at a time, so
please do not talk over each other, one
another, until I finish my question, or when
applicable, your lawyer finishes his objection
before you start answering my question.
          Do you understand the difference
between a guess versus an estimate?
     A.    Yes.
     Q.    Okay.
          After this deposition, you will
have an opportunity to review your deposition
transcript and make changes, if necessary.
          Nonetheless, I have to caution
you now, if you do make any substantive change
such as changing from no to yes or yes to no,

Page 5

---

EXHIBIT 10          H I N E S   R E P O R T E R S          124 (2 - 5)

Interworks Unlimited, Inc. vs. Digital Gadgets, LLC      Deposition of Charles Tebele

**Page 6**

1 myself or my associate could make comments on
2 your changes at trial and it would affect your
3 credibility as a witness.
4      MR. LAZARUS: I think you are
5 going over the line in instructing the
6 witness, and now you are counseling the
7 witness on matters that I should be
8 counseling him on, not you.
9      If a change needs to be made, the
10 change is going to be made, and the
11 effect is for the judge to instruct the
12 jury, not for you to instruct
13 Mr. Tebele.
14      Thank you.
15      MR. HSU: I would take it that's
16 your objection, Mr. Lazarus?
17      MR. LAZARUS: Lazarus.
18      MR. HSU: Lazarus.
19      THE WITNESS: He did that
20 yesterday too, to the other two.
21      Q. Well, any objection from your
22 attorney, Mr. Lazarus he's doing this to
23 preserve the record, so when there is a need
24 in the future, then he and I will get into
25 some kind of dispute in front of the judge,

**Page 7**

1 that's why he's doing this.
2      Did you take any medication in
3 the last 24 hours that would prevent you from
4 giving your testimony today?
5      A. No.
6      Q. Okay.
7      Other than Charlie Tebele, have
8 you ever used any other name in the past?
9      A. Charles.
10      Q. Any other names?
11      A. No.
12      Q. What's your current occupation?
13      A. Entrepreneur.
14      Q. Excuse me, I didn't catch that.
15      A. Entrepreneur.
16      Q. Entrepreneur.
17      Do you have an employer?
18      A. Yes.
19      Q. Who is that person?
20      A. It's not a person.
21      Q. When you say "it's not a person,"
22 what is the employer? Who's the employer?
23      A. Digital Gadgets; it's an entity.
24      Q. Do you know the form of this
25 business entity?

**Page 8**

1      A. Yes.
2      Q. What is that?
3      A. What is the form?
4      Q. Correct.
5      A. The form is the nature of the
6 articles of how an organization is formed.
7      Q. Was it a corporation?
8      A. No.
9      Q. Was it an LLC?
10      A. Yes.
11      Q. What is your current position at
12 Digital Gadgets?
13      A. President and CEO.
14      Q. Do you own this company?
15      A. Yes.
16      Q. How long have you worked for your
17 company, Digital Gadgets?
18      A. About ten years.
19      Q. Is it accurate to say that
20 Digital Gadgets was established or formed
21 about ten years ago?
22      A. I'm not sure exactly when it was
23 formed, but it might be a little bit more than
24 ten years ago.
25      Q. And you don't recall what year?

**Page 9**

1      A. I don't recall what year.
2      Q. Okay.
3      Other than officer and owner of
4 Digital Gadgets, are you a director?
5      Strike that.
6      Are you the sole managing member
7 of Digital Gadgets?
8      A. I am the managing member.
9      Q. Are you familiar with a company
10 called Techpoint, LLC, one word,
11 T-E-C-H-P-O-I-N-T?
12      A. Yes.
13      Q. And do you know any business
14 affiliation between Techpoint, LLC and Digital
15 Gadgets?
16      A. Yes.
17      Q. And what is that business
18 affiliation?
19      A. Techpoint, LLC sources certain
20 products for Digital Gadgets and serves as an
21 agency for sourcing products.
22      Q. When you say "sourcing products,"
23 can you explain to me what "sourcing" means?
24      A. Means finding sources that have
25 products that may be applicable for sale by

**Digital Gadgets.**
Q. Is it fair to say sourcing is like finding vendors of the products?
A. **It's fair to say.**
Q. Do you know an individual named Chris Mitchell?
A. **Yes.**
Q. Is he still working for Digital Gadgets?
A. **No.**
Q. Do you know who he currently works for?
A. **No.**
Q. Is he currently working for Techpoint, LLC?
A. **No.**
Q. By the way, Techpoint, LLC --
A. **If I would not know who he's working for, how would I know if he is working for Techpoint, LLC?**
Q. Well, that's a very good question.
By the way, Chris Mitchell was employed by Digital Gadgets, correct?
A. **I'm not sure.  I don't believe**

Page 10

so.
Q. Was Chris Mitchell ever employed by any company that had dealings with Digital Gadgets in the past?
A. **You just asked me if Techpoint, LLC has an affiliation with Digital Gadgets, and you asked me if Chris Mitchell works for Techpoint, LLC.**
Q. Right.
A. **Now you are asking me if I know if Chris Mitchell had been employed by any company that had any dealings with Digital Gadgets?**
Q. Right.
A. **So I don't understand where the difference would be.**
Q. Well, the difference -- let me try to ask another question, maybe it's the question that I asked was incorrect.
Was Digital Gadgets, sorry not Digital, was Chris Mitchell once employed by Techpoint, LLC?
A. **Yes.**
Q. Do you know when he was employed by Techpoint, LLC?

Page 11

A. **I can estimate.**
Q. Can you give me an estimate of when he was employed by Techpoint, LLC?
A. **Roughly 2016 and 2017.**
Q. Do you know when he left Techpoint, LLC?
A. **Towards the end of 2017.**
Q. Did you have any personal dealings with Techpoint, LLC?
A. **As the president of Digital Gadgets.**
Q. And how -- can you explain to me --
A. **Techpoint, LLC was responsible for sourcing products for Digital Gadgets, then I would have dealings with, in my capacity of president of Digital Gadgets, have dealings with Techpoint, LLC.**
Q. Did you personally form Techpoint, LLC?
A. **No.**
Q. Did you own any ownership interest in Techpoint, LLC?
A. **Yes, in the past.**
Q. And would that be 100 percent

Page 12

owned by you?
A. **No.**
Q. Majority owner of Techpoint, LLC?
A. **I don't know.**
Q. And is it fair to say that you had control on Techpoint, LLC at all times in the past?
A. **No.**
Q. Who's the current president of Techpoint, LLC?
A. **There is no current president.**
Q. And who is the managing member of Techpoint, LLC?
A. **Today?**
Q. Correct.
A. **I'm not sure.**
Q. Do you know back in 2016, let me give you a time frame, early 2017, who was the managing member at Techpoint, LLC?
A. **No.**
Q. When Chris Mitchell was employed by Techpoint, LLC, did you hire him?
A. **I'm not sure who hired him.  I might have been involved in the interviews.**
Q. Do you know who else was involved

Page 13

EXHIBIT 10          H I N E S   R E P O R T E R S          4 (10 - 13)
126

Page 14

1  in the interviews?
2      A.   No.
3      Q.   Have you heard of Interworks
4  Unlimited, Inc.?
5      A.   I've heard of the term
6  Interworks, I don't know about the comma Inc.
7      Q.   Okay.
8          When did you first hear of this
9  company?
10     A.   I don't recall.
11     Q.   Have you ever met an individual
12 named Eric Lu?
13     A.   Yes.
14     Q.   Do you recall when you met him?
15     A.   I believe it would be in
16 January 2017.
17     Q.   Did you meet him in New York?
18     A.   I don't believe so.
19     Q.   Do you recall where you met him
20 first?
21     A.   I recall that I met him in
22 Las Vegas.  I don't know if there were other
23 meetings, but that's one that I recall.
24     Q.   Were you in Vegas for a trade
25 show?

Page 15

1      A.   Yes.
2      Q.   And what trade show was that?
3      A.   The CES trade show.
4      Q.   CES would stand for?
5      A.   Consumer Electronics.  I don't
6  know what the "S" is for.  Show.
7      Q.   That's a good guess.
8          When you first met Eric Lu in
9  Las Vegas for this trade show, what did you
10 guys talk about?
11     A.   (No response.)
12     Q.   Do you remember anything that you
13 discussed with Eric Lu when you first met him?
14     A.   No.
15     Q.   Did he ever offer any of his
16 merchandise to your company as a vendor?
17     A.   I believe when I met him we were
18 already involved in some sort of business, but
19 I don't know the sequence.  I don't recall
20 offhand the sequence of events.
21     Q.   Was Chris Mitchell there to?
22     A.   Yes.
23     Q.   At the meeting -- do you recall
24 at the time the meeting taking place your
25 company had already made purchase of

Page 16

1  hoverboards from --
2      A.   Are you stating that as a fact or
3  are you asking me -- what's the question?
4      Q.   Do you remember at the time you
5  first met Eric Lu your company had already
6  made purchases from his company?
7      A.   Do I remember if my company
8  already made purchases?
9      Q.   Yes.
10     A.   Again, just like I said before,
11 I'm not clear on the timeline, but we
12 purchased purchases from him and I met him.
13 I'm not recalling the sequence of events.
14     Q.   So you don't remember when your
15 company first purchased products from his
16 company?
17     A.   In relation to when I met him,
18 I'm not sure.
19     Q.   Okay.
20         Do you know what was the
21 merchandise your company purchased from his
22 company?
23     A.   Hoverboards.
24     Q.   Before you came today, did you
25 review any documents, intra-company, relating

Page 17

1  to the purchase of these hoverboards?
2      A.   I reviewed certain documents.
3      Q.   And what were these documents
4  that you had reviewed?
5      A.   There were a production of
6  documents, they were voluminous, I reviewed
7  them to refresh my memory, but I don't know
8  which documents -- I can't recall which
9  documents or why.  There were a lot of
10 documents.
11     Q.   Did you review your company's
12 purchase orders?
13     A.   Not particularly.  I may have
14 scanned them.  I'm sure I scanned them.
15     Q.   Did you review the invoices
16 issued by Interworks to your company?
17     A.   What do you mean by "review"?
18     Q.   Review, meaning look at the
19 document and have -- for a certain purpose,
20 and when you finished reading it, well, I
21 can't give you a definition of review.  Review
22 means review.
23     A.   Then I can't answer it.
24     Q.   Well, have you had a chance to
25 look at those documents?

EXHIBIT 10        H I N E S   R E P O R T E R S        5 (14 - 17)
127

1  A.    I looked at them.
2  Q.    Okay.
3      The invoices -- with respect to
4  these invoices issued by Interworks to your
5  company, did you have a chance to look at
6  those invoices?
7  A.    When you say "these invoices," I
8  don't know what you mean.
9  Q.    Invoices of -- pertaining to the
10  hoverboards sold by Interworks to your
11  company.
12  A.    Is there a particular invoice you
13  are referencing?
14  Q.    Any invoice in the past.
15  A.    I've seen invoices, yes.
16  Q.    Do you recall how many invoices
17  that you looked at?
18  A.    No.
19  Q.    Was it more than one?
20  A.    I'm not sure.
21  Q.    Do you have a good idea of how
22  many units of the hoverboards your company
23  purchased from Interworks in the last three
24  years?
25  A.    No.

Page 18

1  Q.    Was it more than 10,000 pieces?
2  A.    I just said I don't have an
3  idea.  I don't have a good idea.
4  Q.    With passage of time you may not
5  have exact recollection of things, and that is
6  very natural.
7      I'm not asking you to give me the
8  exact units or numbers of hoverboards that
9  your company purchased from my client.  All
10  I'm trying to figure out is if you have an
11  estimate of how many units?
12  A.    I don't have an estimate.
13  Q.    When you first met Eric Lu in
14  Las Vegas, did you discuss any payment terms
15  with respect to the goods that were being sold
16  to your company?
17  A.    I don't recall.
18  Q.    What do you recall, if at all,
19  any discussion that you had with Eric Lu, when
20  you first met him?
21  A.    I remember he was taking us
22  through some new products that he was coming
23  out with, and we were discussing the potential
24  business relationship between our companies.
25  Q.    When you say "new products," do

Page 19

1  you recall what new products he was trying to
2  sell you?
3  A.    At this point, I couldn't recall
4  them, no.
5  Q.    Okay.
6  A.    It was beyond what we had or were
7  already discussing.  He had a suite with lots
8  of products in it that he was looking to sell
9  to us.
10  Q.    Other than hoverboards, did
11  Interworks ever sell any products to Digital
12  Gadgets?
13  A.    I'm not sure.
14  Q.    Did you discuss with Eric Lu,
15  when you first met him, anything relating to
16  an exclusive distributorship agreement?
17  A.    I don't recall.  In that meeting,
18  I don't recall what was discussed.
19  Q.    Subsequent to that meeting, did
20  you have any discussion with Eric Lu
21  pertaining to some kind of exclusive business
22  relationship with Interworks?
23  A.    Yes.
24  Q.    And do you recall when that
25  conversation took place?

Page 20

1  A.    No.
2  Q.    Do you recall what kind of
3  exclusive deal you were talking about?
4  A.    Yes.
5  Q.    Can you generally describe to me
6  the terms of such deal exclusivity?
7  A.    Generally, I can describe it.
8  Q.    Okay.
9      Can you help me describe it?
10  A.    Interworks asked us to market his
11  boards that he got stuck with to certain
12  accounts that we deal with, "we" being Digital
13  Gadgets, and have good relationships with
14  those retailers.  And in exchange for us
15  marketing the boards to those retailers, being
16  that he was also in the business, the
17  arrangement was that we, Digital Gadgets,
18  would be the exclusive seller of certain
19  technology and boards to those retailers,
20  meaning no other seller could sell those
21  boards to those accounts.
22  Q.    And QVC was one of those
23  retailers?
24  A.    Yes.
25  Q.    When you had this discussion on

Page 21

EXHIBIT 10        H I N E S   R E P O R T E R S        6 (18 - 21)
128

Case 2:17-cv-04983-TJH-KS  Document 50-2  Filed 12/14/18  Page 12 of 108  Page ID #:913

Interworks Unlimited, Inc. vs. Digital Gadgets, LI  Deposition of Charles Tebele

this type of exclusivity agreement with Eric Lu, did you know at the time that Eric Lu's company had already been selling products to QVC, products, specifically hoverboards?

A. Yes.

Q. And you also know that QVC had completed its sample testing on Eric Lu's hoverboards and approved the quality of his hoverboards?

A. I couldn't know if they approved the quality on his hoverboards, quote/unquote.

Q. He never told you about that?

A. That's not what I said.

Q. Yeah, my question is: Did he ever tell you that he has submitted sample -- samples of hoverboards to QVC for testing and it was approved?

A. He did say that his -- one of his boards was approved.

Q. Was that board Model C hoverboard?

A. I would need to refresh my memory or see documents to answer that question.

Q. Did your discussion with Eric Lu

on this exclusive agreement ever lead to anything in writing?

A. I wouldn't know.

Q. Did you ever sign any exclusive agreement with Eric Lu's company?

A. I don't recall.

Q. When I say "you," I meant Digital Gadgets.

Do you recall Digital Gadgets signed any written exclusive distributorship agreement?

A. I don't recall.

Q. Do you know when -- I think you previously said you don't remember when Digital Gadgets first purchased some hoverboards from Interworks?

A. I did say that.

Q. You did say that, right?

A. (Witness nodding.)

Q. Do you recall when was the very last time Digital Gadgets purchased any hoverboards from Interworks?

A. No.

Q. Are you familiar with a business entity called Phoenix Warehouse located in

Santa Fe Springs in California?

A. I'm familiar with the name.

Q. Was this Phoenix Warehouse providing services to Digital Gadgets?

A. Yes.

Q. And for how long?

A. I don't know.

Q. Do you know that Phoenix Warehouse went out of business?

A. Yes.

Q. Do you know what year?

A. No.

Q. When you first met Eric Lu, did you have any discussion on getting a consignment deal from him?

A. I don't recall.

Q. Did you ever discuss with him at any time in the past that your company is willing to purchase hoverboards from his company based on consignment terms?

A. You just asked me if I discussed consignment with him and I said I don't recall. Now you are asking me something about consignment again. I'm not sure what you mean.

Q. The first question was the first time you met him.

A. Oh.

Q. The second question is, whenever in the past, did you ever have any discussion with him on that?

A. Possibly.

Q. How many times did you personally meet him, if you recall?

A. I don't recall.

Q. Was it more than one time?

A. I don't recall. I remember one time. I don't recall if there were more.

Q. I'm not sure if I got the answer from you.

Do you recall ever discussing with him on the consignment term, ever in the past?

A. Again, I don't recall if I discussed consignment with him. I just don't recall.

Q. Do you recall having discussion with Eric Lu concerning Digital Gadgets' application for credit with a factor?

A. Application?

EXHIBIT 10  **H I N E S   R E P O R T E R S**  7 (22 - 25)
129

Q.    Yes.

A.    No.

Q.    To your knowledge, did Digital Gadgets ever submit any application to a factor named Bibby?

A.    I recall there were conversations with Bibby, I don't know about an application.

Q.    You said you had some recollection about that name; do you remember anything about this factor, Bibby?

A.    I remember that Eric was very worried about his relationship with Bibby, and was desperate to satisfy them in terms of the transaction that we need to do.

Q.    Did Eric Lu request your company to submit your application to Bibby for Bibby's approval on --

A.    I remember on numerous occasions, he would ask either myself or Chris Mitchell to get involved with Bibby to satisfy them regarding the purchase, multiple occasions.

Q.    To sat --

A.    It was an urgent request.

Q.    It was an urgent request; do you remember when that happened?

Page 26

A.    No.

Q.    And what was the purpose for Eric Lu to request you and Chris Mitchell to start talking to Bibby?

A.    You would have to ask him.

Q.    Was he trying to get your company approved by this vendor, so the vendor, I'm sorry, approved by this factor, so this factor can finance your purchase deals?

A.    You are asking me to answer what his state of mind to do something would be, I don't think that would be in my ability to swear to.

Q.    That's fair.
    Did you hear from anybody in your company regarding Bibby's decision on qualifying you, I mean your company, after the application was turned in?

A.    I did not understand that question at all.

Q.    Well, I think you previously testified that you don't remember any application that was ever submitted to Bibby --

A.    So I was answering you in terms

Page 27

of the word "application."

Q.    Right.

A.    It's a very broad, you know, might mean a piece of paper that's filled out, it might mean a phone call, it might mean an e-mail, it might mean a conversation, so what I was answering to was I don't remember if there was an application in the definition of application where a form might be filled out.

Q.    When you said "application" you meant a form, so you don't remember whether or not there was any written --

A.    Correct.

Q.    Do you recall any verbal application?

A.    I remember discussions.

Q.    With Bibby?

A.    Yes.

Q.    And who at Bibby?

A.    I don't recall.

Q.    Do you recall the gist of the conversation?

A.    Not particularly.
    What do you mean by "gist"?

Q.    The gist is the important -- the

Page 28

important part of that conversation.

A.    Bibby was trying to establish a credit line for Digital Gadgets.

Q.    With respect to the goods that your company purchased?

A.    I don't know with what respect, I just know the purpose of the gist, as you describe it, would be for them to establish a line.  I would presume that that line would be allocated to Interworks to enable credit protected sales to Digital Gadgets.
    I don't think it would include sales, but I believe if he wanted to use his credit line, that that's what the conversation or the gist, as you call it, would be.

Q.    Do you know why that conversation had any relevance to Digital Gadgets?

MR. LAZARUS:  Objection to the form of the question.

A.    Yeah, I don't understand the question.

Q.    Well, do you know why you were on the phone -- were you on the phone with Bibby?

A.    Possibly.

Q.    Do you know why Bibby had to

Page 29

EXHIBIT 10          H I N E S   R E P O R T E R S          8 (26 - 29)
150

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 14 of 108   Page ID #:915

Interworks Unlimited, Inc. vs. Digital Gadgets, LI                    Deposition of Charles Tebele

1  discuss a credit line of Interworks with you
2  or your company?
3       **A.   You'd have to ask Bibby or**
4  **Interworks.**
5       Q.   Was it because you were buying
6  products from Interworks?
7       **A.   It could be a reason.**
8       Q.   Do you know any other reasons?
9       **A.   I don't wanna speculate as to**
10 **reasons.**
11      Q.   Did you ever go to law school?
12      **A.   No.**
13      Q.   Did you ever personally involve
14 (sic) in making any purchase orders for
15 hoverboards?
16      **A.   Repeat the question.**
17      Q.   Have you ever personally involve
18 in making any purchase order for buying
19 hoverboards from Interworks (sic)?
20      **A.   Me personally?**
21      Q.   Yes.
22      **A.   No.**
23      Q.   That wasn't your job, right?
24      **A.   I didn't say that wasn't my job.**
25 **I said I haven't been involved in issuing any**

Page 30

1  **purchase orders to Interworks.**
2       Q.   By the way, we missed that, what
3  was your job duties?
4       **A.   You did ask that.**
5       Q.   I did?
6       **A.   Yeah.**
7       Q.   Maybe I missed that.
8            I don't think I asked that.
9            You told me --
10      **A.   I said I was the president and**
11 **CEO.**
12      Q.   That was the position I have
13 down, but I never asked you your job duties.
14           What are your job duties?
15      **A.   Honestly, I couldn't answer a**
16 **question like that.  As president/CEO of the**
17 **company, your job duties are to ensure the**
18 **company has objectives and meets its plans.**
19 **That would be my definition.**
20      Q.   Do you supervise your company's
21 operations?
22      **A.   Yes.**
23      Q.   Do you have to attend business
24 meetings with vendors and customers from time
25 to time?

Page 31

1       **A.   Yes.**
2       Q.   Do you have to be in charge of
3  the company's finance?
4       **A.   I'm involved in finance.  As the**
5  **president and CEO, everything rolls up, but I**
6  **don't do the financial day-to-day.**
7       Q.   Do you recall when Digital
8  Gadgets started selling hoverboards to QVC?
9       **A.   No.**
10      Q.   Before Digital Gadgets started
11 selling those hoverboards to QVC, was there a
12 prior business relationship going between
13 these two entities?
14      **A.   Which two?**
15      Q.   Digital Gadgets and QVC.
16      **A.   You need to rephrase the**
17 **question.**
18      Q.   Before you started selling these
19 hoverboards --
20      **A.   Which hoverboards?**
21      Q.   The hoverboards that you
22 purchased, your company purchased from
23 Interworks.
24      **A.   So you are asking prior to**
25 **Digital Gadgets selling hoverboards --**

Page 32

1  **Interworks hoverboards to QVC?**
2       Q.   Why don't I change it to a
3  simpler question?
4            When did you, if you recall, when
5  did your company start doing business with
6  QVC?
7       **A.   2008 -- 2009, I'm sorry.  2009.**
8       Q.   Do you recall the very first
9  product of merchandise your company was
10 selling to QVC back in 2009?
11      **A.   No.**
12           THE WITNESS:  Can I pause you for
13 a second?
14           Can we take a five-minute break
15 for a phone call prior to 11:00?
16           MR. HSU:  Sure.
17           THE WITNESS:  Now?
18           MR. HSU:  Let's do a ten-minute
19 break now.
20           THE WITNESS:  Fine.
21           (Recess taken.)
22 BY MR. HSU:
23      Q.   Before Digital Gadgets placed any
24 purchase order, do you have to review it and
25 approve it?

Page 33

EXHIBIT 10          **H I N E S   R E P O R T E R S**          9 (30 - 33)
151

1 A. Me personally?
2 Q. Yes.
3 A. No. Doesn't preclude me from
4 reviewing any.
5 Q. If you want to, you could?
6 A. Yes.
7 MR. HSU: Let me attach these two
8 documents; why don't we mark them as
9 Exhibit 1 and 2.
10 (Tebele Exhibit 1, Second Amended
11 Notice of Taking Deposition of Charlie
12 Tebele, marked for identification.)
13 (Tebele Exhibit 2, Second Amended
14 Notice of Taking Deposition of
15 Defendant/Counterclaimant Digital
16 Gadgets, LLC, marked for
17 identification.)
18 Q. These two exhibits or notices of
19 deposition of you individually and notice of
20 taking deposition of defendant, Digital
21 Gadgets.
22 The -- my understanding is that
23 you have been designated as the person most
24 knowledgeable about the issues in this case by
25 your company, Digital Gadgets, right?
Page 34

1 knowledge of any returns of hoverboards made
2 by Digital Gadgets to Interworks?
3 A. Personal knowledge that I'm
4 carrying in my head, no. There may be
5 documents to support in whatever we would
6 submit.
7 Q. Okay.
8 A. Whether there were or weren't...
9 Q. That's fair.
10 Have you ever seen any documents
11 in the possession of your company that had
12 anything to do with the return that was
13 referenced in number 14 here?
14 A. I don't recall any specific
15 documents.
16 Q. Okay.
17 A. That doesn't mean there aren't
18 documents, that doesn't mean I didn't see
19 them, but I don't know of any specific
20 documents.
21 Q. You might have seen them, but you
22 don't remember at that point?
23 A. Correct.
24 MR. LAZARUS: Give me one second
25 with Charlie.
Page 36

1 A. (No response.)
2 MR. LAZARUS: Yes.
3 MR. HSU: Okay.
4 Q. Now, fairly quickly, if you look
5 at the Exhibit 2, the second amended notice of
6 taking deposition of defendant, if you can
7 help me go to the second page.
8 A. (Witness complying.)
9 Q. Look at the third page.
10 A. (Witness complying.)
11 Q. And you can see these categories
12 being described on top of the pages number 10
13 all the way through number 21, right?
14 A. Yes.
15 Q. Did you look at those categories
16 before you came today?
17 A. You are asking me if I saw this
18 document before I came today?
19 Q. Yes.
20 A. I don't recall.
21 Q. 14, if you look at that 14, says
22 in a return of merchandise to the defendant
23 that were previously purchased from the
24 plaintiff.
25 Do you have any personal
Page 35

1 THE WITNESS: Yeah.
2 (Recess taken.)
3 A. So just to clarify, any returns,
4 there would be paperwork if it was requested,
5 that would substantiate whether there were
6 terms or not in the submissions.
7 Q. My previous question to you is,
8 do you recall seeing any of those documents?
9 A. In the ordinary course of
10 business we returned product, so I don't
11 recall specific documents, but, like I said,
12 if there were documents and reports showed to
13 me, I can identify whether they were returns
14 or not based on those documents.
15 Q. Sitting there, you don't have any
16 specific recollections on any specific
17 documents?
18 A. Correct. However, you know,
19 there are registers and documents and backup
20 to what was returned and wasn't returned.
21 Q. Let's move on to the next one.
22 This will be -- you guys can share.
23 It is a letter dated May 19,
24 2017.
25 MR. HSU: This will be Number 3.
Page 37

EXHIBIT 10        H I N E S   R E P O R T E R S        10 (34 - 37)
152

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 16 of 108   Page ID #:917

Interworks Unlimited, Inc. vs. Digital Gadgets, LLI                                    Deposition of Charles Tebele

1 (Tebele Exhibit 3, Document
2 bearing Bates stamp Interworks 7, marked
3 for identification.)
4 Q. This letter apparently was
5 written by Thomas Carulli, supposedly a lawyer
6 working for this firm. I'm looking at the
7 letterhead; Kaplan, Massamillo & Andrews.
8 Have you ever seen this document?
9 A. Yes.
10 Q. Did you hire this law firm to
11 write this letter to Interworks?
12 A. Yes.
13 Q. And let's look at the first
14 paragraph.
15 Says "Dear Mr. Lu, we represent
16 Digital Gadgets, LLC. This is to place you on
17 notice that Interworks has violated the
18 exclusive right granted DG," that's Digital
19 Gadgets, "to sell Interworks products to and
20 through QVC, moreover, at a price lower than
21 offered by Digital Gadgets, resulting in
22 significant and irreparable harm to Digital
23 Gadgets."
24 A. Yes, it was terrible.
25 Q. There are two issues raised by

Page 38

1 this paragraph. One, the first one was the
2 exclusive right. You don't recall seeing any
3 written documents or written agreements signed
4 by Interworks and Digital Gadgets pertaining
5 to this exclusive right?
6 A. I don't know about a written
7 agreement, however there is a certain
8 agreement without question between Interworks
9 and Digital Gadgets that when Digital Gadgets
10 was selling those goods to QVC, which
11 Interworks was stuck with and QVC canceled
12 their orders with, that Digital Gadgets would
13 fill Interworks' shoes as the exclusive
14 partner, there's no doubt about that.
15 Q. When you say "there's no doubt
16 about that," you know, what proof do you
17 recall?
18 MR. LAZARUS: Objection to the
19 form of the question.
20 Q. Let me ask you this: When you
21 say there's no doubt about this exclusive
22 right, have you ever seen any e-mails sent by
23 Eric Lu?
24 A. I've seen e-mails, I was on
25 conversations, I spoke to Chris Mitchell on

Page 39

1 multiple occasions, I spoke to QVC. I mean
2 this was a heavy issue, this wasn't a light
3 issue and we would never, as our company
4 policy, sell something that someone else
5 makes, to then have that company go and
6 compete with us on the same thing.
7 Q. Well, that's fair.
8 So Chris Mitchell reported this
9 to you; what did he tell you, if anything,
10 that you recall pertaining to this exclusive
11 right?
12 A. Look, I had many conversations
13 with Chris Mitchell and with Eric, but what I
14 will say is Interworks was in a jam, we helped
15 them, and explicit in the help was this
16 exclusive, which was being honored for a time,
17 but then at some point, Interworks decided to
18 go rogue and go behind our backs, so it was
19 not just implied, it was the tone of the
20 entire relationship. And, moreover, we were
21 discussing further exclusive and further
22 accounts, so it wasn't that it was this one
23 little thing, it was beyond that.
24 At some point, Interworks just
25 decided that they were gonna not honor it.

Page 40

1 Q. Okay.
2 To your knowledge, is --
3 A. Which caused us a tremendous
4 amount of lost work and time and reputation.
5 Q. Do you know if Interworks is
6 currently selling hoverboards to QVC?
7 A. I don't understand the question.
8 Q. To your personal knowledge, is
9 Interworks selling hoverboards to QVC now?
10 A. At this moment, I don't know.
11 Are they in business?
12 Q. Which party is in business?
13 A. Is Interworks still in business?
14 Q. That's why I'm here.
15 A. I don't understand.
16 Q. Well, you know, maybe your
17 attorney can ask my client that question two
18 weeks from now.
19 A. Okay. I don't know if they are
20 selling it. I don't even know if they are in
21 business. I'm hearing all kinds of things in
22 the trade about deceptive things that they are
23 doing, so I don't know if they are there, they
24 are not there, they are selling, they are not
25 selling, I don't know.

Page 41

EXHIBIT 10          H I N E S   R E P O R T E R S          11 (38 - 41)
155

Q.    You heard something about Interworks going out of business?

A.    I'm speculating.  I'm wondering.  I'm asking you.

Q.    Unfortunately, I can't give you that answer.

But your attorney can ask my client a couple weeks from now, two, three weeks from now.

A.    Okay.  I just don't wanna -- you are asking me if they are selling something, I don't even know if they are in business, so I'm trying to --

Q.    All I'm trying to get --

A.    How would I know what they are doing?

Q.    Did you hear from QVC that they are still selling to QVC?

A.    It's not something that I discussed with QVC on a daily basis.

Q.    Okay.  That's a good answer.

The -- if you look at the second paragraph, a reference of insurance coverage was mentioned.  Do you know why lack of insurance coverage was an important issue at

Page 42

the time when this letter was written?

A.    Why insurance is important?

Q.    Why lack of insurance coverage was an important issue?

A.    It's a requirement of doing business, and part of the product -- when QVC approves a product for sale, there are certain requirements.  If insurance on that product is part of the approval, it becomes part of the -- you can't separate the insurance from the product.  If QVC approves the product that has this cup with this holder with this lid, and you take off the lid, it's no longer the cup.

You follow what I'm saying?

Q.    Yes, I follow.

A.    So if the board doesn't have the insurance and it was approved with the insurance, then the lack of the insurance makes the product not what it was represented to be.

Q.    Okay.

The -- at the time, did you, I mean Digital Gadgets, have serious concern on lack of insurance coverage with respect to

Page 43

these hoverboards supplied by Interworks?

A.    Doesn't the letter state that?

Q.    Yes, it does say that.  I mean, I'm asking you -- well, let me try to ask another question.

When you had this letter written to Interworks, did Interworks promptly show you sufficient insurance coverage to alleviate your such concern?

A.    Are you saying -- are you asking me if we had insurance I would still go and pay money to hire a lawyer and write a letter that we didn't have insurance?

Q.    No.  The question is, after you sent this letter, after, did you or anybody else at Digital Gadgets receive satisfactory explanations from Interworks?

A.    I know that there was attempt to resolve the insurance issue by Interworks.  I don't know if it was quote/unquote satisfactory, but I do know that there was certain actions taken as a result of this letter to mitigate what -- maybe what Interworks felt it needed to provide.

Q.    Subsequent to sending this

Page 44

letter, did you realize that it was actually a non-issue?

A.    No.

Q.    Are you aware Digital Gadgets had to purchase insurance subsequent to sending this letter to Interworks?

A.    Am I aware that Digital Gadgets had to purchase -- if Interworks didn't solve the problem, then Digital Gadgets would have had to purchase insurance.  I don't know the dates and times, but if we had to do something to mitigate damages, we would have done that based on our relationship with QVC.

Q.    Right, QVC would have required you, meaning your company, to provide that coverage, if Interworks failed to provide one, right?

A.    If it was provideable (sic) by us.  It's not like you could just go out and like buying a pack of gum in the store, not like saying, okay, you don't have it, I'll do it, it's an intricate piece of equipment that many insurance companies will not insure.

Q.    Do you personally involve in obtaining or procuring such insurance coverage

Page 45

EXHIBIT 10          H I N E S   R E P O R T E R S          12 (42 - 45)
154

1  after you realized that Interworks has failed
2  to provide such coverage (sic)?
3      A.   I don't recall exactly what
4  insurance we might have bought, but subject to
5  my review of documents I would be able to
6  refresh my memory.
7      Q.   You don't remember exactly what
8  insurance coverage Digital Gadgets had to
9  purchase?
10      A.   Correct.
11      Q.   Because Interworks failed to
12  maintain one?
13      A.   Correct, and I don't know if just
14  Digital Gadgets purchasing insurance would be
15  sufficient to remedy that breach.
16      Q.   Do you have any recollection on
17  how QVC was affected by this lack of
18  insurance?
19      A.   I don't have specific -- we have
20  an obligation to fulfill the terms of our
21  contracts with QVC.  How if affects them on
22  the other side, I don't know.  We -- we, by
23  virtue of our reputation, you asked me how
24  long I'm doing business with them, which was
25  from 2008, have to adhere to certain standards

Page 46

1  around products and reputation for having
2  insurance, and the lack of insurance is a
3  large problem.
4      Q.   Well, you may not recall seeing
5  the insurance policy or you may not be
6  personally involved in obtaining such
7  insurance coverage?
8      A.   Correct.
9      Q.   But is it your recollection that
10  Digital Gadgets had to go out and purchase
11  insurance coverage to resolve this issue with
12  QVC?
13      A.   The ordinary course of business
14  would be for us to do whatever needs to be
15  done to mitigate and provide.  I don't know
16  what we provided or what we got or when.
17  Based on me looking at documents I would be
18  able to refresh my memory.
19      Q.   But is it fair to say that you
20  knew it was provided but you don't remember?
21      A.   No, it's not fair to say.
22      Q.   You don't remember the terms of
23  the policy?
24      A.   No, it's not fair to say.
25      Q.   Okay.

Page 47

1      Let's look at the next one, would
2  be Number 4.
3          (Tebele Exhibit 4, Document
4      bearing Bates stamp Interworks 8, marked
5      for identification.)
6      Q.   Next one is a short e-mail
7  Bates number Interworks 8 at the bottom of the
8  page.
9          This e-mail was sent to Eric Lu
10  by Thomas Carulli.  Thomas Carulli was one of
11  your lawyers retained by your company back
12  then in May 2017, right?
13      A.   You just asked me to testify that
14  Thomas Carulli was an alleged lawyer on this
15  letter; we said yes.
16      Q.   Right.
17          It's the same Thomas Carulli,
18  correct?
19      A.   Same one.
20      Q.   And he stated on this e-mail that
21  there is no reasonable dispute that Interworks
22  granted Digital Gadgets the exclusive right to
23  sell through QVC and Zulilly; who is Zulilly,
24  to your understanding?
25      A.   It's a retailer.

Page 48

1      Q.   Is it an online retailer?
2      A.   I guess you could call it that,
3  yeah.
4      Q.   Do they have retail shops?
5      A.   I don't believe so.
6      Q.   Do you recall Interworks signing
7  any of the exclusive right to sell agreement
8  with respect to Zulilly?
9      A.   What was the question?
10      Q.   Do you recall Interworks signing
11  any written document or written agreement
12  granting Digital Gadgets the exclusive right
13  to sell through Zulilly with respect to
14  Zulilly?
15      A.   I don't recall signing an
16  agreement.
17          MR. HSU:  Next one will be 5.
18  It's a one page e-mail.
19          (Tebele Exhibit 5, Document
20      bearing Bates stamp Interworks 22,
21      marked for identification.)
22      Q.   Let me take it back.  On this
23  document Bates stamped Interworks number 22,
24  consists of a number of e-mails, at least two.
25  On top you see an e-mail from you to Eric Lu

Page 49

EXHIBIT 10        H I N E S   R E P O R T E R S        13 (46 - 49)
155

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 19 of 108   Page ID #:920

Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                    Deposition of Charles Tebele

dated February 17, 2017, subject was High Roller Returns from QVC.

And you said to Eric "Noted on the below, we will work it out."

And you further said "Do you know if Bibby spoke to Rosenthal?"

Who's Rosenthal?

**A.   Rosenthal is the factor for Digital Gadgets.**

Q.   To your recollection, when you composed this e-mail to Eric, Digital Gadgets was trying to get a line of credit from Bibby?

**A.   I don't think the way you are phrasing it is proper.**

Q.   Let's look at the e-mail down below.

This was written by Eric Lu on the same day to Chris and Charlie, and that Charlie is you, right?

**A.   That's me.**

Q.   And Chris is -- was Chris Mitchell?

**A.   Yes.**

Q.   Eric says here, "I can support you guys on the Mini."

Page 50

Do you know what Mini is?

**A.   It's a certain version of the hoverboard.**

Q.   Okay.

"However, we still don't have our factor to approve you guys."

Who was "our factor" referred to by Eric Lu here?

**A.   My assumption is, I mean I can't speak for him, but my assumption is Bibby.**

Q.   Okay.

He further says "Like I had said before, I could give you guys terms only if our factor approves you.  I have been nervous about Model C."

Was the Model C the only model of Digital Gadgets purchased from Interworks?

**A.   I don't know.**

Q.   Is it your recollection that Bibby ultimately did not approve Digital Gadgets?

**A.   I don't know.  I don't know. Digital Gadgets bought the goods from Interworks.  Interworks shipped the goods. What it appears to me from this e-mail is**

Page 51

**after shipping the goods, and agreeing to terms and conditions with Digital Gadgets, Interworks then went to seek Bibby's approval, rather than getting it prior to him shipping it.**

Q.   Do you know why Interworks is trying to get Digital Gadgets hooked up with Bibby?

**A.   They wouldn't get them hooked up.**

Q.   Was it because Bibby will pay Interworks first for the account payable on the side of the Digital Gadgets?

**A.   The way I would understand how factoring would work, that would be a reasonable assumption, but I don't know what Bibby's relationship was.**

**But it's clear to me that from this e-mail that the goods were shipped and then he seeked (sic) the credit approval from Bibby after -- not the other way around, which would be a traditional way to do it.  So maybe he was in trouble with his factor or I don't know what, but...**

Q.   The reason he sent this letter, was it because he wanted to --

Page 52

**A.   He wanted to sell us more goods.**

Q.   Exactly.

**A.   And even more goods on top of the fact that we already had goods, and wanted to give us more goods, but Bibby didn't approve it, and then on top of giving us more goods then go around and sell them behind our back and not have the insurance and all these things, that's basically, and me go do the work to make his factor happy, that's the way it looks like to me, like a whole big scheme.**

Q.   Let me ask you this:  For all the goods that Digital Gadgets had purchased from Interworks, is it your recollection that all of these goods had been sold?

**A.   I don't know.**

Q.   And delivered to QVC or QVC's customers?

**A.   I don't know.**

Q.   Here on the second paragraph, Eric Lu said that Digital Gadgets still owes $35,000, did this -- do you remember that this number is correct when he wrote this e-mail to you and Chris reminding you that Digital Gadgets still owed 35k to Interworks?

Page 53

EXHIBIT 10          H I N E S   R E P O R T E R S          14 (50 - 53)
156

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 20 of 108   Page ID #:921

Interworks Unlimited, Inc. vs. Digital Gadgets, LI                    Deposition of Charles Tebele

1    A.    The number might be correct, but
2 there might be a reason for it, so what he is
3 he stating is he got $400,000 and there was a
4 balance of 35k.
5    Q.    35k he says here is not so much,
6 so I don't want to chase you guys; do you
7 remember what was the unit price for each
8 hoverboard?
9    A.    I don't know.
10   Q.    Was it about a-hundred-something
11 bucks?
12   A.    I really don't remember.  If it
13 was 35k outstanding, there would be a reason
14 for the 35k to be outstanding.
15   Q.    What would be the reason?
16   A.    There could be various reasons.
17   Q.    I don't want you to speculate.
18   A.    If you are asking me the reason
19 for this particular -- particular 35k --
20   Q.    I'm asking you that.  I was
21 asking you for that.
22   A.    I don't have that reason.  I
23 could refresh my memory looking at documents,
24 but off the top of my head, just as general
25 business practice there are many reasons that

Page 54

1 one company says that the amount owed is this,
2 the other company says what we owe is this and
3 there are mitigating reasons for the
4 reconciling differences.
5         You could send a client a bill
6 for $13,600 for "X" amount of hours, and the
7 client can come back and say well, I have
8 record that you worked this many hours and pay
9 you that, and then there is reconciling
10 differences.
11   Q.    Well, one of the reasons,
12 generally speaking, between merchants for
13 mitigating or for disputing the invoices is
14 defective products, right?
15   A.    Could be one of the reasons.
16   Q.    Was it -- was a defective product
17 the reason that Digital Gadgets had not paid
18 or owed a balance of 35,000?
19   A.    It could be one of the reasons.
20 In a general sense QVC, due to the nature of
21 their business, returns products on a regular
22 basis, so there could be a reserve against
23 returns in transit or the reserve based on
24 what the estimated returns would be, that
25 could be.

Page 55

1    Q.    Okay.
2         Also it could be -- it could be
3 based on approved discount by the vendor?
4    A.    Could be -- could be on a
5 discount, could be an advertising program,
6 could be.
7    Q.    Could be a lot of things?
8    A.    Could be a lot of things, but it
9 doesn't look out of line that on $400,000
10 worth of payments there might be $35,000 worth
11 of these things.
12   Q.    Right, and the 400k for the first
13 shipment, at the time only $35,000 was owed
14 which is less than ten percent?
15   A.    Right.
16   Q.    But if you look at this e-mail
17 and the subsequent e-mail, there's nothing
18 mentioning about the reason for this balance
19 of 35k?
20   A.    Well, there is an e-mail trail
21 below it, but it's not there.  This is just a
22 snippet of one e-mail.
23   Q.    Okay.
24         THE WITNESS:  Can we take a
25 one-minute break or two-minute

Page 56

1 break?
2         MR. SHU:  Sure.
3         (Recess taken.)
4         MR. HSU:  Next in order will be
5 number 6.
6         (Tebele Exhibit 6, Document
7 bearing Bates stamps Interworks 42
8 through Interworks 54, marked for
9 identification.)
10   Q.    Number 6 consists of e-mails of
11 twelve pages, a string of e-mails.
12         These document pages were
13 Bates stamped from number 42 through 54.
14 Let's start with number -- page number 1 or
15 Interworks 42, bottom right of the page.
16         The top e-mail was composed and
17 sent by Chris Mitchell to Sam, Gillian Yip,
18 Eric Lu and have you cc'd on it, the subject
19 was High Roller Model C Returns.  The date of
20 this e-mail was April 6, 2017.  Chris Mitchell
21 said "Hi, Sam, the goods are at the
22 warehouse."
23         The goods that he referred to in
24 this e-mail were Model C hoverboards?
25         MR. LAZARUS:  That's a question?

Page 57

EXHIBIT 10         H I N E S   R E P O R T E R S         15 (54 - 57)
157

Case 2:17-cv-04983-TJH-KS Document 50-2 Filed 12/14/18 Page 21 of 108 Page ID #:922

Interworks Unlimited, Inc. vs. Digital Gadgets, LI                    Deposition of Charles Tebele

1  Q.    That's a question.
2        Do you know that the goods being
3  referred to here by Chris Mitchell were the
4  Model C hoverboards sold by Interworks to your
5  company?
6  **A.    That's what the header says, but**
7  **I don't know without looking through the back**
8  **e-mails.**
9  Q.    That's fair.
10       Let's go to -- you see the Bates
11 number on the bottom right, right?
12 **A.    Yeah.**
13 Q.    Let me just direct you to a
14 specific page.
15       Let's look at page 46.
16 **A.    Yes, so 46 says we are prepared**
17 **the trailers for pickup for total of 5763 --**
18 Q.    5,763 units of high roller
19 hoverboard?
20 **A.    Right.**
21 Q.    High roller hoverboard sold to
22 your company by Interworks back then consists
23 of only one model, which was Model C, correct?
24 **A.    I don't know.  I would assume so.**
25 Q.    All right.

1        At all times in the past, do you
2  know there were two different models of
3  hoverboard sold by Interworks to Digital
4  Gadgets, or there was only one model?
5  **A.    There were multiple models.**
6  Q.    Are you aware of this return --
7  are you aware of this term called RMA?
8  **A.    Yes.**
9  Q.    And that's the initial for return
10 merchandise authorization?
11 **A.    Yes.**
12 Q.    And this number, 1393, for a
13 total of 5,763 units of hoverboards?
14 **A.    Yes.**
15 Q.    Do you know what happened to this
16 RMA number 1393 with respect to the 5,763
17 units of hoverboards?
18 **A.    No.**
19 Q.    Do you know that Interworks
20 intended to pick them all up after the e-mail
21 was sent by Sam to Chris Mitchell along with
22 other people?
23 **A.    (No response.)**
24 Q.    Let me ask you this:  Did you
25 know why Interworks wanted to pick up those

1  5,700 units?
2  **A.    No.**
3  Q.    Was it because Digital Gadgets
4  told Interworks that I still have those 5,700
5  units in our warehouse, you can come pick them
6  all up if you want to?
7  **A.    It's possible.  But I'm looking**
8  **at an e-mail on the string from Chris that**
9  **says the goods are at the warehouse, but we**
10 **were discussing with Eric about purchasing**
11 **more of them and waiting for more details**
12 **before finalizing, so I'm sure there were**
13 **subsequent conversations after April 6th about**
14 **this return.**
15 Q.    Okay.
16       Let's go over to 51, Interworks
17 51.
18 **A.    (Witness complying.)**
19 Q.    At the bottom right?
20 **A.    Yep.**
21 Q.    You see at the bottom of this
22 page, there is an e-mail from Chris Mitchell?
23 **A.    Yes.**
24 Q.    Dated March 10, 2017 and Chris
25 Mitchell was writing this e-mail to Sam?  In

1  this e-mail Chris Mitchell outlined a
2  proposal.  Did he tell you -- you were cc'd on
3  this e-mail to, right?
4  **A.    I don't know.**
5  Q.    If you look --
6  **A.    Yeah, I'm cc'd on this e-mail.**
7  Q.    Right.
8        And then --
9  **A.    But I'm not sure if this one -- I**
10 **see the one from Eric.  I see one from Chris,**
11 **I don't know if I'm cc'd on it.**
12 Q.    Okay.
13       Did Chris Mitchell report to you
14 about this proposal?
15 **A.    Yes.**
16 Q.    That he was making to Eric, and
17 this proposal involves a number of payments at
18 different times and it also -- also a number
19 of hoverboard at a discounted price, 160.  If
20 you look at the bottom of Interworks 51, Chris
21 Mitchell said we'll be keeping a thousand
22 boards at the 160; do you know that was a
23 discounted price that he was proposing?
24 **A.    I don't know that it was a**
25 **discounted price.**

EXHIBIT 10        **H I N E S   R E P O R T E R S**        16 (58 - 61)
158

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 22 of 108   Page ID #:923

Interworks Unlimited, Inc. vs. Digital Gadgets, LI                    Deposition of Charles Tebele

**Page 62**

Q.   And then you go to the next page and essentially we agreed to pay weekly for what is sold.  We agree to send a sales report on Monday from the prior week and then a wire on the coming Friday.

A.   Yeah, I see that.

Q.   Right around the time, meaning March 10, 2017, when this e-mail was sent to Interworks by Chris Mitchell, do you know how much of the invoice of Interworks issued to Digital Gadgets were not paid or were not satisfied?

A.   If you are asking me knowing the amount now looking, no, I wouldn't.  I would be able to look at reports and refresh my memory and provide it.

Q.   Okay.

If you look at the second paragraph from the top, on Interworks 52 for the remaining 30 percent outstanding, we agree to pay a third of the remaining 30 percent.  Did Interworks ever agree with this proposal, to your understanding?

A.   It says here we had a conversation with Eric and here I have

**Page 63**

outlined the implication of next steps, so I don't know -- then I see Eric saying confirm.  So looks to me that he did.

Q.   Let's go to the next page.

A.   Next page of what?

Q.   Next page of this document.

A.   What number?

Q.   Interworks 53, very next.

A.   (Witness complying.)

Q.   There is only one e-mail on this page, and then we'll continue on to the next page.  This is an e-mail composed and sent by Chris Mitchell on April 16, 2017 to Eric Lu, subject, our proposal, and then here Chris Mitchell was proposing, as you can see down below, one, will take remaining boards 5,000 plus that we have in inventory.

Second line, we'll pay 50 percent on May 1, the other 50 percent on June 5 wire.  There's some other terms being proposed -- oh, the third line says by him, he said, with that, "we need the exclusive contract drafted per" our discussion -- "per our conversation.  Need to know we are being protected in our class of trade moving your boards."

**Page 64**

Is it your understanding, prior to this day, the written exclusive contract had not been drafted by anybody?

A.   It's not my understanding.  I don't know that there was or there wasn't, but what this looks like to me is that they were talking about other accounts, and maybe based on all the back and forth, it looks like they wanted to outline it in the contract based on whatever conversation they had.

Q.   Did Chris Mitchell ever discuss with you before he sent this proposal to Eric Lu?

A.   Yes.

Q.   Was Chris Mitchell correct in stating that there was 5,000 plus of hoverboards that you had in inventory at the time?

A.   I don't understand the question.

Q.   Well, it says Chris Mitchell said we will take remaining boards, 5,000 plus that we have in inventory.

A.   So what's the question?

Q.   The question is:  To your recollection, was Chris Mitchell correct in

**Page 65**

saying that Digital Gadgets still had over 5,000 units of hoverboards in inventory?

A.   I would assume that to be correct.

Q.   Do you know subsequent to this e-mail sent to Eric Lu, did Interworks and Digital Gadgets ever reach an agreement with respect to this proposal?

A.   Can you please repeat the question?  Is this --

Q.   There is a proposal as reflected on this e-mail, did this proposal ever lead to any written agreement?

A.   I don't know.

Q.   Chris Mitchell was general manager when he sent this e-mail out to Eric Lu, right?

A.   What was the question?

Q.   Was he -- what was the job title?  Let's look at Interworks 54, the very next page.

A.   (Witness reviewing.)

Q.   See on top "Talk soon.  Thanks, Eric.  Chris.  Chris Mitchell, general manager"?

EXHIBIT 10          H I N E S   R E P O R T E R S          17 (62 - 65)
159

1     A.    Yes, Chris was the general
2 manager.
3     Q.    Was he always the general manager
4 when he was working for Digital Gadgets?
5     A.    He was working for Techpoint,
6 LLC.
7     Q.    Techpoint, LLC, okay.
8     And Techpoint, LLC was
9 outsourcing vendors for Digital Gadgets?
10     A.    Sourcing.
11     Q.    Sourcing.
12     Do you know what happened to the
13 remaining 5,000-plus hoverboards in inventory?
14     A.    No.
15     Q.    Were these records eventually all
16 sold to QVC and/or its customers?
17     A.    I don't know all -- what
18 quantity.  I know some boards were sold, I
19 don't know the exact numbers or what's
20 remaining or what's left.
21     Q.    Who at Digital Gadgets would have
22 that personal knowledge?
23     A.    Personal knowledge nobody would
24 have, but we would have access to reports and
25 computer generated reports to see who they

1 were sold to, when they were sold and what's
2 remaining.  No one would retain personal
3 knowledge of numbers like that.
4     Q.    Well, you were here yesterday
5 with Mr. Asamoah, remember that, Mr. Asamoah?
6     A.    Yes.
7     Q.    He was in charge of the POs and
8 invoices and receiving report; he would have
9 that personal knowledge of how many?
10     A.    Of how many were sold, no.
11     Q.    What about Ms. Gillian Yip, she
12 was in charge of warehousing?
13     A.    Yes.
14     Q.    Specifically the shipments of
15 products to QVC's customers or QVC; would she
16 have personal knowledge of how many units were
17 sold to QVC and/or its customers?
18     A.    Please refer to my statement.  My
19 statement is that nobody would retain such
20 personal knowledge unless they were guessing.
21     The amounts are reflected in our
22 computer systems as to what were sold, who
23 they were sold to, how many are remaining.
24 When you start using numbers like 5,000 and
25 did they all ship, that's just an impossible

1 number to answer based on the amount of
2 activity that goes on in the warehouse or in
3 accounts payable.
4     You follow what I'm saying?
5     Q.    Yeah, I'm following what you are
6 saying.
7     All the information, the items
8 you just made reference to, you had the
9 ability to get in your company's computer and
10 put that -- have them all printed out on
11 paperwork after you have time to go over them,
12 you would have pretty good idea of how many
13 units were sold?
14     A.    Correct.
15     Q.    And how much money was paid by
16 QVC, how much money was paid by Digital
17 Gadgets to Interworks with respect to these
18 goods?
19     A.    Yes.
20     Q.    And you had the ability to do
21 that because you have access into your
22 company's computer?
23     A.    Yes.
24     MR. HSU:  This will be number 7.
25     (Tebele Exhibit 7, Document

1 bearing Bates stamp Interworks 88,
2 marked for identification.)
3     Q.    Number 7 is a short page that has
4 two e-mails.  On top you can see -- well, we
5 don't know who sent it, but if you look at the
6 content of the e-mail, you see Gillian Yip,
7 Essential Logistic Fulfillment; that's the
8 company that you formed to provide services on
9 logistics to Digital Gadgets, right?
10     A.    Yes.
11     Q.    Okay.
12     And Ms. Yip says here "According
13 to the notes on your accounts, Interworks is
14 currently on hold pending legal review."
15     Do you understand why she said
16 Interworks is currently on hold?
17     A.    Do I understand why?
18     Q.    Yes.
19     A.    I understand what it means.
20     Q.    Can you tell me the meaning of
21 that?
22     A.    It means that our legal
23 department placed the company on hold.
24     Q.    And do you know why?
25     A.    Why the company was put on hold?

1  Q.   Right.
2  A.   I mean, looking at this letter
3  dated -- Interworks 7, dated May 19th, and
4  looking at this e-mail from Gillian, which is
5  dated after that letter of May 19th, I would
6  assume it may have something to do with each
7  other.  The reasons outlined in Interworks 7
8  are the reasons why the account was put on
9  hold.
10  Q.   That letter written by your
11  lawyer, Thomas Carulli, specifically stated
12  two complaints or two claims concerning the
13  breach of the exclusive right to sell to QVC
14  and failure to maintain the required insurance
15  coverage, correct?
16  A.   Yep.
17  Q.   Okay.
18      Again, based on your
19  recollection, were these the two reasons that
20  caused your company to place Interworks'
21  account on hold?
22  A.   I believe there were other
23  reasons as well that might have happened
24  subsequent to May 19th, but I don't know if it
25  was prior to this e-mail.

Page 70

1  Q.   And what were these other
2  reasons, if you recall?
3  A.   There was a serious fraudulent
4  conveyance of the items that were sold to us
5  relative to the part that was approved by QVC,
6  and the battery that was inside the unit did
7  not match specifications of what we purchased.
8  Q.   Well, when you say "fraudulent
9  conveyance," what do you mean by that?
10  A.   I didn't use the term "fraudulent
11  conveyance."
12      MR. HSU:  Can you read that back?
13      (Record read.)
14  A.   There was a fraudulent -- so
15  those two -- take those two words separately.
16  Fraudulently we were sold boards that had been
17  conveyed to us that there was a certain
18  battery inside those units that were not the
19  batteries that were approved by QVC for sale.
20  Q.   How did you know about that?
21  A.   QVC reported that to us.
22  Q.   And did you receive any paperwork
23  from QVC stating that these batteries were
24  nonconforming batteries?
25  A.   Yes.

Page 71

1  Q.   And do you recall the form of
2  these documents that you received from QVC?
3  A.   What do you mean?
4  Q.   Did QVC send you a letter saying
5  that hey, all your batteries are no good now,
6  does not match with the battery that we
7  inspected; did you receive a letter from QVC?
8  A.   It's not a letter; however,
9  subsequent to all of our transactions with
10  Interworks, we submitted one of the boards for
11  testing for a new program that we were doing
12  with QVC, which was supposed to be the same as
13  the boards that we were selling all along to
14  QVC, and QVC alerted us that the units failed
15  compliance, and the reason that they failed
16  compliance were due to batteries that were not
17  matching what was submitted, which led us to,
18  by process of elimination, determine that we
19  were selling incorrectly the item that QVC
20  thought it was buying, based on what
21  Interworks represented to us that they were
22  selling to us.
23  Q.   Do you recall when you first,
24  meaning you, meaning Digital Gadgets, when did
25  Digital Gadgets first receive any notice from

Page 72

1  QVC concerning the battery issue?
2  A.   I would need to look at documents
3  to refresh my memory.
4  Q.   Was it after your lawyer sent
5  this letter out?
6  A.   I would imagine that it would be
7  after or it would have been on that letter.
8  Q.   And it would be after Chris
9  Mitchell sent this proposal in April to
10  Eric Lu?
11  A.   I don't know.  It is possible
12  that QVC could have notified that there was an
13  issue that didn't rise to the level of what we
14  now had suspected would be fraudulent.  It
15  could be clerical, it could be -- I don't know
16  at what time the notice would happen when it
17  would start, but certainly it elevated, and at
18  the time that it elevated I assume would be
19  after this May 19th letter.
20  Q.   Okay.
21      Did you have any meeting with QVC
22  concerning the battery at issue?
23  A.   I'm sure that people in the
24  company had meetings or phone calls.
25  Q.   Do you recall when you received,

Page 73

EXHIBIT 10        H I N E S   R E P O R T E R S        19 (70 - 73)
141

Interworks Unlimited, Inc. vs. Digital Gadgets, LI#:926                    Deposition of Charles Tebele

Page 74

1 when I say you, I meant Digital Gadgets, do
2 you recall when Digital Gadgets received
3 notice from QVC concerning the battery issue,
4 how many hoverboards at the time still
5 remained in the warehouse of QVC or subject to
6 control of -- not QVC, let me try to -- strike
7 that.
8           When you realized that there was
9 a problem concerning the battery issue and you
10 received any notice -- the first notice from
11 QVC about this particular issue, did Digital
12 Gadgets still have hoverboards, or Interworks,
13 in the warehouse?
14      A.    I'm pretty sure we did, yes.
15      Q.    Did you ask anybody else to tell
16 you how many units of hoverboards that still
17 remained on inventory with Digital Gadgets
18 (sic)?
19      A.    I don't understand this question
20 at all.
21      Q.    Well, were you concerned at the
22 time when Digital Gadgets received notice from
23 QVC for this issue, battery issue, did you
24 have concern that Digital Gadgets should
25 return these hoverboards back to Interworks

Page 75

1 because of this battery issue?
2      A.    I don't really understand.  I
3 really don't understand the question.  You are
4 asking me if there was a concern to return
5 them?  Really what you are saying doesn't make
6 sense at all from a business standpoint.
7      Q.    Well, when you received the
8 complaint or the report or notice from QVC,
9 relating to the battery issue --
10      A.    Right.
11      Q.    -- did you at the time want to
12 return all of those hoverboards remaining on
13 inventory with you to Interworks?
14      A.    I don't know.  It would be a
15 developing situation and the general business
16 practice would be put -- would be to put
17 everything on hold once we discover we have a
18 serious breach like that and figure out what
19 happened later.
20      Q.    If you had known a problem from
21 your customer pertaining to quality, not
22 quantity, quality, of the goods --
23      A.    Yep.
24      Q.    -- out of ordinary course of
25 business, would you not want to return those

Page 76

1 goods?
2      A.    No, we would put everything on
3 hold.  If there's evidence that we need, if
4 there's anything, we wouldn't touch anything.
5 Once we discover a fraudulent situation, our
6 business practice is to put everything on
7 hold, stop selling it, stop shipping it, stop
8 moving it, don't touch it until our attorneys
9 advise us what to do.
10      Q.    At the time, did you decide not
11 to sell them pending the on hold?
12      A.    Please refer to my statement that
13 I just said.
14      Q.    I understand what you are saying,
15 but, you know, I could not get the -- maybe I
16 will try another way.
17      A.    Everything goes on hold, that
18 means everything goes on hold, that means we
19 stop now.  There could be a sequence of
20 events, there could be time that it takes for
21 every department to get the message, but the
22 message is we have been defrauded, we have a
23 serious issue in terms of reputation with QVC,
24 customer exposure, what we sold, liability, so
25 the instruction is we hold everything until

Page 77

1 our attorneys tell us what to do.  Hold means
2 hold.  Means we don't touch them, we don't
3 ship them, we don't sell them to customers.
4           And again, it may take time to
5 shut down the engine, there might be goods in
6 transit, there might be things being
7 processed, there might be things happening,
8 but the general sense is we shut down the
9 engine and everything goes on hold, hence the
10 e-mail from Ms. Yip to Sam at Interworks;
11 Interworks is currently on hold pending legal
12 review.
13      Q.    Did Digital Gadgets ever receive
14 a bill from or multiple bills from QVC that
15 have anything to do with the battery issue?
16      A.    I don't know what you are talking
17 about.
18      Q.    Did QVC ever make a claim of
19 damages against Digital Gadgets because
20 Digital Gadgets was supplying these
21 hoverboards that had the wrong battery or
22 defective battery?
23      A.    We were subject to very serious
24 conversations with QVC over this issue.  There
25 was a severe reputational issue.

EXHIBIT 10        H I N E S   R E P O R T E R S        20 (74 - 77)
142

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 26 of 108   Page ID #:927

Interworks Unlimited, Inc. vs. Digital Gadgets, LI                    Deposition of Charles Tebele

Q.   Where did this conversation take place?

A.   **With buyers, with quality assurance people, many different conversations.**

Q.   Do you recall when?

A.   **No.**

Q.   Do you recall where?

A.   **At QVC.**

Q.   And were you present?

A.   **I was present.**

Q.   And do you recall -- do you recall who else was present at QVC for that issue?

A.   **Our reps and buyers and sales reps.**

Q.   Are you able to recall the names of QVC's employees attending that meeting?

A.   **I would need to look at e-mails to refresh my memory.**

Q.   To your knowledge, was there any QVC customers returned any of the hoverboards supplied by Interworks because of the battery issue?

A.   **I don't know.  I don't know what**

Page 78

reason customers use for returns, I wouldn't have access to that.

Q.   That's fair.

Did you receive any notice from QVC concerning how many returns made by their customers, because of the battery issues?

A.   **Again, we don't get the reason for the return, we just get the return.  If you knew you were providing fraudulent services to one of your clients, would you wait for one of your clients to say -- if you realize you were providing fraudulent services to your client and you realized that by accident, and are you gonna wait for your client to complain that you are providing fraudulent services before you take action?**

Q.   Well, I would not be able to answer that question, because I --

A.   **I don't think you need to answer it.**

Q.   I wouldn't know the definition of fraudulent.

A.   **I don't think you need to answer it.  So what you are asking me is, did we get notice or did someone at QVC complain, and**

Page 79

what I guess the implication is we would need to have some complaint or some evidence to take action, and what I'm telling you is, as soon as we discovered the problem and the problem rose to a level where it was serious, we stopped.

Q.   And what did you do after you stopped?  You mentioned about a few things that -- other than those things that you mentioned, any other efforts that you had set in place to confront this issue?

A.   **I don't know, but at some point it became a legal issue, and once it became a legal issue it took on a life of its own and I guess that's why we are sitting here.**

Q.   Well, QVC discovered this issue and --

A.   **No.  QVC told us that this is not what we submitted.  We submitted this and when we opened the box it was that.  That's not good.  If I tell you I'm handing you a wallet with $10 in it, and you took it home and you got $5 and somebody calls you and says I only got $5, not 10, the 10 that you promised me, that's a problem.**

Page 80

Q.   Right.

A.   **Right.**

Q.   Right.

And --

A.   **And if I go back and say the guy who gave me all these $10 wallets only put $5 in them, I'm gonna start looking to see where the problems lie.**

**Does that make sense to you?**

Q.   When you receive indications or reports that led you to believe that there -- the batteries supplied by Interworks were defective, not matching with whatever they submitted for sample testing by QVC, is that your statement (sic)?

A.   **Say that one more time.**

Q.   When you -- by the way, do you know your company had to submit some samples to QVC before you started selling the hoverboards to QVC?

A.   **That's not entirely accurate.**

Q.   Oh.

Which part was not entirely accurate?

A.   **All of it.**

Page 81

EXHIBIT 10          **H I N E S   R E P O R T E R S**          21 (78 - 81)

145

Q.   The question, very simple:  Did you know Digital Gadgets had to submit samples to QVC for testing and approval before you started selling them?

A.   That's not true.

Q.   Not true?

A.   No.  In this case, because Interworks purported to sell us the unit that was already approved by QVC, QVC allowed us to sell it based on our reputation and vouching for the fact that it was the same model, so we began to sell it without submitting a sample. And only after five months later when we needed to submit a sample for a new program and new orders did we then submit them a sample, and then determined that what we were selling them all along was fraudulent.

Q.   You are 100 percent sure about that?

A.   I'm sure of what I just said.

Q.   Okay.

That's very good answer.  I'm just --

A.   That doesn't mean that's 100 percent of what occurred.

Page 82

Q.   Well, that's based on your recollection that's what happened, right?

A.   Yes.

Q.   Okay.

MR. HSU:  Let's mark this as 8.

(Tebele Exhibit 8, Document bearing Bates stamps Interworks 212 through Interworks 221, marked for identification.)

Q.   Exhibit 8 is a computer generated form on top of the first page says QVC, QA sample, evaluation report?

A.   Correct.

Q.   And have you ever seen this entire report?

A.   I have seen this form.  I don't know if I've seen this report before, but I'm familiar with the form.

Q.   And if you look at those days, probably the seventh or eighth line from the top, indicates that the sample evaluation due date, pick due date, requested due date, look at those days, do those tell you that the samples were submitted to QVC by Interworks in early October?

Page 83

A.   That's what it says.

Q.   Okay.

Does it say that the -- by the way, what is the products described on this report?

A.   (No response.)

Q.   Description on top, you see Chic High Roller Self Balancing Hoverboard W?  I don't know what that "W" means.  Do you know, W slash --

A.   What are you asking me?

Q.   I'm asking if you know what that means?  I have no idea what that means.  What the W at the end and slash, what does that mean?

A.   Probably is truncated that there's some words after that, but it doesn't pick up on the form.

Q.   The reason I was asking you, because I don't know what that means.

If you go through this report, it seems like the samples submitted by Interworks to QVC passed the testing?

A.   Yes.

Q.   Is there anything -- you see the

Page 84

second page of this exhibit, the Bates number Interworks 213 in the midsection of the page where it says battery identification, four battery packaging, four general electrical requirement test, Interworks passed all of those things, right?

A.   I don't know what -- I mean you are making a statement, I guess, yeah.

Q.   So you were saying that Interworks -- I'm trying to understand what your claim is.  One of your claims is that Interworks fraudulently --

A.   Interworks had got this board approved.

Q.   Right.

MR. LAZARUS:  Referring to?

A.   Interworks 212.

Q.   This is 8.

A.   The item on this Exhibit Number 8 was approved for sale by QVC.

Q.   And QVC --

A.   And you want me to continue to answer, make it easier?

Q.   Sure.

A.   Interworks sold us this board,

Page 85

EXHIBIT 10    H I N E S   R E P O R T E R S    22 (82 - 85)
144

1  item number T34604, purportedly the same
2  board, that's what we ordered, that's what we
3  told QVC we were gonna be shipping them.
4  Subsequently, in April, May or June or March
5  or I don't know what date when we submitted
6  these very boards to QVC, they failed with QVC
7  telling us that's not the same battery.
8       When we went back and said --
9  referred them to this very report and said
10 wait a minute, it passed, what do you mean
11 it's the same, they said no, it's not the
12 same, which means that until we submitted
13 it -- from the time that we started, to the
14 time that we submitted it, there was something
15 very rotten going on, because it wasn't this
16 passed board.
17      Q.   Do you know why QVC asked Digital
18 Gadgets to submit these samples for testing in
19 March, April or May of 2017?
20      A.   There was a new program, and
21 based on a new program sometimes they require
22 a new submission, and based on that new
23 submission, which were the same boards that we
24 bought from the first day from the same batch
25 of 5,000 or 7,000 or whatever thousand is

Page 86

1  rolling around here, we kept sending boards to
2  QVC saying no, this can't, it's the same
3  board, no, it says T346, whatever, and they
4  are saying no, it's different, it's failed.
5       So that would lead us to believe
6  we were selling failed boards to our large
7  customer.
8       Q.   And when you said there was a new
9  program, that new program was put in place by
10 QVC, right, it was not your decision, it was
11 their decision, meaning QVC's decision to
12 initiate this new program?
13      A.   I don't know whose decision it
14 is.
15      Q.   And after QVC tested a few
16 examples that your company submitted, in
17 March, April or May, and notified you that the
18 battery failed and that does not match with
19 their previous model that were submitted by
20 Interworks --
21      A.   Can you repeat it, please?
22      Q.   You said that the battery -- the
23 battery -- well, let's start with QVC asked
24 your company to submit a few samples for
25 retesting?

Page 87

1       A.   I didn't say for retesting.
2       Q.   For testing.  This was after your
3  lawyers sent a letter to Eric Lu?
4       A.   No.
5       Q.   Or could be before?
6       A.   I would imagine it was somewhere
7  in -- I don't know when the submission
8  started, and I don't know what the report back
9  happened in relation to that letter.
10      Q.   But there was a submission
11 happening, and the problem discovered after
12 QVC notified you that hey, the samples you
13 submitted for testing does not match --
14      A.   It wouldn't happen like that.  We
15 wouldn't -- if it failed, we wouldn't first
16 suspect that the vendor committed fraud on us.
17 We would first try to, in the ordinary course
18 of business, say wait, it must be wrong, must
19 be right, let's see what it is.  Only after
20 very many back and forths in this case did we
21 end up saying, wait a minute, we have a
22 problem.
23      In other words, if we submit it
24 and it failed, you see this document Exhibit 8
25 how many different areas of compliance there

Page 88

1  are, each one is -- it could take weeks or
2  months to figure out the very nature of the
3  failure and point out to, by process of
4  elimination, that the batteries didn't match,
5  and it was through a lot of work and back and
6  forth that we had to get to that
7  determination.
8       Q.   What decision made by QVC, if you
9  know, specifically with respect to Model C
10 hoverboard that they purchased from you, when
11 they realized there was an issue on battery
12 (sic)?
13      A.   I really don't understand your
14 question.
15      Q.   Did QVC request that your company
16 take back all of the Model C hoverboards
17 because this problematic battery that does not
18 match with what --
19      A.   I don't know what they requested
20 to do.  I know what we would do to protect
21 ourselves which would be to cease sales, to
22 hold and stop and find out what the
23 ramifications are.
24      Q.   Did you request QVC to return all
25 of the existing hoverboards on inventory --

Page 89

EXHIBIT 10        H I N E S   R E P O R T E R S        23 (86 - 89)
145

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 29 of 108   Page ID #:930

Interworks Unlimited, Inc. vs. Digital Gadgets, LLC                    Deposition of Charles Tebele

**A.** I don't know QVC had boards on inventory. I don't know where you are making that assumption from.

Q. Well, did you ask QVC how many boards QVC still has sitting in its warehouse?

**A.** Again, I don't know that that would be part of the general line of questioning. The way I understand it is we would ship the boards for QVC so they wouldn't have them in their warehouse.

Q. Now, yesterday, I don't know if you were here or not, did you hear that Ms. Gillian testified, Gillian Yip?

**A.** Yes.

Q. She testified yesterday that the -- your company would ordinarily ship hoverboards to QVC's warehouse and QVC's customers?

**A.** That's correct.

Q. So when she was talking about QVC's customers, she's saying these end users, right?

**A.** Right. The way I understand it, these boards were being shipped to end users.

Q. So there are boards that shipped

Page 90

directly to QVC's warehouse in New Jersey and being stored there?

**A.** QVC doesn't have a warehouse in New Jersey.

Q. Or maybe she was saying some other warehouse located in New York?

**A.** Let's cut to what you are trying to say. I don't believe that QVC had boards in their warehouse at the time of this.

Q. You don't believe there was any remaining inventory being stored at QVC's warehouse?

**A.** For sale.

Q. What is the location of QVC's warehouse?

**A.** They have warehouses all over the country, but they don't have one in New Jersey.

Q. Do they have any warehouse in New York?

**A.** I don't believe so.

(Tebele Exhibit 9, Document bearing Bates stamp Interworks 299, marked for identification.)

Q. Number 9 is a certificate of

Page 91

liability insurance.

Before you came today, did you review all of the certificates of liability insurance provided by Interworks to your company?

**A.** No.

Q. So you've never seen this document before?

**A.** I'm not familiar with it. I may have seen it.

Q. Okay.

Let's mark the next one and see if you have seen this one.

(Tebele Exhibit 10, Document bearing bates stamp Interworks 300, marked for identification.)

Q. If you look at this certificate of liability insurance dated July 13, 2017, have you ever seen this document before?

**A.** I may have.

Q. But you are not sure about it?

**A.** I'm not sure that I have seen it before. I may have.

(Tebele Exhibit 11, Document bearing Bates stamp Interworks 301,

Page 92

marked for identification.)

Q. Number 11, have you ever seen this certificate of insurance?

**A.** I may have.

Q. Let me go back to that QVC QA sample testing report, that was Exhibit 8.

Do you recall receiving a report from QVC stating that the battery that came with the hoverboard failed the testing and also on the report says that the battery that came with the samples do not match with what was previously submitted?

**A.** Again, let me take you through how it would be. We would get a failure, it would outline many areas of failure. Only through going back and forth and resubmitting and trying again and resubmitting and trying again, by process of elimination, finally get down to the fact that batteries didn't match.

It wouldn't be, hey, you submitted this, the battery didn't match. It would be submitted, it would be failed. It's like a game of ping pong, then we'd have to try to mitigate the failures, all the while not knowing, not even thinking in a million

Page 93

EXHIBIT 10        H I N E S   R E P O R T E R S        24 (90 - 93)
146

years that the battery would be different
inside the units, because it's not a battery
you open up and take out.  You have to
actually disassemble the unit to get to the
battery.  It wouldn't be apparent, and QVC
wouldn't provide us a road map and say it's a
different battery.  They didn't even know it
was tied to this submission.  We said, hey, it
has to be the same battery, it has to pass,
you passed it before.
    Q.    Right.
    A.    And they said no, sorry.  Then it
would lead to more and more and meetings until
we would finally be able to isolate it as a
different battery.
    Q.    Okay.
        My question is:  When that issue
was discovered by your company, you also
receive a report, QA report from QVC outlining
all the failures which would also include the
battery issues in that?
    A.    Right, but it wouldn't say it's a
different battery, it would just say the
battery failed.
    Q.    Okay.

    A.    You follow?
    Q.    I understand.  I understand.
        Do you recall on that report you
received from QVC -- how will you know --
based on that report, how will you know the
hoverboard came from Interworks?
    A.    How would we know that board that
we submitted came from Interworks?
    Q.    Right.
    A.    If it was an Interworks High
Roller whatever model that we submitted.
    Q.    Does the report actually say
that, Interworks High Roller Model C?
    A.    I don't know, but if you are
asking how we know what was submitted, there
are pictures, probably, and there are records
that support what we are submitting.
        Obviously, if that was the case
we could support -- we could submit anything
to QA and nobody would be able to have any
accountability over what it would be and then
ship any other thing, so there has to be a
trail and a supported trail that's kind of
sophisticated that measures what was submitted
versus -- and I believe even QVC takes

pictures and records and to protect themselves
against people submitting them one thing and
shipping another.
    Q.    Again, I don't remember if you
were here when Ms. Yip testified on certain
questions or responded to my questions
yesterday regarding the hoverboards that your
company is currently selling.  She, if I
recall correctly, she said, correct me if I'm
wrong, she said your company is currently
selling hoverboards?
    A.    Yes.
    Q.    And these hoverboards were
manufactured by different factories?
    A.    Yes.
    Q.    Than those you got from
Interworks?
    A.    Yes.
    Q.    And when I asked her are the
hoverboards that your company is selling are
all Model C, and I think she was not able to
recall?
    A.    Model C is a term unique to
Interworks.  If it was a quote/unquote Model
C, it would be an Interworks board.

    Q.    So the current hoverboards that
you are selling to QVC that were manufactured
by other factories, and not exactly the same
model --
    A.    We only purchased those models
after we realized we couldn't sell the
Interworks boards, so they came in subsequent
and later.
    Q.    Okay.
        And your company purchased
directly from the manufacturer in China?
    A.    Yes.
    Q.    And do you recall when you first
started selling these hoverboards to QVC?  I
mean a different factory that you purchased
and turned around and sold to QVC, do you
recall when you started doing that?
    A.    I need you to rephrase the
question.
    Q.    Well, we are talking about a
different factory, different manufacturers of
the hoverboards that your company is currently
selling to QVC; when did you start buying from
that factory?
    A.    We've been dealing with that

factory for many years.

Q.   So that was before you met Eric Lu, you were in business with that factory?

A.   **Along many different products that have nothing to do with hoverboards.**

Q.   To your knowledge, does that factory also manufacture a similar product like Model C manufactured by Shenzhen?

A.   **I don't know, it's quite possible.**

Q.   Shenzhen is a city that is one hour away from Hong Kong roughly, right?

A.   **Yes.**

(Recess taken.)

BY MR. HSU:

Q.   Next in order, Exhibit 12.

(Tebele Exhibit 12, Document bearing Bates stamp Interworks 405, marked for identification.)

Q.   12 is an e-mail prepared and sent by ingridchen@bibbyusa.com on Tuesday, February 14, 2017, sent to Eric Lu and cc on Charlie.

Mr. Tebele, have you ever seen

this e-mail before?

A.   **Yes.**

Q.   Okay.

Was this the last e-mail that you received from Bibby USA rejecting the application?

A.   **I don't know.**

Q.   Submitted by Digital Gadgets for $1 million plus credit coverage?

A.   **I don't know.**

Q.   To your knowledge, did Bibby Financial Services ever grant any credit coverage to Digital Gadgets in the past?

A.   **I would have no way of knowing that.**

Q.   After you received this e-mail, did you personally do anything in attempt to get this million dollar credit coverage?

A.   **I don't know.**

Q.   Ms. Chen mentioned the bank information only shows 26,000 checking account. Your understanding, this 26,000 in credit -- in checking account, whose checking account was that?

A.   **I don't know who she's referring**

to.

(Tebele Exhibit 13, Document bearing Bates stamp Interworks 399, marked for identification.)

Q.   13 consists of two pages.  On top there is a date February 14, 2017, to Todd Valoff, V-A-L-O-F-F?

A.   **Yep.**

Q.   Do you recognize this document?

A.   **Yes.**

Q.   Who's Todd Valoff?

A.   **Todd is the representative at First Republic Bank that handles Digital Gadgets' bank account.**

Q.   Okay.

When you see on the first page of this exhibit checking account balance of 26,672.74, was that the checking account of Digital Gadgets?

A.   **That's what it says.**

Q.   And it was -- the date this checking account was opened was back in December of 2015?

A.   **That's what it says.**

Q.   Going back to the last exhibit,

Ms. Chen mentioned about the checking account balance of 26,000, was she mentioning this particular document?

A.   **Ms. Chen?**

Q.   Ingrid Chen.

A.   **It could be.**

Q.   But you don't have any personal knowledge about that?

A.   **I mean you are showing me two documents.  It looks like that's what she would be referring to.  They are on the same date.**

Q.   Next one will be 14.

(Tebele Exhibit 14, Document bearing Bates stamp Digital Gadgets 154, marked for identification.)

Q.   14 has a number of e-mails; one, two, three.  On top the -- this Cheryl Baiocchi sent to bunch of individuals, Chris Mitchell was one of them.  You were not cc'd on this e-mail.  Have you ever seen the top e-mail?

A.   **Possibly.**

Q.   And if you look at the date and time subsequent to the top e-mail, Paulette

EXHIBIT 10          H I N E S   R E P O R T E R S          26 (98 - 101)

Interworks Unlimited, Inc. vs. Digital Gadgets, LII                    Deposition of Charles Tebele

1  Brown at Digital Gadgets responded to -- oh,
2  Cheryl was working for QVC at the time; do you
3  know her?
4       **A.    Are you asking me a question?**
5       Q.    Yes.  Do you know her personally?
6       **A.    No.**
7       Q.    It seems to me that these e-mails
8  were discussing about some samples submitted
9  to QVC's testing.
10      Do you have any personal
11 knowledge about the subjects being discussed
12 on these e-mails?
13      **A.    Yes.**
14      Q.    What would that be?
15      **A.    What would what be?**
16      Q.    Your personal knowledge?
17      **A.    What we've been discussing for**
18 **the last hour regarding the QA.**
19      Q.    Right, and you looked at the
20 second e-mail from the top, Paulette, she was
21 your employee, right?
22      **A.    Yes.**
23      Q.    She said we have done that,
24 verified that we have the hoverboards matching
25 the specs in testing for T34764?

Page 102

1       **A.    That's what I told you before.**
2       Q.    What is T34764?
3       **A.    That's the item number that QVC**
4  **assigned to the Interworks board.**
5       Q.    Is that the same as the SKU
6  number?
7       **A.    No.**
8       Q.    Item number?
9       **A.    Um-hmm.**
10      Q.    From that previous exhibit, the
11 sample testing report, can you tell me where
12 the report states -- not the SKU number, but
13 the item number?
14      **A.    It says here T34604.**
15      Q.    That's the SKU number, right, it
16 has SKU on top?
17      **A.    Yes.**
18      Q.    To your understanding, SKU number
19 is the same as the item number that you were
20 referring to?
21      **A.    It should be.**
22      Q.    Okay.
23      By looking at the SKU number, you
24 would know what model of hoverboard --
25      **A.    No.**

Page 103

1       Q.    Will you be able to identify
2  who --
3       **A.    This is the number that QVC**
4  **assigns to it.**
5       Q.    Okay.
6       And this number then will be the
7  very number used to identify the hoverboards
8  sold by Digital Gadgets to QVC?
9       **A.    No, this is the board that**
10 **Interworks sold to QVC.**
11      Q.    First, and then --
12      **A.    This number that was assigned**
13 **here.**
14      Q.    Oh, I got it.
15      **A.    Is assigned on the submission**
16 **that Interworks submitted.**
17      Q.    Okay.
18      And that, to your understanding,
19 that was a Model C High Roller?
20      **A.    I can't tell from this, but**
21 **that's what my understanding is.**
22      Q.    Okay.
23      And regardless of a color, every
24 hoverboard supplied by Interworks to QVC
25 through you would bear the same SKU number?

Page 104

1       **A.    No.  No.**
2       Q.    Okay.
3       **A.    This was the number that they**
4  **assigned to this submission to this board from**
5  **Interworks.**
6       Q.    Okay.
7       **A.    There might be other submissions.**
8  **There might be other bundles.  Every item they**
9  **could have submitted a series of items, they**
10 **could put it under a family of product, they**
11 **create their own SKU number, it has nothing to**
12 **do with us.**
13      Q.    So this SKU number came from
14 Interworks?
15      **A.    No.**
16      Q.    From QVC?
17      **A.    Yes.**
18      Q.    QVC assigned this number to --
19      **A.    To this sample.**
20      Q.    Okay.
21      I'll move on after this question,
22 but you don't have any personal knowledge on
23 whether this number assigned by QVC is
24 applicable to any given product, for example,
25 QVC would only assign one SKU number to a

Page 105

EXHIBIT 10          H I N E S   R E P O R T E R S          27 (102 - 105)

1 model supplied by Interworks, for example,
2 Model C, am I correct on that understanding or
3 let me give you a scenario, you can correct me
4 if I'm wrong.  If Interworks had carried more
5 than one model, Model A, B, C then D, four
6 different models of hoverboards, and
7 Interworks was able to get all of these four
8 model numbers approved by QVC, QVC then would
9 assign four different SKU numbers?
10     **A.     Yes, that would be --**
11     Q.     Because there are four different
12 models?
13     **A.     That would be their practice.**
14     Q.     For every different model QVC
15 would assign one SKU number for
16 identification?
17     **A.     They could assign multiple SKU**
18 **numbers to one model, but they would assign**
19 **one different SKU number for every single**
20 **model.**
21     Q.     At least one?
22     **A.     At least one, that's what I mean.**
23     Q.     Get that clear.
24     **A.     They can assign two or three or**
25 **four to the same board.**

Page 106

1     Q.     Okay.
2          Next one will be 15.
3          (Tebele Exhibit 15, Document
4      bearing Bates stamps Digital Gadgets 14
5      through Digital Gadgets 18, marked for
6      identification.)
7     Q.     15 is another QVC sample QA
8 report.  As a matter of fact, this sample
9 report was produced by your company in this
10 litigation.  Have you ever seen this document
11 before?
12     **A.     I might have seen it.**
13     Q.     There are a few days mentioned
14 and printed on the first page, top portion of
15 this exhibit.  You will see the pick due date
16 June 5, 2017, sample evaluation due date
17 June 15, 2017, requested due date June 2,
18 2017, and further down to the left you see
19 last activity date and time, June 2, 2017.
20 These dates remind you when QVC received these
21 samples from your company; was it in June,
22 early June?
23     **A.     This sample was received on the**
24 **dates that it says there.**
25     Q.     Which date, would be the date

Page 107

1 that QVC received from --
2     **A.     I don't know.**
3     Q.     Were these --
4     **A.     These are the general dates of**
5 **when they were evaluating it.  I don't know**
6 **how they track what day they received it.**
7     Q.     Would be the last activity day?
8     **A.     No, that's the last activity day.**
9     Q.     Okay, so it's before this date?
10     **A.     Again, I refer to my earlier**
11 **statement, I don't know how they track what**
12 **day they received them.**
13     Q.     You see the vendor's name, vendor
14 name Digital Gadgets LLC?
15     **A.     Yes.**
16     Q.     And vendor code, CX82-0000,
17 that's your company, right?
18     **A.     Um-hmm.**
19     Q.     Okay.
20          Was there anything in this report
21 showing the product came from Interworks?
22     **A.     Yeah, it says High Roller Self**
23 **Balancing Board right on the top.  It didn't**
24 **come from Interworks.  We submitted the sample**
25 **from Interworks.  It came from Digital**

Page 108

1 Gadgets.
2     Q.     Right.
3     **A.     We submitted an Interworks board.**
4     Q.     At the time, was there any other
5 company selling so-called High Roller Self
6 Balancing Hoverboard?
7     **A.     No.**
8     Q.     Was there any information
9 presented on this report that says these
10 hoverboards were manufactured by the factory
11 who work with Interworks at the time?
12     **A.     I don't think that's something**
13 **that they would catalog.**
14     Q.     To your recollection or
15 knowledge, personal knowledge, would QVC know
16 about who manufactured the -- these
17 hoverboards by looking at the product and the
18 SKU numbers?
19     **A.     If they wanted to determine who**
20 **manufactured it, they could.**
21     Q.     When you -- again, when I said --
22 I was asking for your personal knowledge.
23 When your company submitted these samples for
24 QVC for testing purpose, did you submit the
25 samples with the boxes or without the boxes?

Page 109

EXHIBIT 10          H I N E S   R E P O R T E R S          28 (106 - 109)
150

A.    We always have to submit it with the boxes.

Q.    So QVC wants to take a look at what's printed on the box, QVC wouldn't know where the hoverboard came from?

A.    Yes, other than what you said the description of the product.

Q.    Was there anything in this report saying that these hoverboards were manufactured by Shenzhen Chic?

A.    I don't know what Shenzhen Chic has to do with it.  You asked me about Interworks.

Q.    Do you know Shenzhen Chic was manufacturing these hoverboards that were sold to Digital Gadgets then sold to Digital gadgets?

A.    No, I don't know that.

Q.    Is there anything in this report mentioned -- mentioning that these hoverboards came from Interworks?

A.    I don't know.  I mean the report speaks for itself.

Q.    Right.
      You know, if I tell you that

there's really nothing in this report showing that --

A.    I'll take you at your word.

Q.    Would you agree with me on that?

A.    Not really.  I will tell you where maybe there's some information that you haven't -- if you look at page 2 of 5 --

Q.    205?

A.    2 of 5.

Q.    Okay.

A.    The fourth line down, it says confirm items listing this correct and active, UL Model Smart C file E 483, blah, blah, blah, I would imagine that's the model tied to Interworks.

Q.    Well, hold on.  We are talking about page number --

A.    2 out of 5.

Q.    And then --

A.    All the way to the bottom.

Q.    All the way to the bottom?

A.    Fourth line down.

Q.    Okay.  The UL 1642 certificate for the lithium battery sales required had not been received?

A.    No.  Take a look all the way in the middle section, the last line says batteries included; you see that?

Q.    Yes.

A.    Go up three lines from that.

Q.    Right.  UL Model Smart C file E483017?

A.    Yeah.

Q.    And there's a UL adapter Model SPS, then there is some numbers after that?

A.    Right.  It would be some tie back -- that's the Model C.

Q.    So you would say is that based on your personal knowledge that these numbers are somehow tied to Interworks product?

A.    Yes, based on my personal knowledge.

Q.    Do you know which one?

A.    No, but it says Model C, it says Smart C, I would assume there is some connection to Model C there.

Q.    Okay.

A.    Does that make sense to you?

Q.    I don't know.  I wish I knew. See, that's the beauty of being a lawyer, we

know nothing about what you are doing.

A.    He knows a lot.  He tells me he does.

Q.    That's what's so great about lawyers, you walk into different case, you start all over again by learning what's happening in that business.
      Anything else that you can help me with that -- by looking at this report and tell me which one could point to Interworks?

A.    I think that QVC would have more information.  I don't know what would be here.

Q.    To your recollection, does QVC still have these sample sitting in their warehouse or their office?

A.    Sorry?

Q.    With respect to these samples, does QVC still have them?

A.    You can't ask me that.  You need to ask them.  How would I know?

Q.    You may know, but, you know, I'm just asking.

A.    They are a big place.  That's not me.

      MR. HSU:  This one is 16.

EXHIBIT 10          H I N E S   R E P O R T E R S          29 (110 - 113)
151

Page 114

1    (Tebele Exhibit 16, Document
2  bearing Bates stamp Digital gadgets 35,
3  marked for identification.)
4    Q.    16, there is a short e-mail on
5  top from Eric Lu to Chris Mitchell in
6  December, specifically on December 21, 2016.
7    It says "Chris, see my comments
8  below in red.  I'll give you a call shortly."
9    In response to Chris Mitchell's
10  e-mail to Eric Lu dated the same day earlier
11  than that, well, yes, a little earlier than
12  3:04 a.m., was 9:26 a.m. in the morning, here
13  by the way, have you received this e-mail from
14  Chris Mitchell?
15    A.    Did I receive this e-mail from
16  Chris Mitchell?
17    Q.    Right.
18    Did he subsequently forward it to
19  you?
20    A.    I don't remember.
21    Q.    And says -- Chris Mitchell says
22  here "Eric" starting from the second paragraph
23  "current order QVC isn't going to be able to
24  resolve the lithium battery reissue until next
25  month."

Page 116

1    Q.    And discuss our partnership
2  further?
3    A.    Yep.
4    Q.    So you did discuss, meaning your
5  company, did discuss this exclusive agreement
6  with Eric Lu?
7    A.    Yes.
8    Q.    At the trade show, and what was
9  your recollection on Eric Lu's response or
10  anything that he said in Las Vegas -- when you
11  met Eric Lu, did he agree to give that
12  exclusive deal to you guys?
13    A.    There was no doubt that he agreed
14  that as long as we had inventory in place that
15  we remained the exclusive partner.  We would
16  never buy somebody else's goods for them to go
17  sell them to the same customer behind our
18  back.  The discussion further was we were
19  discussing other accounts to extend the
20  exclusive to.
21    Q.    Did you also at Las Vegas discuss
22  the payment terms such as consignment?
23    A.    It's possible.
24    Q.    But you don't remember sitting
25  here?

Page 115

1    Are you aware of such issue
2  existing in December of 2016?
3    A.    That's a different issue.  That's
4  a different lithium battery issue than what we
5  are talking about with the QA.
6    Q.    Right.
7    And you say is a different issue?
8    A.    It has nothing to do with the QA.
9    Q.    Okay.
10    And was this around the time when
11  Chris Mitchell was negotiating with Eric on
12  the price terms along with the other terms for
13  the sale of the hoverboards?
14    A.    It appears to be.
15    Q.    And when Chris Mitchell
16  mentioned -- you see down below like one, two,
17  three, four, fourth bullet point, if you look
18  at the second one?
19    A.    Yep.
20    Q.    Received exclusive agreement to
21  supply chip listen board to QVC for 2017 and
22  then Eric's comment is yes, we can put this
23  agreement to you, but let's have our meetings
24  and see it and that's the trade show, right?
25    A.    Yes.

Page 117

1    A.    Again, there was a sequence of
2  events and a lot of conversations.  I don't
3  know what conversation was at CES versus on
4  the phone, but it was a fluid situation.
5    (Tebele Exhibit 17, Document
6  bearing Bates stamp Digital Gadgets 80,
7  marked for identification.)
8    Q.    Next one is 17.  Have you ever
9  seen this certificate of liability insurance?
10    A.    Possibly.
11    Q.    You see towards the bottom left
12  underneath two words certificate, Digital
13  Gadgets, LLC and that's your company, right?
14    A.    Yes.
15    Q.    On top -- well, it's not very
16  top, it's like ninth or tenth or twelfth line
17  from the top, you see under the insured
18  Interworks Unlimited, Inc.?
19    A.    Yes.
20    Q.    Was printed there, so the insured
21  of this policy was Interworks?
22    A.    Yes.
23    Q.    And your company was made as an
24  additional insured?
25    A.    Yes.

EXHIBIT 10          H I N E S   R E P O R T E R S          30 (114 - 117)
152

Q.   On this certificate?

A.   Yes.

Q.   Right?

MR. LAZARUS:  Yes.

A.   Yes.  It says that I'm named as additional insured in the middle of the page 2, third down, certificate of holder's name as additional insured with respect to products as the named insured as their interest may appear, then it says in big bold letters, no coverage extended to hoverboards.

Q.   Right, it does say that.

Do you recall seeing this document any time in 2017?

A.   Yes.

Q.   Around the time of May 9th, like the date?

A.   I don't know the dates specifically, but there was a time when we were made aware that there was no coverage, so this may be around that time.

Q.   When you say there is no coverage, you meant on this certificate Digital Gadgets was somehow excluded because the coverage was not made to extend to

Page 118

hoverboards?

A.   No, Digital Gadgets wasn't excluded.  Digital Gadgets is a certificate holder.

Q.   Right and then --

A.   The exclusion was hoverboards.  The only thing we bought from Interworks were hoverboards.

Q.   Do you know at the time Interworks had other insurance coverage?

A.   I wouldn't know what Interworks had, but this certificate is the certificate that we would rely upon or certificates other than this like you produced to have me, then look at and ask me if I have seen, if you got a certificate and you bought hoverboards from a company and they gave you a certificate and it says here is your insurance, Mister, but it doesn't apply to hoverboards, that would cause concern.

Q.   You had concern, and after that I think you don't remember if your company had to go out and purchase your own policy until after you received this?

A.   Correct.

Page 119

Q.   You don't recall that?

A.   But this is dated 5/9 and the letter from Tom Carulli is dated 5/19, I think, so around that time there was drama.

Q.   Let me ask you:  If you had known -- would there be a difference for Interworks to maintain its policy that cover all the hoverboards that is sold to your company versus your company had to be listed as additional insured on the policy?

A.   It's both.

Q.   Does QVC require that your company carry and maintain liability insurance?

A.   Yes.  Products are what dictates the insurance.

Q.   Right.

A.   So even though I'm required to maintain a general amount of insurance by QVC, subset of that, if there are specific products that they require different insurers requirements, higher or different or some kind of -- maybe they have an added risk, they would require an extra layer of protection and I believe the hoverboards are one of those

Page 120

products.

Q.   Okay.

For the sake of discussion, if you had given Interworks' certificate of insurance to QVC, would they accept it, because they might have realized that while these goods were initially supplied by Interworks --

A.   Say that again.

Q.   At the time or around the time where your company received this notice that there is no coverage extended to hoverboards, and you raised that issue to Interworks, correct?

A.   I'm certain someone raised the issue to Interworks, because it's on the letter from Tom Carulli.

Q.   Right.

Around the time when this became an issue, did you ask for Interworks to forward their liability insurance to your company so you guys can use that to satisfy QV's requirement?

A.   I don't know.

Q.   Do you know at the time, right

Page 121

EXHIBIT 10        H I N E S   R E P O R T E R S        31 (118 - 121)
155

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 37 of 108   Page ID #:938

Interworks Unlimited, Inc. vs. Digital Gadgets, LI                    Deposition of Charles Tebele

around that time May 2017 Interworks had
continuously maintained its liability
insurance?

A.    I don't know.

Q.    Now, you wouldn't know either if
you had asked for it and Digital Gadgets did
provide that to you would QVC okay on that
policy of Interworks?

A.    What's the question?

Q.    Let me give you a hypothetical.
Could be a hypothetical, because you don't
have any personal knowledge.

Based on the ordinary course of
business, custom and practice adopted in your
company, if Eric Lu had forwarded their
liability insurance coverage that says
Interworks only, if you had forwarded that
coverage to QVC asking them to approve it,
because you are actually selling to QVC --

A.    We would need to provide them our
own policy.  We would need to be an additional
insured by the vendor or hold the insurance
ourselves.

Q.    Okay.

A.    That's my understanding of how it

Page 122

works.

Q.    Okay, that's your understanding
of how it works at QVC?

A.    Yes.

(Tebele Exhibit 18, Document
bearing bates stamp Digital Gadgets 81
through Digital Gadgets 82, marked for
identification.)

Q.    18 starting from the top shows an
e-mail from Chris Mitchell to Eric and the
subject was Chic, C-H-I-C, 2017 plus Digital
Gadgets.  Have you ever seen this e-mail?

A.    I don't know.

Q.    When you see the -- well, there
are about six bullet points.  You see the
first bullet point approaching the midsection
of the page, met with QVC today and they are
finally able to turn high roller boards back
on?

A.    Yes.

Q.    They figured out the lithium
battery issue with their legal team?

A.    Yes.

Q.    Do you know what was going on
with respect to this?

Page 123

A.    Yes.

Q.    Particular discovery by QVC?

A.    Yes.

Q.    Okay.

Can you tell me what that is?

A.    There were -- there was a general
fear in the marketplace around lithium ion
batteries in general, not to do anything with
hoverboards, having to do with hoverboards,
but a greater issue, whereby there were
lithium ion batteries exploding on planes.

Q.    Okay.

A.    And QVC determined that since
there was a Christmas rush, at a certain date
they stopped selling many items that had heavy
lithium ion batteries in total.  They just
froze all the items and would not turn them
back on until they were assured that people
wouldn't ship them on planes.  So that means
if UPS -- if you ordered one and said I need
it overnight, they were worried that we were
gonna put it on an UPS truck or another vendor
would put it on an UPS truck, it would explode
and QVC would have the liability because it
was their UPS account number.

Page 124

Q.    Got it.

A.    So they froze all of this plus
many, many other items from being sold and by
January 20th, we were able to prove to them
that we had sufficient checks and balances to
make sure that they only go by ground and not
air.

Q.    Not by air.

A.    And then they turned the unit
back on.

Q.    Okay.

So basically because of that
issue, there was no overnight delivery by
anybody.

A.    Right.

(Tebele Exhibit 19, Document
bearing Bates stamp Digital Gadgets 264,
marked for identification.)

Q.    This 19 is another certificate of
liability insurance that lists Digital Gadgets
as a certificate holder.  The date of this
certificate was December 8, 2016; have you
seen this document before?

A.    Possibly.

Q.    Do you know if Digital Gadgets

Page 125

EXHIBIT 10          H I N E S   R E P O R T E R S          32 (122 - 125)
154

1 submitted this certificate to QVC around the
2 time Digital Gadgets received this from
3 Interworks?
4    A.    What's the question again?
5    Q.    Do you know if Digital Gadgets
6 ever submitted this certificate of liability
7 insurance to QVC ever?
8    A.    I don't know.
9       (Tebele Exhibit 20, Document
10      bearing Bates stamps Digital Gadgets 244
11      through Digital Gadgets 247, marked for
12      identification.)
13   Q.    20 has a number of pages.
14      These documents were produced by
15 Digital Gadgets.
16      If you see the second e-mail from
17 the top on Digital Gadgets 244, this e-mail
18 was sent by Chris Mitchell to Eric, presumably
19 Eric Lu, and you were cc'd on it.  Do you see
20 that?
21   A.    Yep.
22   Q.    And Chris Mitchell first said
23 "Eric understood about wanting the boards
24 back.  We were honoring the consignment backup
25 agreement per our conversation.  But if that's

Page 126

1 no longer an option for you, we can send back
2 the remaining boards."
3      What is the consignment backup
4 agreement Chris Mitchell was talking about
5 here, if you know?
6    A.    Basically, that there were,
7 throughout the negotiations, like I said, it
8 was fluid and what they agreed to was rather
9 than shipping the boards back and forth
10 between Interworks and Digital Gadgets and
11 having them sit in one warehouse or another,
12 since they were only for QVC that we would pay
13 them based on when they were sold.  So that's,
14 I mean, call it a consignment agreement, but
15 it's not a very technical term.  Consignment
16 agreement would basically mean to me we would
17 pay for the goods per specific agreement as
18 they were sold.
19   Q.    Okay.
20      And then the -- see there's some
21 bold printed lines or words starting from an
22 arrow pointing to the left, "I have honored
23 everything" that -- "everything I've said.  I
24 told you guys I would give you
25 terms/consignment if you guys would get

Page 127

1 approved from my factor."
2      Did Eric Lu write all of these
3 responses in bold printed form?
4    A.    I don't know, looks like it.
5    Q.    And here he was complaining to
6 you guys that if you had been approved by my
7 vendor, I would have given this consignment
8 backup agreement to you guys at the time this
9 e-mail was sent to them, to Eric Lu, to your
10 recollection, Interworks' factor never
11 approved your company on this credit line of
12 $1 million, right?
13   A.    I have no idea.  It looks to be
14 he shipped it, bought approval from his factor
15 and maybe he was in trouble or something.  I
16 don't know what -- I don't know what -- I
17 don't know what the inner workings between him
18 and his factor are, but we don't have any
19 obligation as Digital Gadgets to satisfy his
20 factor.  His factor relationship is between
21 him and his factor.
22   Q.    If you look down below,
23 there's -- it seems like there is a
24 spreadsheet prepared by Chris Mitchell to
25 Eric Lu.  If you can help me go over the

Page 128

1 second page of the document, where you can see
2 not this page, can you just briefly go to a
3 second page?
4    A.    Yes.
5    Q.    Second page on top to the right,
6 you see the total received number is 10,608
7 units?
8    A.    Yes.
9    Q.    Is that consistent with your
10 recollection of how many units of
11 hoverboards --
12   A.    I previously answered I'm not
13 sure how many hoverboards were received, but
14 if this e-mail states -- the e-mail stands on
15 its own.  The statement is what it is.
16   Q.    Okay.
17      But you mention about computer
18 data and software.  If you have to retrieve
19 this information or spreadsheet from your
20 computer you would be able to do that, right?
21   A.    Yes.
22   Q.    After you received these e-mails
23 from Chris Mitchell and Eric Lu, did you
24 remember -- did you remember you had a meeting
25 or a couple of meetings with Chris Mitchell?

Page 129

EXHIBIT 10        H I N E S   R E P O R T E R S        33 (126 - 129)
155

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 39 of 108   Page ID #:940

Interworks Unlimited, Inc. vs. Digital Gadgets, LL                Deposition of Charles Tebele

1    A.    Yes.

2    Q.    And do you remember what was
3 being discussed about issues being raised by
4 these two, three e-mails between Chris
5 Mitchell and Eric Lu, if anything?

6    A.    Do I remember?

7    Q.    Do you remember the significance
8 or the important part of the conversation that
9 you had with Chris Mitchell?

10    A.    I'm sure it was everything that's
11 outlined in this e-mail.

12    Q.    When this e-mail was sent early
13 March 2017, the battery issues with QVC had
14 not occurred yet?

15    A.    I don't know when exactly it
16 started occurring, but it doesn't appear to be
17 an issue because it's not mentioned in this
18 e-mail.

19    Q.    Right.

20         It was not mentioned throughout
21 these e-mails, so would that be correct to
22 say --

23    A.    Would be a reasonable assumption.

24    Q.    Okay.

25         Did you ask Chris Mitchell to go

Page 130

1 back to Eric Lu to further negotiate on the
2 price about March 3, 2017?

3    A.    I don't recall anything specific
4 on the price. I think that these negotiations
5 have multiple components and price being one
6 of them, but I don't know -- I don't know if
7 this specific direction was to negotiate on
8 price, but all in all we would have to get
9 terms and conditions satisfactory for us to
10 move forward.

11    Q.    Okay.

12         You do recall that we had gone
13 through a proposal, at least one proposal made
14 by Chris Mitchell to Eric Lu about taking
15 50 percent of inventory at one price; will you
16 consider that would be an attempt to negotiate
17 price with Interworks on the part of Digital
18 Gadgets?

19    A.    No.

20    Q.    Will you consider that was a
21 business strategy adopted by Digital Gadgets
22 because Digital Gadgets was unable to sell the
23 remaining inventory which at the time was
24 about 5,000 plus?

25    A.    No, it was probably dictated by

Page 131

1 market conditions. It's not a strategy to
2 renegotiate. We work with our vendors in
3 partnership to maximize sales based on the
4 market conditions.

5    Q.    You understand this term
6 consignment, right?

7    A.    Yes.

8    Q.    And ordinarily when -- in a
9 consignment situation the seller retains title
10 to the goods and the buyer doesn't have it
11 until the goods are sold and the title passed
12 to the buyer and then to the ultimate end user
13 or ultimate buyer?

14    A.    From a legal standpoint that may
15 be the definition.

16    Q.    Right.

17         And what's your understanding of
18 that term in the business world?

19    A.    From a practical standpoint to us
20 means we pay as we sell them. Who holds title
21 is a separate and maybe legal type of
22 agreement around title, which would be
23 clarified by title, but if they were invoices,
24 then they wouldn't be invoiced to us, so if
25 they were invoiced to us, then title to us,

Page 132

1 meaning Digital Gadgets, that means title
2 passed to Digital Gadgets. If there was a
3 consignment agreement for title, that would be
4 a legal description of consignment. The
5 business description of consignment which kind
6 of means we pay when we sell.

7    Q.    You pay when you sell and then
8 when you are unable to sell, you would be able
9 to return them to the seller?

10    A.    It would be all covered under
11 whatever the agreement would be. Some vendors
12 tell us to throw them away, some vendors tell
13 them to give them back.

14         MR. HSU: Just pretty much gone
15    through what I wanted to talk about
16    today. Let me just -- let's get off the
17    record. I wanna make sure I have
18    everything that I want to cover today.

19         (Recess taken.)

20         MR. HSU: During the recess, I
21    have discussed with Mr. Lazarus, it's a
22    little hard to pronounce your name, I'll
23    do my best to try to do it correctly
24    next time, Mr. Lazarus, and I discussed
25    and agree that the stipulation that I

Page 133

EXHIBIT 10          H I N E S   R E P O R T E R S          34 (130 - 133)
156

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 40 of 108   Page ID #:941

Interworks Unlimited, Inc. vs. Digital Gadgets, LI                    Deposition of Charles Tebele

made with Mr. Louzon yesterday will be
also applicable 100 percent to today's
deposition transcript. You want me to
recite the terms, everything?
        MR. LOUZON: No.
        MR. HSU: I have recited every
little and big term of the stipulation
to Mr. Lazarus and he agreed that he
will stipulate to the proposed handling
of the deposition transcript as I
stipulated with Mr. Louzon yesterday.
        So stipulated?
        MR. LAZARUS: Yes.
        MR. HSU: We are done.
        (Time noted: 1:57 p.m.)

Page 134

**A C K N O W L E D G M E N T**

STATE OF NEW YORK   )
                    ) ss.
COUNTY OF           )

        I, CHARLES TEBELE, hereby certify
that I have read the transcript of my
testimony taken under oath in my deposition of
August 21, 2018, that the transcript is a
true, complete and correct record of my
testimony, and that the answers on the record
as given by me are true and correct.



        _____
        CHARLES TEBELE



Signed and subscribed to before
me, this        day
of             , 2018.
_____
Notary Public, State of New York

Page 135

136

**I N D E X**

Examinations                        Page
Mr. Hsu                          5

**E X H I B I T S**
No.    Description                Page
1   Second Amended Notice of Taking      34
    Deposition of Charlie Tebele
2   Second Amended Notice of Taking      34
    Deposition of
    Defendant/Counterclaimant Digital
    Gadgets, LLC
3   Document bearing Bates stamp         38
    Interworks 7
4   Document bearing Bates stamp         48
    Interworks 8
5   Document bearing Bates stamp         49
    Interworks 9
6   Document bearing Bates stamps        57
    Interworks 42 through Interworks 54
7   Document bearing Bates stamp         68
    Interworks 88
8   Document bearing Bates stamps,       83
    Interworks 212 through Interworks
    291
9   Document bearing Bates stamp         91
    Interworks 299
10  Document bearing Bates stamp         92
    Interworks 300
11  Document bearing Bates stamp         92
    Interworks 301
12  Document bearing Bates stamp         98
    Interworks 405
13  Document bearing Bates stamp         100
    Interworks 393
14  Document bearing Bates stamp         101
    Digital Gadgets 154
15  Document bearing Bates stamps        107
    Digital Gadgets 14 through Digital
    Gadgets 18
16  Document bearing Bates stamp         114
    Digital gadgets 35
17  Document bearing Bates stamp         117
    Digital Gadgets 80

137

18  Document bearing Bates stamp         123
    Digital Gadgets 81 through Digital
    Gadgets 82
19  Document bearing Bates stamp         125
    Digital Gadgets 204
20  Document bearing Bates stamps        126
    Digital Gadgets 244 through Digital
    Gadgets 247

INFORMATION REQUESTED
        Page

INFORMATION TO BE FURNISHED
        Page

EXHIBIT 10        **H I N E S   R E P O R T E R S**        35 (134 - 137)
                                                           157

Case 2:17-cv-04983-TJH-KS   Document 50-2   Filed 12/14/18   Page 41 of 108   Page ID #:942

**Interworks Unlimited, Inc. vs. Digital Gadgets, LLC**                    **Deposition of Charles Tebele**

C E R T I F I C A T E

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF SUFFOLK    )


       I, CINDY A. AFANADOR, a Notary
Public within and for the State of
New York, do hereby certify:
       That CHARLES TEBELE, the witness
whose deposition is hereinbefore set
forth, was duly sworn by me and that such
deposition is a true record of the
testimony given by such witness.
       I further certify that I am not
related to any of the parties to this
action by blood or marriage; and that I
am in no way interested in the outcome
of this matter.
       IN WITNESS WHEREOF, I have
hereunto set my hand this 27th day of
August, 2018.


       -------------------------
       CINDY A. AFANADOR

Page 138

EXHIBIT 10          **H I N E S   R E P O R T E R S**          36 (138 - 138)
                                                                      138

138

C E R T I F I C A T E

STATE OF NEW YORK         )
                          ) ss.:
COUNTY OF SUFFOLK         )

      I, CINDY A. AFANADOR, a Notary Public within and for the State of New York, do hereby certify:

      That CHARLES TEBELE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

      I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

      IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of August, 2018.

*Cindy A. Afanador*

-----------------------------

CINDY A. AFANADOR

EXHIBIT 10                                          159

# EXHIBIT 11

# TO BE FILED

# UNDER SEAL

EXHIBIT 12

**Jared Louzon**

| | |
|---|---|
| **From:** | Eric <Eric@interworks-usa.com> |
| **Sent:** | Wednesday, May 10, 2017 12:11 PM |
| **To:** | Chris Mitchell |
| **Cc:** | 'Tony Tu' |
| **Subject:** | FW: Fw: High Roller Model C Lithium Form |
| **Attachments:** | HY Lithium Battery Form Final for QVC.XLS |

Hi Chirs,

Please see attached battery form.

Thanks!

Eric

**From:** naya
**Sent:** Wednesday, May 10, 2017 8:31 AM
**To:** eric <eric@interworks-usa.com>; tony <tony@interworks-usa.com>
**Cc:** luying <luying@chicrobo.com>
**Subject:** Re: Fw: High Roller Model C Lithium Form

Dear Eric&Tony,

Pls check the attached battery form for the following battery, thx:



Pls let me know if any question , thx

1

EXHIBIT 12                167



Best regards

Naya

Digital Gadgets 289

EXHIBIT 12                    168

# Lithium Battery Information Form

Vendor Name: **INTERWORKS UNLIMITED INC.**

Battery mfg / supplier name: Shenzhen Elite Electronic Co., Ltd

QVC Item number: (i.e. E123456)

Battery part #: ICR18650-22P M (i.e.: CR2032)

Vendor sku:

UL File #:

| Battery / Cell type | |
|---|---|
| **Ion / Polymer (Secondary / Rechargeable):** | Y |
| **Metal / Alloy (Primary / Non-rechargeable):** | N |
| Is it a Button cell battery?: | N |

| Cell Information | |
|---|---|
| Total quantity of cells in this product: | 20 |
| Equivalent lithium content per cell (Metal ONLY): | N/A grams |
| Watt Hour rating per cell (Ion ONLY): | 7.74 WH |
| Capacity: 2150 mAhs | Volts: 3.60 |

| Battery Information (batteries composed of more than one cell) | |
|---|---|
| Total quantity of batteries in this product: | 1 |
| Equivalent lithium content per battery (Metal ONLY): | N/A grams |
| Watt Hour rating per battery (Ion ONLY): | 154.80 WH |
| Capacity: 4300 mAhs | Volts: 36.00 |

Digital Gadgets 290

EXHIBIT 13

**Jared Louzon**

| | |
|---|---|
| **From:** | Chris Mitchell |
| **Sent:** | Monday, May 15, 2017 11:50 AM |
| **To:** | Eric@interworks-usa.com |
| **Cc:** | tony@interworks-usa.com |
| **Subject:** | Fwd: High Roller Model C Lithium Form- QVC QA sample required |
| **Attachments:** | image001.png; ATT00001.htm; image001.png; ATT00002.htm; UL-1642-NofA-13CA52863-Dec-06-2013.pdf; ATT00003.htm; BC mark SHES161000905901.pdf; ATT00004.htm; UL certificate (1).pdf; ATT00005.htm; Lithium Battery Form_High Roller Model C.XLSX; ATT00006.htm |

Hey guys, see below. As I mentioned we need to submit a new QA and now they are treating this as a new submission given the issues with the docs you sent over previously...

Disaster.

Do you have all this at the ready with a clean sample you can send us to confirm it matches these forms you provide?

Thank you,
Chris


Begin forwarded message:

> **From:** Paulette Brown <pbrown@digitalgadgets.com>
> **Date:** May 15, 2017 at 11:36:10 PM GMT+8
> **To:** Chris Mitchell <cmitchell@techpointproducts.com>
> **Cc:** Jill Pierson <jpierson@digitalgadgets.com>, Gillian Yip ELF <gyip@elfwarehouse.com>, Charlie Tebele <CHARLIE@digitalgadgets.com>
> **Subject: FW: High Roller Model C Lithium Form- QVC QA sample required**
>
> Hi Chris
>
> Below email from Rafiq outlines what we are required to submit with the new live sample we are preparing to send out
>
> Please send us back a clean email with feedback and attachments that should be sent with the sample
>
> (I've attached all of the forms that Jill has on file for the item- so please confirm these are good or supply updated)
>
> Thanks much
> Paulette
>
>
> **From:** Rafiq Zabrani [mailto:Rafiq.Zabrani@qvc.com]
> **Sent:** Monday, May 15, 2017 10:58 AM
> **To:** Cheryl Baiocchi <Cheryl.Baiocchi@qvc.com>; Paulette Brown <pbrown@digitalgadgets.com>; Gabrielle Ceritano <Gabrielle.Ceritano@qvc.com>; Dennis Dangelo <dennis@raecs.com>; Jill Pierson <jpierson@digitalgadgets.com>; John R. Teter <John.R.Teter@qvc.com>; Mark Shaeffer

EXHIBIT 13

<Mark.R.Shaeffer@qvc.com>
**Cc:** Meghan Kane <Meghan.Kane@qvc.com>; Mark Shaeffer <Mark.R.Shaeffer@qvc.com>
**Subject:** RE: T35011 new sample needed

Paulette,

The original unit had too many complications with paper work, unit model was changed at last minutes and too many non-related documents sent to QA.  Much of the information we have seen for this new unit does not match with the old unit. So we can no longer call this similar to last unit from QA's perspective.
Please treat this hoverboard as a brand new unit to QA.  Below are the QA requirements for hoverboard.

- Current hoverboard requirements are:
    - UL2272 listed hoverboard with complete UL report.  Hoverboards only listed directly by UL will be accepted by QVC. Must have UL Holographic logo.
    - UL Listed battery charger (we will need UL file number information for battery charger).
    - UL listed lithium battery   (we will need UL file number information for lithium battery).
    - UN for 38.3 (we will need UN38.3 report for lithium battery).
    - Lithium battery form.
    - Battery disposal instructions in manual.
    - If age graded, appropriate toy or children product testing.
    - Must have third party testing for weight claim.
    - All testing related to claims including, run time, travel distance, charging time etc.
    - Any claims of additional product safety must accompany a third party design review to be mentioned on air after QA verification.

---

**From:** Jill Pierson
**Sent:** Friday, May 12, 2017 5:30 PM
**To:** Paulette Brown <pbrown@digitalgadgets.com>; Chris Mitchell <cmitchell@techpointproducts.com>; Gillian Yip ELF <gyip@elfwarehouse.com>
**Cc:** Charlie Tebele <CHARLIE@digitalgadgets.com>
**Subject:** RE: High Roller Model C Lithium Form- QVC QA sample required

Chris,
Please see the attached documents that I have from previous emails. Please review and verify with the vendor.

Regards,

Jill Pierson

EXHIBIT 13

EXHIBIT 14

**Jared Louzon**

| | |
|---|---|
| **From:** | Chris Mitchell |
| **Sent:** | Wednesday, June 07, 2017 4:42 PM |
| **To:** | Eric |
| **Subject:** | RE: Digital Gadget.xlsx |
| **Attachments:** | QVC_QA_Eval_Report_T35011_011_000_6152017-1_OF_1.html |

Eric,

That's like saying b/c QVC ordered a 16GB iPad and we shipped an 8GB iPad, that they should be mad at Apple…maybe Chic did screw you, I don't know. But you're the seller, we're the customer and as such, have / had an expectation of specifications of the ordered products being met…Clearly the docs we submitted that you provided to us weren't the documents you sent to QVC as they kept saying that they didn't match. Here's the QVC QA report when we actually sent in a physical unit b/c after so much back & forth with the docs, they required it – one of the fail points is that even the Poly Bag isn't the right thickness! Unreal.

What about the insurance? What's the update?

Best,
Chris

**From:** Eric [mailto:Eric@interworks-usa.com]
**Sent:** Tuesday, June 06, 2017 6:21 PM
**To:** Chris Mitchell <cmitchell@techpointproducts.com>
**Subject:** RE: Digital Gadget.xlsx

Chris,

This is a CHIC issue…all QA submission for QVC are provided from CHIC to interworks…we are not the manufacture. So the best thing to do is get all the boards back and return back to CHIC. I will issue an RA tomorrow. I could only provide you with the documents that I have which are provided from CHIC…and those are the documents that I provided to you, and what they've gave me is also what I have provided to QVC the first time around. If there's QA submission issues please send me the reports and I can have CHIC provide the documents to me.

I think its best to again return the goods and if you want to continue with Hoverboards then we order a new batch of products and start from scratch. Why and how the packaging has changed, that's above and beyond me.

I don't think we need to have further relationship if Charlie is resourcing to the lawyer…as I am trying to clean up the issue CHIC has caused…tell him to sue CHIC.

Eric

**From:** Chris Mitchell [mailto:cmitchell@techpointproducts.com]
**Sent:** Tuesday, June 06, 2017 2:54 PM
**To:** Eric <Eric@interworks-usa.com>
**Subject:** RE: Digital Gadget.xlsx

EXHIBIT 14

1

172

Hey Eric,

I just got killed. Had a convo with Charlie and then he got our lawyer.

I can't do anything until I get this QA and Insurance issues fixed. We don't have insurance on the boards and now there is a litany of QA issues given that the board we got from our CA warehouse (that you sent us) and was sent into QVC b/c you couldn't get us the right QA docs, don't match the first QA submission. They opened it all up and NONE of it matches with what you guys sent originally.  Not only is the battery different, but the physical Age Grade of the Product is different too! This says 12+ but QVC is saying you were originally instructed to say 14+…12+ requires kids testing…disaster.

We have formally opened an investigation at our CA warehouse to audit the boards we have on-hand and do an inventory against what QVC says should be the right boards. This is assuming we can maintain our relationship with QVC and not get charged back for all the boards already sold b/c who the hell knows what we've actually been selling.

Not going to be able to get on a call tonight.

Please advise about the COI that you were supposed to get as of 5/26 and how you advise we fix this QA issue.

Regards,
Chris

---

**From:** Eric [mailto:Eric@interworks-usa.com]
**Sent:** Monday, June 05, 2017 7:59 PM
**To:** Chris Mitchell <cmitchell@techpointproducts.com>
**Subject:** FW: Digital Gadget.xlsx

Chris,

Please see attached balance owe…I need to finalize this balance tomorrow, whether you wants the Models C or I need to pick them up and move them elsewhere…then we just reconcile everything that you've sold.

Thanks!

Eric

---

**From:** Priscilla Murillo [mailto:priscilla@interworks-usa.com]
**Sent:** Monday, June 05, 2017 3:23 PM
**To:** eric@interworks-usa.com
**Subject:** Digital Gadget.xlsx

EXHIBIT 14

EXHIBIT 15

**Jared Louzon**

| | |
|---|---|
| **From:** | Meghan Kane <Meghan.Kane@qvc.com> |
| **Sent:** | Friday, June 30, 2017 11:12 AM |
| **To:** | Paulette Brown; Dennis Dangelo (dennis@raecs.com); Chris Mitchell; Jill Pierson |
| **Cc:** | Cheryl Baiocchi; Gabrielle Ceritano |
| **Subject:** | Model C QA |
| | |
| **Importance:** | High |

Hi All
Still a lot of back and forth regarding the QA for T35011- the model C hoverboard we are/were trying to bring in for July. The following is still needed:

1) New QA sample- **please confirm this sample will come from your CA warehouse stock and not just a sample you have in the office**
2) Heavier poly bag over the hoverboard- at least 1.5mil thick
3) Claims substantiation for- charging time, no overcharging, max speed, weight capacity and range
4) Warranty needs to meet FTC Requirements
   a. For warranties, we will need these following (5) FTC requirements addressed: **(1) What does the warranty cover/not cover ** (2) What is the coverage period ** (3) What will you do to correct the problems. This requires an explanation of the remedy vendor offers under the warranty. This could be repair or replacement of product, a refund of the purchase price, or a credit ** (4) How can customer get warranty service: This includes Name of Company, address, toll free telephone number, and contact local or regional service center **(5) How will the state law affect your customer' rights under the warranty. Also should include the following statement: This warranty gives you specific legal rights and you may also have other rights which vary from state to state.
5) New Lithium battery form
6) UL and UN certificates
7) Toy testing


I do want to note that I know a lot of this information is info needed from Interworks as that is who you bought this inventory from. We have personally reached out to Interworks to help assist with getting this info and they informed us there is an outstanding invoice with DG which is why they are not sending the paperwork to clear up QA. With all this said, QVC is stuck in the middle. We want to work with you guys but it will be challenging to get all this info without Interworks assistance. Please work with your partners at Interworks to clear up whatever the issues are so we can move forward

Have a nice weekend!


Thank you

Meghan Kane
Buyer- Mattress, Toys, Furniture, Home Decor
P: 484-701-8539
F: 484-701-8277

1

EXHIBIT 15

Δ π EXHIBIT____
Deponent __2 - 13__
Date __10-11-18__ Rptr. __CH__
WWW.DEPOBOOK.COM

Digital Gadgets 292

2

EXHIBIT 15                                     175

EXHIBIT 16

TO BE FILED

UNDER SEAL

# EXHIBIT 17

**Jared Louzon**

| | |
|---|---|
| **From:** | Eric Lu <eric@interworks-usa.com> |
| **Sent:** | Wednesday, March 01, 2017 3:06 PM |
| **To:** | Bright Asamoah |
| **Cc:** | Charlie Tebele; Priscilla Murillo; Chris Mitchell; Michael Kidakarn |
| **Subject:** | Re: Invoices past due |

Bright / Charlie,

I gave you guys 60days on the lower cost which I have to carry the AR and if you're going to paid 99k, that is not acceptable, I could have sold those inventory to other accounts. Janet had requested that I work with you guy and in good faith, I gave you QVC and Zullilly...I have tried to work with you guys, but I feel like I'm getting the short end of the stick...

Please ship all goods back to me...as I cannot tie up my funds and wait for weekly reports/payments.

I need to know how many units you have now and I will have my team schedule the pick up immediately.

Eric

Sent from my iPhone

On Mar 1, 2017, at 11:19 AM, Bright Asamoah <basamoah@elfwarehouse.com> wrote:

> Priscilla/Eric
>
> Below is a break of what is being paid today.
>
>
> <image007.png>
>
> Of the 3,187 units from the first batch, DG paid 3,000units – which will be left with 187unis to be paid.
>
> However, we did get some returns from the sales of 77units.
>
> So far, DG has sold 3,678units of the inventory.
>
> <image008.png>
>
>
> <mark>Please note…we will be sending a weekly sales report and a corresponding wire for the units sold starting next week….</mark>

---

**From:** Eric Lu [mailto:eric@interworks-usa.com]
**Sent:** Wednesday, March 01, 2017 4:06 AM
**To:** 'Charlie Tebele'; 'Priscilla Murillo'; Bright Asamoah
**Subject:** RE: Invoices past due

1

EXHIBIT 17                221

# EXHIBIT 18

TO BE FILED

UNDER SEAL

# EXHIBIT 19

# Q V C   Q A   S a m p l e   E v a l u a t i o n   R e p o r t

| Tracking Number: | SKU: | Description: | |
|---|---|---|---|
| 201705010636 | T35011 011-000 | High Roller Self Balancing Hoverboard with | |
| **Templated Item:** | **Submission Number:** | **Color/Size Desc:** | |
| Yes | 4 | Blue NA | |
| **Current Location:** | **Sample Type Desc:** | **Drop Ship Ind:** | **MultiBox:** |
| Trash | Documentation | | No |
| **Sample Evaluator:** | **Pit Due Date:** | **Sample Eval Due Date:** | **Requested Due Date:** |
| John R Teter | 05/01/2017 | 05/01/2017 | 05/01/2017 |
| **Buyer Code:** | **Buyer Name:** | **Country of Origin:** | **Disposition:** |
| 121 | MEGHAN KANE | Not Available | REJECT |
| **Vendor Code:** | **Vendor Name:** | | **Vendor Part Nbr:** |
| CX82-0000 | DIGITAL GADGETS LLC | | HR |
| **Last Activity Date/Time:** | **Record Last Updated By:** | | |
| 05/08/2017 01:58:48 PM | John R Teter | | |
| **Sample Needed by Product Central:** | **Ship Method:** | | **Post QA Disposition:** |
| No | Not Available | | Not Applicable |
| **Buyer Comments:** | | | |
| Updated Lithium form | | | |

## SKN-Level Descriptive Product Information

| PackSlip Description: (SKN-Level Descriptive Product Information) | | Subtitle: |
|---|---|---|
| High Roller Self Balancing Hoverboard with | | Carrying Bag |

**Dubner/Product Box:**

| High Roller | Self Balancing | Hoverboard | with |
|---|---|---|---|

**Enterprise Long Description:**

The High Roller portable transportation solution is ideal for getting around the park, campus and even the office. Easy and safe to use. Charging time: 2-3hours. No overcharging. Max speed: 5MPH. Weight Capacity: 220lbs. Range: 6-8 miles. Battery: Lithium ion. Measures approx: 7"H x 23-1/2"W x 7-1/2"L. Weight: 23lbs. UL Listed. Color choice. LMW. Ages 14+. Includes hover board carrying bag. Imported.

## Test

| Test Result | Test Description | Test Comments |
|---|---|---|
| FAIL | 4 General Electrical Requirements Test | 5/8/17 JT - Battery form submitted 5/1 notes a battery part# and UL file# different from a previous model, therefore, it cannot be used as a "transfer". Document on "hold" until more details are provided. **UPDATE** 5/8/17 JT - new document submitted. This form is voided. |
| NA | Sample Evaluator | Processed by John Teter. (484) 701-8441. EMAIL: jteter@qvc.com |

## Samples for this Item

| Tracking Number | SKU | Current Location | Sample Type Desc |
|---|---|---|---|
| 201705080374 | T35011 011 000 | Documents received into QA | Documentation |

EXHIBIT 19                                    223

EXHIBIT 20

## Q V C   Q A   S a m p l e   E v a l u a t i o n   R e p o r t

| Tracking Number: | SKU: | Description: | |
|---|---|---|---|
| 201706020066 | T35011 011-000 | High Roller Self Balancing Hoverboard with | |
| Templated Item: | Submission Number: | Color/Size Desc: | |
| Yes | 5 | Blue NA | |
| Current Location: | Sample Type Desc: | Drop Ship Ind: | MultiBox: |
| Michael Zelinski's desk | QVC Product Sample | N | No |
| Sample Evaluator: | Pit Due Date: | Sample Eval Due Date: | Requested Due Date: |
| Mike Zelinski | 06/05/2017 | 06/15/2017 | 06/02/2017 |
| Buyer Code: | Buyer Name: | Country of Origin: | Disposition: |
| 121 | MEGHAN KANE | CHINA | REJECT |
| Vendor Code: | Vendor Name: | | Vendor Part Nbr: |
| CX82-0000 | DIGITAL GADGETS LLC | | HR |
| Last Activity Date/Time: | | Record Last Updated By: | |
| 06/02/2017 03:56:37 PM | | Mike Zelinski | |
| Sample Needed by Product Central: | | Ship Method: | Post QA Disposition: |
| No | | Not Available | Product Central |
| Buyer Comments: | | | |
| Please refer to Rafiq for testing requirements | | | |

## SKN-Level Descriptive Product Information

| PackSlip Description: (SKN-Level Descriptive Product Information) | | | Subtitle: |
|---|---|---|---|
| High Roller Self Balancing Hoverboard with | | | Carrying Bag |
| Dubner/Product Box: | | | |
| High Roller | Self Balancing | Hoverboard | with |
| Enterprise Long Description: | | | |

The High Roller portable transportation solution is ideal for getting around the park, campus and even the office. Easy and safe to use. Charging time: 2-3hours. No overcharging. Max speed: 5MPH. Weight Capacity: 220lbs. Range: 6-8 miles. Battery: Lithium ion. Measures approx: 7"H x 23-1/2"W x 7-1/2"L. Weight: 23lbs. UL Listed. Color choice. LMW. Ages 14+. Includes hover board carrying bag. Imported.

## Test

| Test Result | Test Description | Test Comments |
|---|---|---|
| PASS | *Vendor Risk Level | This vendor has not been assigned a risk level. |
| PASS | 1 Descriptive Product Information | The QVC Packslip, Dubner/Product Box and Long Descriptions were reviewed, edited and released by QA for QVC Merchant approval. QVC MERCHANT: Please review and approve in IBM (POMS) or notify QA of any needed changes. VENDOR: Any goods shipped to QVC Distribution Centers (or directly to customers in the case of drop-shipped merchandise) must match the QVC Long Description. If there are ANY discrepancies or changes, advise QVC QA before shipping goods. SKN : T35011 PACK SLIP: High Roller Self Balancing Hoverboard with_____ SUBTITLE : Carrying Bag____ DUBNER: High Roller____ Self Balancing____ Hoverboard_____ with_____ LONG DESCRIPTION The High Roller portable transportation solution is ideal for getting_ around the park, campus and even the office. Easy and safe to use._____ Charging time: 2-3hours. No overcharging. Max speed: 5MPH. Weight_____ Capacity: 220lbs. Range: 6-8 miles. Battery: Lithium ion. Measures_____ approx: 7"H x 23-1/2"W x 7-1/2"L. Weight: 23lbs. UL Listed. Color_____ choice. 90day LMW. Ages 12 . Incl: hover board carrying bag. |
| PASS | 1 Internal Packaging | No issues were found with the internal packaging of the item. It is acceptable. Brown corrugate shipper, retail box, eps foam, white corrugate box, polybags. MZE 6.2.17 |
| FAIL | 1 Polybag and Film Requirements | Audited against a "toy" item - The REJECTED 1st piece QA sample did not meet the poly bag and/or film specification for a toy item. Toy products using a poly bag and/or film do not require a suffocation warning label. However, if a poly bag and/or film is used with a toy item points 1 or 2 below must be met. 1. Actual wall thickness must be at least 1.5 mils (1.5/1000 inches) thick. 2. Alternatively, sheeting with a thickness of less than 1.5 mils (1.5/1000 in) shall be perforated with defined holes so that a minimum of 1% of the area has been removed over any area of 1.18 X 1.18in. |
| PASS | 2 Country of Origin | The Country of Origin was marked or labeled on the product and/or the packaging, is in the QVC Long Description, and is acceptable. China. MZE 6.2.17 |

EXHIBIT 20                    224

file:///N|/300/300.TC/Digital%20Gadgets%20General/Interworks/QVC_QA_Eval_Report_T35011_011_000_6152017-1_OF_1.HTML[6/15/2017 4:18:20 PM]

| NA | 3 Bouncebacks | No Comments Noted |
|---|---|---|
| FAIL | 3 Claims Substantiation | VENDOR: QA must receive documentation to substantiate specific claims made regarding the product. Please send all claims documentation to QVCQAHardgoods@qvc.com.<br>Charging time: 2-3hours. No overcharging. Max speed: 5MPH. Weight Capacity: 220lbs. Range: 6-8 miles. MZE 6.2.17 |
| PASS | 3 Liability Insurance Policy | The product category of this item requires a minimum of five million US dollars ($5,000,000) liability insurance coverage. A Certificate of Insurance ("COI") must be on file with QVC. The "COI" must evidence at least this amount of general liability insurance coverage (per occurence and in the aggregate) and name QVC, Inc as "Additional Insured". The vendor is required to maintain general liability coverage for the life of the merchandise. The coverage must include full product liability, advertising injury, naming QVC, Inc as an Additional Insured, and issued by an insurance carrier rated "A" or better by A.M. Best. The vendor must also notify QVC within thirty (30) days of the cancellation of such policies and provide a new COI. RENEWALS of the COI should be sent to the following address: QVC, Inc. Mail Code 206, 1200 Wilson Drive, West Chester, PA 19380-4262, or faxed to 484-701-1380. If you have questions concerning the insurance requirements, please contact your insurance broker, or contact QVCs Insurance Administrator, Patti Forti, at 484-701-6715.<br>A copy of the Certificate of Insurance is on file, and apparently complies with all QVC requirements. If there are any issues with the liability insurance, then the vendor will be contacted by QVCs Insurance Administrator. |
| FAIL | 3 Limited Manufacturers Warranty | The sample includes a limited manufacturers warranty which was reviewed and determined to be unacceptable. VENDOR: QA must receive a copy the proposed LMW for review. Please submit documents electronically when available.<br>Item includes a 90 day limited manufacturers warranty.<br>For warranties, we will need these following (5) FTC requirements addressed: **(1) What does the warranty cover/not cover ** (2) What is the coverage period ** (3) What will you do to correct the problems. This requires an explanation of the remedy vendor offers under the warranty. This could be repair or replacement of product, a refund of the purchase price, or a credit ** (4) How can customer get warranty service: This includes Name of Company, address, toll free telephone number, and contact local or regional service center **(5) How will the state law affect your customer' rights underthe warranty. Also should include the following statement: This warranty gives you specific legal rights and you may also have other rights which vary from state to state. |
| PASS | 4 Battery Identification | includes lithium ion batteries / cells |
| CONDITIONAL | 4 Battery Packaging | No Comments Noted |
| FAIL | 4 General Electrical Requirements Test | The UL 1642 certificate for the lithium battery / cell is required and has not been received. Please submit to "qvcqahardgoods@qvc.com" and copy your buyer.<br>The UN certificate for the lithium battery / cell is required and has not been received. Please submit to "qvcqahardgoods@qvc.com" and copy your buyer.<br>A "Lithium Battery Information Form" is required to be submitted. Please submit the completed document to "qvcqahardgoods@qvc.com" and copy your buyer.<br>Confirmed item's listing is correct and active. Thank you!<br>UL Model SMART-C file E483017, UL adapter Model SPS-T844202000-C8 file E307126 verified online. MZE 6.2.17<br>Batteries included with the item were found acceptable when tested in the unit. |
| NA | 4 General Regulatory Compliance | No Comments Noted |
| FAIL | 4 Regulatory Compliance/ASTM | Item is properly labeled with required age grading<br>The toy/batch testing report is currently not available. The product will remain in "HOLD" status for eight (8) weeks. If a report is not received within that time, the item will be disposition as "reject" until an acceptable report is received. |
| NA | 5 Assembly | No Comments Noted |
| PASS | 6 Workmanship, Materials and Components | The workmanship and materials are acceptable.<br>All required components were included with the sample. |
| PASS | 7 Function Test | The users guide/use instructions sheet included with the sample is acceptable.<br>The sample was not actually function tested as it is a Virtual Sample or it cannot be fully tested. |
| NA | CPSIA Certification of Conformity | No Comments Noted |
| PASS | Check Vendor-Level Comments | Vendor-level Comments in the IBM System were checked. |
| NA | Induction Seal Test | No Comments Noted |

EXHIBIT 20                                    225

| NA | M1 SDS Requirements | No Comments Noted |
|---|---|---|
| NA | M2 Hazardous Materials Transportation Markings | No Comments Noted |
| NA | M2 Hazmat Category | No Comments Noted |
| NA | M3 VOC Regulated Items | No Comments Noted |
| PASS | P1 Carton Packaging Graphics Classification | No Comments Noted |
| PASS | P1 Carton Sealing (Does Not Imply OK/not-OK) | This package is sealed with 2" packaging tape down the opening of the carton seam.<br>Carton was sealed with clear 2" packaging tape. |
| PASS | P1 Packaging Description | Product was submitted in plain kraft packaging (corrugate or chipboard).<br>Doublewall corrugate box was submitted.<br>The corrugated container possessed a Box Maker's Certificate that stated that the box has a minimum Edge Crush Test (ECT) of 48 pounds. |
| PASS | P2 Package Testing Reqd? Does not imply pkg is OK. | The packaging evaluation was completed by John Conrad. Should you have any questions, please contact him at john.b.conrad@qvc.com or 484-701-8694 Please note this sample is from a package tier 1 vendor.<br>6/2/17 JBC: Lithium Battery. Not drop tested. |
| NA | P2 QVC Bar Coding Requirements | Bar code labels and/or QVC specific carton markings on a 1st piece product sample or TOP (Top of Production) are NOT reviewed, approved or commented on by QA as part of the evaluation report. Vendors should order all QVC bar code labels from an approved label supplier - Verified Label & Print (800)764-6110 or FineLine Technologies (800) 500-8687. Please review QVC QA Packaging & Labeling Guidelines All Commodities. Please contact your Supplier Relationship Manager with questions. |
| PASS | PITSTOP | No Comments Noted |
| NA | Q Compression Test | No Comments Noted |
| NA | Q Drop Test | The QVC Drop Test is not required for this sample. No package testing is required at PSFGA or DC inspection. |
| PASS | Q Initial Packaging Evaluation | NOTES ON MASTER CARTONS: QVC does NOT require master cartons for all hardgoods items. (For more details, see QVC QA Packaging & Labeling Guidelines All Commodities.) A master carton MUST contain at least four (4) saleable units. A master carton for hardgoods cannot exceed 40" L x 24" W x 24" H (102 cm x 61 cm x 61 cm) in outer dimensions, or 40 pounds (18 kg) in weight. Any questions regarding master cartons can be emailed to Packaging@qvc.com. Failure to comply with these requirements may result in the rejection of PO receipts and/or a QVC Vendor Chargeback. |
| NA | Q Multi-Box Samples | No Comments Noted |
| NA | Q Vibration Test | No Comments Noted |
| PASS | Sample Type | Physical Sample was received. |
| PASS | Z "System Test" that Enables Capture of Pkg Info | No Comments Noted |
| PASS | ZZ Digital Images | Digital images have been taken of the sample and downloaded into the digital storage section of QUEST. |
| PASS | ZZ Hots processing | Sample processed as a HOT per request. |
| FAIL | ZZ Next Actions Required | The sample is Rejected pending the receipt of satisfactory information and/or documentation as requested.<br>Submit a New Physical Sample for review along with all requested information to address all product failures. |

## Packaging Attributes

| Vendor Packaging: | | Vendor Box Type: | |
|---|---|---|---|
| Corrugated Container | | 0201 - Regular Slotted Container (RSC) | |
| Carton Package Graphics Classification: | | | |
| 0 - N/A | | | |
| Rigidity: | | Straps: | |
| Rigid | | No | |
| Conveyable: | | Sortable: | |
| Yes | | Yes | |
| Divertable: | | Straps Permitted: | |
| No | | No | |

## Pack Recipe

| Outer Mailer (OM): | Packaged-Product Weight: |
|---|---|
| VENDOR CARTON - VA - Automation-Ready VC | 28 lbs, 5.6 oz. |

EXHIBIT 20                                      226

| Presentation Case (PC): | Ship-to-Customer Product Weight: |
|---|---|
| None - NONE | 28 lbs, 6.256 oz. |
| **Certificate (CT):** | **Packaged-Product Dimensions (L x W x H):** |
| NA - NONE_____ | 25.8 x 10.8 x 10.7 inches |
| **Special Instructions (SI):** | **Length + Girth:** |
| NA - None | 68.8 inches |
| **Stand-up Tag (ST):** | **Dimensional Weight:** |
| NA - None | 17 lbs. |
| **Pouch (P):** | **Ship-to-Customer Packaged-Product Dimensions:** |
| NA - None | 25.8 x 10.8 x 10.7 inches |
| **Hazmat/Oversize:** | |
| N | |

## CoShip Information

| Boxes Per Item: | Max Items Per Box: |
|---|---|
| 1 | 5 |
| **Co-Ship Code:** | **Ship With:** |
| 2 - Ship With Other Items | X |
| **Co-Ship Family Group:** | **Orientation:** |
| 555 - Hardgoods | X |
| **Co-Ship Commodity Group:** | **Fragility:** |
| 555 - All Hardgoods | 0 |

## Gift Wrap

| Gift Wrap Eligible: | Gift Box Required: | Gift Box: |
|---|---|---|
| E - INELIGIBLE - ITEM OVERSIZE | N | NGB - No Gift Box Required |
| **Gift Wrap Recipe:** | **Gift Wrap Ship Weight:** | |
| NA | 0 (Lbs.) 0 (Ozs.) | |

## BarCode Information

| Bar Code Present: | Bar Code Symbology: |
|---|---|
| No | Pending |
| **Bar Code Content:** | **Bar Code ANSI Readability Score:** |
| Not Applicable | Not Applicable |
| **Bar Code Human Readable Text:** | |
| X | |

## Digital Documents and Images

| File Name | File Type | File Comment |
|---|---|---|
| T35011-Fisrt_Sample_6.2.17.pdf | Images of Product Itself | Images of Product |
| T35011_Box1.jpg | Images of Packaging | Box1 |
| T35011_Box2.jpg | Images of Packaging | Box2 |
| T35011_Box3.jpg | Images of Packaging | Box3 |
| T35011_Box4.jpg | Images of Packaging | Box4 |
| T35011_Box5.jpg | Images of Packaging | Box5 |
| T35011_Box6.jpg | Images of Packaging | Box6 |
| T35011_HOLOGRAPHIC.jpg | Miscellaneous Digital Documents and Images | Holographic Logo |
| T35011_UL_LABEL.jpg | Miscellaneous Digital Documents and Images | UL Label - Adapter |

EXHIBIT 20                    227

# EXHIBIT 21

**Jared Louzon**

---

| | |
|---|---|
| **From:** | Chris Mitchell |
| **Sent:** | Monday, June 19, 2017 4:34 PM |
| **To:** | Eric |
| **Subject:** | RE: QA Eval for T35098 |
| **Attachments:** | QVC_QA_Eval_Report_T35011_011_000_6152017-1_OF_1.html; 88170810102R2 CHIC.PDF; Lithium Battery Form_High Roller Model C.XLSX |
| **Importance:** | High |

Eric,

Got off the phone with QVC QA. Everything below refers to your Model S. I got the CPSIA testing handled based on your attachment (thank you).

However, we still need all the documentation for the CLAIM SUBSTANTIATION that matches the Lithium Battery Docs you provided us – reattached again here.

Also, what are you going to do about the below two items?

Do you have new samples of the Poly Bag and Warranty Card Details you'll be submitting?? Need these overnighted to us tonight in NJ:

- ATTN: Jill Pierson
  21 Englehard Drive
  Monroe Township, NJ 08831

| FAIL | 3 Limited Manufacturers Warranty | The sample includes a limited manufacturers warranty which was reviewed and determined to be unacceptable. VENDOR: QA must receive a copy the proposed LMW for review. Please submit documents electronically when available.<br>Item includes a 90 day limited manufacturers warranty.<br>For warranties, we will need these following (5) FTC requirements addressed: **(1) What does the warranty cover/not cover ** (2) What is the coverage period ** (3) What will you do to correct the problems. This requires an explanation of the remedy vendor offers under the warranty. This could be repair or replacement of product, a refund of the purchase price, or a credit ** (4) How can customer get warranty service: This includes Name of Company, address, toll free telephone number, and contact local or regional service center **(5) How will the state law affect your customer' rights underthe warranty. Also should include the following statement: This warranty gives you specific legal rights and you may also have other rights which vary from state to state. |

| FAIL | 1 Polybag and Film Requirements | Audited against a "toy" item - The REJECTED 1st piece QA sample did not meet the poly bag and/or film specification for a toy item. Toy products using a poly bag and/or film do not require a suffocation warning label. However, if a poly bag and/or film is used with a toy item points 1 or 2 below must be met. 1. Actual wall thickness must be at least 1.5 mils (1.5/1000 inches) thick. 2. Alternatively, sheeting with a thickness of less than 1.5 mils (1.5/1000 in) shall be perforated with defined holes so that a minimum of 1% of the area has been removed over any area of 1.18 X 1.18in. |

Please advise at your earliest convenience.

Best,
Chris

EXHIBIT 21

# EXHIBIT 22

**MTI**

**MAX TRANSPORT INC.**

P.O. Box 8098, Rowland Hts  CA 91748

TEL: (626) 715-8225

(626) 715-8226

FAX: (909) 606-9282

**FREIGHT BILL**

REF

NO. 109812

DATE: 12-07-16

PICK UP FROM:

JATARROW'S UNLIMITED, INC.

2448 PECK ROAD

CITY OF INDUSTRIAL, CA 90601

DELIVERY TO:

PHOENIX WAREHOUSE CALIFORNIA

9306 SOREMSEN AVE

SANTA FE SPRINGS, CA 90670

SHIPPER SHRINK-WRAPPED SAID TO CONTAIN:

BILL TO:   (JATARROW'S)

| QTY. | DESCRIPTION | WEIGHT | REMARK |
|------|-------------|--------|--------|
| 12 Pallet | HIGH ROLLER | 1484 LBS | |
| | Pallet — Blank C | | |
| | Polly — White C | | |

SHIPPER SELECT
☐ Cashier's Check only
☐ Consignee's Check only
Check#
C.O.D. $
Your C.O.D. check will be mailed through US Postal Service regular mail. Max Transport Inc. is not responsible for lost mail sent through U.S. Postal Service.

| DRIVER PICKUP | | | DELIVERY DRIVER | | | |
|---------------|------|------|-----------------|------|------|--------|
| | DATE | TIME | | DATE | TIME | PIECES |
| SHIPPER SIGNATURE: | | | RECEIVED IN GOOD ORDER EXCEPT AS NOTED. PLEASE PRINT THE DATE & TIME | | | |
| X | X | X | 1 Truck 6 Pallet  2 Truck 6 Pallet | 12/07/16 | 12 PLTS | |

In case of loss or damage, the company's maximum liability is the lesser of $1.10 per kilogram or $100.00 unless a higher value is declared in charges for such greater value paid. Shortage and Exceptions must be reported within 24 hours.

LOOSE CARGO DIVISION

EXHIBIT 22          229

## MAX TRANSPORT INC.

P.O. Box 8098, Rowland Hts., CA 91748

TEL: (626) 715-8225
(626) 715-8226
FAX: (909) 606-9282

**FREIGHT BILL**

REF №: 109011

DATE: 12-9-16

**PICK UP FROM:** Industrys University Inc
3418 Peck Road
City of Industrial, CA 91061

**DELIVERY TO:** Phoenix Warehouse - CA
4306 Sorensen Ave.
Santa Fe Springs, CA 90670

**BILL TO:** Marina FFS

SHIPPER SHRINK-WRAPPED SAID TO CONTAIN:

| QTY. | DESCRIPTION | WEIGHT | REMARK |
|---|---|---|---|
| 7 Pallet | HIGH ROLLER | 963 LBS | |
| 336 CBS | Shipment #2 5 Pallets BLUE C 2 Pallet BLANK C | | |

| DRIVER PICKUP | DATE | TIME | DELIVERY DRIVER | DATE | TIME | PIECES |
|---|---|---|---|---|---|---|
| | 12-9-16 | | | | | / / : |

SHIPPER SIGNATURE:
X _____

RECEIVED IN GOOD ORDER EXCEPT AS NOTED, PLEASE PRINT THE DATE & TIME
X _____        X _____

**SHIPPER SELECT**
□ Cashier's Check only
□ Consignee's Check only

C.O.D. $ _____
Check #

Your C.O.D. check will be mailed through US.
Postal Service regular mail. Max Transport Inc. is
not responsible for lost mail sent through U.S.
Postal Service.

In case of loss or damage, the company's maximum liability is the lesser of $1.10 per kilogram or $100.00 unless a higher value is declared in charges
for such greater value paid. Shortage and Exceptions must be reported within 24 hours.
LOOSE CARGO DIVISION.

EXHIBIT 22                    230

# MAX TRANSPORT INC.

P.O. Box 8098, Rowland Hts., CA 91748
TEL: (626) 715-8225
(626) 715-8226
FAX: (909) 606-9282

**FREIGHT BILL**

REF NO **109810**

DATE: 12 / 17 / 16

PICK UP FROM:
MARTHON'S LINEN'S RAD. INC.
2418 Peck Road
City of industry, CA 90601

DELIVERY TO:
PHOENIX WHOLESALE - CA
7306 SCREENSEN AVE
SANTA FE SPRINGS CA 90670

BILL TO: MARTHON

| QTY. | DESCRIPTION | WEIGHT | REMARK |
|---|---|---|---|
| 3 pallets | HIGH RULLER | | |
| 7 pallets | 144 BLACK | | |
| | 144 WHITE | 9858285 | |
| | 48 blue | | |

SHIPPER SHRINK-WRAPPED SAID TO CONTAIN:

**SHIPPER SELECT**
☐ Cashier's Check only
☐ Consignee's Check only
C.O.D. $
Check #
Your C.O.D. check will be mailed through U.S.
Postal Service regular mail. Max Transport Inc. is
not responsible for lost mail sent through U.S.
Postal Service.

| SHIPPER PICKUP | DATE | TIME | DELIVERY DRIVER | DATE | TIME | PIECES |
|---|---|---|---|---|---|---|
| X | 12 17 16 | | X | | | / |
| | | | | | | / |

DRIVER PICKUP

SHIPPER SIGNATURE: X

RECEIVED IN GOOD ORDER EXCEPT AS NOTED. PLEASE PRINT THE DATE & TIME

In case of loss or damage, the company's maximum liability is the lesser of $1.10 per kilogram or $100.00 unless a higher value is declared in charges for such greater value paid. Shortage and Exceptions must be reported within 24 hours.
· LOOSE CARGO DIVISION

EXHIBIT 22                    231

Interworks 4

**MTI** MAX TRANSPORT INC.

P.O. Box 8098, Rowland Hts., CA 91748

TEL: (626) 715-8225

(626) 715-8226

FAX: (909) 606-9282

**FREIGHT BILL**

REF. № 103728

DATE: 12-12-16

PICK UP FROM: *Margaret's Warranteed Tile*
2413 Peck Road

CITY of Industry, CA 90601

DELIVERY TO: *Phoenix Warehouse - CA*
9306 Sorensen Ave

Santa Fe Springs, CA 90670

SHIPPER SHRINK-WRAPPED SAID TO CONTAIN:

BILL TO: *Margaret's*

| QTY | DESCRIPTION | DELIVERY DRIVER | WEIGHT | REMARK |
|---|---|---|---|---|
| 12 Pallet | High Roll White - 2 Tricks | | (4700 LBS) | Margaret's |
| $10 Cash | White: 336 (?) | | 4 ½ Shipping | |
| | White: 174 (?) | | | |

**SHIPPER SELECT**
☐ Cashier's Check only
☐ Consignee's Check only

C.O.D. $: _____

Check # _____

Your C.O.D. check will be mailed through U.S. Postal Service regular mail. Max Transport Inc. is not responsible for lost mail sent through U.S. Postal Service.

| DRIVER PICKUP | DATE | TIME | DELIVERY DRIVER | DATE | TIME | PIECES |
|---|---|---|---|---|---|---|
| | | | | | | |

SHIPPER SIGNATURE:

X _____

RECEIVED IN GOOD ORDER EXCEPT AS NOTED. PLEASE PRINT THE DATE & TIME

X _____

In case of loss or damage, the company's maximum liability is the lesser of $1.10 per kilogram or $100.00 unless a higher value is declared in charges for such greater value is paid. Shortage and Exceptions must be reported within 24 hours.

LOOSE CARGO DIVISION

EXHIBIT 22                232

# BILL OF LADING

12/12/2016

Bill of Lading Number: 12/12/2016 - Interworks

## SHIP FROM

| | |
|---|---|
| Name: | Interworks |
| Address: | 2418 Peck Road |
| City/State: | City of Industry, ca 90601 |
| Contact: | Sam |
| Tel: | 562-693-8400 ext.110 |

BAR CODE SPACE

## SHIP TO

| | |
|---|---|
| Name: | Phoenix Warehouse-CA |
| Address: | 9306 Sorensen Ave |
| City/State: | Santa Fe Springs. CA 90670 |
| Contact: | Isabel |
| Tel: | 562-944-0833 ext 11 |

Carrier Name: Lipstick Transportation

Trailer number:

Seal number(s):

SCAC:

## THIRD PARTY FREIGHT CHARGES BILL TO:

| | |
|---|---|
| Name: | OEC Shipping Los Angeles Inc |
| Address: | 13100 Alondra Blvd., Suite 100 |
| City/State/Zi p: | Cerritos, CA, 90703 |

BAR CODE SPACE

**Freight Charge Terms:** (freight charges are prepaid unless marked otherwise)

Prepaid _____    Collect _____    3rd Party XXX

☐ (check box)  Master Bill of Lading: with attached underlying Bills of Lading

SPECIAL INSTRUCTIONS: Same day service – Pick up at 9am Delivery:

## CUSTOMER ORDER INFORMATION

| CUSTOMER ORDER NUMBER | # PKGS | WEIGHT | PALLET/SLIP (CIRCLE ONE) | | ADDITIONAL SHIPPER INFO |
|---|---|---|---|---|---|
| S.O #27928 | 1212 | 34846lbs | Y | N | 5th SHIPMENT |
| | | | Y | N | |
| | | | Y | N | |
| GRAND TOTAL | 1212 | 34846lbs | | | |

## CARRIER INFORMATION

| HANDLING UNIT | | PACKAGE | | WEIGHT | H.M (X) | COMMODITY DESCRIPTION Commodities requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Section 2(e) of NMFC Item 360 | LTL ONLY | |
|---|---|---|---|---|---|---|---|---|
| QTY | TYPE | QTY | TYPE | | | | NMFC # | CLASS |
| 26 | PLT | | | | | General Merchandise | | |
| 26 PLT | | | | | | **GRAND TOTAL** | | |

Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows:
"The agreed or declared value of the property is specifically stated by the shipper to be not exceeding _____ per _____.

COD Amount: $ _____

Fee Terms:   Collect: ☐   Prepaid: ☐
Customer check acceptable: ☐

NOTE Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S.C. 0 14706(c)(1)(A) and (B).

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request, and to all applicable state and federal regulations.

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ Shipper
Signature

## SHIPPER SIGNATURE / DATE

This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT.

12-12-16

**Trailer Loaded:**
X By Shipper
☐ By Driver

**Freight Counted:**
☐ By Shipper
☐ By Driver/pallets
X By Driver/Pieces

## CARRIER SIGNATURE / PICKUP DATE

Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the U.S. DOT emergency response guidebook or equivalent documentation in the vehicle.
Property described above is received in good order, except as noted.

EXHIBIT 22    Page    233

## MAX TRANSPORT INC.

P.O. Box 8098, Rowland Hts., CA 91748

TEL: (626) 715-8225
(626) 715-8226
FAX: (909) 606-9282

**FREIGHT BILL**

**REF №: 103736**

**DATE:** 12-14-16

**PICK UP FROM:** PHILLDEWS WAREHOUSE INC.
2445 PECK ROAD
CITY OF INDUSTRY, CA 90601

**DELIVERY TO:** PHOENIX WAREHOUSE CALIFORNIA
9306 SORENSEN AVE
SANTA FE SPRINGS, CA 90670

**BILL TO:** INTERALLIES

**SHIPPER SHRINK-WRAPPED SAID TO CONTAIN:**

| QTY. | DESCRIPTION | WEIGHT | REMARK |
|---|---|---|---|
| | EUR | 9663 LBS | |
| | INLINE C | | |
| | 556 CTNS | | |

| DRIVER PICKUP | | | DELIVERY DRIVER | | |
|---|---|---|---|---|---|
| DATE | TIME | | DATE | TIME | PIECES |
| | | | 12/14/16 | 7 PM | 1 / 1 |

**SHIPPER PICKUP**

X _____

**SHIPPER SIGNATURE:**

X _____

RECEIVED IN GOOD ORDER EXCEPT AS NOTED. PLEASE PRINT THE DATE & TIME

**SHIPPER SELECT**

☐ Cashier's Check only
☐ Consignee's Check only

Check # _____
C.O.D. $ _____

Your C.O.D. check will be mailed through U.S. Postal Service or by mail. Max Transport Inc. is not responsible for lost mail sent through U.S. Postal Service.

-In case of loss or damage, the Company's maximum liability is the lesser of $11.10 per kilogram or $100.00 unless a higher value is declared in charges for such greater value paid. Shortage and Exceptions must be reported within 24 hours.

LOOSE CARGO DIVISION

Interworks 437

EXHIBIT 22        234

# BILL OF LADING

12/14/2016

**SHIP FROM**

| | |
|---|---|
| Name: | Interworks |
| Address: | 2418 Peck Road |
| City/State: | City of Industry, ca 90601 |
| Contact: | Sam |
| Tel: | 562-693-8400 ext.110 |

Bill of Lading Number: 12/14/2016 - Interworks

BAR CODE SPACE

**SHIP TO**

| | |
|---|---|
| Name: | Phoenix Warehouse-CA |
| Address: | 9306 Sorensen Ave |
| City/State: | Santa Fe Springs. CA 90670 |
| Contact: | Isabel |
| Tel: | 562-944-0888 ext 11 |

Carrier Name:  Lipstick Transportation

Trailer number:

Seal number(s):

SCAC:

**THIRD PARTY FREIGHT CHARGES BILL TO:**

| | |
|---|---|
| Name: | OEC Shipping Los Angeles Inc |
| Address: | 13100 Alondra Blvd., Suite 100 |
| City/State/Zip: | Cerritos. CA, 90703 |

SPECIAL INSTRUCTIONS: Same day service – Pick up at 1PM Delivery:

BAR CODE SPACE

Freight Charge Terms: (freight charges are prepaid unless marked otherwise)

Prepaid _____   Collect _____   3rd Party XXX

☐ (check box)  Master Bill of Lading: with attached underlying Bills of Lading

**CUSTOMER ORDER INFORMATION**

| CUSTOMER ORDER NUMBER | # PKGS | WEIGHT | PALLET/SLIP (CIRCLE ONE) | | ADDITIONAL SHIPPER INFO |
|---|---|---|---|---|---|
| | | | Y | N | |
| | | | Y | N | |
| GRAND TOTAL | | | | | |

**CARRIER INFORMATION**

| HANDLING UNIT | | PACKAGE | | WEIGHT | H.M (X) | COMMODITY DESCRIPTION Commodities requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Section 2(e) of NMFC item 360 | LTL ONLY | |
|---|---|---|---|---|---|---|---|---|
| QTY | TYPE | QTY | TYPE | | | | NMFC # | CLASS |
| 24 | PLT | 1128 | CTNS | | | General Merchandise | | |
| | | | | | | 600 – WHITE – C | | |
| | | | | | | 528 – BLACK – C | | |
| 24 PLT | | 1128 | | | | GRAND TOTAL | | |

Where the rate is dependant on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows:
"The agreed or declared value of the property is specifically stated by the shipper to be not exceeding _____ per _____.

COD Amount: $ _____

Fee Terms:  Collect: ☐  Prepaid: ☐
Customer check acceptable: ☐

NOTE Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S.C.0 14706(c)(1)(A) and (B).

RECEIVED, subject to individually determined contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, request, and to all applicable state and federal regulations

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

Signature _____ Shipper

SHIPPER SIGNATURE / DATE
These is ravify that the named materials properly classified described packaged marked and labeled, and are in condition for transportation according to the applicable regulations of the U.S. DOT

12-14-10

Trailer Loaded:
X By Shipper
☐ By Driver

Freight Counted:
☐ By Shipper
☐ By Driver/pallets said to contain
X By Driver/Pieces

CARRIER SIGNATURE / PICKUP DATE
Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the U.S. DOT emergency response guidebook or equivalent documentation in the vehicle. Property described above is received in good order, except as noted.

12-14-16

EXHIBIT 22

MAX TRANSPORT INC.

P.O. Box 8098, Rowland Hts., CA 91748

TEL: (626) 715-8225
(626) 715-8226
FAX: (909) 606-9282

**FREIGHT BILL**

REF **№ 103735**

DATE: 12-15-16

PICK UP FROM:
INTERNATIONAL WAREHOUSE INC.
24h 8 PECK ROAD
CITY OF INDUSTRY, CA 90601

DELIVERY TO:
PHOENIX WAREHOUSE - CA
4306 SORENSEN AVE
SANTA FE SPRINGS, CA 90670

BILL TO: INTERNATIONAL

SHIPPER SHRINK-WRAPPED SAID TO CONTAIN:

| CITY | DESCRIPTION | WEIGHT | REMARK |
|------|-------------|--------|--------|
| 7 Pallet | MR | | |
| 336 C7703 | 336 C7703 or | 96836885 | |
| (TOP BOYS OPEN) | BLACK C | | |

**SHIPPER SELECT**
☐ Cashier's Check only
☐ Consignee's Check only

C.O.D. $ _____

Check # _____
Your C.O.D. check will be mailed through U.S. Postal Service regular mail. Max Transport Inc. is not responsible for lost mail sent through U.S. Postal Service.

| DRIVER PICKUP | DATE | TIME | DELIVERY DRIVER | DATE | TIME | PIECES |
|---------------|------|------|-----------------|------|------|--------|
| David | 12-15-16 | | | | | |

SHIPPER SIGNATURE:
X _____

RECEIVED IN GOOD ORDER EXCEPT AS NOTED. PLEASE PRINT THE DATE & TIME
X _____

In case of loss or damage, the company's maximum liability is the lesser of $1.10 per kilogram or $100.00 unless a higher value is declared in charges for such greater value paid. Shortage and Exceptions must be reported within 24 hours.
**LOOSE CARGO DIVISION**

EXHIBIT 22

Interwor    440

EXHIBIT 23

Report Date: 12/23/2016 7:55:39 PM

**DIGITAL GADGETS**

**PURCHASE ORDER NUMBER #: 6909**

VERSION # 3

Page: 1 of 2

DIGITAL GADGETS, LLC
21 ENGLEHARD DRIVE,
MONROE TOWNSHIP NJ - 08831
TEL: 8466977680
FAX: 8465975515

| VENDOR | | SHIP TO | | | | BILL TO | | | | PO / SHIPPING SUMMARY INFO: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Interworks Unlimited, Inc. | | PHOENIX WAREHOUSE OF CALIFORNIA | | | | DIGITAL GADGETS, LLC | | | | SEASON: | ALL SEASON |
| 2419 Peck Road | | 9306 SORENSEN AVENUE | | | | 21 ENGLEHARD DRIVE | | | | SHIP VIA: | TRUCK |
| City of Industry CA 90601 USA | | SANTA FE SPRINGS CA 90670 | | | | MONROE TOWNSHIP NJ 08831 | | | | TOTAL UNITS: | 5000 |
| | | | | | | | | | | TOTAL VPO$: | $1,290,000.00 |

| PURCHASE TERMS | CANCEL DATE | EX-FACTORY DATE | EXPECTED IN-HOUSE DATE | PO TYPE |
|---|---|---|---|---|
| NET 90 DAYS | 12/30/2016 | 01/20/2017 | 12/20/2016 | DOM |

VPO HEADER REMARKS:
CUSTOMER INSTRUCTIONS:

| LINE | ITEM CODE | ITEM DESCRIPTION | COLOR CODE | COLOR DESCRIPTION | INNER QTY | MASTER QTY | CUSTOMER NAME | UPC | ORDERED QTY | CUSTOMER PRICE | EXTENDED PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 11200 | High Roller Model C Hoverboard - Black | 001 | BLACK | 1 | 1 | DIGITAL GADGETS. | 899557112002 | 1872 | $215.00 | $402,480.00 |
| PO DETAIL REMARKS | | | | | | | | | | | |
| 2 | 11201 | High Roller Model C Hoverboard - Blue | 400 | BLUE | 1 | 1 | DIGITAL GADGETS. | 899557112010 | 1920 | $215.00 | $412,800.00 |
| PO DETAIL REMARKS | | | | | | | | | | | |
| 3 | 11202 | High Roller Model C Hoverboard - Red | 600 | RED | 1 | 1 | DIGITAL GADGETS. | 899557112029 | 1248 | $215.00 | $268,320.00 |
| PO DETAIL REMARKS | | | | | | | | | | | |
| 4 | 11203 | High Roller Model C Hoverboard - White | 100 | WHITE | 1 | 1 | DIGITAL GADGETS. | 899557112203 | 960 | $215.00 | $206,400.00 |
| PO DETAIL REMARKS | | | | | | | | | | | |

Purchase Order Terms and Conditions

EXHIBIT 23
Digital Gadgets 220

Report Date:   12/23/2016  7:55:39  PM                 Purchase Order #8909                 Page:   2  of  2

In the absence of written acceptance of the purchase order, Seller's commencement of work on the services or goods subject to this purchase order, or the shipment of such goods, whichever occurs first, shall be deemed an in effective and binding mode of acceptance of this purchase order. Time is of the essence. If Seller fails to meet shipping dates, delivery dates, and/or work commencement or completion dates, then Buyer may immediately terminate this purchase order for cause or exercise any other rights and remedies to which it may be entitled at law or in equity. In addition the Buyer may accept delivery under the purchase order after the dates listed in this order subject to a 5% discount on the purchase price of delivered goods, which is solely at the discretion of the Buyer. Buyer may also cancel the purchase order, or any part thereof or make changes to the drawings, designs, specifications, materials, packaging, time and place of delivery and method of transportation without cause at any time prior to shipment or commencement of the performance of any services pursuant hereto. Seller shall consider all information furnished by Buyer to be confidential and shall not disclose any such information to any other person, or use such information itself for any purpose other than performing this purchase order unless Seller first obtains written permission from Buyer to do so.  Payment for goods delivered hereunder shall not constitute acceptance thereof.  Buyer shall have the right to keep or reject goods and to reject goods that are in Buyer's judgment defective or nonconforming. Goods rejected and goods supplied in excess of quantities called for herein may be returned to Seller at its expense and in addition to Buyer's other rights. Buyer may charge Seller all expenses of unpacking, examining, repacking and reshipping noncomforming goods. In the event Buyer receives goods whose defects or nonconformity are not apparent upon examination, Buyer reserves the right to require replacement, as well as payment of damages, if such defect or nonconformity later appears.  Nothing contained in this purchase order shall relieve in any way Seller from the obligation of testing, inspection and quality control.

EXHIBIT 23

Digital Gadgets 221

238

# EXHIBIT 24

63495

**BILL OF LADING**

12/28/2016

| SHIP FROM | |
|---|---|
| Name: | *Interworks Unlimited, Inc.* |
| Address: | *2418 Peck Road* |
| City/State: | *City of Industry, CA 90601* |
| Contact: | *Sam Fang* |
| Tel: | *5626938400\1ext100* |

Bill of Lading Number: 12/28/2016 - **2** - Interworks

**BAR CODE SPACE**

| SHIP TO | |
|---|---|
| Name: | Phoenix Warehouse-CA |
| Address: | 9306 Sorensen Ave. |
| City/State: | Santa Fe Springs, CA 90670 |
| Contact: | Isabel |
| Tel: | 5629440888 ext 11 |

Carrier Name:  Lipstick trans
Trailer number:

Seal number(s):
SCAC:

| THIRD PARTY FREIGHT CHARGES BILL TO: | |
|---|---|
| Name: | OEC Shipping Los Angeles Inc |
| Address: | 13100 Alondra Blvd., Suite 100 |
| City/State/Zip: | Cerritos, CA, 90703 |

**BAR CODE SPACE**

Freight Charge Terms: (freight charges are prepaid unless marked otherwise)

Prepaid ____    Collect ____    3rd Party XXX

☐ Master Bill of Lading: with attached underlying
(check box)  Bills of Lading

SPECIAL INSTRUCTIONS: Same day service
Delivery: by 5pm today

**CUSTOMER ORDER INFORMATION**

| CUSTOMER ORDER NUMBER | # PKGS | WEIGHT | PALLET/SLIP (CIRCLE ONE) | | ADDITIONAL SHIPPER INFO |
|---|---|---|---|---|---|
| PO #6909 | 1248 | 35854 | Y | N | (SEALED) # 65\|5919 |
| | | | Y | N | |
| **GRAND TOTAL** | | | | | |

**CARRIER INFORMATION**

| HANDLING UNIT | | PACKAGE | | WEIGHT | H.M (X) | COMMODITY DESCRIPTION | LTL ONLY | |
|---|---|---|---|---|---|---|---|---|
| QTY | TYPE | QTY | TYPE | | | Commodities requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Section 2(e) of NMFC Item 360 | NMFC # | CLASS |
| 26 | PLT | | | 35854lbs | | 624ctns of Model C Blue | | |
| | | | | | | 624ctns of Model C Red | | |
| PLT | | | | lbs | | **GRAND TOTAL** | | |

Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows:
"The agreed or declared value of the property is specifically stated by the shipper to be not exceeding _____ per _____.

COD Amount: $ _____

Fee Terms:  Collect: ☐   Prepaid: ☐
Customer check acceptable: ☐

NOTE Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S.C. ☐ 14706(c)(1)(A) and (B).

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request, and to all applicable state and federal regulations.

This carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

12/28/16  Shipper

Signature

**SHIPPER SIGNATURE / DATE**
This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the U.S. DOT

12-28-16

Trailer Loaded:
X  By Shipper
☐  By Driver

Freight Counted:
☐  By Shipper
☐  By Driver/pallets said to contain
X  By Driver/Pieces

**CARRIER SIGNATURE / PICKUP DATE**
Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the U.S. DOT emergency response guidebook or equivalent documentation in the vehicle.
Property described above is received in good order, except as noted.

EXHIBIT 24                Digital Gadgets 222
239

#-03,281

# BILL OF LADING

12/29/2016

Bill of Lading Number: 12/29/2016 - 2 - Interworks

**SHIP FROM**

| | |
|---|---|
| Name: | Interworks Unlimited, Inc. |
| Address: | 2418 Peck Road |
| City/State: | City of Industry, CA 90601 |
| Contact: | Sam Fang |
| Tel: | 56269384001ext100 |

**BAR CODE SPACE**

**SHIP TO**

| | |
|---|---|
| Name: | Phoenix Warehouse-CA |
| Address: | 9306 Sorensen Ave. |
| City/State: | Santa Fe Springs, CA 90670 |
| Contact: | Isabel |
| Tel: | 5629440888 ext 11 |

Carrier Name:  Lipstick Trans.

Trailer number:

Seal number(s):

SCAC:

**THIRD PARTY FREIGHT CHARGES BILL TO:**

| | |
|---|---|
| Name: | OEC Shipping Los Angeles Inc |
| Address: | 13100 Alondra Blvd., Suite 100 |
| City/State/Zip: | Cerritos, CA, 90703 |

**BAR CODE SPACE**

Freight Charge Terms: (freight charges are prepaid unless marked otherwise)

| Prepaid ____ | Collect ____ | 3rd Party XXX |
|---|---|---|

☐ (check box)   Master Bill of Lading: with attached underlying Bills of Lading

SPECIAL INSTRUCTIONS:  Same day service
Delivery: by 3PM today

**CUSTOMER ORDER INFORMATION**

| CUSTOMER ORDER NUMBER | # PKGS | WEIGHT | PALLET/SLIP (CIRCLE ONE) | ADDITIONAL SHIPPER INFO |
|---|---|---|---|---|
| PO #6909 | 1248 | 35844 | Y   N | |
| | | | Y   N | |
| GRAND TOTAL | | | | |

**CARRIER INFORMATION**

| HANDLING UNIT | | PACKAGE | | | | COMMODITY DESCRIPTION | LTL ONLY | |
|---|---|---|---|---|---|---|---|---|
| QTY | TYPE | QTY | TYPE | WEIGHT | H.M (X) | Commodities requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Section 2(e) of NMFC item 360 | NMFC # | CLASS |
| 26 | PLT | | | 35844lbs | | Model C Blue:1008ctns, 21 pallets | | |
| | | | | | | Model C Red: 240ctns, 5 pallets | | |
| PLT | | | | lbs | | **GRAND TOTAL** | | |

Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows:
"The agreed or declared value of the property is specifically stated by the shipper to be not exceeding -
_____ per _____ .

COD Amount: $ _____
Fee Terms:  Collect: ☐   Prepaid: ☐
Customer check acceptable: ☐

NOTE  Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S.C. □ 14706(c)(1)(A) and (B).

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request, and to all applicable state and federal regulations.

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ Shipper
Signature

| SHIPPER SIGNATURE / DATE | Trailer Loaded: | Freight Counted: | CARRIER SIGNATURE / PICKUP DATE |
|---|---|---|---|
| This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the U.S. DOT.  12-29-16 | X By Shipper ☐ By Driver | ☐ By Shipper ☐ By Driver/pallets said to contain ☐ By Driver/Pieces  X By Driver/Pieces | Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the U.S. DOT emergency response guidebook or equivalent documentation in the vehicle. Property described above is received in good order, except as noted.  12-28-16 |

EXHIBIT 24        Digital Gadgets 227        240

# BILL OF LADING

12/28/2016

**Bill of Lading Number:** 12292016/2 - Interworks

### SHIP FROM

| | |
|---|---|
| Name: | Interworks Unlimited, Inc |
| Address: | 2418 Peck Road |
| City/State: | City of Industry, CA 90601 |
| Contact: | Sam Fang |
| Tel: | 562-692-8400 x110 |

**BAR CODE SPACE**

### SHIP TO

| | |
|---|---|
| Name: | Phoenix Warehouse -, CA |
| Address: | 9306 Sorensen Ave |
| City/State: | Santa Fe Springs, CA 90670 |
| Contact: | Isabel |
| Tel: | 562-944-0888 x11 |

Carrier Name:   lipstick transportation

Trailer number:

Seal number(s):

SCAC:

### THIRD PARTY FREIGHT CHARGES BILL TO:

| | |
|---|---|
| Name: | OEC Shipping Los Angeles Inc |
| Address: | 13100 Alondra Blvd., Suite 100 |
| City/State/Zip: | Cerritos, CA, 90703 |

**BAR CODE SPACE**

**Freight Charge Terms:** (freight charges are prepaid unless marked otherwise)

Prepaid     Collect     3rd Party XXX

☐ (check box)   Master Bill of Lading: with attached underlying Bills of Lading

**SPECIAL INSTRUCTIONS:** For Interworks Same day service ready at 11am

### CUSTOMER ORDER INFORMATION

| CUSTOMER ORDER NUMBER | # PKGS | WEIGHT | PALLET/SLIP (CIRCLE ONE) | | ADDITIONAL SHIPPER INFO |
|---|---|---|---|---|---|
| PO#6909 | 26 plts | | Y | N | 3rd Shipments |
| | | | | N | |
| GRAND TOTAL | ctn | | | | |

### CARRIER INFORMATION

| HANDLING UNIT | | PACKAGE | | WEIGHT | H.M (X) | COMMODITY DESCRIPTION | LTL ONLY | |
|---|---|---|---|---|---|---|---|---|
| QTY | TYPE | QTY | TYPE | | | | NMFC # | CLASS |
| 26 | PLT | | | 37352bs | | Model C Black: 1152ctns | | |
| | | | | | | Model C Blue: 96ctns | | |
| 26 PLT | | | | 37358lbs | | GRAND TOTAL | | |

Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows:
"The agreed or declared value of the property is specifically stated by the shipper to be not exceeding _____ per _____.

**COD Amount: $** _____

Fee Terms:  Collect: ☐  Prepaid: ☐
Customer check acceptable: ☐

**NOTE** Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S.C. ☐ 14706(c)(1)(A) and (B).

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request, and to all applicable state and federal regulations.

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ Shipper
Signature

### SHIPPER SIGNATURE / DATE

This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the U.S. DOT.

12-30-16

| Trailer Loaded: | Freight Counted: |
|---|---|
| X By Shipper | ☐ By Shipper |
| ☐ By Driver | ☐ By Driver/pallets said to contain |
| | X By Driver/Pieces |

### CARRIER SIGNATURE / PICKUP DATE

Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the U.S. DOT emergency response guidebook or equivalent documentation in the vehicle. Property described above is received in good order, except as noted.

EXHIBIT 24     Digital Gadgets 232     241

**1/3/2017**

# BILL OF LADING

**Bill of Lading Number: 1/03/2017 - Interworks**

### SHIP FROM
Name: *Interworks Unlimited, Inc.*
Address: *2418 Peck Road*
City/State: *City of Industry, CA 90601*
Contact: *Sam Fang*
Tel: 56269384001ext100

**BAR CODE SPACE**

### SHIP TO
Name: Phoenix Warehouse-CA
Address: 9306 Sorensen Ave.
City/State: Santa Fe Springs, CA 90670
Contact: Isabel
Tel: 5629440888 ext 11

Carrier Name: Lipstick Trans.
Trailer number:
Seal number(s):
SCAC:

### THIRD PARTY FREIGHT CHARGES BILL TO:
Name: OEC Shipping Los Angeles Inc
Address: 13100 Alondra Blvd., Suite 100
City/State/zip: Cerritos, CA, 90703

**BAR CODE SPACE**

**Freight Charge Terms:** *(freight charges are prepaid unless marked otherwise)*

| Prepaid _____ | Collect _____ | 3rd Party XXX |
|---|---|---|

☐ (check box) Master Bill of Lading: with attached underlying Bills of Lading

SPECIAL INSTRUCTIONS: Same day service pick up ready at 1pm Delivery: by 4pm today

### CUSTOMER ORDER INFORMATION

| CUSTOMER ORDER NUMBER | # PKGS | WEIGHT | PALLET/SLIP (CIRCLE ONE) | | ADDITIONAL SHIPPER INFO |
|---|---|---|---|---|---|
| P.O #6909 | 1248 | 35844 | Y | N | 4TH Shipment |
| GRAND TOTAL | | | Y | N | |

### CARRIER INFORMATION

| HANDLING UNIT | | PACKAGE | | WEIGHT | H.M (X) | COMMODITY DESCRIPTION | LTL ONLY | |
|---|---|---|---|---|---|---|---|---|
| QTY | TYPE | QTY | TYPE | | | *Commodities requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Section 2(e) of NMFC Item 360* | NMFC# | CLASS |
| 26 | PLT | | | 35844 lbs | | Model C White: 960ctns    Model C LLMC = 488ctns | | |
| | | | | | | Model C Black: 288ctns +   For 3RD SHIPMENT. | | |
| PLT | | | | 35844 lbs | | **GRAND TOTAL** | | |

Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows:
"The agreed or declared value of the property is specifically stated by the shipper to be not exceeding _____ per _____.

COD Amount: $ _____
Fee Terms: Collect: ☐  Prepaid: ☐
Customer check acceptable: ☐

NOTE Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S.C. ☐ 14706(c)(1)(A) and (B).

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request, and to all applicable state and federal regulations.

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ Shipper
Signature

| SHIPPER SIGNATURE / DATE | Trailer Loaded: | Freight Counted: | CARRIER SIGNATURE / PICKUP DATE |
|---|---|---|---|
| This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable requirements of the U.S. DOT. | X By Shipper  ☐ By Driver | ☐ By Shipper  ☐ By Driver/loaders said to contain  X By Driver/Pieces | Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the U.S. DOT emergency response guidebook or equivalent documentation in the vehicle. Property described above is received in good order, except as noted. |

*[signature]* 01-3-17

*[signature]* 1-3-17

EXHIBIT 24        Digital Assets 237        242

03185

# BILL OF LADING

| 1/4/2017 | | | | | | | |
|---|---|---|---|---|---|---|---|

**SHIP FROM**

Name: *Interworks Unlimited, Inc.*
Address: *2418 Peck Road*
City/State: *City of Industry, CA 90601*
Contact: *Sam Fang*
Tel: 5626938400 ext100

Bill of Lading Number: 1/04/2017   Interworks

**BAR CODE SPACE**

**SHIP TO**

Name: Phoenix Warehouse-CA

Address: 9306 Sorensen Ave.

City/State: Santa Fe Springs, CA 90670
Contact: Isabel
Tel: 5629440888 ext 11

Carrier Name: Lipstick Trans.
Trailer number:

Seal number(s):
SCAC:

**THIRD PARTY FREIGHT CHARGES BILL TO:**

Name: OBC Shipping Los Angeles Inc
Address: 13100 Alondra Blvd., Suite 100
City/State/Zip: Cerritos, CA, 90703

**BAR CODE SPACE**

Freight Charge Terms: *(freight charges are prepaid unless marked otherwise)*

SPECIAL INSTRUCTIONS: Same day service pick up ready at 1pm
Delivery: by 4pm today

Prepaid _____   Collect _____   3rd Party XXX

☐ (check box)   Master Bill of Lading: with attached underlying Bills of Lading

**CUSTOMER ORDER INFORMATION**

| CUSTOMER ORDER NUMBER | # PKGS | WEIGHT | PALLET/SLIP (CIRCLE ONE) | | ADDITIONAL SHIPPER INFO |
|---|---|---|---|---|---|
| PO #6909 | | | Y | N | The 5th Shipment |
| S.O #28484 | | | Y | N | |
| GRAND TOTAL | | | | | |

**CARRIER INFORMATION**

| HANDLING UNIT | | PACKAGE | | WEIGHT | H.M (X) | COMMODITY DESCRIPTION *Commodities requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Section 7(a) of NMFC Item 360* | LTL ONLY | |
|---|---|---|---|---|---|---|---|---|
| QTY | TYPE | QTY | TYPE | | | | NMFC # | CLASS |
| 17 | PLT | | | 23443 lbs | | Model C Black: 432ctns (9pallets) | | |
| | | | | | | Model C Blue: 96ctns (2 Pallets) | | |
| | | | | | | Model C Red: 288ctns (6 Pallets) | | |
| PLT | | | | 23443 lbs | | **GRAND TOTAL** | | |

Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows:
"The agreed or declared value of the property is specifically stated by the shipper to be not exceeding _____ per _____.

COD Amount: $ _____
Fee Terms: Collect: ☐   Prepaid: ☐
Customer check acceptable: ☐

NOTE Liability Limitation for loss or damage in this shipment may be applicable. See 49 U.S,C. □ 14706(c)(1)(A) and (B).

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request, and to all applicable state and federal regulations.

The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.
_____ Shipper
Signature

| SHIPPER SIGNATURE / DATE | Trailer Loaded: | Freight Counted: | CARRIER SIGNATURE / PICKUP DATE |
|---|---|---|---|
| This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the U.S. DOT. | X By Shipper ☐ By Driver | ☐ By Shipper ☐ By Other/parties said to contain X By Driver/Pieces | Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the U.S. DOT emergency response guidebook or equivalent documentation in the vehicle. Property described above is received in good order, except as noted. |
| 1-4-17 | | | 1-4-17 |

EXHIBIT 24   Digital Guests 242   243

# EXHIBIT 25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

INTERWORKS UNLIMITED, INC.      §
§
       Plaintiff,      §
§     CIVIL ACTION
§
      v.      §     MISC. NO. *18-mc-163*
§
DIGITAL GADGETS, LLC,      §
§
       Defendant.      §
§

## O R D E R

**AND NOW**, this **13**TH day of **August**, 2018, upon consideration of the Motion of QVC, Inc. for Approval of Stipulated Protective Order, it is hereby ORDERED that the Motion is GRANTED. The Stipulated Protective Order set forth as Exhibit "D" to the Motion is hereby APPROVED.

BY THE COURT:



_____
U.S.D.J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTERWORKS UNLIMITED, INC., | § § § | CIVIL ACTION |
| Plaintiff, | § § | MISC. NO. |
| v. | § § | |
| DIGITAL GADGETS, LLC, | § § | |
| Defendant. | § § | |

## STIPULATED PROTECTIVE ORDER

WHEREAS, on or about July 7, 2017, Interworks Unlimited, Inc., by and through its counsel (the "Plaintiff") commenced a civil action against defendant Digital Gadgets, LLC ("Defendant"), in the United States District Court for the Central District of California (the "California Court") styled and pending as *Interworks Unlimited, Inc. v. Digital Gadgets, LLC*, Case No. 2:17-cv-4983-AB-KS (the "California Action");

WHEREAS, Plaintiff asserts claims against Defendant in the California Action for, among other things, alleged breach of contract;

WHEREAS, Defendant denies the allegations and claims asserted against it in the California Action, and has asserted counterclaims against Plaintiff;

WHEREAS, on or about June 27, 2018, Plaintiff directed a subpoena *ad testificandum* (the "Subpoena") to QVC, Inc. ("QVC") under the authority of the California Court seeking certain testimony of a corporate designee of QVC, as set forth in the Subpoena;

WHEREAS, on or about August 2, 2018, Defendant served a subpoena *ad testificandum* (which the Parties agree would be considered a "Subpoena" as defined herein) under the

authority of the California Court seeking certain testimony of a corporate designee of QVC, as set forth in the Subpoena;

WHEREAS, on or about August 2, 2018, Defendant served a subpoena upon QVC (which the Parties agree would be considered a "Subpoena" as defined herein), seeking the production of documents, as set forth in the Subpoena;

WHEREAS, Plaintiff has indicated that it may serve on QVC a subpoena for documents as well (which the Parties agree would be considered a "Subpoena" as defined herein), seeking the production of documents related to the hoverboards QVC purchased from the Plaintiff and the hoverboards purchased from the Defendant, TechPoint, LLC and any of their affiliated entities;

WHEREAS, QVC is not a party to the California Action and no claims are asserted against it in the California Action;

WHEREAS, QVC is a general merchandise electronic retailer that markets and distributes a wide variety of products directly to consumers through various means and media, including, among other things, through its merchandise-focused, direct response television programming;

WHEREAS, QVC timely served objections to the Subpoena upon Plaintiff pursuant to Fed. R. Civ. P. 45(c)(2)(B), maintaining that the information sought by the Subpoena constitutes QVC's confidential and propriety business and financial information protected from disclosure;

WHEREAS, QVC contests the validity and scope of the Subpoena;

WHEREAS, QVC, among other things, maintains that the Subpoena impermissibly seeks production of confidential and proprietary materials pertaining to QVC's business and financial affairs;

2

WHEREAS, QVC, among other things, maintains that compliance with the Subpoena, without reimbursement of the expense required for compliance, contravenes the protections to which QVC is entitled under Fed. R. Civ. P. 45(c)(3);

WHEREAS, among other things, QVC maintains that the Subpoena contravenes the permissible scope of discovery under Fed. R. Civ. P. 26(b)(1) in that it seeks production of documents and information neither relevant nor reasonably calculated to lead to discovery of admissible evidence with respect to the parties' respective claims or defenses at issue in the California Action;

WHEREAS, Plaintiff and Defendant maintain that the Subpoena is a permissible exercise and use of Fed. R. Civ. P. 45;

WHEREAS, Plaintiff and Defendant maintain that the Subpoena seeks production of documents and information either relevant or reasonably calculated to lead to discovery of admissible evidence with respect to the parties' respective claims and/or defenses at issue in the California Action;

WHEREAS, as a result of discussions by and between QVC, Plaintiff, and Defendant, through their respective counsel, Plaintiff and Defendant are amenable to clarifying and limiting the scope and categories of documents and/or other tangible things sought by the Subpoena;

WHEREAS, QVC maintains that the Subpoena, even as limited, seeks confidential and proprietary materials pertaining to QVC's business and financial affairs and contravenes the protections to which QVC is entitled under Fed. R. Civ. P. 45(c)(3);

WHEREAS, QVC is amenable to producing certain requested documents and/or other tangible things, as limited by this Stipulated Protective Order and to the extent that the same may exist, pursuant to the terms and conditions set forth below;

3

WHEREAS, unrestricted production or disclosure of information, documents and/or other tangible things constituting asserted proprietary business information, trade secrets, confidential research, development or otherwise confidential commercial information and/or documents and/or other tangible things may cause clearly defined and serious injuries to QVC. *See Pansy v. Borough of Stroudsburg*, 23 F.2d 772, 786 (3d Cir. 1994);

WHEREAS, protections are necessary to preserve and protect from QVC's competitors and vendors the confidentiality of QVC's proprietary business information, trade secrets, confidential research, development or otherwise confidential commercial information and/or information, documents and/or other tangible things;

WHEREAS, QVC's confidential materials concern matters of little or no legitimate public interest and there is no harm to the public interest or policy from the preservation and protection of the confidentiality of QVC's proprietary business information, trade secrets, confidential research, development or otherwise confidential commercial information and/or information, documents and/or other tangible things;

WHEREAS, there exists "good cause" for the protection of QVC's confidential materials pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, particularly with regard to the disclosure of QVC's confidential and proprietary business information;

WHEREAS, upon execution of this Stipulated Protective Order and approval by the Pennsylvania Court, Plaintiff, Defendant and QVC have settled, compromised and resolved the outstanding issues between them, as set forth herein, concerning the Subpoena;

WHEREAS, Plaintiff, Defendant and QVC desire to resolve the within dispute in an amicable fashion; and

4

It is **STIPULATED** and **AGREED** between and among QVC, Plaintiff and Defendant, by and through their respective counsel, and subject to the approval of the United States District Court for the Eastern District of Pennsylvania (the "Pennsylvania Court"), as follows:

1.      QVC shall be required to produce a corporate designee on behalf of QVC, Inc., only, and not on behalf of any other person or entity, to testify about QVC's "purchase of hoverboards from [Defendant] and TechPoint, LLC in the last three years," QVC's "purchase of hoverboards from [Plaintiff]", and "the specifications of and testing related to the [hoverboards]." In response to the Subpoena, QVC has reviewed its files for terms and names set forth in the Subpoena, as well as purchases and other data. QVC shall not be required to undertake excessive measures to locate any information described above, to the extent that the same may exist. Any other requests for testimony pursuant to Subpoena are deemed withdrawn, with prejudice, upon approval of this Stipulated Protective Order by the Pennsylvania Court.

2.      QVC shall be required to produce the documents described in the Subpoena (to the extent that the same exist) in hard copy format only. QVC shall be required to produce such documents (to the extent that they exist) on behalf of QVC, Inc., only, and not on behalf of any other person or entity. In response to the Subpoena, QVC will review its files for terms and names set forth in the Subpoena, as well as sales and other data. QVC shall not be required to undertake excessive measures to locate any documents described above, to the extent that the same may exist. Any other requests for the production of documents and/or tangible things pursuant to the Subpoena are deemed withdrawn.

3.      Any and all testimony, transcripts of testimony and exhibits attached to the transcripts of testimony as described in Paragraph 1 above and any and all documents described in Paragraph 2 above (hereinafter referred to collectively as the "Confidential Material") and produced by QVC for deposition and/or for inspection and copying pursuant to this Stipulated Protective Order shall be deemed to be "confidential" under the terms of this Stipulated Protective Order and within the meaning of Fed. R. Civ. P. 26(c) and the cases decided thereunder concerning confidential trade secrets, research, development, commercial or other financial information. Any inadvertent failure by QVC not to so mark any or all of the Confidential Material shall not constitute a waiver by QVC of the protections of this Stipulated Protective Order.

4.      The Confidential Material, and all copies thereof, shall bear the designation "CONFIDENTIAL" by writing or stamping the same on the cover or first page and each page thereafter.

5.      No copies of the Confidential Material shall be made by Plaintiff or Defendant, except to the extent necessary in the preparation for any deposition, hearing or trial conducted in connection with the California Action or the filing of any motion, brief or memoranda in connection with the California Action, and, in either case, only in accordance with the terms and provisions of this Stipulated Protective Order. If the duplicating process by which copies of the Confidential Material are made does not reproduce the "CONFIDENTIAL" designation appearing on the original, all copies shall be so stamped or designated as "CONFIDENTIAL" by some other means.

6. The Confidential Material may not be used and/or disclosed by Plaintiff or Defendant (including, without limitation, any legal counsel, representative, employee or agent thereof) except for purposes of prosecution or defense of the California Action (and any appeals arising from the California Action) only, and then only to the following persons:

(a) The respective outside legal counsel of record for Plaintiff and Defendant in the California Action and no more than two (2) respective in-house counsel for each of Plaintiff and Defendant who are responsible for the prosecution or defense of the California Action (hereinafter referred to collectively as "Legal Counsel", unless stated otherwise) and the respective professional and clerical secretarial and other support personnel of such Legal Counsel necessary to assist in the prosecution or defense of the California Action;

(b) Experts who are retained to consult with or assist Legal Counsel in the preparation for any deposition, hearing or trial conducted in connection with the California Action;

(c) Witnesses, in the course of deposition or trial testimony in connection with the California Action, but only where, in the reasonable and "good faith" belief of Legal Counsel, examination with respect to such Confidential Material is necessary for legitimate discovery or trial purposes in connection with the California Action, and then only subject to satisfaction of the requirements of Paragraphs 7 and 8 below;

(d) The Plaintiff and Defendant and employees of same, but only where such employees, in fact, are actively involved in assisting Legal Counsel for the purposes of prosecuting or defending the California Action, and have a need to see such Confidential Material in connection with the prosecution or defense of the California Action, and then, in any event, subject to satisfaction of the requirements of Paragraph 8 below; and

(e) The Pennsylvania Court and the California Court, and their respective employees, as well as any court reporters transcribing deposition or trial testimony taken in connection with the California Action.

7. Where QVC makes a "good faith" determination that certain Confidential Material is extraordinarily confidential and sensitive (because, among other reasons, such Confidential Material may contain, among other things, information relating to confidential business practices, customers or prospective customers, and/or vendors or prospective vendors; information that is competitively sensitive or strategic in nature; sensitive financial data; and/or business or marketing plans, any and all of which could be used by Plaintiff, Defendant or others for commercial use or to otherwise harm QVC's competitive position) and, therefore, is inappropriate for treatment only as Confidential Material under Paragraphs 1 through and including 5 above, such extraordinarily confidential and sensitive Confidential Material may be designated by QVC as "Confidential-For Attorneys' Eyes Only" and shall be treated as "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY" under the terms of this Stipulated Protective Order. Confidential Material designated as "CONFIDENTIAL-FOR ATTORNEYS'

EYES ONLY" shall be marked as such by writing or stamping the same on the cover or first page and each page thereafter with the designation "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY." Confidential Material designated and marked as "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY" shall not be used and/or disclosed by Plaintiff or Defendant (including, without limitation, any legal counsel, representative, employee or agent thereof) to any person other than except for purposes of prosecution or defense of the California Action (and any appeals arising from the California Action) only, and then only to the following persons:

       (a)    Outside legal counsel of record for Plaintiff and Defendant, respectively, in the California Action and/or the Pennsylvania Court and the respective professional and clerical secretarial and other support personnel of such outside legal counsel necessary to assist in the prosecution or defense of the California Action;

       (b)    Experts who are retained to consult with or assist outside legal counsel in the prosecution or defense of the California Action;

       (c)    Witnesses, in the course of deposition or trial testimony in connection with the California Action, but only where such witness is either a signatory, author, addressee, or recipient of such material, and then only subject to satisfaction of the requirements of Paragraphs 7 and 8 below;

       (e)    The Pennsylvania Court and the California Court, and their respective employees, as well as any court reporters transcribing deposition or trial testimony taken in connection with the California Action.

Absent QVC's express written consent, there shall be no use of Confidential Material designated as "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY" that is produced by QVC pursuant to this Stipulated Protective Order in any manner contrary to the restrictions and limitations set forth in this Stipulated Protective Order.

       8.    Under no circumstances shall any Confidential Material (including, without limitation, any Confidential Material designated and marked as "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY") be used by Plaintiff or Defendant, or any respective agent or representative of Plaintiff or Defendant, or any third party, for any business, commercial, competitive, personal purposes; and/or for any purpose other than the prosecution or defense of the California Action or any appeals arising therefrom; and/or in connection with any litigation other than the California Action or any appeals arising therefrom.

       9.    Before disclosure of any Confidential Material pursuant to this Stipulated Protective Order to persons described in Paragraph 5(b) through and including 5(d) above, or to in-house counsel for either Plaintiff or Defendant, or the respective professional and clerical secretarial and other support personnel of any such in-house counsel, as described in Paragraph 5(a) above, all such persons shall read this Stipulated Protective Order and shall acknowledge and evidence that he or she is bound by its terms by signing and dating the acknowledgement form set forth in Exhibit "A" hereto. There shall be no disclosure of Confidential Material to any persons described in Paragraph 5(b) through and including 5(d) above, or to in-house counsel for

either Plaintiff or Defendant, or the respective professional and clerical, secretarial and other support personnel of such in-house counsel, as described in Paragraph 5(a) above, unless and until there has been compliance with the requirements of this Paragraph or an Order is entered in accordance with Paragraph 9 below compelling such person(s) to comply with this Stipulated Protective Order or otherwise providing that such person is bound by this Stipulated Protective Order. A copy of the executed acknowledgement form for such person shall be provided to counsel for QVC (directed to Amy S. Kline, Esquire, Saul Ewing Arnstein & Lehr LLP, 1500 Market Street, Centre Square West, 38th Floor, Philadelphia, Pennsylvania 19102, Tel. no. 215.972.8567/Fax no. 215.972.1943, e-mail: *Amy.Kline@saul.com*), but shall not be filed with the Pennsylvania Court or the California Court. The respective witnesses for Plaintiff and Defendant at any deposition, hearing and/or trial in the California Action will comply with the requirements of this Paragraph 8 as a prerequisite to their testimony in the California Action. The respective outside legal counsel of record for Plaintiff and Defendant in the California Action, as well as their respective clerical, secretarial and paralegal personnel, agree to be, and are, bound by the terms of this Stipulated Protective Order without need to execute the aforesaid acknowledgement form.

10. In the event that a person identified in Paragraph 5(b) through 5(d) is unwilling to agree to comply with, and be bound by, this Stipulated Protective Order, Plaintiff or Defendant, as the case may be, may move the Pennsylvania Court for an Order compelling such person to comply with this Stipulated Protective Order or otherwise providing that such person is bound by this Stipulated Protective Order. In the event that any such motion is filed, the Confidential Material shall not be disclosed to such person prior to entry of an Order by the Pennsylvania Court granting such motion or the person in question otherwise agrees to be bound by, and to comply with, this Stipulated Protective Order by written acknowledgement in the manner described in Paragraph 8 above.

11. In the event that any Confidential Material, or any portion thereof, is utilized at any deposition, proceeding, hearing and/or trial in connection with the California Action, the transcript(s) of any testimony and the copy(ies) of any exhibit(s) relating or referring to the Confidential Material shall be placed in a separate envelope or container, marked "CONFIDENTIAL PURSUANT TO ORDER ENTERED IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA." Such envelope or container shall on its face, or by a document permanently affixed thereto, state further that it has been filed under seal and/or is designated as confidential pursuant to this Stipulated Protective Order, and is not to be opened nor the contents displayed or revealed except pursuant to the provisions of this Stipulated Protective Order or upon further Order of the Pennsylvania Court. To the extent possible, documents and/or other tangible things containing Confidential Material that are utilized at any deposition, proceeding, hearing and/or trial in connection with the California Action should be redacted to protect the Confidential Material in any such documents and/or other tangible things, rather than be filed under seal pursuant to this Paragraph.

12. In the event that any Confidential Material, or any portion thereof, is utilized at any deposition in connection with the California Action, only the stenographer transcribing such deposition and those persons who are authorized pursuant to the terms of this Stipulated Protective Order to receive such Confidential Material may be present. The stenographer

transcribing such deposition shall be considered to be a person within the meaning and scope of Paragraph 5(e) above.

13. In the event that any Confidential Material, or any portion thereof, is used in connection with any legal brief, pleading, memorandum, motion, or other legal paper filed of record in connection with the California Action, such Confidential Material shall be filed and maintained under seal. The Confidential Material so filed shall not be made available to any person other than those persons identified in Paragraph 5 above and in the manner, and subject to, the restrictions described in this Stipulated Protective Order. Any Confidential Material so filed shall be placed in a separate envelope or container, marked "CONFIDENTIAL PURSUANT TO ORDER ENTERED BY THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA." Such envelope or container shall on its face, or by a document firmly affixed thereto, further state that it has been filed under seal pursuant to this Stipulated Protective Order, and is not to be opened nor the contents displayed or revealed except pursuant to the provisions of this Stipulated Protective Order. To the extent possible, documents and/or other tangible things containing Confidential Material that are filed with the California Court should be redacted to protect the Confidential Material in any filed documents and/or other tangible things, rather than be filed under seal pursuant to this Paragraph. Notwithstanding anything contained in the above Paragraphs 5 and 7 through 11 and this Paragraph 12 to the contrary, the provisions of Paragraph 6 above shall govern and control use of documents and/or other tangible things designated as "CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY."

14. In the event that the Confidential Material (or documents and/or other tangible things designated as "CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY") should be disclosed to any person other than in the manner authorized by this Stipulated Protective Order, any person bound by this Stipulated Protective Order responsible for any such disclosure shall (a) promptly inform QVC (Attn: Amy S. Kline, Esquire, Saul Ewing Arnstein & Lehr LLP, 1500 Market Street, Centre Square West, 38th Floor, Philadelphia, Pennsylvania 19102, Tel. no. 215.972.8567/Fax no. 215.972.1943, e-mail: *Amy.Kline@saul.com*) of such disclosure and of all pertinent facts relating to such disclosure; (b) inform the person to whom such disclosure was made of the existence and terms of this Stipulated Protective Order; (c) make all reasonable and diligent efforts to retrieve any disclosed Confidential Material and to prevent further disclosure by each and every unauthorized person who received the Confidential Material or who learned the information contained therein; and (d) make all reasonable and diligent efforts to have the unauthorized person or persons in possession of the disclosed Confidential Material execute the acknowledgement form set forth in Exhibit "A" hereto, and evidencing thereupon his/her/their agreement to be bound by the terms of this Stipulated Protective Order.

15. Nothing in this Stipulated Protective Order shall require disclosure of information, documents and/or other tangible things which QVC contends is protected from disclosure or protection by any applicable privilege or protection, including, without limitation, the attorney-client privilege, the Pennsylvania statutory accountant-client privilege or the attorney "work-product" doctrine, all of which are preserved and shall not be deemed or construed to be waived by this Stipulated Protective Order. To the extent any documents responsive to the Subpoena are withheld on the basis of privilege, QVC will provide a log of those documents and the basis for the claim of privilege.

9

16.     This Stipulated Protective Order shall not be amended, modified or varied except pursuant to a writing executed by all of the parties hereto and subsequently approved by the Court.

17.     Either Defendant or Plaintiff, at any time, may request that QVC withdraw a designation of "CONFIDENTIAL" or "CONFIDENTIAL–ATTORNEYS' EYES ONLY" with respect to any document and/or other tangible thing asserted by QVC to be Confidential Material. Such request shall be made in writing to counsel for QVC (Attn: Amy S. Kline, Esquire, Saul Ewing Arnstein & Lehr LLP, 1500 Market Street, Centre Square West, 38th Floor, Philadelphia, Pennsylvania 19102, Tel. no. 215.972.8567/Fax no. 215.972.1943, e-mail: *Amy.Kline@saul.com*), and shall particularly identify the designated Confidential Material that Defendant and/or Plaintiff maintain should not be designated as "CONFIDENTIAL" or "CONFIDENTIAL–ATTORNEYS' EYES ONLY" and shall set forth the reasons supporting the contentions as to why the subject document and/or other tangible thing in question should not be designated as "CONFIDENTIAL" or "CONFIDENTIAL–ATTORNEYS' EYES ONLY." If QVC does not agree to withdraw the designation of "CONFIDENTIAL" or "CONFIDENTIAL–ATTORNEYS' EYES ONLY" designation with respect to the document and/or other tangible thing in question, the Plaintiff and/or Defendant may thereupon move the Pennsylvania Court for entry of an Order determining that the document and/or other tangible thing in question does not constitute Confidential Material and/or should not be designated as "CONFIDENTIAL–ATTORNEYS' EYES ONLY" and should not be treated as such under the provisions of this Stipulated Protective Order.

18.     This Stipulated Protective Order shall be governed, interpreted and construed pursuant to the internal substantive laws of the Commonwealth of Pennsylvania, without regard to conflict of laws principles. The Pennsylvania Court shall have the exclusive jurisdiction of all matters and disputes arising from the interpretation and enforcement of this Stipulated Protective Order, including, without limitation, any and all challenges by Plaintiff or Defendant to any designation by QVC of any document or other tangible thing as either Confidential Material or Confidential Material further designated as "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY" as set forth in Paragraph 16 above and/or any and all disputes pertaining to assertions of privilege or "work product" protection by QVC in furtherance of Paragraph 14 above.

19.     Notwithstanding anything contained in this Stipulated Protective Order to the contrary, this Stipulated Protective Order shall not be construed or deemed to negate, supersede or novate (a) the provisions or terms of any and all other agreements or contracts by and between QVC, on the one hand, and any and all other parties.

20.     Unless otherwise agreed in writing by QVC, within thirty (30) days after the dismissal of, or the entry of final judgment in, the California Action, and the exhaustion of all appeals therefrom, the Confidential Material (excluding only that Confidential Material which has been filed with the court in the California Action pursuant to Paragraph 12 above), including any and all documents and/or other tangible things designated and marked as "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY", shall be returned by Plaintiff and Defendant to QVC, through its undersigned counsel, or, in the case of any and all Confidential Material other than documents and/or other tangible things designated and marked as "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY", destroyed. In the event that either

10

Plaintiff or Defendant elect to destroy Confidential Material in lieu of returning the same to QVC, written certification thereof shall be provided to QVC, through the undersigned counsel. Any "attorney work-product" materials, as may be designated as such, which includes or references the Confidential Material may be retained by counsel, provided that any and all inclusions of, and/or references to, the Confidential Material (including any and all documents and/or other tangible things designated and marked as "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY") in such "attorney work-product" materials are destroyed and a written certification of such destruction is provided to QVC, through its undersigned counsel.

21.    This Stipulated Protective Order shall be binding upon, and inure to the benefit of, the respective successors and assigns of QVC, Plaintiff and Defendant.

22.    This Stipulated Protective Order may be executed and delivered by telefacsimile or electronic transmission and in any number of counterparts, all of which together shall be one document.


**SO STIPULATED AND AGREED:**


SAUL EWING ARNSTEIN & LEHR LLP

By: _Amy S. Kline_
Amy S. Kline, Esquire
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102
Telephone: 215.972.8567

*Attorneys for Non-Party QVC, Inc.*


LAZARUS & LAZARUS, P.C.

By: _____
Harlan M. Lazarus, Esq.
240 Madison Avenue
8th Floor
New York, NY 10016
Telephone: 212.889.7400


*Counsel for Defendant*


LAW OFFICES OF ROGER C. HSU

By: _____
Roger C. Hsu, Esq.
175 South Lake Avenue
Suite 210
Pasadena, CA 91101
Telephone: 626.792.7936

*Attorneys for Plaintiff
Interworks Unlimited, Inc.*


11

Plaintiff or Defendant elect to destroy Confidential Material in lieu of returning the same to QVC, written certification thereof shall be provided to QVC, through the undersigned counsel. Any "attorney work-product" materials, as may be designated as such, which includes or references the Confidential Material may be retained by counsel, provided that any and all inclusions of, and/or references to, the Confidential Material (including any and all documents and/or other tangible things designated and marked as "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY") in such "attorney work-product" materials are destroyed and a written certification of such destruction is provided to QVC, through its undersigned counsel.

       21.    This Stipulated Protective Order shall be binding upon, and inure to the benefit of, the respective successors and assigns of QVC, Plaintiff and Defendant.

       22.    This Stipulated Protective Order may be executed and delivered by telefacsimile or electronic transmission and in any number of counterparts, all of which together shall be one document.

**SO STIPULATED AND AGREED:**

SAUL EWING ARNSTEIN & LEHR LLP       LAW OFFICES OF ROGER C. HSU

By: _____       By: _____
   Amy S. Kline, Esquire             Roger C. Hsu, Esq.
   1500 Market Street              175 South Lake Avenue
   Centre Square West, 38th Floor     Suite 210
   Philadelphia, PA 19102          Pasadena, CA 91101
   Telephone: 215.972.8567       Telephone: 626.792.7936

*Attorneys for Non-Party QVC, Inc.*     *Attorneys for Plaintiff*
                                  *Interworks Unlimited, Inc.*

LAZARUS & LAZARUS, P.C.

By: _____
Harlan M. Lazarus, Esq.
240 Madison Avenue
8th Floor
New York, NY 10016
Telephone: 212.889.7400

*Counsel for Defendant*

11

*Digital Gadgets, LLC*

**APPROVED AND SO ORDERED**
**THIS**          **DAY OF**              **2018**

_____
                              **U.S.D.J.**

Digital Gadgets, LLC

**APPROVED AND SO ORDERED**
**THIS 13ᵗʰ DAY OF** August **2018**

_____
                    **U.S.D.J.**

12

# EXHIBIT "A"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTERWORKS UNLIMITED, INC., | § § § | CIVIL ACTION |
| Plaintiff, | § § | MISC. NO. |
| v. | § § | |
| DIGITAL GADGETS, LLC, | § § | |
| Defendant. | § § § | |

## ACKNOWLEDGEMENT TO BE BOUND
## BY STIPULATED PROTECTIVE ORDER

I HEREBY AGREE TO THE CONTENTS OF THE FOREGOING STIPULATED PROTECTIVE ORDER AND ALSO SUBMIT TO THE JURISDICTION OF THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA IN REGARD TO THE ENFORCEMENT OF THIS ORDER. I UNDERSTAND THAT IF I VIOLATE THIS ORDER, I KNOW THAT I MAY BE SUBJECT TO SANCTIONS FOR SUCH VIOLATION.

NAME: _____

ADDRESS: _____

_____

SIGNATURE: _____

DATE: _____